Copy # _____

**Private Placement Memorandum**                                    **Strictly Confidential**

# BORDERPLEX REALTY TRUST
## MINIMUM OF $39,990,000
### OF ITS
## COMMON SHARES OF BENEFICIAL INTEREST

––––––––––––––

Borderplex Realty Trust, a Maryland real estate investment trust ("*Borderplex*" or the "*Company*"), is a real estate investment trust ("*REIT*") under the Internal Revenue Code of 1986, as amended (the "*Code*"), focused on becoming the leading owner-operator of apartment communities for the rapidly growing—and underserved—communities located in the major metropolitan areas of the southwestern United States.

Borderplex seeks to acquire, own and actively manage a diversified portfolio of quality multi-family properties located in historically underserved demographic and rapidly growing submarkets of our Target Markets. The initial Target Markets include Austin, Dallas-Ft. Worth, Denver, El Paso, Houston, Phoenix, San Antonio and Santa Fe (the "*Target Markets*").

Borderplex is offering and selling a minimum of 5,160,000 of its common shares of beneficial interest, $0.01 par value per share, which we refer to in this Private Placement Memorandum as the *"REIT Shares,"* at a price of $7.75 per REIT Share. This offering is being made only to "accredited investors."

––––––––––––––

The securities described in this Private Placement Memorandum have not been registered under the Securities Act of 1933, as amended (the "*Securities Act*"), or under the securities laws of any other jurisdiction, nor is any such registration contemplated. Neither the Securities and Exchange Commission nor the securities commission or any other regulatory authority of any other jurisdiction has passed upon the accuracy or adequacy of this Private Placement Memorandum or approved the securities or endorsed the merits of this offering. Any representation to the contrary is a criminal offense. The securities are offered pursuant to exemptions promulgated under the securities laws and rules and regulations of jurisdictions where the securities are being offered. The securities may not be transferred in the absence of an effective registration statement under the Securities Act and any applicable securities law of any other jurisdiction or an opinion of counsel acceptable to us and our counsel that such registration is not required.

The securities are being offered only to a limited number of investors who meet the suitability requirements described in this Private Placement Memorandum. We reserve the right to modify or cancel this offering at any time, increase or decrease the number of shares and the price per share, approve or disapprove each investor, and accept or reject any subscriptions in whole or in part in our sole discretion.

**The securities being offered by Borderplex are speculative and an investment in these securities involves a high degree of risk. See "Risk Factors" beginning on page 8 of this Private Placement Memorandum for a summary of the risks that you should consider. You must be prepared to bear the economic risk of your investment for an indefinite period of time and be able to withstand a total loss of your investment.**

There is no established market for these securities and no such market may ever develop. The securities being offered are subject to limitations on transfer as set forth herein. See "Private Placement and Notice to Investors" and "Description of Shares of Beneficial Interest."

Unless extended by Borderplex in its sole discretion, this offering will terminate on December 31, 2015.

––––––––––––––

The date of this Private Placement Memorandum is October 1, 2015.

1021263.13

EXHIBIT A

**TABLE OF CONTENTS**

 Page

IMPORTANT NOTICE TO INVESTORS ............................................................................................. iii

EQUITY PRIVATE PLACEMENT PROCEDURES ......................................................................... vii

SUMMARY ........................................................................................................................................ 1

RISK FACTORS .................................................................................................................................. 8

FORWARD-LOOKING STATEMENTS ......................................................................................... 26

PRIVATE PLACEMENT AND NOTICE TO INVESTORS ........................................................... 27

USE OF PROCEEDS ........................................................................................................................ 29

DISTRIBUTIONS AND DISTRIBUTION POLICY ...................................................................... 30

CAPITALIZATION ........................................................................................................................... 32

SELECTED CONSOLIDATED FINANCIAL DATA ..................................................................... 33

THE COMPANY ............................................................................................................................... 35

MANAGEMENT DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS ................................................................................................................................... 56

DESCRIPTION OF REAL ESTATE ................................................................................................ 65

MANAGEMENT OF BORDERPLEX REALTY TRUST .............................................................. 71

SECURITIES AND SECURITY OWNERSHIP ............................................................................. 75

CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS ............................... 77

DESCRIPTION OF SHARES OF BENEFICIAL INTEREST ........................................................ 78

CERTAIN PROVISIONS OF MARYLAND LAW AND OF THE BORDERPLEX
DECLARATION OF TRUST, BYLAWS AND SECURITYHOLDERS' AGREEMENT ................ 82

DESCRIPTION OF PARTNERSHIP AGREEMENT OF BRT REALTY OPERATING
LIMITED PARTNERSHIP ............................................................................................................... 88

MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ........................ 89

CERTAIN CONSIDERATIONS APPLICABLE TO ERISA, GOVERNMENTAL AND
OTHER PLAN INVESTORS ........................................................................................................... 102

PLAN OF DISTRIBUTION ............................................................................................................. 105

LEGAL MATTERS .......................................................................................................................... 106

INDEPENDENT AUDITORS/ACCOUNTING SERVICES .......................................................... 107

ADDITIONAL INFORMATION ...................................................................................................... 108

ANNEXES ................................................................................................................................ 109

ANNEX A – BORDERPLEX SECURITYHOLDERS' AGREEMENT ............................................... A-1

ANNEX B – BORDERPLEX COMMUNITY TRUST AND SUBSIDIARIES
    CONSOLIDATED FINANCIAL REPORT AND INDEPENDENT AUDITOR'S
    REPORT, DECEMBER 31, 2014 AND 2013, AND UNAUDITED FINANCIAL
    STATEMENTS AS OF SEPTEMBER 30, 2015 ........................................................................ A-7

GLOSSARY OF DEFINED TERMS ........................................................................................... G-1

**IMPORTANT NOTICE TO INVESTORS**

This Private Placement Memorandum is submitted to prospective investors on a confidential basis for their use in considering an investment in the securities and may not be used for any other purpose.  This Private Placement Memorandum may not be reproduced, distributed or provided to others in whole or in part nor may its contents be disclosed to any other person without our prior written consent.  Notwithstanding the foregoing, however, a prospective investor and such prospective investor's partners, employees, representatives or other agents may disclose to any person (including the prospective investor's tax and financial advisors, attorneys and accountants), without limitations of any kind (except as provided in the next sentence), the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the prospective investor relating to such tax treatment and tax structure.  Any such disclosure of the tax treatment, tax structure and other tax-related materials shall not include our name (or any variation of our name) or the names of our affiliates, agents or advisors, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information and shall not be made for the purpose of offering to sell the securities or soliciting an offer to buy the securities or if such disclosure would result in a violation of federal or state securities laws.  By accepting delivery of this Private Placement Memorandum, each prospective investor agrees to the foregoing and to return the Private Placement Memorandum and all related material to us if the prospective investor does not undertake to purchase any of the securities, if the prospective investor's subscription is rejected, if the offering is cancelled, or otherwise upon our request.

———————————

The information contained in this Private Placement Memorandum may not conform to all of the requirements applicable to registration statements under U.S. securities laws.  The securities described herein are being offered only to "accredited investors," as that term is defined under the Securities Act, and all prospective investors will be required to represent in writing to Borderplex that they are accredited investors.  See "Private Placement and Notice to Investors."  Prospective investors will be granted access to all reasonably available, relevant data concerning us and are urged to request whatever documents or material they believe will be useful in making their investment decisions.  By accepting this Private Placement Memorandum, prospective investors acknowledge that they recognize and accept the need to conduct their own thorough investigation and due diligence before considering an investment in these securities.

———————————

The information presented herein was prepared by us and is being furnished solely for use by prospective investors in connection with this offering.  We do not make any representation as to our future performance.

———————————

Because the securities offered hereby have not been registered, none of the securities may be resold, transferred or otherwise disposed of unless the transaction effecting such disposition is registered under the Securities Act and under the securities law of any other applicable jurisdiction or an exemption from registration is available.  The resale or other transfer of the securities will be subject to restrictions.  No public market exists with respect to any of our securities and no assurances are given that any such market will develop.  An investment in the REIT Shares is speculative in nature and will be illiquid for an indefinite period of time.  As such, it involves a high degree of risk, making it suitable only for persons who have substantial financial resources, who do not anticipate that they will be required to liquidate this investment in the foreseeable future, who can afford to risk the loss of their entire investment, and who understand and have been advised by their own tax, financial, and legal consultants with respect to the consequences and risks associated with this investment.

———————————

The securities will bear a restrictive legend confirming that such securities will not be registered for sale to the public under the Securities Act, or under the securities laws of any other jurisdiction and that, consequently, the securities may not be sold, transferred or otherwise disposed of by an investor except pursuant to a registration

statement or an exemption from the registration requirements of the Securities Act and any other applicable jurisdiction's securities laws.  Each investor must sign an investment representation consistent with the foregoing.

---

This Private Placement Memorandum does not constitute an offer or a solicitation to any person in any jurisdiction in which such offer or solicitation is not authorized or to any person to whom it is unlawful to make such solicitation or offer.  This offering is not being made to, nor will subscriptions be accepted from or on behalf of, recipients of this Private Placement Memorandum in any jurisdiction in which the making or acceptance thereof would not be in compliance with the laws of such jurisdiction.  We may, however, in our sole and absolute discretion, take such action as we may deem necessary to make this offering in any such jurisdiction and extend this offering to offerees in such jurisdiction.

---

This Private Placement Memorandum replaces and supersedes in its entirety any other documents, if any, previously supplied to prospective investors concerning our Company and the terms and conditions of the offering being made hereby.  Prospective investors in this offering should rely only on the information contained in this Private Placement Memorandum.  The Company has not authorized any other person to provide different or additional information.  If anyone provides different or additional information, it should not be relied upon in connection with any investment decision.  This Private Placement Memorandum contains summaries of the contents of certain agreements and other documents.  Prospective investors should not assume that the summaries are complete.  These summaries are qualified in their entirety by reference to the texts of the original agreements and documents.  Subject to any applicable restrictions as to confidentiality, any such agreements and documents that are not attached hereto as annexes to this Private Placement Memorandum will be made available to prospective investors upon request.  Prospective investors should read the agreements and documents prior to purchasing the securities to obtain complete information concerning the rights and obligations of the parties thereto and the matters described therein.

---

Market data and certain industry forecasts used in this Private Placement Memorandum were obtained from our internal analysis, market research, outside consultants, publicly available information and industry publications. Industry publications and outside consultant reports generally provide that the information contained therein has been obtained from sources believed to be reliable, but that the accuracy and completeness of such information is not guaranteed.  The information in internal analyses, market research, outside consultant reports and industry publications has not been independently verified by us or anyone acting on our behalf, and we do not make any representation as to the accuracy of such information.

---

No person has been authorized to make any representations concerning this offering, and no person, other than our designated representative, has been authorized to furnish any information, other than as set forth in this Private Placement Memorandum, and, if made or given, these representations and information must not be relied upon by prospective investors.

---

Prospective investors are not to construe the contents of this Private Placement Memorandum or any other communications from Borderplex or any of its officers, employees or agents as legal, tax, investment or other advice.  Each prospective investor should consult his advisors as to legal, financial, tax and related matters concerning the acquisition, holding and disposition of the securities by the investor.  Prospective non-U.S. investors should satisfy themselves as to full compliance with the legal requirements and tax consequences within the countries of their citizenship, residence, domicile and place of business with respect to the acquisition, holding or disposition of the securities, and any relevant foreign exchange restrictions, including obtaining any required governmental or other consent.

The information set forth herein was not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer.  The advice was written to support the promotion or marketing of the REIT Shares and the transaction(s) and matter(s) addressed in this Private Placement Memorandum.  Each taxpayer should seek advice based upon the taxpayer's particular circumstances from an independent tax advisor.  The foregoing language is intended to satisfy the requirements under the regulations in Section 10.35 of Circular 230.

---

Except as otherwise indicated, this Private Placement Memorandum speaks as of the date indicated on the cover page.  Neither the delivery of this Private Placement Memorandum nor any sale made hereunder shall, under any circumstances, create any implication that the information herein is correct as of any time subsequent to the date hereof or that there has not been any change in the information contained herein since the date hereof.   The Company's business, financial condition, results of operations and prospects may have changed since the date of this Private Placement Memorandum.  Any such change could be material.  This Private Placement Memorandum may be amended or supplemented from time to time to set forth material subsequent events or information; *provided, however,* that, except as expressly provided herein, the Company has no duty to update, amend or supplement this Private Placement Memorandum.

---

The securities are offered by us pursuant to this Private Placement Memorandum, and are subject to acceptance of subscriptions by us and the other conditions, including receipt of a fully executed subscription agreement and investor questionnaire, as set forth in this Private Placement Memorandum.

---

We may not sell, or accept any offer to purchase, any of the securities until we have delivered to you and you have executed and returned the subscription agreement and investor questionnaire reflecting the definitive terms and conditions of this offering, and the joinder to the Securityholders' Agreement.  You should not purchase any of the securities unless you have completely and thoroughly reviewed and completed the subscription agreement and investor questionnaire and reviewed and understood the provisions of the other related agreements.  If any of the terms, conditions or other provisions of the subscription agreement and investor questionnaire or other related agreements are inconsistent with or contrary to any information or summaries provided in this Private Placement Memorandum, including any schedules, exhibits, or annexes attached to this Private Placement Memorandum, the provisions of the subscription agreement and investor questionnaire and the related agreements will prevail.

---

We reserve the right, in our sole discretion, to reject any and all proposals or subscriptions made by or on behalf of any prospective investor, to accept any such subscription, to negotiate with one or more prospective investors at any time, and to enter into subscription agreements without prior notice to other prospective investors. We also reserve the right to terminate, at any time, this offering, or any discussions or negotiations with any prospective investor without providing any reasons therefor, or to modify any aspect of this offering, including, without limitation, the number of REIT Shares offered.

**Notice to Residents of Mexico**

Any prospective purchaser of the REIT Shares must be either an institutional investor (inversionista institucional) or a qualified investor (inversionista calificado) within the meaning of the Mexican Securities Market Law (la Ley del Mercado de Valores) (the "*Securities Market Law*") and other applicable Mexican laws in effect.

The REIT Shares have not been and will not be registered in the special section or the securities section of the Mexican National Registry of Securities (el Registro Nacional de Valores) maintained by the Mexican Banking and Securities Commission (la Comisión Nacional bancaria y de Valores). The REIT Shares may not be offered or sold in the United Mexican States by any means except in circumstances which do not constitute a public offering

within the meaning of the Securities Market Law and its regulations.  No Mexican regulatory authority has approved or disapproved the REIT Shares, or passed on the solvency of the Company.  All applicable provisions of the Securities Market Law must be complied with in respect of any sale, offer or distribution of, or intermediation with, the REIT Shares in, from or otherwise involving Mexico, and any resale of the REIT Shares must be made in a manner that will not constitute a public offering of securities or securities intermediation in Mexico.

**For All Other Non-United States Residents**

It is the responsibility of the prospective investor to satisfy himself as to full observance of the laws of any relevant territory or jurisdiction outside the United States in connection with any purchase of the securities, including, without limitation, obtaining any required governmental or other consents or observing any other applicable requirements.

## EQUITY PRIVATE PLACEMENT PROCEDURES

Borderplex will act in its own behalf in arranging the private placement of the REIT Shares offered hereby. The Borderplex representative designated below will act as primary contact for, and will be available to consult with, any prospective investor who is a recipient of this Private Placement Memorandum.  No officer or employee of Borderplex, including the representative designated below, will receive any commission or other special remuneration in connection with the offering and sale of REIT Shares.

Borderplex undertakes to make available to every prospective investor, during the course of this offering and before any sale, the opportunity to ask questions of and receive answers from Borderplex concerning the terms and conditions of this offering and to obtain any appropriate additional information necessary to verify the accuracy of the information contained in this Private Placement Memorandum or for any other purpose relevant to a prospective investment in the REIT Shares offered hereby.  Additional information will be made available to you to the extent that Borderplex's management possesses the information or can obtain it without unreasonable effort or expense.

All communications or inquiries from prospective investors relating to this Private Placement Memorandum, or to a possible transaction involving Borderplex, should be directed as follows:

Borderplex Realty Trust
Attn:  Jamie Gallagher
221 N. Kansas St., Suite 2010
El Paso, Texas 79901
(915) 533-8807
(915) 975-8141 (Telefax)
jamie.gallagher@borderplexreit.com

## SUMMARY

*This summary does not contain all of the information that may be important to you. Before you invest in the REIT Shares, you should read this entire Private Placement Memorandum carefully, including the sections entitled "Risk Factors", "Description of Real Estate" and "Forward-Looking Statements" appearing elsewhere in this Private Placement Memorandum. Unless the context indicates otherwise, the terms "Borderplex," "our," "us," "we," "the Company," "our Company" and similar expressions refer to Borderplex Realty Trust, a Maryland real estate investment trust, together with its consolidated subsidiaries, including BRT Realty Operating Limited Partnership, a Delaware limited partnership, of which we are the sole general partner and which we refer to in this Private Placement Memorandum as our "Operating Partnership".*

**Borderplex**

*Overview*. Borderplex Realty Trust (formerly known as Borderplex Community Trust) is a Maryland Real Estate Investment Trust organized under Title 8 of the Corporations and Associations Article of the annotated Code of Maryland (*"Title 8"*). Since its commencement of operations in the first quarter of 2007, the Company has been a self-administered and self-managed REIT with a strategic objective of acquiring income producing properties in downtown El Paso, Texas and capitalizing on expected growth in El Paso, Texas.

*New Multi-Family Strategy*. Using its existing platform and growing management resources and experience, the Company intends to redirect its focus onto becoming the leading owner-operator of apartment communities for rapidly growing, and underserved, communities located in the major metropolitan areas of the southwestern United States. As more fully described below, the Company has begun the implementation of its new multi-family strategy in two initial phases – (i) Phase 1, with the acquisition of the San Isidro Apartments in Santa Fe, New Mexico in April 2015, and (ii) Phase 2, with the acquisition and eventual merger into the Company of the multi-family development operations of Encore Enterprises, Inc., anticipated to be concluded within the first quarter of 2016. See "The Company", "Overview and New Multi-Family Strategy", and "Implementation of New Strategy".

**Board of Trustees/Management**

Borderplex is currently managed by an eight person Board of Trustees, four of whom are founders of the Company, and have served since the inception. We expect that the Board of Trustees will be expanded as we begin to implement our new multi-family strategy and position the Company for rapid growth. While we currently have 15 employees, all but two of whom are devoted exclusively to the management of the Company's Existing Portfolio, we expect to increase our employees devoted to our multi-family strategy, beginning with the acquisition of the six person Encore multi-family development team, all of whom will operate under the direction of Borderplex Chief Investment Officer James C. Potts. See "Management of Borderplex Realty Trust" and "The Company" – "Overview and New Multifamily Strategy" and "Implementation of New Strategy".

**Target Markets**

Borderplex seeks to acquire, own and actively manage a diversified portfolio of quality multi-family properties located in historically underserved demographic and rapidly growing submarkets of our Target Markets. The initial Target Markets include Austin, Dallas-Ft. Worth, Denver, El Paso, Houston, Phoenix, San Antonio and Santa Fe. Borderplex intends to acquire higher yielding assets by focusing on the predominately Hispanic submarkets of our initial Target Markets, which have been historically underserved by institutional capital. These submarkets are experiencing exceptional growth that far outpaces overall population growth in the United States, and as a result, has important implications for housing and, in particular, rental housing.

**Investment Strategy/Competitive Advantages/Strengths**

The selection of our initial Target Markets is predicated on the identification of markets with (i) a metro population size sufficient to ensure the potential for liquidity and rational pricing within the market, (ii) rapidly growing demographics and/or submarkets, and (iii) demonstrated potential for economic growth and increased rental demand. The rapidly expanding population segments within these submarkets will drive demand for rental housing because of (i) the significantly fewer number of households within these submarkets that own their homes,

compared to the general population, and (ii) the high percentages of populations within these submarkets that fall within age groups that are heavily weighted toward age cohorts that make up the U.S. renter base.

**Investment / Growth Opportunities**

*Initial Acquisitions*.  In April 2015, the Company acquired the San Isidro Apartments in Santa Fe, New Mexico, one of our Target Markets.  This acquisition constituted Phase 1 of the implementation of our new multi-family strategy.  Phase 2 of the implementation of the new multi-family strategy will be started in the last quarter of 2015, and we anticipate will be fully effected before the close of the first quarter of 2016 through the formation of a Delaware limited liability company to be known as "Encore Borderplex Multi-Family, LLC" (the *"DownREIT"*), to which Encore Enterprises, Inc. will contribute up to five current multi-family development pipeline projects and to which the Company will contribute cash. Four of the five Pipeline Projects will be contributed upon the Company successfully raising the $39.99M minimum in this Offering. The fifth Pipeline Project will be contributed if the Company is successful in raising an additional $7.1M in this offering. Following such contributions, the development and construction of the Pipeline Projects will be completed within the DownREIT.  All of the Pipeline Projects are located within our Target Markets – two in San Antonio, one in Houston, one in Dallas, and one in Denver.  See *"The Encore Transaction"* below.

*Other Acquisitions*.  Having established an initial market position with the acquisition of the San Isidro Apartments in Santa Fe, and the consummation of the joint venture with Encore through the formation of the DownREIT, we will continue to (i) acquire existing multifamily properties directly into our Operating Partnership (See "Our Operating Partnership" below) that produce attractive cash returns or that can be repositioned or redeveloped such that they produce attractive cash returns, and (ii) develop new multi-family projects in our DownREIT. As we execute our new multifamily strategy, we expect to significantly increase our multifamily asset base. As a result, our future multifamily acquisitions of completed projects through our Operating Partnership, and new development and construction through the DownREIT, will be the primary driver of our performance.

**The Encore Transaction**

*Who is Encore?*  Encore Enterprises, Inc. (*"Encore"*) is a diversified real estate investment company headquartered in Dallas, Texas with over 500 corporate and project-level employees.  Encore develops and acquires multi-family apartment home communities, mixed use complexes, limited and full service hotels, retail shopping centers, commercial office buildings, restaurants and raw land.  Since Encore's formation in 1999, it has completed over $1.6B in real estate acquisition and development transactions.  Encore business activities are conducted through eight subsidiaries, including Encore Multifamily, LLC, which is responsible for all of Encore's multi-family development activities.

*Acquisition of Multi-Family Platform and Pipeline Projects.*  The Company has negotiated an agreement with Encore to acquire the multi-family development operations of Encore Multifamily, LLC.  We expect to finalize this agreement on the terms set forth in this Private Placement Memorandum before accepting any subscriptions. The acquisition of the multi-family development operations of Encore Multifamily, LLC (*"Encore Transaction"*) will be effected through the formation of the DownREIT, which will be a Delaware limited liability company to be known as "Encore Borderplex Multifamily, LLC" which will be owned by our Operating Partnership and a wholly owned Encore entity as the sole members.  Encore will contribute up to five (5) current multi-family development Projects (the *"Pipeline Projects"*) to the DownREIT and our Operating Partnership will contribute cash.  Following such contributions, the development and construction of the five (5) Pipeline Projects will be completed within the DownREIT.  The Initial Closing will include four (4) projects located in Dallas, Denver, and San Antonio.  A second closing scheduled on or before March 31, 2016 (*"Second Closing"*), will be on the Grand Mission Pipeline Project located in Houston.  The total development cost for all five Pipeline Projects is approximately, $234.4M, and will require total equity of approximately $67.11M, $47.12M of which will consist of cash contributed by our Operating Partnership and $19.99M of which will be Encore's contributed equity in the Pipeline Projects.  The total development cost of the four projects in the Initial Closing will be approximately $200.38M, and will require total equity of approximately $56.00M, $36.00M of which will consist of cash contributed by our Operating Partnership and $19.99M of which will be Encore's contributed equity in the Pipeline Projects.  The Grand Mission Pipeline Project in the second closing has a total development cost of $34.06M and will require equity of $11.11M (consisting of extra cash from the Initial Closing and $7.1 million of additional cash the Company intends to raise in this Offering), all of which will be cash contributed by the Operating Partnership.  We anticipate that the average

cash return on investment in the Pipeline Projects at stabilization will be approximately 9.21%; the average cash return on investment in the four Pipeline Projects in the Initial Closing will be approximately 9.14%.

   ***Phased Closings – Merger Effective Date/Initial Closing.***   Assuming we are successful in raising the $39.99 million minimum amount in this Offering, we anticipate the first closing under the Encore Contribution Agreement will occur in late December 2015 or January 2016, depending upon when HUD approval for the assumption by the DownREIT of the HUD loan on Sendero Ranch project can be obtained.  At the initial closing under the Encore Contribution Agreement (*"Initial Closing"*), the DownREIT will be organized and begin operations (the *"Merger Effective Date"*), such operations to consist, initially, of the completion of construction of the Sendero Ranch Pipeline Project, which is the Pipeline Projects that is furthest along in the development and construction process.  We anticipate that the Evans Station, Swiss Avenue and River Walk Pipeline Projects will be transferred by Encore to the DownREIT either at the Initial Closing, at the same time that the Sendero Ranch Pipeline Project is acquired by the DownREIT, or as soon thereafter as requisite lender or third-party consents can be obtained and/or the required HUD insured financing put in place with respect to the Evans Station, River Walk and Swiss Avenue Pipeline Projects, but it is possible that some or all of the closings on the Evans Station, River Walk and Swiss Avenue Pipeline Projects could come first.  We anticipate the Second Closing on the Grand Mission Pipeline Project will occur on or before March 31, 2016, subject to approval for the assumption by the DownREIT of the HUD loan on the Grand Mission Pipeline Project, and our successfully raising the additional $7.1M in additional proceeds from this offering. <u>See</u> "Private Placement and Notice to Investors".

   ***Ownership of DownREIT/DownREIT Units.***   The value of the DownREIT Units to be issued in connection with the initial contribution of the Pipeline Projects by Encore and the cash contributions by our Operating Partnership is $7.75 per DownREIT Unit, which is the same as the offering price of the REIT Shares set forth on the cover page of this Private Placement Memorandum.  The Down REIT Units and the pricing of the REIT Shares is equivalent because each of the DownREIT Units is convertible into one Operating Partnership Unit, subject to dilution and antidilution adjustments.

   ***Management of the DownREIT.***   The DownREIT will be managed by a five person Board of Managers consisting of two managers appointed by Encore and three managers appointed by our Operating Partnership.  All decisions of the Board of Managers for matters other than "Major Decisions" require the affirmative vote or consent of at least three managers.  Major Decisions include material contracts and commitments of the DownREIT and extraordinary transactions.

   ***Operations; Transfer of Multi-Development Team and Platform; Fees.***   Under the Encore Contribution Agreement to be executed between our Operating Partnership and Encore, the six person Encore multi-family development team with substantial experience in multi-family development, construction, financing and asset management will transfer to the DownREIT and become employees of the DownREIT on the Merger Effective Date.  This team will operate under the direction of Borderplex Trustee and Chief Investment Officer James C. Potts.  Under the DownREIT Operating Agreement, Encore will be entitled to a development fee, construction management fee, acquisition fee, and Performance Incentive Fee for new development projects undertaken by the DownREIT, up to a $10M aggregate cap for all development fees.  These fees, subject to the cap, are intended to compensate Encore in part for the value of its multi-family platform being acquired by the DownREIT.

   ***Conversion of DownREIT Units into OPUs.***   Under the DownREIT Operating Agreement to be executed between us and Encore, Encore will have the right to convert each DownREIT Unit held by Encore into an equal number of Operating Partnership Units of our Operating Partnership.  By the earlier of (i) five years from the Merger Effective Date, (ii) the date on which Borderplex completes an initial public offering with respect to its common shares of beneficial interest, or (iii) the date on which Encore has voluntarily elected to convert all of its DownREIT Units into Operating Partnership Units (*"Outside Conversion Date"*), any remaining DownREIT Units held by Encore that have not been converted into Operating Partnership Units shall automatically be converted into OPUs.  At that time, as the holder of all outstanding DownREIT Units, our Operating Partnership would merge the DownREIT into our Operating Partnership and the multi-family development platform, activities and assets in the DownREIT will be combined with all of our other assets owned by our Operating Partnership.  <u>See</u> "The Company" "Overview and New Multi-Family Strategy" – "Implementation of New Strategy" – "Phase II – The Encore Transaction", and "Management of Borderplex Realty Trust" – "Management".

**Existing Portfolio**

As of the date of this Private Placement Memorandum, the Company's Existing Portfolio is comprised of our two Office Properties (Chase Tower and Wells Fargo Plaza), 13 Retail Properties, one multi-family property (San Isidro Apartments, Santa Fe, New Mexico), and three parcels of undeveloped land, two in close proximity to the Office Properties and the third adjacent to the San Isidro Apartments, which we are holding for expansion.  See "The Company" – "Company Background and Existing Structure" – "Existing Portfolio" and "Description of Real Estate".

**Recent Developments**

***Dutch Auction***.  In the second quarter of 2013, in response to requests by a number of shareholders to sell shares, the Company became aware of a buyer that was willing to purchase the Company's shares, up to a total purchase price of approximately $1,000,000, via a "Dutch Auction" process.  The (*"Dutch Auction"*) process entailed shares being purchased from selling shareholders in the order of lowest priced shares to highest priced shares, up to the buyer's maximum purchase price of $7.90 per share and up to a maximum total investment amount of approximately $1,000,000.  Eleven shareholders offered their shares at or below the maximum per share amount, and the Dutch Auction purchaser actually consummated the purchase of $1,123,690 worth of shares in the Company from the 11 selling shareholders at an average purchase price of $7.75 per share in September 2013.  This transaction involved the sale of a substantial block of the Company's shares (5.08 % of the shares then outstanding) in an arm's-length transaction between unrelated sellers and the Dutch Auction buyer.  This average purchase price of $7.75 per share is the price that the REIT Shares are being offered for sale pursuant to the Private Placement Memorandum.

***Main Strategic Investments Transaction***.  In the first quarter of 2015, Main Strategic Investments, LLC ("*MSI*"), an entity controlled by Christopher H. Cole, contributed to our Operating Partnership as an investment 1,645,338 shares of the common stock of American Realty Capital Properties, Inc. ("NASDAQ: ARCP") which had a value of $15M at the time of contribution.  On July 28, 2015, American Realty Capital Properties, Inc. changed its name to VEREIT, Inc. (NYSE: VER).  In exchange for this contribution, our Operating Partnership issued to MSI, 1,935,483 units in our Operating Partnership (*"Operating Partnership Units"* or "*OPUs*") having a total value of $15M, based upon the agreed value of the OPUs of $7.75 per OPU, which is the same as the offering price of the REIT Shares set forth on the cover page of this Private Placement Memorandum.  In connection with this contribution, we entered into various agreements with MSI, including the following:  (i) a contribution agreement, which provides for limited representations and warranties by MSI regarding the VEREIT, Inc. common stock, and entitles us and our Operating Partnership to indemnification for breaches of these representations and warranties; (ii) a Tax Protection Agreement pursuant to which we have agreed to make certain tax indemnity advances if we dispose of any VEREIT, Inc. common stock in a transaction that results in recognition of gain by MSI prior to January 21, 2024; (iii) an Investor Rights Agreement in which we agreed to allow MSI to (i) include two of its nominees in the slate of nominees recommended by the Board of Trustees of the Company for election as Trustees of the Company at the annual or special meeting of the shareholders, so long as MSI in the aggregate owns common shares of beneficial interest of Borderplex (or Operating Partnership Units convertible into common shares of beneficial interest of Borderplex) representing at least 15% of the total number of outstanding common shares of beneficial interest of the Company, assuming that all OPUs are converted into common shares of beneficial interest ("*Threshold Ownership Percentage*").  As part of the Investor Rights Agreement, the Company further agreed, as long as the Threshold Ownership Percentage is maintained, (i) to certain limitations on total indebtedness of the Operating Partnership, (ii) limitations on the Company's sale of a material portion of the Company's Existing Assets (excluding the San Isidro Apartments) without the prior consent of MSI, and (iii) not to issue equity interests in the Operating Partnership having designations, preferences, and/or other special rights and powers superior to the OPUs held by MSI and the other limited partners in the Operating Partnership.  See "*The Company*", "*Company Background and Existing Structure*", and "*Main Strategic Investments Transaction*".

**Our Operating Partnership**

Our Company operates in an "UPREIT Structure".  Following the completion of this offering, our Operating Partnership will, directly or indirectly through its wholly owned subsidiaries, hold substantially all of our

assets and conduct substantially all of our operations.  We will contribute the net proceeds from this offering to our Operating Partnership in exchange for OPUs. As the sole general partner of our Operating Partnership, we will generally have the exclusive power under the Limited Partnership Agreement of BRT Realty Operating Limited Partnership (*"Operating Partnership Agreement"*) to manage and conduct its business, subject to limited approval and voting rights of the limited partners described more fully under "Description of Partnership Agreement of BRT Realty Operating Limited Partnership."

## Company Information

Borderplex is a Maryland real estate investment trust formed in October 2006 under Title 8.  Our main offices are located at 221 N. Kansas St., Suite 2010, El Paso, Texas 79901, and our telephone number is (915) 533-8807.

## The Offering

*REIT Shares offered*.  Borderplex is offering 5,160,000 REIT Shares at a price of $7.75 per share.

*Minimum Investment*. This offering is conditioned on receiving minimum subscriptions for 5,160,000 REIT Shares ($39,990,000) which will enable the company to complete the Encore Transaction and the acquisition of four of the five Pipeline Projects – i.e. the Sendero Ranch, Evans Station, Swiss Avenue and River Walk Pipeline Projects.  Acquisition of the Grand Mission Pipeline Project will require that we raise $7.1M in additional equity in the offering (i.e. $47.1M in total proceeds as opposed to $39.99M, which is the minimum amount needed to complete the Encore Transaction and the acquisition of the four Pipeline Projects specified).  Under the Encore Contribution Agreement we have until March 31, 2016 to notify Encore that we have raised sufficient additional capital to acquire the Grand Mission Pipeline Project.  If we do not raise such additional capital and therefore consummate the Encore Transaction by acquiring only four of the four Pipeline Projects, as specified above, we believe that we will still be able to execute our new multi-family strategy as specified herein. The REIT Shares are being offered in 100 share increments, with a minimum investment of 13,000 REIT Shares ($100,750). However, Borderplex reserves the right, in its sole discretion, to accept subscriptions in lesser amounts.

*Termination of the offering*.  The offering will terminate on the close of business on December 31, 2015, unless Borderplex elects to extend the offering in its sole discretion.

*Minimum Subscriptions*.  This offering is conditioned on receiving minimum subscriptions for 5,160,000 REIT Shares ($39,990,000), which will enable the Company to complete the Encore Transaction and the acquisition of the initial four Pipeline Projects.  See "The Company" – "Overview and New Multi-Family Strategy" – "Implementation of New Strategy" – "The Encore Transaction".

*Determination of Offering Price*. The per REIT Share offering price of $7.75 was determined by numerous factors, including (i) the Dutch Auction described herein, and recent arms-length transactions involving the issuance of our OPUs, as well as (ii) our evaluation of financial results and various assumptions that we have made. Borderplex cannot assure that the offering price (or the valuation on which it was based) is accurate or fairly reflects a price that would have been reached as of the date of this Private Placement Memorandum by independent parties in arm's-length negotiations or that it fairly reflects the current value of the REIT Shares in the marketplace given alternative investment opportunities.

*Investor Suitability Standards*.  The REIT Shares will be sold only to investors whom we reasonably believe are accredited investors as defined under the Securities Act.  This is a minimum requirement for investors, and being an accredited investor does not necessarily mean the REIT Shares are a suitable investment.  Each subscriber will be required to deliver a completed and executed subscription agreement and investor questionnaire, as well as a joinder to the existing Securityholders' Agreement, and we may reject subscriptions in whole or in part in our sole discretion.  In addition, certain states may establish suitability standards for shareholders resident in such states.

*Increase in REIT Shares Offered*.  In addition to the minimum 5,160,000 of REIT Shares and in order to fund the fifth Pipeline Project (Grand Mission), Borderplex intends to offer and sell additional REIT Shares pursuant to this Private Placement Memorandum in an amount the Board of Trustees deem advisable.  Borderplex will not accept subscriptions, however, in excess of what the Board of Trustees believes can be invested and used to execute

Borderplex's business plan.  In the event that the offering of REIT Shares is increased, the share increment requirements and minimum investment requirements will continue to apply.

*Trustee Investment*.  Six of our seven non-employee Trustees (Bernard, Cardwell, de la Vega, Fernandez, Sanders and Schwartz) have indicated an interest in purchasing, directly or through their controlled entities and/or affiliates, up to $1.0 million of our REIT Shares in this offering at the price indicated on the front cover of this Private Placement Memorandum.  Because indications of interest are not binding agreements or commitments to purchase, these Trustees may elect to purchase a different amount of REIT Shares or not purchase any REIT Shares in this offering.

*Lack of Liquidity.*  An investment in Borderplex is intended to be for the long term.  The REIT Shares are not listed on any national securities exchange or quotation system, and there is currently no private market for the REIT Shares and we cannot ensure that there will be any market (public or otherwise) for the REIT Shares in the future.  Moreover, the sale or other transfer of the REIT Shares is substantially restricted by the Declaration of Trust and Securityholders' Agreement and by state and federal securities laws.  Consequently, investors may not be able to liquidate their investment in the event of an emergency or for any other reason.

*Use of Proceeds.*  At a minimum, this offering will attempt to raise net proceeds of approximately $39,690,000 (assuming the sale of the minimum number of REIT Shares being offered hereby), after deducting an estimated $300,000 in offering expenses payable by us (a substantial portion of which are legal, consulting and accounting fees).  The net proceeds will be used for the consummation of the joint venture with Encore through the formation of the DownREIT and for general trust purposes.  See "Use of Proceeds."

*Placement of Shares.*  Borderplex will act in its own behalf in connection with arranging the private placement of the REIT Shares offered hereby.  Jamie Gallagher will act as primary contact for, and will be available to consult with, any prospective investor who is a recipient of this Private Placement Memorandum.  No officer or employee of Borderplex, including Jamie Gallagher, will receive any commission or other special remuneration in connection with the offering and sale of the REIT Shares.

*Distribution Policy.*  Historically, we have paid dividends semi-annually, in June to shareholders of record as of May 31, and in December to shareholders of record as of November 30.  We intend to continue payment of semi-annual dividends, depending on various factors, including funds available for distribution, financial condition, capital expenditure requirements, and applicable annual distribution requirements needed to qualify and maintain our status as a REIT under the Code.  Following the completion of this offering, we intend to pay regular semi-annual dividends to our shareholders.  We intend to make distributions that will enable us to meet the distribution requirements applicable to REITs and to eliminate or minimize our obligation to pay income and excise taxes.  Distributions authorized by our Board of Trustees in its sole discretion will be declared and paid by us out of funds legally available for such purpose and will depend upon various factors, including restrictions under applicable law and the requirements for our qualification as a REIT for federal income tax purposes.

*Restrictions on Ownership of our Shares.*  Because of limitations on the concentration of ownership of REIT stock imposed by the Code, our Declaration of Trust generally prohibits any shareholder from owning more than 9.8% of the number or value of the issued and outstanding shares of beneficial interest of Borderplex. The Board of Trustees, upon receipt of a ruling from the Internal Revenue Service ("*IRS*") or an opinion of counsel or other evidence satisfactory to the Board of Trustees and upon such other conditions as the Board of Trustees may direct, may also exempt a proposed transferee from the ownership limit.

*Borderplex Securityholders' Agreement.*  As part of this offering, each Borderplex shareholder will be required to execute a joinder to the Borderplex Securityholders' Agreement.  The Borderplex Securityholders' Agreement is attached to this Private Placement Memorandum as Annex A.  Investors bound by the Borderplex Securityholders' Agreement may transfer their common shares of beneficial interest in Borderplex, subject to compliance with applicable securities laws and a right of first offer in favor of Borderplex.  Notwithstanding the foregoing restrictions on transfers, subject to certain conditions, each investor may transfer such investor's shares to (i) affiliates, (ii) members of the investor's immediate family, (iii) such investor's executors, administrators, testamentary trustees, legatees or beneficiaries upon such investor's death, and (iv) any lender to whom such common shares of beneficial interest in Borderplex are assigned to secure a bona fide indebtedness of such investor. Additionally, no transfer of Borderplex shares will be permitted if such transfer or conversion would result in or constitute a non-exempt prohibited transaction under the Employee Retirement Income Security Act of 1974, as

1021263.13

amended ("*ERISA*") or Section 4975 of the Code or would likely cause the assets of Borderplex to be deemed "plan assets" (as defined in ERISA and regulations under ERISA).

**Material Benefits to Related Parties**

*Competing Businesses of Trustees.*  Some of the Trustees are engaged in the real estate business in El Paso, Texas and in some of the other initial Target Markets.  The interests and economic objectives of the Trustees, insofar as their existing holdings are concerned, may compete with and conflict with the objectives and holdings of Borderplex in its Target Markets.  See "The Company – Conflict of Interest Policies."

*Renewal of Leases with Tenants of the Chase Tower Affiliated with Certain Trustees.*  Two of the major tenants in the Chase Tower are ScottHulse PC, occupying 24,042 square feet of office space and 1,256 square feet of storage, and Strategic Growth Bancorp, occupying 36,939 square feet of office space.  Those tenants are affiliates of Trustees W. David Bernard and William D. Sanders, respectively.  The leases in the Chase Tower with ScottHulse PC and Strategic Growth Bancorp are material to the profitability of the Chase Tower.  The lease with ScottHulse PC comes up for renewal in 2018, and the lease with Strategic Growth Bancorp comes up for renewal in 2022.  There are no assurances that either of these leases will be renewed or that, if either of them is renewed, it will be renewed at the same rental rates as or higher rates than currently provided in the lease.

*ScottHulse PC.*  ScottHulse PC, an affiliate of Trustee W. David Bernard, has provided legal services to Borderplex in connection with the preparation of this Private Placement Memorandum and the offering of the REIT Shares.  ScottHulse PC will receive payment for these legal services from Borderplex from the proceeds of the offering.

*Trustee Compensation.*  Dating to the founding of the Company, Trustees have served without compensation.  The Board of Trustees will continue to review the appropriateness of implementing a compensation plan for its Trustees as we begin the implementation of our new multi-family strategy.

*Indemnification Agreements.*  The Borderplex Declaration of Trust eliminates the liability of Trustees and officers to Borderplex and its shareholders for money damages to the maximum extent permitted by Maryland law as in effect from time to time.  Maryland currently permits the declaration of trust of a Title 8 REIT to provide that trustees and officers will not be liable to the trust or its shareholders for money damages, except for liability resulting from (i) actual receipt of an improper benefit or profit in money, property, or services; or (ii) a final judgment based upon a finding of active and deliberate dishonesty by the trustee or officer that was material to the cause of action adjudicated.  See "Certain Provisions of Maryland Law and of the Borderplex Declaration of Trust, Bylaws and Securityholders' Agreement" – "Limitation of Liability and Indemnification of Trustees and Officers".

**Tax Status**

Based upon an opinion of our legal counsel, ScottHulse PC, we believe that we have qualified as a REIT under the Code in each year of our operation, although there can be no assurance that we have in fact met all of the requirements for such qualification.  To maintain REIT status, we must meet various organizational and operational requirements, including a requirement that we annually distribute at least 90% of our taxable income to our shareholders.  As a REIT, we generally are not subject to federal income tax on our taxable income that we currently distribute to our shareholders.  If we fail to qualify as a REIT in any taxable year, we will be subject to federal income tax at regular corporate rates.  Even if we qualify for taxation as a REIT, we may be subject to some federal, state and local taxes on our income or property.  In addition, the income of any taxable REIT subsidiary that we own will be subject to taxation at regular corporate rates.  See "Material United States Federal Income Tax Considerations."

**Our Structure**

Diagrams "B" and "C" under "The Company" and "Company Background and Existing Structure" depict our current structure prior to completion of this offering, and our ownership structure assuming the sale of the minimum 5,160,000 REIT Shares offered, as well as the additional 920,000 REIT Shares to fund the Second Closing in connection with the Grand Mission Pipeline Project, and completion of the Encore Transaction.

1021263.13

## RISK FACTORS

*Before you invest in the REIT Shares, you should be aware that there are various risks, including those described below.  Before you decide to purchase the REIT Shares, you should carefully consider these risk factors together with all of the other information included in this Private Placement Memorandum.  Any of the following factors could harm, in a material and adverse way, our business, prospects, financial condition, results of operations and our ability to make distributions to our shareholders, which could cause you to lose all or a part of your investment in our common shares.  Some statements in this Private Placement Memorandum, including statements in the following risk factors, constitute forward-looking statements. Please refer to the section entitled "Forward-Looking Statements."*

**Risks Related to Our Properties and Our Business**

### *Risks related to concentration of Existing Assets.*

Prior to the execution of our new business strategy described under the heading "Management Discussion and Analysis of Financial Condition and Results of Operations," other than the San Isidro Apartments in Santa Fe, all of our assets will be located in downtown El Paso, Texas (the "*El Paso Market*") and the performance of those assets will depend upon conditions in the El Paso Market.

### *Risks related to lack of track record in Multi-Family Market.*

Other than the San Isidro Apartments, which we acquired in April of 2015, we have no operating history or demonstrated performance with respect to our ability to acquire, own and operate multi-family properties within the Target Markets and are relying completely on our ability to deploy the capital raised in this and future offerings in order to execute our new business plan.  We may be unable to raise capital in the future; in addition, our ability to raise capital in the future will depend upon conditions in the Target Markets.  Even if we raise additional capital, we may not be able to identify and complete suitable multi-family investments in the Target Markets.  Our failure to meet our investment objectives could adversely impact implementation of our operating strategies and reduce anticipated returns to investors.  The results of our operations in the Target Markets will depend on many factors, including the availability of opportunities for the acquisition of properties, the level and volatility of interest rates, readily accessible short- and long-term funding, conditions in the financial markets and economic conditions generally and in the Target Markets.

### *The past performance of our management is not an indicator or guarantee of our future results.*

The track record of our management is not any indication or guarantee of our future performance. Our performance is dependent upon future events and market conditions, including, without limitation, varying business strategies, different local, national and foreign economic circumstances, different supply and demand characteristics relevant to buyers and sellers of our investments, varying degrees of competition, and varying circumstances related to the capital markets.  All of the factors discussed in this ''Risk Factors'' section may affect our future results. Accordingly, you should not rely on the past performance of our management in making your investment decision.

### *Our business depends upon economic, real estate and other conditions in the Target Markets.*

The economic growth and well-being of our initial Target Markets is highly dependent on the economic health of the eight cities comprising our initial Target Markets.  Accordingly, we are highly susceptible to developments that may adversely affect our Target Markets' competitiveness.  The Target Markets economy may be negatively impacted by many factors, including a downturn in the local, regional, national or world economy and adverse events affecting and the oversupply of, or reduced demand for, multi-family housing.  An increase in the supply of properties competitive with ours in the Target Markets could have a material adverse impact on our ability to attract and retain tenants in these markets.  Any adverse economic or real estate developments in our Target Markets could adversely impact our financial condition, results of operations, cash flow, and ability to satisfy our debt service obligations and to pay distributions on our common shares.  We cannot assure you of the continued growth of our Target Markets economy or our future growth rate.

*Our business will not be geographically diversified.*

Because we will focus our operations initially in the Target Markets, we will be exposed to the economic conditions and other events and occurrences that affect the Target Markets. Our operating performance will further be affected by the fact that initially we will own only six multifamily properties in the Target Markets. Any adverse change in the economic conditions in the Target Markets or any other adverse event or occurrence in the Target Markets may therefore have a more direct and adverse impact on our results of operations than if we owned more properties in more markets. Any such adverse impact could adversely affect our distributable cash flow and the value of our common shares.

*Our success will depend upon our ability to successfully identify and invest in suitable properties, some of which you may disagree with, and a delay in investing in those assets may cause a delay in our ability to make future distributions, if any, to holders of our common shares.*

There could be a substantial delay between the time you invest in REIT Shares and the time we invest any material portion of the offering proceeds. This delay could cause a further substantial delay in the time that it may take for us to generate revenues and could impair our ability to make any future distributions to you.

*Acquisitions may fail to perform as expected.*

Acquisition of properties entails risks that include the following, any of which could adversely affect our results of operations and our ability to meet our obligations:

- We may not be able to identify suitable properties to acquire or may be unable to complete the acquisition of the properties we select for acquisition;

- We may not be able to integrate new acquisitions into our existing operations successfully;

- Our estimate of the costs of improving, repositioning or redeveloping an acquired property may prove to be too low, and, as a result, the property may fail to meet our estimates of the profitability for that property, either temporarily or for a longer time;

- The real estate assets we acquire may fail to achieve the occupancy and rental rates we anticipate at the time we make the decision to invest in the properties, resulting in lower profitability than we expected in analyzing the properties;

- Our pre-acquisition evaluation of the physical condition of each new investment may fail to detect certain defects or necessary repairs until after the property is acquired, which could significantly increase our total acquisition and maintenance costs; and

- Our investigation of a property or building prior to its acquisition, and any representations we may receive from the seller, may fail to disclose various liabilities, which could effectively reduce the cash flow from the property or building, or increase our acquisition cost.

*We rely on our Trustees and executives with long-standing business relationships, the loss of any of whom could impair our ability to operate successfully.*

Our future success depends, to a significant extent, on the continued services of our Trustees and on key members of the management team. None of our Trustees is required to devote all of his or her time to the business of Borderplex, nor is any executive subject to an employment agreement. Several of the Trustees are engaged in other real estate related businesses or serve in fiduciary capacities to such businesses and may have conflicts of interest regarding business opportunities. As a result, there can be no guarantee that our Trustees or the executive(s) employed by us will remain employed or affiliated with us in any capacity, or be capable of continuing in their current capacities. We currently have only the basic structure of our management team and do not maintain key

1021263.13

9

person life insurance on any members of the management team.  The loss of services of one or more members of our management team could harm our business and our prospects.

***We may be affected by conflicts of interest that arise out of relationships with the Trustees and their affiliates.***

There may be occasions when Borderplex and its affiliates may encounter potential conflicts of interest in connection with our activities.  The following are certain actual and potential conflicts of interest:

- As more specifically discussed in "Certain Relationships and Related-Party Transactions," two of the major tenants in the Chase Tower are ScottHulse PC, occupying 24,042 square feet of office space and 1,256 square feet of storage, and Strategic Growth Bancorp, occupying 36,939 square feet of office space.  Those tenants are affiliates of Trustees W. David Bernard and William D. Sanders, respectively.  The leases in the Chase Tower with ScottHulse PC and Strategic Growth Bancorp are material to the profitability of the Chase Tower.  The lease with ScottHulse PC comes up for renewal in 2018, and the lease with Strategic Growth Bancorp comes up for renewal in 2022.  There are no assurances that either of these leases will be renewed or that, if it is renewed, it will be renewed at the same rental rate as or higher than the pro forma rates set forth under the heading "Description of Real Estate".   The interests of ScottHulse PC and Strategic Growth Bancorp, respectively, will be adverse to the interests of Borderplex in negotiating any such lease renewals.

- Several of our Trustees are engaged in the real estate business in El Paso, Texas and one or more of the other initial Target Markets.  The interests and economic objectives of the Trustees concerning their existing holdings may compete and conflict with the objectives and holdings of Borderplex in its Target Markets.  Each of the Trustees has duties to Borderplex, and certain of the Trustees may also have duties to their affiliated business enterprises, which may require that any such Trustee recuse himself or herself from considering and voting on certain matters in which such Trustee or his or her affiliates may have an interest and/or possibly resign his or her position as a Trustee.  See "The Company – Conflicts of Interest Policies."

***Our use of debt to finance acquisitions or developments could restrict our operations, inhibit our ability to grow our business and our revenues, and adversely affect our cash flow.***

Our ability to achieve our objectives in the Target Markets depends on our ability to raise capital through borrowings and/or securities issuances.  We cannot assure you that we will be able to raise capital in the future on a timely basis or on satisfactory terms, if at all.

Some of our planned and/or future property acquisitions or developments may be made by borrowing a portion of the purchase price or the development cost of our properties and securing the loan with a mortgage on the property.  In addition, we may obtain debt financing by placing secured mortgage loans on properties that we initially acquire for cash.  There is no limitation on the amount that we may borrow on a single property or the aggregate amount of our borrowings, and our Board of Trustees can change this policy at any time without the approval of shareholders of Borderplex.  The amount of debt we incur could have important consequences.  It could, for example:

- make it difficult to satisfy our debt service requirements;

- prevent us from making distributions on our outstanding common shares;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our debt, thereby reducing funds available for operations, property acquisitions and other appropriate business opportunities that may arise in the future;

- require us to dedicate increased amounts of our cash flow from operations to payments on variable rate, unhedged debt if interest rates rise;

- limit our flexibility in planning for, or reacting to, changes in our business and the factors that affect the

1021263.13

10

profitability of our business;

- limit our ability to obtain additional financing, if the future need arises for working capital, debt refinancing, capital expenditures, acquisitions, development or other general corporate purposes;

- exacerbate the adverse effects that changing economic conditions may have on our available cash flow; and

- limit our flexibility in conducting our business, which may place us at a disadvantage compared to competitors with less debt.

Our ability to make scheduled payments of interest and principal, or to refinance our indebtedness will depend on our future performance, which is to a certain extent subject to economic, financial, competitive and other factors beyond our control.  There can be no assurance that our business will generate sufficient cash flow from operations to service our debt or meet our other cash needs.  If we are unable to do so, we may be required to refinance all or a portion of our existing debt, to sell assets or to obtain additional financing.  We cannot assure you that any such refinancing, sale of assets or additional financing would be possible on terms that would be favorable or acceptable to us.

We may not be able to obtain debt financing at favorable rates.  Non-recourse debt financing is generally available only for mature properties.  To the extent such financing is available, it may be at rates less favorable than anticipated.  In addition, if interest rates increase, any variable rate borrowings we have would result in our interest expenses increasing.  Further, if we have to refinance our debt as it matures in a rising interest rate environment, our expenses will increase.  An increase in our expenses would reduce the funds we have available to pay distributions to you.

If we are unable to make our debt payments as required, a lender could foreclose on the property or properties securing its debt.  This could cause us to lose part or all of our investment, which in turn could cause a decrease in the value of our shares and any distributions to our shareholders.

***We may be obligated to comply with certain financial and other covenants in connection with debt financing that will restrict our operating activities and, if breached, may have other adverse effects.***

To the extent agreements governing our borrowings contain financial and other covenants with which we are required to comply, our operating flexibility may be limited. This could cause us to have to forego investment opportunities or may cause us to have to finance investments in a less efficient manner than if we were not subject to the covenants.

Secured debt generally contains certain customary covenants, including, among others, provisions that:

- relate to the maintenance of the property securing the debt;

- restrict our ability to pledge assets or create other liens;

- restrict our ability to incur additional debt;

- restrict our ability to amend or modify existing leases; and

- restrict our ability to enter into transactions with affiliates.

Unsecured debt generally contains various covenants, including provisions restricting our ability to:

- incur additional debt;

- incur additional secured debt and subsidiary debt;

- make certain distributions, investments and other restricted payments;

1021263.13

11

- enter into transactions with affiliates;

- create certain liens;

- enter into certain sale-leaseback transactions; and

- consolidate, merge or sell all or substantially all of our assets.

Certain covenants may require us to maintain certain financial ratios, including, without limitation, minimum debt service ratios and maximum leverage ratios.

In addition, some debt may limit our ability to make certain types of payments on equity and other distributions on our common shares unless we meet certain financial tests or are required to make the distributions to maintain our qualification as a REIT. As a result, if we are unable to meet the applicable financial tests, we may not be able to pay distributions on our shares in one or more periods.

If we were to breach debt covenants, our lenders could require us to repay the debt immediately and, if the debt is secured, could foreclose on the property securing the loan. In addition, the agreements governing our borrowing may have cross-default provisions, so that a default on one of our borrowings would lead to a default on other borrowings or on all of our borrowings. As a result, any default under our debt covenants could have an adverse effect on our financial condition, our results of operations and our ability to meet our obligations.

### Rising interest rates and the failure to hedge effectively against interest rate changes may adversely affect our operating results.

We may borrow funds at variable interest rates. Increases in interest rates (or the loss of the benefits of any interest rate hedging arrangements, as described below) would increase our interest expense on our variable rate debt, which would adversely affect cash flow and our ability to service our debt and meet our obligations. In addition, an increase in market interest rates may lead purchasers of our debt securities, should we ever decide to issue debt securities, to demand a higher annual yield, which could adversely affect the market price of any outstanding debt securities. To mitigate our exposure to interest rate volatility, we may enter into interest rate hedging arrangements that involve risks. These arrangements may not be effective, however, in reducing our exposure to interest rate changes. Failure to hedge effectively against interest rate changes may have a material adverse effect on our operating results and financial condition, as well as our ability to pay distributions.

### Balloon payment obligations may adversely affect our financial condition.

Some of the financing that we may obtain may require us to make a lump-sum or ''balloon'' payment at maturity. Our ability to make any such payments is uncertain and may depend on our ability to obtain additional financing or our ability to sell the property. At the time the payment is due, we may not be able to refinance the payment on terms as favorable as the original loan or sell the property at a price sufficient to make the payment, if at all. If the loan is refinanced at a higher rate, it could reduce or eliminate any income from the property. If we fail to sell the property, we may default on our loan, which may trigger cross-defaults on our other then-outstanding indebtedness, which could materially and adversely affect our operating results and financial condition as well as our ability to pay distributions to you and the value of your common shares.

### We will be subject to the risk of foreign currency fluctuation.

The economy of the El Paso Market is highly dependent on cross-border trade with Mexico, including Mexican shoppers and customers. As a result, we are subject to foreign currency risk due to potential fluctuations in exchange rates between the Mexican peso and the U.S. dollar. For example, a significant depreciation in the value of the Mexican peso may materially and adversely affect the ability of Mexican shoppers to buy goods and services in the El Paso Market, and thus the value and demand for real estate in the El Paso Market. This could materially and adversely affect our results of operations and the value of the common shares.

1021263.13

*We may change our investment strategy and/or our policy with respect to debt financing without your consent, which may result in investments and/or debt financing that are riskier than those we are currently contemplating.*

We may change our investment strategy and/or our strategy with respect to debt financing at any time without the consent of our shareholders, which could result in our making investments and/or incurring debt financing different from, and possibly riskier than, that which is presently contemplated in this Private Placement Memorandum. You may disagree with any policy changes we make. A change in our investment strategy may increase our exposure to interest rate and real estate market fluctuations. In addition, you will have no opportunity to evaluate the terms of transactions or other economic or financial data concerning our investments that are not described in this Private Placement Memorandum. You must rely entirely on our investment selection and you may not agree with our investments.

*We may not have adequate access to funding to successfully execute our growth strategy and/or to effectively manage a rapidly growing portfolio.*

Our business strategy primarily depends on our ability to acquire multi-family real estate and grow the size of our real estate portfolio within our Target Markets, including the second closing for the acquisition of the Grand Mission project in the Encore Transaction. Our business plan requires significant funds for property acquisition, property development, working capital and other needs. This strategy depends, in part, on our ability to access the debt and equity capital markets to finance our spending requirements. An inability to effectively access these markets would have an adverse effect on our ability to make new investments and could adversely affect our ability to make distributions to you over time and the value of our common shares. The successful implementation of our growth strategy also depends, in part, on our ability to effectively manage rapid growth in our portfolio. Our ability to effectively manage rapid growth in our portfolio depends on our ability to successfully attract and retain additional qualified personnel. An inability to attract the necessary qualified personnel to properly manage and grow our portfolio could have an adverse effect on our business.

*We will compete for acquisition of properties and tenants, which could reduce the yields we are able to realize on our investments.*

We will encounter competition in the acquisition of properties. This competition may include financial institutions, real estate funds, investment companies, pension funds, real estate developers, public and private real estate companies and real estate investors. The market for the type of properties we seek to acquire can be highly competitive. This competition may reduce the number of suitable investment opportunities offered to us and may increase the bargaining power of property owners. We will face similar competition in our efforts to dispose of properties. Competition may further interfere with our ability to attract and retain tenants and may as a consequence cause us to lower our rental rates. Many of our competitors may have greater name recognition, resources and access to capital than we have. In order to remain competitive, we may have to increase our offer prices for properties, reduce the rent we seek from tenants or make modifications to properties in order to attract and secure tenants. If this happens, our results of operations, our ability to make distributions and the value of our common shares may be adversely affected.

*The loss of tenants or their failure to pay rent could adversely affect our operating results and ability to make distributions.*

Our financial results depend primarily on leasing space in our properties to tenants on economically favorable terms. The loss of a tenant, the failure of a tenant to pay rent or our inability to re-lease a property in the event of the loss of a tenant will reduce our revenues, which could lead to losses on our investments and reduce returns. In recent years, tenants of our Office Properties and Retail Properties in the El Paso Market have declared bankruptcy and other tenants may declare bankruptcy or become insolvent in the future. In the event of the loss of a significant number of tenants or the failure by a significant number of tenants to pay rent, we may incur substantial costs in enforcing our rights as landlord.

We intend to maintain an allowance for doubtful accounts that will be reviewed for adequacy by assessing such factors as the credit quality of our tenants, delinquencies in payment, historical trends and current economic

conditions.  If our assumptions regarding the collectability of tenant accounts receivable prove incorrect, we could experience write-offs in excess of the allowance for doubtful accounts, which would result in a decrease in our earnings.

### *We may experience difficulty or delay in renewing leases or re-leasing space.*

We will initially derive all of our revenue in the form of rent received from tenants.  We are subject to the risks that, upon expiration, leases for space in our Office Properties may not be renewed, the space may not be re-leased or the terms of renewal or re-lease, including the cost of required renovations or concessions to tenants, may be less favorable than current lease terms.  Should any of these circumstances occur, our results of operations and our ability to meet our obligations could be adversely affected.

As of the date of this Private Placement Memorandum, leases of approximately 8,557, 36,597 and 48,549 square feet of office space in the Chase Tower (representing respectively, approximately 3%, 12% and 15% of net rentable area in the Chase Tower) expire in 2016, 2017 and 2018, respectively.  As of the date of this Private Placement Memorandum, leases of approximately 13,366, 25,915 and 96,519 square feet of office space in the Wells Fargo Plaza (representing respectively, approximately 5%, 10%, and 36% of net rentable area in the Wells Fargo Plaza) expire in 2016, 2017, and 2018, respectively.  In addition we have 3,697 square feet office space at Chase tower, and 9,257 square feet office space at Wells Fargo that is leased on a month-to-month basis.

### *We are subject to the risks of commercial real estate ownership that could reduce the value of our properties.*

Our performance is subject to risks incident to the ownership and operation of commercial properties, including:

- changes in the international,  national, regional and local economic and business climate;

- the illiquid nature of real estate compared to other financial assets, which may limit our ability to make timely changes in our portfolio in response to changes in economic or other conditions;

- environmental risks related to the presence of hazardous or toxic substances or materials on our properties;

- changes in consumer trends and preferences that affect the demand for products and services offered by our tenants;

- changes in local real estate conditions, including the availability and demand for lease space;

- changes in interest rates and the availability of financing;

- real estate valuations are subjective and may change over time;

- changes in laws and governmental regulations, including those governing land use, zoning and taxes;

- decreases in market rental rates;

- costs associated with the need to periodically repair, renovate and re-lease space;

- increases in the costs of maintenance, insurance and other operating costs, including real estate taxes associated with one or more properties, which may occur even when revenues from such properties are static or decreasing due to economic, market, or other conditions or circumstances;

- competition from other properties;

1021263.13

14

- changes in tenant preferences that reduce the attractiveness of our properties to present and prospective tenants; and

- tenant defaults.

Any of these changes could cause the value of our real estate to decline.

***We may be unable to sell properties when we want to sell them because real estate investments are typically illiquid.***

Real estate investments cannot generally be sold quickly.  In addition, limitations under federal income tax laws applicable to REITs may limit our ability to sell assets.  As a result, we may not be able to alter our portfolio promptly in response to changes in economic or other conditions.  Our inability to respond quickly to adverse changes in the performance of our investments could have an adverse effect on our ability to meet our obligations.

***Many real estate costs are fixed, even if income from our properties decreases.***

Our financial results depend primarily on leasing space in our properties to tenants on terms favorable to us.  Fixed costs associated with real estate investment, such as real estate taxes and insurance costs, do not generally decrease even when a property is not fully occupied, when the rate of rentals at a project decreases or when other circumstances cause a reduction in income from the investment.

***We may incur unanticipated costs with respect to our development projects, which could reduce the funds we have available to pay distributions.***

We may develop, expand or renovate our properties.  These activities may expose us to the following risks, each of which could adversely affect our results of operations and our ability to meet our obligations:

- Certain construction materials, equipment and labor may not be readily available, if at all;

- We may incur costs for development, expansion or renovation of a property that exceed our original estimates due to increased costs for materials or labor or other unexpected costs;

- We may not be able to obtain financing with favorable terms, which may make us unable to proceed with our development and other related activities on the schedule we originally planned or at all;

- We may be unable to complete in a timely manner the construction and sale or lease of a property, which could result in increased debt service expense or construction costs;

- We may be unable to obtain, or may suffer delays in obtaining, incentives and/or specific government and community land use and development approvals, including zoning, building, occupancy, tax abatement, public use and impact fee arrangements, enterprise trade zone, foreign trade zone and other required governmental permits and authorizations.  Any of these delays could result in increased costs or our abandonment of these activities;

- We may lease, rent or sell developed properties at below expected rental rates or unit prices; and

- Occupancy rates, rents or unit sales at newly completed properties may fluctuate depending on various factors, including market and economic conditions, and may result in our investment not being profitable.

Additionally, the time required for development, construction and lease-up of these properties means that we may have to wait a substantial period of time for a significant cash return.  As a REIT, we will be required to make cash distributions of our taxable income to our shareholders. If our cash flows from operations are not sufficient, we may be forced to borrow to fund these distributions, which could adversely affect our ability to meet our other obligations.

1021263.13

*Demand for our real estate is subject to various risks, some of which are cyclical in nature, which could reduce value and/or profitability.*

The value of our properties may be affected by changes in the overall demand for real estate within our Target Markets.  In particular, changes in demand could result from higher interest rates, the unavailability of mortgage financing on advantageous terms, or inflation, recessions or other economic conditions that reduce the utilization of and demand for real estate.  Any increases in interest rates or downturn in the international (cross-border), national or local economies affecting our initial Target Markets could also affect our profitability and the value of our properties.  These factors have tended to be cyclical in nature.

*Our insurance on our real estate may be inadequate.*

We will maintain casualty and general commercial liability insurance on all of our properties.  There are various types of potential losses, generally of a catastrophic nature, such as earthquakes, floods, hurricanes, terrorism or acts of war that may be economically uninsurable or at all.  We therefore may not have or may cease to have insurance coverage against certain types of losses and/or there may be decreases in the limits of insurance available.  In addition, we may be unable to renew or duplicate our current insurance coverage in adequate amounts or at reasonable prices.  Inflation, changes in building codes and ordinances, environmental considerations and other factors, including terrorism or acts of war, also might make the insurance proceeds insufficient to repair or replace a property if it is damaged or destroyed.  If an uninsured loss or a loss in excess of our insured limits occurs, we could lose all or a portion of our capital investment and/or anticipated profits and cash flow from one or more properties, but still remain obligated for any mortgage debt or other financial obligations related to the property.  We cannot guarantee that material losses in excess of insurance proceeds will not occur in the future.  Further, there can be no assurance that the insurance proceeds that we may receive will be adequate to restore our economic position with respect to the affected real property.  If any of our properties were to experience a catastrophic loss, it could seriously disrupt our operations, delay revenue and result in large expenses to repair or rebuild the property.  Events such as these could adversely affect our results of operations and our ability to meet our obligations and make distributions to you.

*Natural disasters and severe weather may affect our operating results and financial condition.*

Natural disasters and severe weather, such as floods and wild fires, may result in significant damage to our properties. The extent of our casualty losses and loss in operating income in connection with such events depends upon the severity of the event and the total amount of exposure in the affected area.  When we have geographic concentration of exposures, a single catastrophe or destructive weather event affecting a region may have a significant adverse effect on our financial condition and results of operations.  We cannot accurately predict natural disasters or severe weather or the number and type of such events that will affect us. As a result, our operating and financial results may vary significantly from one period to the next.  Although we anticipate and plan for losses, there can be no assurance that our financial results will not be adversely affected by our exposure to losses arising from natural disasters or severe weather in the future that exceed our previous experience and assumptions.

*The costs of compliance with or liabilities under environmental laws may harm our operating results.*

The properties we acquire may be subject to certain environmental liabilities.  An owner of real property can face liability for environmental contamination created by the presence or discharge of hazardous substances on the property.  We may face liability regardless of:

- our knowledge of the contamination;

- the timing of the contamination;

- the cause of the contamination; or

- the party responsible for the contamination of the property.

Our properties may have environmental problems of which we are unaware.  Some of our properties may use, or may have used in the past, underground or aboveground tanks or containers for the storage of petroleum-based products, and/or waste or hazardous products that could create a potential for release of hazardous substances.  Dumping of debris and other waste products may have occurred on some of the properties that we acquire.  Some properties that we acquire may contain asbestos-containing materials.

If environmental contamination exists on our acquired properties, we could be subject to strict, joint and several liability for the contamination by virtue of our ownership interest.  Under various federal, state and local laws, ordinances and regulations, we may be required to investigate and clean up certain hazardous or toxic substances released on or in properties we own or operate, and we may also be required to pay other costs relating to hazardous or toxic substances.

Our environmental liability may include property damage, personal injury, investigation and clean-up costs.  These costs could be substantial.  Properties we acquire may not be covered by environmental insurance.  Although we may obtain insurance for environmental liability for some properties we acquire in the future, our insurance may be insufficient to address any particular environmental situation, and we may be unable in the future to continue to obtain insurance for environmental matters at a reasonable cost or at all.  If we do not have insurance on affected property, or our environmental liability insurance is inadequate, we may become subject to material losses for environmental liabilities.  Our ability to receive the benefits of any environmental liability insurance policy will depend upon the financial ability of our insurance company and the position it takes with respect to our insurance claims.

The presence of hazardous substances on a property that we acquire or the failure to properly remediate such hazardous substances may adversely affect our ability to sell or lease the property or to borrow using the property as collateral.  In addition, we may incur substantial remediation costs associated with such hazardous substances.  Such costs and liabilities may exceed the value of the affected property.  If we ever become subject to significant environmental liabilities, our business, financial condition, liquidity and results of operations could be materially and adversely affected.

***Our properties may contain or develop harmful mold, which could lead to liability for adverse health effects and costs of remediation of the problem.***

When excessive moisture accumulates in buildings or on building materials, mold growth may occur, particularly if the moisture problem remains undiscovered or is not addressed in a timely manner.  Some molds may produce airborne toxins or irritants.  Concern about indoor exposure to mold has been increasing as exposure to mold may cause a variety of adverse health effects and symptoms, including allergic or other reactions.  As a result, the presence of significant mold at any properties that we acquire could require us to undertake a costly remediation program to contain or remove the mold from the affected property.  In addition, the presence of significant mold could expose us to liability from our tenants, employees of our tenants and others if property damage or health concerns arise.  If we ever become subject to significant mold-related liabilities, our business, financial condition, liquidity, results of operations and ability to pay distributions could be materially and adversely affected.

***Compliance with the Americans with Disabilities Act, the Fair Housing Act and fire, safety and other regulations may require us to make unanticipated expenditures that adversely impact our results of operations.***

All of the properties that we own or acquire in the United States are required to comply with the Americans with Disabilities Act (the "*ADA*").  The ADA has separate compliance requirements for "public accommodations" and "commercial facilities," but generally requires that the buildings be made accessible to people with disabilities.  Compliance with the ADA requirements could require removal of access barriers, and non-compliance could result in imposition of fines by the U.S. government or an award of damages to private litigants, or both.  Other federal, state and local laws may require modifications to or restrict further renovations of our properties for similar reasons.  The costs associated with compliance with such laws and regulations may adversely affect our results of operations, financial condition and our ability to pay distributions.  We must also comply with the Fair Housing Act, which prohibits us and our tenants/operators from discriminating against individuals on certain bases in any of our practices if it would cause such individuals to face barriers in gaining residency in any facility located on our properties.  In addition, we are required to operate and develop our properties in compliance with fire and safety

1021263.13

regulations, building codes and other land use regulations, as they may be adopted by applicable governmental agencies and bodies.  We may be required to make substantial capital expenditures to comply with those requirements, and these expenditures could have an adverse effect on our ability to pay distributions to you. Additionally, failure to comply with any of these requirements could result in the imposition of fines by governmental authorities or awards of damages to private litigants.  While we intend only to acquire or develop properties that we believe are in substantial compliance with all regulatory requirements, these requirements could be changed or new requirements could be imposed that would require significant unanticipated expenditures by us and could have an adverse effect on our cash flow and distributions paid.

> ***We may become subject to litigation, which could have an adverse effect on our financial condition, results of operations, cash flow and value of our common shares.***

In the future, we may become subject to litigation, including claims relating to our operations, and otherwise in the ordinary course of business. Some of these claims may result in significant defense costs and potentially significant judgments against us, some of which are not, or cannot be, insured against.  We generally intend to vigorously defend ourselves; however, we cannot be certain of the ultimate outcomes of any claims that may arise in the future.  Resolution of these types of matters against us may result in our having to pay significant fines, judgments or settlements, which, if uninsured, or if the fines, judgments, and settlements exceed insured levels, could adversely impact our earnings and cash flows, thereby having an adverse effect on our financial condition, results of operations, cash flow and value of our common shares.  Certain litigation or the resolution of certain litigation may affect the availability or cost of some of our insurance coverage, which could adversely impact our results of operations and cash flows, expose us to increased risks that would be uninsured and/or adversely impact our ability to attract officers and trustees.

> ***Our participation in joint ventures creates additional risk.***

We may participate in joint ventures and thereby purchase properties jointly with other persons and/or entities, some of which may be unaffiliated with us. There are additional risks involved in these types of transactions, including the loss of total operational control, the potential that our joint venture partner may become bankrupt and the possibility that we and our partner may have divergent or inconsistent economic or business interests.  Such joint ventures may also give a third party the opportunity to influence the return that we can achieve on some of our investments and thus may adversely affect our results of operations and our ability to meet our obligations.  In addition, in many cases we may not control the timing or amount of distributions that we receive from the joint investment, and amounts that would otherwise be available to us for distribution may be reinvested in the property or used for other costs and expenses of the joint operation.  Our partner's divergent interests could result in exposing us to liabilities of the joint venture in excess of our proportionate share of these liabilities.  The partition of rights of each owner in a jointly owned property could reduce the value of each portion of the divided property.  In addition, any fiduciary obligation that we may owe to our partner in a joint venture transaction may make it more difficult for us to enforce our rights.

> ***The market price and trading volume of VEREIT Common Stock may be volatile and VEREIT may be unable to pay or maintain distributions.***

As described under "The Company – Company Background and Existing Structure," MSI contributed to us as an investment 1,645,338 shares of VEREIT common stock.  The per share trading price of VEREIT common stock may be volatile. In addition, the trading volume in VEREIT common stock may fluctuate and cause significant price variations to occur. If the per share trading price of VEREIT common stock declines significantly, we may be unable to resell or leverage the VEREIT common stock on terms favorable to us.  No assurance can be given that VEREIT will be able to make distributions in the future or that the level of any distributions it does make will achieve a market yield or increase or even be maintained over time.  Any decrease in the per share trading price of VEREIT common stock or in the level of any distributions may adversely affect our results of operations, our ability to make distributions and the value of our common shares.

**Risks Related to the Encore Transaction**

***The past development services of Encore is no guarantee of future performance.***

The Encore Transaction is a key springboard for the launch of the Company's multi-family strategy.  The Encore Transaction is subject to numerous risks, including, without limitation, the ability of Encore to perform as anticipated and in accordance with its prior track record.

***The contribution of the Pipeline Projects by Encore require numerous third-party consents, and some of the Pipeline Projects are subject to financing assumptions.***

The Pipeline Projects to be contributed by Encore in the Encore Transaction are subject to numerous contingencies, including third-party consents to the contribution of the Pipeline Projects by Encore to our DownREIT, and certain financing assumptions with respect to the River Walk, Swiss Avenue and Evans Station Pipeline Projects.

***Risks related to financing assumptions.***

We will not accept your subscription until we are reasonably satisfied that we will be able to obtain the requisite third-party consents for Encore's contribution of the Sendero Ranch and Grand Mission Pipeline Projects to the DownREIT, but even after Encore obtains these third-party consents and contributes those Pipeline Projects to our DownREIT, the Company still must obtain construction and permanent financing commitments for the Evans Station, Swiss Avenue and River Walk Pipeline Projects.  Our performance expectations are based upon certain underwriting assumptions with respect to this financing, which assumptions form the basis, in part, for our projected returns on the River Walk, Swiss Avenue and Evans Station Pipeline Projects.  If our DownREIT cannot obtain construction and/or permanent financing that conforms to our underwriting assumptions, then Encore can either reduce its contribution value with respect to any particular Pipeline Project for which acceptable financing cannot be obtained, and accept a reduced number of DownREIT Units in order to allow our DownREIT to achieve the desired returns, or withdraw the non-conforming Pipeline Project and propose a substitute property.  If this were to happen, then the DownREIT would be delayed in acquiring income producing multi-family properties in accordance with our projected schedule, and thus our performance would be adversely affected.

***Risks related to delays if outside limited partner consent to contribution of the Sendero Ranch Pipeline Project is not obtained.***

The Sendero Ranch property, which is the closest Pipeline Project to completion, is subject to a third-party consent from Encore's current outside limited partner.  There is no assurance that this third-party consent can be obtained by Encore, in which event Encore might have to propose a substitute property.  If the Sendero Ranch Pipeline Project is not ultimately acquired by our DownREIT, we could be delayed in meeting our schedule for acquiring income producing multi-family units, which would adversely affect our operating performance.

***Risks related to lender consents on Pipeline Projects under construction.***

While the risk of not meeting underwriting assumptions with respect to financing does not exist with respect to the Sendero Ranch and Grand Mission Pipeline Projects, inasmuch as these Projects are currently under construction with HUD-guaranteed financing in place that meets our underwriting assumptions, Encore and the Company must still obtain lender and HUD consent to the DownREIT's assumption of this existing HUD-guaranteed financing.  While we expect to be able to obtain this consent, there is no assurance that we will do so, or we could be delayed in obtaining it.  If these consents are not obtained, or we are delayed in obtaining these consents, then this will affect our future performance.

*Risks related to management of the DownREIT.*

Since all of our new multi-family development projects will be undertaken within the DownREIT, where we have a joint management structure in place with Encore, all of the risks described elsewhere in this section entitled "Risk Factors" with respect to our participation in joint ventures will apply to our DownREIT.

**Risks Related to this Offering**

*There is not, and may never be, a public market for REIT Shares, and you may be unable to liquidate your investment.*

The REIT Shares have not been registered under the Securities Act or any state securities laws and, unless so registered, may not be offered or sold except under an exemption from the registration requirements of the Securities Act, applicable securities laws and the transfer restrictions described under "Private Placement and Notice to Investors" and "Description of Shares of Beneficial Interest—Restrictions on Ownership and Transfer." The REIT Shares are newly issued securities for which there is no established trading market.  As a result, you should consider the purchase of the REIT Shares as a long-term investment.  Because we cannot assure you of the development or liquidity of any market for the REIT Shares, you must expect to bear the economic risk of an investment in the REIT Shares for an indefinite period.

If we ever complete a registered initial public offering, there can be no assurance that the market price for the REIT Shares will exceed the price per share paid by you in this offering.  In addition, the market price for the REIT Shares following an initial public offering could be subject to significant volatility and the wide price and volume variations often experienced by publicly traded companies.  These fluctuations have often been unrelated to operating performance.

*The price for the REIT Shares may not reflect their actual value and, after this offering, may be lower than the offering price.*

The offering price of the REIT Shares was determined by us and may not reflect the value of the underlying assets we have and may acquire.  The value that investors may ultimately realize from their REIT Shares after this offering, whether or not any market for the shares develops, may be lower than that at which they are sold in this offering.  In addition, the value of the REIT Shares could be less than the proportionate actual value of the real estate we acquire.

*We may issue additional Common Shares or other securities in the future and such issuances may cause dilution or otherwise decrease the value of the REIT Shares.*

Under our Declaration of Trust, our Board of Trustees may cause us, without shareholder approval, to issue additional common or preferred shares of beneficial interest in connection with future equity offerings, acquisitions of properties or other assets or otherwise at any time.  In addition, our Declaration of Trust authorizes our Board of Trustees, without shareholder approval, to (i) amend our Declaration of Trust to increase or decrease the aggregate number of shares or the number of shares of any class or series and (ii) set the preferences, rights, and other terms, including price, of newly issued shares of beneficial interest, including preferred shares that have preference over the REIT Shares with respect to dividends and liquidation and may have voting, conversion and other rights not available to holders of the REIT Shares.

We may also offer additional securities in the future at prices below the price of your REIT Shares in this offering, which could negatively impact the value of your REIT Shares.  The issuance of additional shares could be substantially dilutive to your REIT Shares.

*Future offerings of debt, preferred securities or other equity, which could be senior to the REIT Shares in liquidation or for dividends and other distributions, may adversely affect the value of the REIT Shares.*

In the future, we may attempt to increase our capital resources by making additional offerings of debt or equity securities, including commercial paper, medium-term notes, senior or subordinated notes and classes of

1021263.13

preferred shares or shares of beneficial interest of Borderplex.  If we were to liquidate, holders of our debt securities and any preferred shares and lenders with respect to other borrowings will receive a distribution of our available assets before the holders of REIT Shares.  Additional equity offerings by us may dilute your interest in the Company or reduce the value of your REIT Shares, or both. In the future, we may issue preferred shares that have a preference with respect to distributions, which could limit our ability to make any distributions to you.  Because our decision to issue securities in any future offering will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, pricing, timing or nature of our future offerings.  Thus, you will bear the risk of our future offerings reducing the value of your REIT Shares and diluting your interest in the Company.

### *Our ability to pay distributions depends on various factors and is not assured.*

Our ability to make distributions will depend upon a variety of factors, including efficient management of our properties and our ability to continue to grow, and may be adversely affected by the risks described elsewhere in this Private Placement Memorandum.

All distributions will be made in the sole discretion of our Board of Trustees.  Our Board of Trustees will make determinations regarding distributions based upon, among other factors, our historical and projected results of operations, financial condition, cash flows and liquidity, maintenance of our REIT qualification and other tax considerations, capital expenditure and other expense obligations, debt covenants, contractual prohibitions or other limitations and applicable law and such other matters as our Board of Trustees may deem relevant from time to time.  Among the factors that could impair our ability to make distributions to our shareholders are:

- our inability to realize attractive risk-adjusted returns on our investments;

- unanticipated expenses that reduce our cash flow or non-cash earnings;

- tenant default rates or decreases in the value of our properties; and

- the fact that anticipated operating expense levels may not prove accurate, as actual results may vary from estimates.

As a result, no assurance can be given that we will be able to make distributions to our shareholders in the future or that the level of any distributions we do make to our shareholders will achieve a market yield or increase or even be maintained over time.

**Risks Relating to Admission of ERISA Investors to Borderplex.**

As discussed under "Certain Considerations Applicable to ERISA, Governmental and Other Plan Investors," the Board of Trustees intends to conduct the operations of Borderplex so that the assets of Borderplex will not be deemed to constitute "plan assets" of shareholders that are subject to the fiduciary provisions of ERISA or the prohibited transaction rules of ERISA and Section 4975 of the Code ("*Benefit Plan Investors*").  The Company, however, cannot provide any assurances that ERISA "plan asset" status will be avoided.  If Borderplex were deemed to hold "plan assets" of Benefit Plan Investors, then (i) if any such Benefit Plan Investors are subject to ERISA, ERISA's fiduciary standards would apply to Borderplex and might materially affect the operations of Borderplex, and (ii) any transaction with Borderplex could be deemed a transaction with each Benefit Plan Investor and may cause transactions into which Borderplex might enter in the ordinary course of business to constitute prohibited transactions under ERISA and Section 4975 of the Code, which could result in the imposition of liabilities and excise taxes.  In order to avoid having Borderplex's assets treated as "plan assets", the Board of Trustees intends to restrict the acquisition and transfer of its common shares to ensure that the ownership interests of Benefit Plan Investors do not become "significant" with respect to any class of Borderplex's equity interests, and such restrictions could delay or preclude a Borderplex shareholder's ability to transfer its common shares.  See "Certain Considerations Applicable to ERISA, Governmental and other Plan Investors."

**Risks Related to Our Organization and Structure**

***Certain Provisions of Maryland law and the Borderplex Declaration of Trust and Bylaws contain provisions that may inhibit or prevent potential takeover bids that shareholders may consider favorable.***

Certain provisions of Maryland law and the Borderplex Declaration of Trust and Bylaws may have the effect of delaying or preventing a transaction or a takeover bid that might involve a premium price for our shares or otherwise be in the best interests of our shareholders. Our Declaration of Trust divides our Board of Trustees into three classes of Trustees. Trustees of each class are elected to serve until the third annual meeting after their election and until their successors are duly elected and qualify. This provision, as well as the provisions described under "Certain Provisions of Maryland Law and of the Borderplex Declaration of Trust, Bylaws and Securityholders' Agreement" may have the effect of making it more difficult for a third party to acquire control of Borderplex without the consent of the Board of Trustees, including certain acquisitions which shareholders may deem in their best interests.

***The rights of shareholders of Borderplex are limited.***

Our operating and financial policies, including our policies with respect to acquisitions of real estate or other companies, growth, operations, indebtedness, capitalization and dividends, are exclusively determined by our Board of Trustees. Accordingly, our shareholders do not control these policies. Such control will limit your ability to influence the outcome of key transactions. Additionally, investors bound by the Borderplex Securityholders' Agreement may not transfer REIT Shares without the prior written consent of Borderplex, except under limited circumstances, including the following: (i) investors may transfer their REIT Shares, subject to compliance with applicable securities laws and a right of first offer in favor of Borderplex, and (ii) an investor may transfer REIT Shares to (a) affiliates, (b) members of the investor's immediate family, (c) the investor's executors, administrators, testamentary trustees, legatees or beneficiaries upon the investor's death, and (d) any lender to whom such REIT Shares are assigned to secure a bona fide indebtedness of the investor, in each case subject to the conditions set forth in the Borderplex Securityholders' Agreement. See "Summary—Borderplex Securityholders' Agreement," "Private Placement and Notice to Investors," "Description of Shares of Beneficial Interest," and "Certain Provisions of Maryland Law and of the Borderplex Declaration of Trust, Bylaws and Securityholders' Agreement."

***We will have broad discretion on how many REIT Shares will be sold as a part of this offering.***

Our Board of Trustees may elect in its sole discretion to increase the number of REIT Shares offered pursuant to this Private Placement Memorandum. In addition, we have, at our discretion, the authority to accept your subscription agreement, but for an amount of REIT Shares that is lower than the amount that you request in your subscription agreement.

***Conflicts of interest exist or could arise in the future between the interests of our shareholders and the interests of holders of OP units, which may impede business decisions that could benefit our shareholders***.

Conflicts of interest exist or could arise in the future as a result of the relationships between us and our affiliates, on the one hand, and our Operating Partnership or any partner thereof, on the other. Our Trustees and officers have duties to our Company under applicable Maryland law in connection with their oversight and management of our company. At the same time, we, as the general partner of our Operating Partnership, have fiduciary duties and obligations to our Operating Partnership and its limited partners under Delaware law and the partnership agreement of our Operating Partnership in connection with the management of our Operating Partnership. Our fiduciary duties and obligations as general partner to our Operating Partnership and its partners may come into conflict with the duties of our Trustees and officers to our Company. See "The Company – Conflicts of Interest Policies."

*We are a holding company with no direct operations, and, as such, we will rely on funds received from our Operating Partnership to pay liabilities, and the interests of our shareholders will be structurally subordinated to all liabilities and obligations of our Operating Partnership and its subsidiaries.*

We are a holding company and will conduct substantially all of our operations through our Operating Partnership.  We do not have, apart from an interest in our Operating Partnership, any independent operations.  As a result, we will rely on distributions from our Operating Partnership to pay any dividends we might declare on common shares.  We will also rely on distributions from our Operating Partnership to meet any of our obligations, including any tax liability on taxable income allocated to us from our Operating Partnership.  In addition, because we are a holding company, your claims as shareholders will be structurally subordinated to all existing and future liabilities and obligations (whether or not for borrowed money) of our Operating Partnership and its subsidiaries.  Therefore, in the event of our bankruptcy, liquidation or reorganization, our assets and those of our Operating Partnership and its subsidiaries will be available to satisfy the claims of our shareholders only after all of our and our Operating Partnership's and its subsidiaries' liabilities and obligations have been paid in full.

*Our Operating Partnership may issue additional OP units to third parties without the consent of our shareholders, which would reduce our ownership percentage in our Operating Partnership and would have a dilutive effect on the amount of distributions made to us by our Operating Partnership and, therefore, the amount of distributions we can make to our shareholders.*

After giving effect to this offering, we will own approximately 78% of the outstanding OP units (assuming the sale of the minimum 5,160,000 REIT Shares offered) and we may, in connection with our proposed acquisition of the Grand Mission Pipeline Project if the Second Closing is funded, issue additional REIT shares. Furthermore, in connection with the acquisition of other properties, we may issue additional OP units to third parties.  Such issuances would reduce our ownership percentage in our Operating Partnership and affect the amount of distributions made to us by our Operating Partnership and, therefore, the amount of distributions we can make to our shareholders. Because you will not directly own OP units, you will not have any voting rights with respect to any such issuances or other partnership level activities of our Operating Partnership.

**Risks Related to Taxation**

*Borderplex may fail to qualify as a REIT.*

Borderplex elected to qualify as a REIT for federal income tax purposes for its initial full taxable year of operation that ended December 31, 2007. To qualify for and maintain its REIT status, Borderplex must meet a number of highly technical requirements on a continuing basis. Those requirements seek to ensure, among other things, that the gross income and investments of a REIT are largely real estate related, that the REIT's ownership is not overly concentrated, and that a REIT distributes substantially all of its ordinary taxable income to shareholders on a current basis. Generally, if Borderplex fails to make a required distribution as a result of an adjustment to its tax return by the IRS, Borderplex may retroactively cure the failure by paying a "deficiency dividend," plus applicable penalties and interest, within a specified period. Due to the complex nature of these rules, the available guidance concerning the interpretation of the rules, the importance of ongoing factual determinations, and the possibility of adverse changes in the law, administrative interpretations of the law, and changes in Borderplex's business, there can be no assurance that Borderplex will qualify as a REIT for any particular year.

If Borderplex fails to qualify as a REIT, it will be taxed as a regular corporation, and distributions to its shareholders will not be deductible in computing Borderplex's taxable income. The resulting corporate income tax liabilities could materially reduce the distributable cash flow to shareholders or funds available for reinvestment. Further, Borderplex might not be able to elect to be treated as a REIT for the four taxable years after the year during which it ceased to qualify as a REIT. In addition, if Borderplex later requalified as a REIT, it might be required to pay a full corporate-level tax on any unrealized gain in its assets as of the date of requalification on a disposition of such assets and to make distributions to Borderplex shareholders in an amount equal to any earnings accumulated during the period of non-REIT status. In the absence of REIT status, distributions to shareholders would no longer be required.  See "Material United States Federal Income Tax Considerations."

*Annual distribution requirements limit Borderplex's ability to accumulate capital and may require that Borderplex borrow funds or sell properties on adverse terms in order to maintain its REIT status.*

Generally, to maintain its REIT status, Borderplex must annually distribute to its shareholders at least 90% of its ordinary taxable income, excluding net capital gains. This requirement limits Borderplex's ability to accumulate capital. Borderplex may not have sufficient cash or other liquid assets to meet these distribution requirements due to competing demands for funds or due to timing differences between tax reporting and cash receipts and disbursements because income may have to be reported before cash is received; because expenses may have to be paid before a deduction is allowed; or because deductions may be disallowed or limited. In these situations, Borderplex may be required to borrow funds or sell properties on adverse terms in order to meet the distribution requirements. If Borderplex fails to make a required distribution, it may cease to qualify as a REIT for U.S. federal income tax purposes. If Borderplex fails to make a required distribution as a result of an adjustment to its tax return by the IRS, Borderplex may retroactively cure the failure by paying a "deficiency dividend," plus applicable penalties and interest, within a specified period.

*Tax Rates Applicable to REIT Dividends could affect the desirability of investing in REITs for individual taxpayers.*

Presently, most dividends are taxed to an individual at a maximum rate of 20% plus a 3.8% Medicare tax imposed under Section 1411 of the Code.  The specific dividend rate applicable to an individual is based upon his or her tax bracket. However, dividends payable by REITs are not eligible for this treatment, except in limited circumstances.  Thus, REIT dividends received by an individual are usually taxed at the same, or potentially higher, rates as his or her ordinary income (up to 39.6% plus a 3.8% Medicare tax imposed under Section 1411 of the Code). Although the lower rates for dividends do not have a direct adverse effect on the taxation of REITs or dividends paid by REITs, the more favorable treatment for non-REIT dividends could cause individual investors to consider investments in non-REIT corporations as more attractive relative to an investment in a REIT such as Borderplex.

*U.S. federal income tax treatment of REITs and investments in REITs may change, which may cause Borderplex to lose the tax benefits of operating as a REIT.*

The present U.S. federal income tax treatment of a REIT and an investment in a REIT may be modified by legislative, judicial or administrative action at any time. Revisions in U.S. federal income tax laws and interpretations of these laws could adversely affect Borderplex and the tax consequences of an investment in the REIT Shares.

*Taxable REIT subsidiaries are subject to corporate-level tax, which may devalue REIT Shares relative to other companies.*

Taxable REIT subsidiaries are corporations subject to corporate-level tax. Borderplex does not presently own a taxable REIT subsidiary.  If Borderplex were to use a taxable REIT subsidiary in the future, such use might cause the market to value the REIT Shares (a) lower than the stock of other REITs which may not use taxable REIT subsidiaries; and (b) lower than the equity of mortgage pools taxable as non-publicly traded partnerships, which generally are not subject to any U.S. federal income taxation on their income and gain.

*Use of taxable REIT subsidiaries may have adverse U.S. federal income tax consequences.*

Borderplex must comply with various tests to qualify, and to continue to qualify, as a REIT for U.S. federal income tax purposes.  Its income from, and investments in, taxable REIT subsidiaries does not constitute permissible income and investments for purposes of some of the REIT qualification tests. While it will attempt to ensure that its dealings with its taxable REIT subsidiaries will not adversely affect its REIT qualification, Borderplex cannot assure you that it will successfully achieve that result. Furthermore, Borderplex may be subject to a 100% penalty tax, or its taxable REIT subsidiaries may be denied deductions, to the extent Borderplex's dealings with its taxable REIT subsidiaries are not deemed to be arm's length in nature.

1021263.13

24

***Borderplex may endanger its REIT status if the distributions it receives from its taxable REIT subsidiaries exceed applicable REIT gross income tests.***

The annual gross income tests that must be satisfied to ensure REIT qualification may limit the amount of dividends that Borderplex can receive from its taxable REIT subsidiaries and still maintain its REIT status. Generally, not more than 25% of Borderplex's gross income may be derived from non-real estate related sources, such as dividends from a taxable REIT subsidiary. If, for any taxable year, the dividends Borderplex receives from its taxable REIT subsidiaries, when added to its other items of non-real estate related income, represent more than 25% of its total gross income for the year, Borderplex could be denied REIT status, unless it was able to demonstrate, among other things, that its failure of the gross income test was due to reasonable cause and not willful neglect.

***A portion of our business is potentially subject to prohibited transactions tax.***

As a REIT, Borderplex will be subject to a 100% tax on it net income from "prohibited transactions." In general, prohibited transactions are sales or other dispositions of property to customers in the ordinary course of business. Thus, sales by Borderplex of property in the ordinary course of its business will generally constitute prohibited transactions. At this time, Borderplex does not intend to hold any of its properties for sale to customers in the ordinary course of its business.

1021263.13

## FORWARD-LOOKING STATEMENTS

This Private Placement Memorandum includes forward-looking statements. All statements other than statements of historical facts included in this Private Placement Memorandum, including, without limitation, statements regarding our future financial position, business strategy, budgets, projected costs and plans and objectives of management for future operations, are forward-looking statements. In addition, forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "expect," "intend," "forecasted," "projected," "estimate," "anticipate," "believe," or "continue" and similar words or phrases or the negative thereof or variations thereon or similar terminology. Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to be correct. In addition, the following factors could cause actual events or results to differ materially from any forward-looking statements:

- our ability to complete the pending transaction with Encore;
- the effects of monetary policy and other economic factors which are beyond our control;
- our ability to deploy the capital raised in this offering in the manner or within the time frame that we expect;
- our declaration or payment of distributions;
- the anticipated operating performance of our multi-family real estate assets;
- the lack of reliability of our historical operating results within the El Paso Market as an indication of our future performance in the Target Markets, or elsewhere;
- our ability to raise additional capital and/or obtain additional financing to execute our new multi-family strategy following the consummation of the transaction with Encore;
- difficulties and exposure to potential losses in connection with proposed acquisitions;
- conditions in the financial markets and economic conditions generally;
- weakness in the real estate markets where we do business and in other geographic regions in which we intend to pursue growth;
- our concentration of properties in the initial Target Markets and, generally, in the southwestern United States;
- our qualification as a REIT under the Code;
- the impact of adverse weather, natural disasters, acts of war or terrorism and other external events; and
- our reliance upon key personnel.

Other important factors that could cause actual results to differ materially from our expectations ("cautionary statements") are disclosed under "Risk Factors" and elsewhere in this Private Placement Memorandum, including, without limitation, in conjunction with the forward-looking statements included in this Private Placement Memorandum. All subsequent written and oral forward-looking statements attributable to us or any person acting on our behalf, are expressly qualified in their entirety by the cautionary statements. The foregoing review of important risk factors should not be construed as exhaustive and should be read in conjunction with other cautionary statements that are included herein. We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information, future events or otherwise.

1021263.13

## PRIVATE PLACEMENT AND NOTICE TO INVESTORS

**Private Placement**

We are seeking commitments for a minimum $39,990,000 of our REIT Shares, at a price of $7.75 per REIT Share. This offering is being offered exclusively to "accredited investors." This offering is conditioned on receiving minimum subscriptions for at least 5,160,000 REIT Shares, which will allow us to complete the Initial Closing of the Encore Transaction. See "The Company" – "Overview and New Multi-Family Strategy" – "Implementation of New Strategy" – "The Encore Transaction". Borderplex intends to offer and sell additional REIT Shares to fund the Second Closing for the Grand Mission Pipeline Project (approximately $7.1 million of REIT Shares) and we may elect to sell a greater number of REIT Shares, provided that the Board of Trustees has determined that the additional proceeds from the sale of additional REIT Shares can be invested in the implementation of Borderplex's business plan. Six of our seven non-employee Trustees have indicated an interest in purchasing, directly or through their controlled entities or affiliates, up to $1.0 million of our REIT Shares in this offering at the price of $7.75 per REIT Share. Because indications of interest are not binding agreements or commitments to purchase, these Trustees may elect to purchase a different amount of REIT Shares or not to purchase any REIT Shares in this offering.

The REIT Shares are being offered in 100 share increments, with a minimum investment of 13,000 shares ($100,750). However, Borderplex reserves the right, in its sole discretion, to accept subscriptions in lesser amounts. The consummation of the offering of REIT Shares is expected to occur on or before December 31, 2015. Unless extended by the Board of Trustees in its sole discretion, this offering will terminate no later than December 31, 2015. We may also terminate this offering at any time.

We will offer and sell REIT Shares only to ''accredited investors'' (as defined in Rule 501(a) under the Securities Act). This is a minimum requirement for investors, and being an accredited investor does not necessarily mean the REIT Shares are a suitable investment. As a condition to your purchase of the REIT Shares, you must deliver to us a completed and executed subscription agreement and investor questionnaire as well as a joinder to the Securityholders' Agreement, each of which will be delivered to you by Borderplex. Borderplex will instruct you as to the deadline for subscriptions. Your subscription agreement and investor questionnaire as well as a joinder to the Securityholders' Agreement must be delivered in the manner specified herein and therein.

In addition, certain states may establish suitability standards for shareholders resident in such states. In the case of sales to fiduciary accounts, the suitability standards must be met by the fiduciary account or by the person who directly or indirectly supplies the funds for the purchase of REIT Shares.

We may elect not to consummate the offering or to decline to accept your subscription, which we may do for any reason and at our sole discretion. If we accept your offer to purchase REIT Shares in whole or in part, we will so notify you in the manner set forth in your subscription agreement. Payment for your REIT Shares will be made as specified herein and in your subscription agreement. Any failure on your part to make the necessary payment will result in a cancellation of your subscription or in a delay in your receipt of the REIT Shares.

The REIT Shares have not been registered under the Securities Act or any state securities laws and may not be offered or sold except in transactions exempt from, or not subject to, the registration requirements of the Securities Act, or unless the REIT Shares are registered under the Securities Act. The REIT Shares will constitute "restricted securities" within the meaning of Rule 144 under the Securities Act. In addition, the REIT Shares are subject to restrictions on transfer pursuant to the Borderplex Declaration of Trust and Securityholders' Agreement. See "Summary – "The Offering" – "Borderplex Securityholders' Agreement", and "Description of Shares of Beneficial Interest—Restrictions on Ownership and Transfer", and "Transfer Restrictions."

No action has been taken by us in any jurisdiction, including the United States, that would permit the offering of the REIT Shares offered hereby in any jurisdiction where action for that purpose is required. The REIT Shares offered hereby may not be offered or sold, directly or indirectly, nor may this Private Placement Memorandum or any other offering material in connection with the offer and sale of the REIT Shares be distributed or published, in any jurisdiction, except in compliance with the laws of such jurisdiction. Persons into whose possession this Private Placement Memorandum comes are advised to inform themselves about and to observe any

restrictions relating to the offering of the REIT Shares and distribution of this Private Placement Memorandum. This Private Placement Memorandum does not constitute an offer to purchase or a solicitation of an offer to sell any of the REIT Shares offered by this Private Placement Memorandum in any jurisdiction in which such an offer or solicitation is unlawful.

Investment in the REIT Shares is inadvisable for investors who may not be able to hold their REIT Shares for an indefinite period.  There currently is no market for the REIT Shares and we can offer no assurance as to the development or liquidity of any market for the REIT Shares.

Each prospective investor should determine independently, upon consultation with such investor's investment, tax or other advisors, accountants and legal counsel, whether an investment in the REIT Shares is suitable in light of the investor's own circumstances.  We may, but will not be obligated to, make such further inquiry and obtain such additional information as we deem appropriate with regard to the suitability of prospective investors.

**Transfer Restrictions**

The REIT Shares being offered in this Private Placement Memorandum are subject to restrictions on resale and transfer and have not been registered under the Securities Act or the securities laws of any other jurisdiction and, accordingly, may not be resold or transferred except as permitted under the Securities Act and the applicable securities laws of any other jurisdiction.  Additionally, our Declaration of Trust and the Borderplex Securityholders' Agreement, with respect to which each purchaser of REIT Shares will be required to execute a joinder, contain restrictions on the transferability of the REIT Shares as described herein under "Summary – Borderplex Securityholders' Agreement" and "Description of Shares of Beneficial Interest – Restrictions on Ownership and Transfer."  You may be required to bear the financial risk of an investment in REIT Shares for an indefinite period of time.

Any certificates evidencing REIT Shares will bear a legend referring to the restrictions on transfer.  There is currently no secondary market for the REIT Shares.  A secondary market for REIT Shares may not develop or, if one does develop, may offer only limited liquidity and it may not continue.

## USE OF PROCEEDS

We estimate that the net proceeds to us from the sale of the minimum 5,160,000 REIT Shares in this offering will be approximately $39.6 million after deducting offering expenses payable by us, and additional net proceeds of approximately $7.1 million if we successfully sell approximately 920,000 REIT shares to fund the Second Closing in connection with the Grand Mission Pipeline Project.  We will contribute the net proceeds of this offering to our Operating Partnership in exchange for OPUs.  Our Operating Partnership intends to use the net proceeds from this offering to fund the Company's obligations under the Encore Contribution Agreement to provide the cash necessary to fund the completion of development and construction and meet lender requirements for financing of the four or five (if we successfully raise the $7.1M in additional proceeds) Pipeline Projects being contributed to our DownREIT by Encore under the Encore Contribution Agreement.  Any excess, which would be available only in the event that the Company elects in its sole discretion to sell a greater number of REIT Shares, will be used primarily for the acquisition and redevelopment of multi-family properties in the Company's Target Markets and for general trust purposes.  Pending use of the net proceeds, we intend to invest them in interest-bearing, short-term, marketable investment-grade securities or money market accounts which are consistent with our intention to elect and qualify as a REIT.  These investments may include, for example, government and government agency securities, certificates of deposit, interest-bearing bank deposits and mortgage loan participations.  These temporary investments are expected to provide a lower net return than we expect to achieve from our targeted investments.

Management believes that the cash flow from existing operations, combined with the Company's existing line of credit, will be sufficient to satisfy any capital needs of the Existing Portfolio, including planned and unplanned capital investments and tenant improvement allowances.  See "The Company" and "Description of Real Estate."

We expect that the net proceeds from this offering (assuming the sale of all 5,160,000 REIT Shares offered) will enable us to consummate the Initial Closing of the Encore Transaction and fund the development of the initial four Pipeline Projects being contributed by Encore to our DownREIT.  The Company anticipates that the Pipeline Projects, located in four of our initial Target Markets, together with the San Isidro Apartments in Santa Fe and the planned 100-unit expansion thereof, will begin to establish a meaningful operating presence in five of our eight initial Target Markets.  Management believes that establishing a meaningful operating presence in a given market positively contributes over time to the Company's ability to (i) acquire new assets, including by off-market transactions; (ii) establish strategic relationships with qualified third-party service providers (*e.g.*, property management companies); (iii) recruit and retain management talent; and (iv) begin to establish an operating brand targeted at renters in our Target Markets.

No investment bankers or placement agencies have been engaged by Borderplex for the purpose of raising capital in the course of this offering.

1021263.13

## DISTRIBUTIONS AND DISTRIBUTION POLICY

**Distribution Policy of Borderplex**

*Dividends*

Historically, we have calculated annual dividends at .30¢ per share, paid semi-annually.  Following the completion of this offering, we intend to make regular semi-annual distributions to holders of our common shares.  U.S. federal income tax law generally requires that a REIT distribute annually at least 90% of its taxable income (which does not equal net income as calculated in accordance with GAAP), determined without regard to the deduction for dividends paid and excluding net capital gains, and that it pay tax at regular corporate rates to the extent that it annually distributes less than 100% of its REIT taxable income.  We generally intend over time to pay quarterly or semi-annual distributions in an amount at least equal to our taxable income.  The timing and amount of distributions to our shareholders are determined by our Board of Trustees and are dependent on various factors, including funds available for distribution, financial condition, capital expenditure requirements and annual distribution requirements needed to qualify and maintain our status as a REIT under the Code.  See "Material United States Federal Income Tax Considerations."   The Board of Trustees intends to review the adequacy of our distribution rate on a regular basis.

The table below presents our dividend history for the past three fiscal years and portion of the current year through the date of this Private Placement Memorandum.

(in thousands, except per share data)

|  | 2012 | | 2013 | | 2014 | | 2015 |
|---|---|---|---|---|---|---|---|
|  | May 31 | November 30 | May 31 | November 30 | May 31 | November 30 | May 31 |
| Paid in Capital | $ 28,548 | $     28,548 | $ 28,548 | $     28,548 | $ 28,548 | $    28,585 | $ 28,585 |
| % of Paid in Capital | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% |
| Dividends | $     428 | $         428 | $     428 | $         428 | $     428 | $       429 | $     429 |
| Average Shares Outstanding | 2,855 | 2,855 | 2,855 | 2,855 | 2,855 | 2,859 | 2,859 |
| Dividend Per Share | $   0.15 | $       0.15 | $   0.15 | $       0.15 | $   0.15 | $     0.15 | $   0.15 |

*Future Dividends*

Future distributions will be affected by a number of factors, including:

- the general condition of the United States economy;

- timely completion of development and construction, general leasing activity, and rental rates in the markets where our DownREIT Pipeline Projects are located;

- general leasing activity and rental rates in the El Paso Market, and our Target Markets with respect to new projects;

- our ability to acquire, lease-up and efficiently operate new projects in our Target Markets;

- the ability of tenants to meet their rent obligations;

- our operating and interest expenses;

- consumer preferences relating to office and retail real estate in the El Paso Market, and multi-family residential properties in our initial Target Markets;

- cash flows from unconsolidated entities owned or acquired by Borderplex, if any;

1021263.13

- the level of our property acquisitions and dispositions;

- applicable law;

- federal, state, and local taxes payable by us;

- the adequacy of our cash reserves; and

- other factors that our Board of Trustees may deem relevant from time to time.

Distributions generally will be taxable to our shareholders as ordinary income; however, because a significant portion of our investments will be comprised of equity interests in our properties, which will generate depreciation and other non-cash charges against our income, a portion of our distributions may constitute a return of capital for federal income tax purposes.  To the extent that, in respect of any calendar year, cash available for distribution is less than our taxable income, we could be required to sell assets or borrow funds to make cash distributions or to make a portion of the required distribution in the form of a taxable distribution of our shares or a distribution of debt securities.  In addition, while we have no intention to do so, prior to the time we have fully invested the net proceeds of this offering, we may fund our semi-annual distributions out of the net proceeds of this offering.  The use of our net proceeds for distributions could adversely impact our financial results.  Furthermore, funding our distributions from our net proceeds will likely constitute a return of capital to our investors for federal income tax purposes, which would have the effect of reducing each shareholder's adjusted tax basis in its common shares.  Income as computed for purposes of the tax rules described above will not necessarily correspond to our income as determined for financial reporting purposes.  We do not currently intend to make taxable distributions of our shares or of debt securities.

## CAPITALIZATION

The following table sets forth our capitalization as of September 30, 2015 on an actual basis and adjusted to give effect to the completion of the minimum  offering at a price of $7.75 per REIT Share (assuming $39,690,000 in net proceeds of this offering).

(amounts in thousands)

| | As of September 30, 2015 | | | |
| --- | --- | --- | --- | --- |
| | 9/30/2015 | | Pro Forma | |
| **Mortgage Notes** | $ | 42,681 | $ | 42,681 |
| | | | | |
| **Stockholders' Equity** | | | | |
| Common Shares (par value $0.01 per share) 250,000,000 shares authorized: 2,858,507 and 8,018,507 Shares issued and outstanding | | 30 | | 82 |
| Additional Paid in Capital | | 28,144 | | 67,783 |
| Accumulated Other Comprehensive Income (Loss) | | (2,298) | | (2,298) |
| Retained earnings (deficit) | | (5,550) | | (5,550) |
| **Total shareholder's equity before non-controlling interest** | $ | 20,326 | $ | 60,017 |
| Add non-controlling interest | | 16,848 | | 16,848 |
| Total Capitalization | $ | 79,855 | $ | 119,546 |

1021263.13

## SELECTED CONSOLIDATED FINANCIAL DATA

The following sets forth selected consolidated financial and operating information on an historical basis. The selected historical financial data is as of December 31, 2012 2013, 2014 and for the nine months ended September 30, 2015.  The selected historical financial data for the full years  indicated has been derived from our audited financial statements, and the selected summary historical financial data as of September 30, 2015 has been derived from our unaudited financial statements.  Both audited and unaudited financial statements are included elsewhere in this Private Placement Memorandum.  You should read the following selected historical financial and operating data together with "Management Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and notes thereto included elsewhere in this Private Placement Memorandum.

**Summary Balance Sheet (in thousands)**

| | December 31 | | | As of September 30, 2015 | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | | |
| Total Assets | $47,405 | $46,556 | $47,774 | $    82,393 | [1] |
| Total Liabilities | 19,104 | 18,805 | 23,402 [2] | 45,219 | [3] |
| Total Equity | 28,301 | 27,751 | 24,372 | 37,174 | |

1. Assets increased due to Main Strategic Investments Transaction and acquisition of San Isidro Apartments along with expansion land.
2. Liabilities increased due to refinancing of Wells Fargo Tower with starting principal of $11,770,000.
3. Liabilities increased due to refinancing of Chase Tower with starting principal of $10,000,000 and addition of the San Isidro note for $16,430,800.

**Real Estate Assets (in thousands)**

| | December 31 | | | As of September 30, 2015 | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | | |
| Office | $28,195 | $28,778 | $27,179 | $    30,143 | |
| Retail | 15,417 | 14,051 | 11,800 | 11,558 | |
| Multifamily | - | - | - | 19,733 | [1] |
| Land | 803 | 2,130 | 2,159 | 3,411 | [2] |
| Total | $44,415 | $44,960 | $41,138 | $    64,846 | |

1. Acquired San Isidro Apartments in April 2015.
2. Acquired expansion land along with San Isidro Apartments.

**Results from Property Operations (in thousands)**

| | December 31 | | | For Nine Months Ended September 30, 2015 |
|---|---|---|---|---|
| | 2012 | 2013 | 2014 | |
| Operating Revenues | $ 9,434 | $ 9,322 | $ 9,195 | $ 7,919 |
| Operating Expenses | (6,057) | (5,943) | (5,697) | (4,537) |
| Net operating Income | $ 3,377 | $ 3,379 | $ 3,498 | $ 3,382 |
| Corporate Expenses [1] | (84) | (406) | (725) | (839) |
| Acquisition Costs | (62) | (9) | (26) | (238) |
| Interest Income | 3 | 1 | 10 | 13 |
| Interest Expense | (1,134) | (1,111) | (1,136) | (1,009) |
| Loan Fees [2] | (25) | (30) | (1,532) | (1,287) |
| Depreciation and Amortizations | (1,445) | (1,487) | (1,440) | (1,343) |
| Non-Operating Revenues (Expenses) [3] | 77 | 21 | 262 | (142) |
| Net Income (Loss) | $ 707 | $ 359 | $ (1,090) | $ (1,463) |

1. Corporate expenses increase due to staffing, legal, and consulting costs associated with new strategic initiatives.
2. Loan fees for 2014 and 2015 contain costs associated with refinancing of the Chase Tower and Wells Fargo Plaza notes payable.
3. Includes net revenues from insurance proceeds and sale of assets.

**Revenues by Property (in thousands)**

| | December 31 | | | For Nine Months Ended September 30, 2015 |
|---|---|---|---|---|
| | 2012 | 2013 | 2014 | |
| **Operating Revenues** | | | | |
| Chase Tower | $ 4,065 | $ 4,145 | $ 4,086 | $ 3,186 |
| Wells Fargo Plaza | 3,907 | 3,871 | 3,911 | 3,038 |
| Bassett Tower | 28 | 29 | (5) | |
| Retail | 1,434 | 1,276 | 1,204 | 769 |
| San Isidro | - | - | - | 914 |
| Land | - | - | - | 12 |
| **Total Operating Revenues** | $ 9,434 | $ 9,322 | $ 9,195 | $ 7,919 |
| Non-operating Revenues | $ 77 | $ 21 | $ 262 | |
| **Total Revenues** | $ 9,511 | $ 9,343 | $ 9,457 | $ 7,919 |

## THE COMPANY

### Overview and New Multi-Family Strategy

*Overview.*  Borderplex Realty Trust (formerly known as Borderplex Community Trust) is a Maryland real estate investment trust organized under Title 8.  Since its commencement of operations in the first quarter of 2007, the Company has been a self-administered and self-managed REIT with the strategic objective of acquiring income-producing properties in downtown El Paso, Texas, and capitalizing on expected growth in El Paso, Texas (the *"El Paso Market"*).  The Company was formed with the explicit purpose of being a catalyst for leading-edge and community-changing redevelopment in the El Paso Market, which it has done.  To that end, the Company has owned, managed, acquired and repositioned office and retail properties, and acquired and sold land for new development, in the El Paso Market.  See "Company Background and Existing Structure" - "Existing Portfolio" below.

*New Multi-Family Strategy.*  Using its existing platform and growing management resources and experience, the Company intends to redirect its focus, initially to eight major metropolitan areas within Arizona, Colorado, New Mexico and Texas, and more directly take advantage of growth within that region, by explicitly serving the rental housing needs of rapidly growing, historically underserved population segments within these markets, many of which have high concentrations of Hispanic residents.  The Company intends to acquire multi-family properties in heavily Hispanic submarkets of eight large apartment markets in the southwestern United States – *i.e.*, Austin, Dallas-Fort Worth, Denver, El Paso, Houston, Phoenix, San Antonio, and Santa Fe – which we refer to in this Private Placement Memorandum as our initial "Target Markets".

As more fully described below, the Company has begun the implementation of the new strategy in two initial phases.  The first phase was accomplished with the acquisition of the San Isidro Apartments in Santa Fe, New Mexico in April of 2015.  The second phase will be accomplished through the acquisition and eventual merger into the Company of the multi-family development operations of Encore Enterprises, Inc., as more fully described below.  Having established an initial market position with the acquisition of the San Isidro Apartments and the consummation of the joint venture with Encore through the formation of the DownREIT, the third phase will consist of (i) the acquisition of existing multi-family projects directly into our Operating Partnership, and (ii) development of new multi-family projects in our DownREIT.

### Implementation of New Strategy

*Overview.*  The United States, and the southwestern United States especially, is experiencing important changes in terms of overall demographic composition.  In particular, growth in the Hispanic population is far outpacing overall population growth, the result of which is that Hispanics are predicted to represent one in three persons in the U.S. by the year 2050.  In the United States, the Hispanic population is growing at a fast pace -- 167%, over 30 years, compared to 42% for the U.S. population as a whole.  This changing demographic composition has important implications for housing and, in particular, rental housing.

Currently, more than half of all Hispanics are renters—and this percentage is expected to grow due to increased restrictions on lending.  The Company intends to acquire multi-family properties in eight large apartment markets within the southwestern United States – *i.e.*, Austin, Dallas-Fort Worth, Denver, El Paso, Houston, Phoenix, San Antonio and Santa Fe.  Borderplex intends to acquire higher-yielding assets by focusing on historically underserved demographic and rapidly growing submarkets of our initial Target Markets, which have been historically underserved by institutional capital.

### Phase I – San Isidro Apartments

Phase I of the implementation of the Company's new multi-family strategy was effected in April 2015 when the Company acquired the 176 unit San Isidro Apartments in Santa Fe, New Mexico.  The San Isidro project was acquired at a total acquisition cost of $20,005,800.  The Company assumed a $16,430,800 loan balance on a 3.2% fixed rate HUD-insured loan, with a remaining term of 38 years and 10 months as of the date of assumption. $2,499,995 of the $3,575,000 balance due to the owner, San Isidro Apartments, LLC, an affiliate of current Borderplex Trustee Jeffrey Perea-Branch, was paid by the issuance by our Operating Partnership of 322,580

1021263.13

Operating Partnership Units, each OPU convertible into one of the Company's common shares of beneficial interest, and valued at $7.75 per OPU, which is the same as the offering price of the REIT Shares set forth on the cover page on this Private Placement Memorandum.  The balance ($1,075,005) was paid in cash.

Concurrently with the purchase, the Company purchased an adjoining approximately 3.87 acre expansion site for $1,250,000.  The expansion site has all approvals and entitlements in place for construction of up to 100 additional units.  It is the Company's intent to begin development on the expansion site of approximately 100 additional units to be included as part of the San Isidro Apartments on or before August 2016.

Financial Highlights of the San Isidro Apartments acquisition are set forth below.

Santa Fe/San Isidro

| | |
|---|---|
| Apartment Units | 176 |
| Acquisition Price (April, 2015) | $20,005,800 |
| Assumed Debt | $16,430,800 |
| Contributor/Seller Equity | $3,575,000[1] |
| Price / Unit | $113,669 |
| Occupancy (Sept 30, 2015) | 95% |
| | |
| Capital/Tenant Improvements | $0 |
| Less Depreciation | ($272,690) |
| Adjusted Cost Basis | $19,733,000 |
| Adjusted Cost / Unit | $112,119 |

|  2015 Forecast (Annualized) | |
|---|---|
| Revenues | $2,200,000 |
| Expenses | ($480,000) |
| NOI | $1,720,000 |
| | |
| Return on Investment | 8.37% |

[1]Approximately 70% of the acquisition price in excess of the assumed debt was paid in Operating Partnership Units.

### Phase II - The Encore Transaction

*Who is Encore Enterprises?*

Encore Enterprises, Inc. (*"Encore"*) is a diversified real estate investment company headquartered in Dallas, Texas with over 500 corporate and project-level employees.  Encore develops and acquires multi-family apartment home communities, mixed use complexes, limited and full service hotels, retail shopping centers, commercial office buildings, restaurants and raw land.  Since Encore's formation in 1999, it has completed over $1.6 billion in real estate acquisition and development transactions.  Encore's business activities are conducted through eight (8) subsidiaries, including Encore Multifamily, LLC, which is responsible for all of Encore's multi-family development activities.

*Acquisition of Encore's Multi-family Platform and Pipeline Projects*

The acquisition of the multi-family development operations of Encore Multifamily, LLC (*"Encore Transaction"*) will be effected through the formation of a Delaware limited liability company to be known as "Encore Borderplex Multi-Family, LLC" which will be owned by our Operating Partnership and a wholly-owned Encore entity as the sole members (the *"DownREIT"*).  Encore will contribute up to five current multi-family development pipeline projects (the *"Pipeline Projects"*) to the DownREIT and our Operating Partnership will contribute cash.  Following such contribution, the development and construction of the Pipeline Projects will be completed within the DownREIT.  The five Pipeline Projects contributed by Encore have a total cost of approximately $234.4M, and will

require total equity of approximately $67.11M, $47.12M of which will consist of cash contributed by our Operating Partnership, and $19.99M of which will be Encore's contributed equity in the Pipeline Projects.  The average cash return on investment in the Pipeline Projects at stabilization is 9.21%.  The five Pipeline Projects are as follows.

| Property | Location | Total Cost[1] (in thousands) | Units | Est. Start Date | Est. Completion |
|----------|----------|------------------------------|-------|-----------------|-----------------|
| Sendero Ranch | San Antonio | $ 33,055 | 228 | 9/14 | 1/16 |
| Evans Station | Denver | $ 49,652 | 224 | 4/16 | 2/18 |
| Swiss Avenue | Dallas | $ 45,508 | 253 | 6/16 | 4/18 |
| River Walk | San Antonio | $ 72,165 | 338 | 7/16 | 7/18 |
| Grand Mission[2] | Katy | $ 34,060 | 240 | 7/15 | 12/16 |

[1] Total Costs includes operating deficit.
[2] Anticipated to be acquired in a second closing on or before March 31, 2016.

The value of the Pipeline Projects contributed by Encore shall equal Encore's "equity" in each Pipeline Project, based upon the projected stabilized fair market value of each Pipeline Project.  While the Pipeline Projects will be contributed by Encore at the agreed stabilized fair market value of each Pipeline Project, the Company believes that this agreed contribution value is still less than the market value of the five Pipeline Projects upon stabilization.  Our Operating Partnership's contribution of cash to the DownREIT of $39.72M is sufficient to fund the completion of development and construction and meet lender equity requirements for financing the initial four Pipeline Projects.  Financings of the Grand Mission Pipeline Project will require from us a cash contribution of approximately $7.1 million to the DownREIT. The projected closing dates, total costs (including operating deficit reserves) amount of cash to be contributed by our Operating Partnership, dollar value of membership units to be issued to Encore and our Operating Partnership evidencing the membership interests in the DownREIT ("*DownREIT Units*") in exchange for their respective contributions, and anticipated debt financing of each Pipeline Project, is as follows:

| | | Equity (in thousands) | | |
|---|---|---|---|---|

| Property | Total Cost (including Operating Deficit)[1] | Borderplex Units/Cash | Encore Units (in Dollars) | Debt[2] (in thousands) | Operating Partnership Return Upon Stabilization |
|----------|---------------------------------------------|-----------------------|---------------------------|------------------------|--------------------------------------------------|
| Sendero Ranch | $ 33,055 | $ 11,444 | $ 0 | $ 21,610[3] | 8.10% |
| Evans Station | $ 49,652 | $ 7,374 | $ 6,560 | $ 35,718 | 9.5% |
| Swiss Avenue | $ 45,508 | $ 7,194 | $ 5,028 | $ 33,286 | 9.7% |
| River Walk | $ 72,165 | $ 9,993 | $ 8,411 | $ 53,762 | 9.22% |
| Grand Mission | $ 34,060 | $ 11,110 | $ 0 | $ 22,950[4] | 9.5%[5] |
| Total | $234,440 | $ 47,115 | $ 19,999 | $ 167,326 | 9.21%[5] |

[1] HUD deposits of approximately $12 million are included in equity amount.
[2] HUD financing is anticipated for all five Pipeline Projects.
[3] 3.94% HUD financing in place; first units should be delivered in fall of 2015.
[4] 3.4% HUD financing in place.
[5] Weighted average return on all five Pipeline Projects.

While Encore is currently under construction on the Sendero Ranch and Grand Mission projects, and has received favorable preliminary responses from the Department of Housing and Urban Development ("*HUD*") with respect to HUD financing on the Evans Station, River Walk, and Swiss Avenue projects, the contribution agreement to be executed between our Operating Partnership and Encore, pursuant to which the parties will form and capitalize the DownREIT ("*Encore Contribution Agreement*"), allows Borderplex to reject a Pipeline Project if the terms of the permanent financing actually obtained vary materially from our underwriting assumptions as set forth in the Encore Contribution Agreement.  If the permanent financing actually obtained does vary materially from our underwriting assumptions as set forth in the Contribution Agreement, then Encore can either reduce its DownREIT Units in an amount sufficient to allow us to obtain our anticipated yield on that particular Pipeline Project, or withdraw the non-

conforming Pipeline Project for which the requisite financing is not obtained and offer a substitute project. Any substitute projects would require the Company's consent to the substitution and would have to meet specified underwriting conditions that would ensure equivalency with the underwriting assumptions for the original Pipeline Project being replaced. Under the Encore Contribution Agreement, Encore guarantees the DownREIT and the Company that the actual acquisition, development and construction costs for each of the Pipeline Projects (*"ADC Cost"*) will not exceed the ADC Costs contained in the underwriting assumptions attached to the Encore Contribution Agreement. The Encore Contribution Agreement allows Encore to offset ADC Cost overruns on a particular Pipeline Project against ADC Cost savings on other Pipeline Projects. Additionally, any actual ADC Cost overruns for which Encore is responsible can be offset to a limited extent if the ultimate, actual stabilized yield on the Pipeline Projects as a whole exceeds the underwriting assumptions set forth in the Encore Contribution Agreement. While the Company is obligated to provide the cash (up to $5.0 M) to pay for actual ADC Cost overruns on an ongoing basis as they are incurred, the Encore Contribution Agreement requires an ultimate accounting of the final ADC Cost overruns or ADC Cost savings among the entire portfolio of Pipeline Projects, and if there is an ADC Cost overrun, Encore is ultimately responsible, and must contribute to the DownREIT additional cash in the amount of the aggregate ADC Cost overrun, or have its DownREIT Units reduced by such amount.

*Initial Closing/Merger Effective Date*

We anticipate the first closing under the Encore Contribution Agreement (*"Initial* Closing") will occur in late December 2015 or January 2016, depending upon when HUD approval for the assumption by the DownREIT of the HUD loan on Sendero Ranch Pipeline Project can be obtained. At the Initial Closing, the DownREIT will be organized and begin operations (the *"Merger Effective Date"*), such operations to consist, initially, of the completion of construction of the Sendero Ranch project, which is the Pipeline Project that is furthest along in the development and construction process. We anticipate that the Evans Station, Swiss Avenue and River Walk Pipeline Projects will be transferred by Encore to the DownREIT either at the Initial Closing, at the same time that the Sendero Ranch Pipeline Project is acquired by the DownREIT, or as soon thereafter as requisite lender or third-party consents can be obtained and/or the required HUD insured financing put in place with respect to the Evans Station, River Walk and Swiss Avenue Pipeline Projects, but it is possible that some or all of the closings on the Evans Station, River Walk and Swiss Avenue Pipeline Projects could come first. The closing on the Grand Mission Pipeline Project will occur on or before March 31, 2016, subject to approval for the assumption by the DownREIT of the HUD loan on the Grand Mission Pipeline Project, and our successfully raising the additional $7.1M in additional funds from this offering. See "Private Placement and Notice to Investors".

*Valuation of DownREIT Units*

The value of the DownREIT Units to be issued in connection with the initial contributions of the Pipeline Projects by Encore and the cash contributions by our Operating Partnership is $7.75 per DownREIT Unit, which is the same as the offering price of the REIT Shares set forth on the cover page of this Private Placement Memorandum. The DownREIT Units and the pricing of the REIT Shares is equivalent because each of the DownREIT Units is convertible into one Operating Partnership Unit, subject to dilution and anti-dilution adjustments.

*Governance*

The DownREIT will be managed by a five person board of managers (*"Board of Managers"*) consisting of two managers appointed by Encore and three managers appointed by our Operating Partnership. All decisions of the Board of Managers for matters other than "Major Decisions" require the affirmative vote or consent of at least three managers. Major Decisions require a unanimous vote of the Board of Managers. As more fully set forth in the Operating Agreement of the DownREIT, which will be provided upon request (*"DownREIT Operating Agreement"*), Major Decisions generally include material contracts and commitments of the DownREIT, material changes in the management of the DownREIT, approval of waivers of various provisions of the DownREIT Operating Agreement, extraordinary decisions involving the sale of all or substantially all of the assets of the DownREIT, and the merger or consolidation of the DownREIT with or into another entity.

*Operations*

1021263.13

Under the Encore Contribution Agreement, the Encore multi-family development team, a six person team with substantial prior experience in multi-family development, construction, financing and asset management, will transfer to the DownREIT and become direct employees of the DownREIT on the Merger Effective Date, which is the Initial Closing under the Encore Contribution Agreement.  This team will operate under the direction of Borderplex Trustee and Chief Investment Officer, James C. Potts.  For a more detailed description of the senior members of the multi-family team that will transfer to the DownREIT as part of the acquisition by the DownREIT of Encore's multi-family development platform, See *"Management of Borderplex".*

*DownREIT Overhead*

The estimated annual operating cost of the multi-family platform to be acquired from Encore by the DownREIT is approximately $2,720,000 per annum (including the six Encore staff members that will transfer at the Initial Closing).  Beginning on the Merger Effective Date, our Operating Partnership will fund such operating expenses, up to $500,000 annually, through December 31, 2016.  All such operating expenses in excess thereof shall be funded by Encore, on an ongoing basis, through December 31, 2016.  The portion of such operating expenses funded by Encore shall, at Encore's election, be reimbursed by the DownREIT to Encore (i) from first available cash flow from the operations of the DownREIT, or (ii) by the issuance of DownREIT Units at the $7.75 initial issuance price (*"Initial Unit Price"*), or a combination of cash and DownREIT Units, at Encore's election.  From and after December 31, 2016, Encore's obligation to fund platform expenses shall cease, and such expenses shall thereafter be funded by the DownREIT.  Pursuant to the DownREIT Operating Agreement, if the DownREIT does not have sufficient cash flow to pay such expenses, our Operating Partnership is obligated to fund the deficit, as well as other expenses of the DownREIT approved by the Board of Managers, through additional cash contributions by our Operating Partnership to the DownREIT.  All cash contributions by our Operating Partnership to the DownREIT in excess of the initial contributions will be made in exchange for DownREIT Units issued at the *"Adjusted Unit Price"*, which is equal to the per share price determined by the Board of Trustees of the Company in the most recent arms-length private or public issuance of our shares of beneficial interest, or the price for Operating Partnership Units received by our Operating Partnership in its most recent arms-length private issuance of OPUs.

*Separate Activities of Borderplex and Encore*

It is contemplated that all multi-family development activities of both Encore and the Company will be conducted within the DownREIT.  If Encore wishes to undertake any multi-family development activities that are not approved by the Board of Managers of the DownREIT, however, which is possible if such projects do not meet the Company's or the DownREIT's investment objectives and/or asset characteristics, then Encore would be free to undertake development of a multi-family project outside of the DownREIT, provided that the development opportunity has first been presented by Encore to the DownREIT.  Our Operating Partnership contemplates that it will continue to acquire fully developed multi-family projects directly in our Operating Partnership, even though it may rely upon Encore to provide various services with respect to such acquisitions, including services with respect to identifying and underwriting such fully developed projects, in which case our Operating Partnership would pay Encore an acquisition fee as described below.

*Fees*

The transfer of the Encore multi-family development platform and development team is a valuable asset of the DownREIT, duplication of which would entail substantial time and expense if our Company were to build such a platform from scratch.  In exchange for the transfer to the DownREIT of this valuable development platform, under the Encore Contribution Agreement, Encore is entitled to various fees for new development projects undertaken by the DownREIT other than the Pipeline Projects (*"New Projects"*).  Those fees are as follows:

(a)     Development Fee.  The DownREIT will pay a development fee in the amount of 4% of the total hard and soft costs of each New Project undertaken by the DownREIT, subject to a cap, in the aggregate, of $10,000,000 for all development fees payable to Encore.  Encore may elect to receive this fee in cash or DownREIT Units valued at the Adjusted Unit Price on the date of election, with the election to be made when such fees are actually payable.

1021263.13

(b)      Construction Management Fee.  The DownREIT will pay a construction management fee in the amount of 1% of the total hard costs of constructing each New Project.  This fee is paid to the Encore affiliate that provides construction management services for all of Encore's operations.  Encore may elect to receive this fee in cash or DownREIT Units valued at the Adjusted Unit Price on the date of election, with the election to be made when such fees are actually payable.

(c)      Acquisition Fee.  In exchange for underwriting and other acquisition services provided by various Encore entities to our Operating Partnership, our Operating Partnership will pay to one or more Encore entities designated by Encore an acquisition fee in the amount of .25% of the total cost of each new multi-family project acquired by our Operating Partnership after the Merger Effective Date and prior to the date that Encore converts all of its DownREIT Units into Operating Partnership Units, as described below.  The acquisition fee is payable only in DownREIT Units, issued at the Adjusted Unit Price on the date of payment.

(d)      Performance Incentive Fee.  On the Outside Conversion Date, as described below, Encore shall be entitled to a performance incentive fee calculated as follows (*"Performance Incentive Fee"*):  with respect to all projects owned by the DownREIT that have been developed by the DownREIT, including, without limitation, the Pipeline Projects initially contributed by Encore (*"DownREIT Development Projects"*), the DownREIT will first calculate a 7% cumulative preferred return to each of our Operating Partnership and Encore on invested capital in the DownREIT.  Encore and our Operating Partnership shall then (i.e. after payment of the 7% cumulative preferred return) share equally the Net Appreciation in each DownREIT Development Project as of the Outside Conversion Date.  *"Net Appreciation"* shall mean the stabilized fair market value of each DownREIT Development Project owned by the DownREIT as of the Outside Conversion Date in excess of the DownREIT's cost basis in each such DownREIT Development Project.  The equal sharing of the Net Appreciation in excess of the 7% cumulative preferred return shall be paid to Encore and our Operating Partnership in DownREIT Units valued at the Adjusted Unit Price.  An example of the methodology for calculating the Performance Incentive Fee is set forth in the DownREIT Operating Agreement, a copy of which will be provided upon request.

(e)      Asset Management Fee.  Our Operating Partnership will pay the DownREIT an annual asset management fee equal to 1% of the cost of each new multi-family project acquired directly by our Operating Partnership, for services rendered by the DownREIT in managing such acquired assets.

*Conversion of DownREIT Units into OPUs*

As more fully set forth in the DownREIT Operating Agreement, a copy of which will be provided upon request, at any time from and after the first anniversary of the Merger Effective Date, Encore shall have the right to convert each DownREIT Unit held by Encore into an equal number of OPUs.  Encore may exercise its conversion right from time to time without limitation as to frequency, with respect to part or all of the DownREIT Units that it holds, as selected by Encore, provided that Encore may not exercise such conversion right for less than one thousand (1,000) Units, unless it holds less than one thousand (1,000) Units, in which case it must elect to exercise the conversion rights with respect to all DownREIT Units it holds.  Subject to certain limitations on the exercise of the conversion right as described in the DownREIT Operating Agreement, on the Outside Conversion Date, any remaining DownREIT Units held by Encore that have not been converted into OPUs shall automatically be converted to OPUs.  At that time, as the holder of all outstanding DownREIT Units, the Operating Partnership would merge the DownREIT into our Operating Partnership and the multi-family development platform, activities and assets in the DownREIT will be combined with all other assets owned by our Operating Partnership.  The *"Outside Conversion Date"* is the earlier of (i) five years from the Merger Effective Date, (ii) the date on which the Company completes an initial public offering with respect to its common shares of beneficial interest, or (iii) the date on which Encore has voluntarily elected to convert all of its DownREIT Units into OPUs pursuant to the terms of the DownREIT Operating Agreement.

**Target Markets**

Research is a key part of our long-term strategy to ensure market and submarket selection that is fully aligned with our investment goals. Borderplex employs a sophisticated research system to track and constantly evaluate the changes in apartment performance by examining trends in more than 21,000 properties in markets across the United States with information on asking and effective rents, concessions and transactions, along with key economic performance variables.

As of mid-2014, there were approximately 55.4 million Hispanics residing in the United States, representing approximately 17.4% of the nation's population.  Eight states have a population of one million or more Hispanic residents, including Arizona, Colorado and Texas, with Texas alone having over 10 million. Nationwide, the Hispanic population increased by 1.2 million persons year over year, representing approximately one half of total U.S. population growth. By 2060, the U.S. Hispanic population is projected to have grown to 119 million. This rapidly expanding population segment will drive demand for rental housing.  Borderplex sees this as an opportunity:

- Approximately 36% of Hispanic households with incomes under $50,000 own their homes, compared to 51% of the general population. At income levels above $50,000, a reported 67% of Hispanic households are homeowners, compared to 81% of the population overall.  Combined with the prospect that many Hispanic households will be newly immigrated with limited support networks, financial resources or access to adequate credit, rental housing should continue to be a primary source for housing for Hispanic households.

- With 38% of Hispanics between the ages of 18 and 34, and 32% between the ages of 35 and 49, the Hispanic demographic is heavily weighted toward age cohorts that make up the U.S. renter base.  The Hispanic rental population continues to grow vs. U.S. population.

The selection of our initial Target Markets is predicated on the identification of markets with (i) a metro population size sufficient to ensure the potential for liquidity and rational pricing within the market; (ii) rapidly growing demographics and/or submarkets, and (iii) demonstrated potential for economic growth and increased rental demand.  Our initial Target Markets include Austin, Dallas-Ft. Worth, Denver, El Paso, Houston, Phoenix, San Antonio and Santa Fe.

**Diagram A: Target Markets**



1021263.13

*Austin, TX*

Considered to be one of the most desirable places to live in Texas, the metropolitan area is home to major defense contractors, universities and corporations. Austin has shown a continuous trajectory of growth and investment and is expected by some economists to grow as quickly as Dallas. Because of construction and services jobs associated with this growth, the market has been popular with Hispanic households.

- City population: 885,400
- Population growth 2010-2014: 12.5%
- Metro population: 1,950,100
- 31% Hispanic
- 3.5% unemployment
- 4.4% high-tech employment
- Ranked 21 on Forbes list of Best Places for Business and Careers 2015
- Largest employers include the Austin Independent School District, the City of Austin, Dell, the U.S. Federal Government, Freescale Semiconductor (spun off from Motorola in 2004), IBM, St. David's Healthcare Partnership, Seton Family of Hospitals, the State of Texas, and the University of Texas at Austin

*Dallas-Fort Worth, TX*

The Dallas-Fort Worth metropolitan area is anticipated to double in size over the next 25 years. The considerable level of economic activity, including retail, hospitality and construction along with professional and business services, has fostered a high employment environment for Hispanic residents. Temperate weather in the area results in greater employment stability throughout the year. Dallas-Fort Worth continues to be the region's leader in population and employment diversity, with an emphasis on trade and transportation and light manufacturing and assembly. The area is also home to many large services companies, major headquarters and subsidiary locations.

- City population: 1,281,047
- Population growth 2010-2014: 7.0%
- Metro population: 4,615,200
- 27% Hispanic
- 4.1% unemployment
- Ranked 15 on Forbes list of Best Places for Business and Careers 2015
- One of the largest concentrations of corporate headquarters for publicly traded companies in the U.S.
- Home of DFW airport, one of the largest and busiest airports in the world

*Denver, CO*

Previously a telecommunications hub, the city and surrounding community, including Boulder and close-in suburbs, have recovered economically and now benefit from government contracting, a military presence, energy-based companies and high-technology startups with a vibrant venture capital core. Denver has seen significant efforts to re-build and add infrastructure, including public transit, making it easier for workers to commute. Hispanic commuters in particular will benefit from the planned expansion of the FasTracks light rail system to connect major blue collar employment hubs to Hispanic-dominated submarkets.

- City population: 663,862
- Population growth 2010-2014: 10.6%
- Metro population: 2,761,100
- 22% Hispanic
- 3.8% unemployment
- Distribution hub for the western U.S.
- Ranked 1 on Forbes list of Best Places for Business and Careers 2015
- Home to several large mining and energy companies

1021263.13

*El Paso, TX*

Proximity to Fort Bliss and to U.S.-Mexico border crossings has provided El Paso with a strong government and trade and transportation economic base that has supported relatively stable growth over the past several years. El Paso is a major port of entry between the U.S. and Mexico and, with recent trends in on-shoring and near-shoring, the region is expected to benefit from increased economic activity. In the near term, strong population growth and supporting services employment are expected to drive growth.

- City population: 679,036
- Population growth 2010-2014: 4.6%
- Metro population: 838,500
- 82% Hispanic
- 5.5% unemployment
- Home to Fort Bliss, one of the largest military installations in the U.S.
- Hub for U.S.-based call centers

*Houston, TX*

As a globally important port, part of the U.S. energy corridor, a major intermodal center for freight in both container and bulk shipments and the home to various core federal facilities, military bases and corporate headquarters, Houston has seen significant economic growth and an influx of Hispanic residents. The size of the economy supports significant existing business and government services, along with growth in construction and new facilities development (oil, gas and pipeline/platform services).

- City population: 2,239,558
- Population growth 2010-2014: 6.8%
- Metro population: 6,504,800
- 35% Hispanic
- 4.6% unemployment
- Major industries include energy, aerospace and defense and bio-science
- Only New York is home to more major public companies than Houston
- The Port of Houston ranks first in the U.S. in international waterborne tonnage and second in total tonnage

*Phoenix, AZ*

The Phoenix metropolitan area has a broadly diversified economy with substantial influences from universities, military, government contracting, financial services and high-tech industries. Much of this diversification is the result of heavy investment in infrastructure along with a low-tax, low-regulation environment that has attracted a wide variety of businesses. Although recent Arizona immigration laws and ballot initiatives have created concern within the Hispanic community, Hispanic residents have longstanding cultural ties to the area coupled with limited mobility options. As such, Phoenix remains one of the top concentrations of Hispanic households in the southwestern U.S.

- City population: 1,537,058
- Population growth 2010-2014: 6.2%
- Metro population: 4,503,400
- 30% Hispanic
- 5.4% unemployment
- Major industries include technology and tourism
- Home to Arizona State University, one of the largest universities in the U.S.
- Significant presence with Luke Air Force Base
- Numerous high-tech and telecommunications companies have recently relocated to the area

*San Antonio, TX*

San Antonio has a large military and retiree population, along with a substantial presence of military contractors and supporting health care facilities.  The area is also home to several major corporations, including the world headquarters of USAA, and has a high concentration of mid-size and small businesses.  It continues to attract new government contractors, research and development companies and state government agencies and is home to thriving hospitality and service industries, which drives blue collar employment and demand for multi-family housing.

- City population: 1,436,697
- Population growth: 2010-2014: 8.2%
- Metro population: 2,333,300
- 36% Hispanic
- 3.9% unemployment
- Major industries include defense, health care and tourism
- Ranked 50 on Forbes list of Best Places for Business and Careers 2015
- Major tourist attractions include The Alamo and River Walk which draw over 20 million visitors per year

Home to six Fortune 500 companies, including Valero Energy Corp, Tesoro Corp, USAA, Clear Channel Communications, NuStar Energy and CST Brands, Inc.

*Santa Fe, NM*

Santa Fe is considerably smaller than the other markets listed here, but it is notable for having a Hispanic majority. It is a major tourist destination for the Southwest. The area houses several ski resorts and casinos. It is also home to Los Alamos National Laboratory.

- City population: 70,297
- Population growth: 2010-2014: 3.4%
- Metro population: 144,170
- 51% Hispanic
- 5.8% unemployment
- Major industries include government agencies, tourism, and Health Care
- Major tourist attractions include Ski Santa Fe, The Santa Fe Opera, Hilton Buffalo Thunder Resort & Casino, and the Santa Fe Opera
- Largest employers include Los Alamos National Laboratory, Christus St. Vincent Regional Medical Center and the State of New Mexico

**Company Background and Existing Structure**

***Background.***  Borderplex was formed on October 31, 2006 as a Maryland real estate investment trust under Title 8.  The founders of the Company, which included current Trustees W. David Bernard, J. A. Cardwell, William D. Sanders and Scott M. Schwartz, oversaw the capitalization of the Company with $30,000,000 in proceeds from the sale of the Company's common shares of beneficial interest in a private placement that was concluded in February 2007, when the private placement offering was closed and the Company consummated its purchase of the Chase Tower.  See "Description of Real Estate".  The Trustees named above, who constituted four of the seven founders of the Company, have served continuously as Trustees of the Company since its inception.  With the net proceeds of the Company's $30,000,000 initial offering, along with financing proceeds from third party lenders, and the use of Operating Partnership Units in our Operating Partnership as a form of "currency" to acquire properties, the Company acquired the Existing Portfolio described below.  The duration of the Company is perpetual unless terminated earlier pursuant to applicable provisions of the Declaration of Trust and Title 8, as described in more detail under "Certain Provisions of Maryland Law and of the Borderplex Declaration of Trust, Bylaws and Securityholders' Agreement."

***Existing Portfolio.***   As of the date of this Private Placement Memorandum, the Company's existing portfolio is comprised of two office properties (Chase Tower and Wells Fargo Plaza), 13 retail properties, one multi-family property (San Isidro) and three parcels of land, two in close proximity to the office towers that we are holding for further development, and the third adjacent to the San Isidro Apartments that we are holding for future multi-family development.   All of the properties other than the San Isidro Apartments and expansion site are located in the El Paso Market, consistent with the Company's original objective.   The acquisition of the San Isidro Apartments in Santa Fe represents the first phase of the Company's new multi-family strategy.   Chase Tower and Wells Fargo Plaza are referred to in this Private Placement Memorandum as the *"Office Properties;"* the retail properties are referred to herein as the *"Retail Properties,"* and together with San Isidro and the undeveloped parcels, are collectively referred to in this Private Placement Memorandum as the *"Existing Portfolio."*   The Company has managed its Office Properties since September 2008, and intends to continue this practice utilizing internal resources.   Until April 2014, the Company's Retail Properties were managed by MIMCO, Inc., an affiliate of Meyer D. Marcus, one of the founders and a former Trustee, and are now managed internally.   The Company does not presently intend to acquire additional office or retail properties or new sites for new office or retail development, either in the El Paso Market or elsewhere.   We have divided our Retail Properties into core and non-core assets, core assets being those Retail Properties in close proximity to the Office Properties.   Over time, and as market conditions permit, the Company expects to dispose of its non-core retail assets and land held for future development and redeploy the sales proceeds into multi-family properties in its Target Markets. The San Isidro property is managed by Monarch Properties, Inc., a third-party service provider.

***Our Operating Partnership.***   On September 21, 2008, the Company reorganized into an umbrella partnership or *"UPREIT Structure"* when it formed our Operating Partnership.   The Company is the sole general partner of the Operating Partnership.   The Company holds 55.52% of the OPUs; the remaining 44.48% are held by three outside limited partners, including MSI (37.59%), the contributor of the VEREIT Common Stock, and San Isidro Apartments, LLC (6.27%), controlled by Company Trustee Jeffrey Perea Branch, which contributed a portion of its interest in the San Isidro Apartments to the Operating Partnership in exchange for OPUs having a total value of $2,499,995, based upon an OPU value of $7.75 per OPU, which is the same as the offering price of the REIT Shares set forth on the cover page of this Private Placement Memorandum.   See "Main Strategic Investments Transaction", below, and "Phase I - San Isidro Apartments", above.   Our Operating Partnership owns directly or indirectly all of the assets of the Company.   At the time that our Operating Partnership was organized, our Operating Partnership acquired approximately $1,831,000 worth of downtown El Paso retail properties by way of contribution of such properties from one or more entities controlled by one of the founders and former Company Trustee Meyer D. Marcus, in exchange for OPUs.   This method of acquisition allowed the Company to acquire these assets in a transaction that was not taxable to the contributor of the assets pursuant to Section 721 of the Code.   As described elsewhere in this Private Placement Memorandum, the interest of the outside limited partners in our Operating Partnership was reduced to a nominal 1.1% owned by the one remaining outside limited partner when the Bassett Tower office property was distributed to two of the outside limited partners in February 2014 in redemption of a portion of their OPUs, and was increased to the current 44.48% (43.37% increase) when the MSI and San Isidro Apartments transactions were closed.   See "Certain Relationships and Related Party Transactions."

Following the completion of this offering, our Operating Partnership will, directly or indirectly through its wholly owned subsidiaries, hold substantially all of our assets and conduct substantially all of our operations.   We will contribute the net proceeds from this offering to our Operating Partnership in exchange for OPUs.   Subject to the preferred rights of any class or series of units that our Operating Partnership may issue in the future, our interest in our Operating Partnership will entitle us to share in cash distributions from, and allocations of profits and losses of, our Operating Partnership in proportion to our percentage ownership of OPUs. As the sole general partner of our Operating Partnership, we will generally have the exclusive power under the Partnership Agreement of BRT Realty Operating Limited Partnership to manage and conduct its business, subject to limited approval and voting rights of the limited partners described more fully below in "Description of Partnership Agreement of BRT Realty Operating Limited Partnership." Our Board of Trustees will oversee the management of the business and affairs of Borderplex by overseeing the management of the business and affairs of our Operating Partnership.

***Main Strategic Investments Transaction.***   In the first quarter of 2015, Main Strategic Investments, LLC (*"MSI"*), an entity controlled by Christopher H. Cole, contributed to our Operating Partnership as an investment 1,645,338 shares of the common stock of American Realty Capital Properties, Inc. (NASDAQ: ARCP), which had a value of $15M at the time of contribution.   On July 28, 2015, American Realty Capital Properties, Inc. changed its

name to VEREIT, Inc. (NYSE: VER)  In exchange for this contribution, our Operating Partnership issued to MSI 1,935,483 Operating Partnership Units having a total value of $15M, based upon the offering price of the REIT Shares set forth on the cover page of this Private Placement Memorandum.  In connection with this contribution, we entered into a contribution agreement with MSI which provides for limited representations and warranties by MSI regarding the VEREIT, Inc. common stock (*"VEREIT Common Stock"*) being contributed, and entitles us and our Operating Partnership to indemnification for breaches of those representations and warranties.  In addition, pursuant to a tax protection agreement, we have agreed to make certain tax indemnity advances if we dispose of any VEREIT Common Stock in a taxable transaction that results in recognition of gain by MSI in a transaction that occurs on or before January 21, 2024.  At the closing of the contribution transaction with MSI, we also entered into an Investor Rights Agreement with MSI pursuant to which we agreed to (i) increase the number of members of the Board of Trustees of the Company to nine and, conditioned on such MSI nominees meeting all requisite qualifications specified in the Investor Rights Agreement, to the fullest extent permitted by applicable law to include in the slate of nominees recommended by the Board of Trustees of the Company for election at each annual meeting (and each special meeting) of shareholders of the Company, two individuals designated by MSI, and to nominate, recommend and use our reasonable efforts to solicit the vote of shareholders of the Company to elect to the Board such slate presented by the Board of Trustees of the Company, including the MSI nominees.  The rights of MSI to so require its nominees to be included shall continue for so long as MSI beneficially owns, in the aggregate, a number of common shares of beneficial interest (or Operating Partnership Units convertible into common shares of beneficial interest) representing at least 15% of the total number of outstanding common shares of beneficial interest of the Company, assuming that all OPUs are converted into common shares of beneficial interest (*"Threshold Ownership Percentage"*).

As part of the Investor Rights Agreement, the Company further agreed with MSI, so long as the Threshold Ownership Percentage is maintained, that (i) the total indebtedness of the Operating Partnership will not exceed 75% of the book value of our Operating  Partnership's assets without the prior written consent of MSI, and (ii) not to sell, assign, transfer, convey or contribute to any person other than an affiliate of the Operating Partnership any real property or improvements in our Existing Portfolio, other than the San Isidro Apartments, having a book value of $7,500,000 or more, without the prior written consent of MSI.  Lastly, the Company agreed under the Investor Rights Agreement, for so long as the Threshold Ownership Percentage is maintained, not to issue any equity interests in the Operating Partnership having designations, preferences, and/or other special rights, powers and duties superior to the OPUs held by MSI and the other limited partners in the Operating Partnership.

***Our Structure***.  Diagram B depicts our current ownership structure, prior to completion of this offering.  Diagram C depicts our ownership structure following completion of this offering, assuming the sale of all of the 5,160,000 REIT Shares offered and the completion of the transaction with Encore.

**Borderplex Realty Trust and Subsidiaries**
*(As of October 1, 2015)*





Madison River Investments, LLC
(Texas)

54.5200 %
LP Interest

Borderplex 201 E. Main, LLC
(Texas)

.6223%

Borderplex San
Isidro, LLC
(New Mexico)

EP Overland/Stanton
Joint Venture
(Texas)

Wheeler Bridger
Joint Venture
(Texas)

MAIN
STRATEGI
C

SAN ISIDRO
APARTMENTS, LLC

EP MARCUS INVESTMENTS,
L.P.

6.2654% LP Interest

37.5923% LP
Interest

1.00% GP Interest

**Asset and Property Management**

*Multi-Family Properties.*

As of the date of this Private Placement Memorandum, Monarch Properties, Inc., a HUD-approved property management company, provides property management services for the San Isidro Apartments in Santa Fe. Services provided by Monarch include property maintenance, leasing, and other services related to the day to day management of the property, and BRT Property Services, LLC provides Asset Management services.

*Existing Portfolio.*

The Company's Existing Portfolio is managed internally by BRT Property Services, LLC, a Texas limited liability company and a wholly owned subsidiary of Borderplex.  BRT Property Services, LLC was formed in 2008 to provide asset and property management services for the Office Properties and asset management services for the Retail Properties.  BRT Property Services, LLC is led by Jamie Gallagher, the Company's senior vice president of operations.   Ms. Gallagher has over 25 years of progressive real estate management responsibility in various commercial property types.  Ms. Gallagher and her team have overseen the investment of more than $8.3 million of building improvements, and $9.6 million of tenant improvements into the Office Properties and are credited with bringing more than 31 new companies with 800 employees into the downtown El Paso Market.  Services provided by BRT Property Services, LLC include capital investment, property maintenance, leasing and other services related to the day-to-day management of the Office Properties and the Retail Properties.

*Retail Properties.*

The Retail Properties in the Company's Existing Portfolio were managed until July 2014 by MIMCO, Inc., an affiliate of founder and former Trustee, Meyer D. Marcus.  Since then, the Company has utilized internal resources to provide property maintenance, leasing and other services related to the day-to-day management of the Retail Properties.

**Investment Strategy**

*Investment in Real Estate or Interests in Real Estate*

We seek to acquire, own and actively manage a diversified portfolio of quality multi-family properties located in historically underserved demographic and rapidly growing submarkets of our Target Markets.  The initial Target Markets include Austin, Dallas-Ft. Worth, Denver, El Paso, Houston, Phoenix, San Antonio, and Santa Fe.

The investment strategy is to identify multi-family properties in predominantly underserved communities that will produce dependable, long-term cash flow growth and are likely to benefit significantly from culturally specific amenities and services, improved property management, prudent investment of capital, sophisticated asset management strategies, refurbishment and marketing expertise and access to efficient financing.

New investments will be effected through the acquisition of existing multi-family properties directly into our Operating Partnership, and the development of new multi-family projects within our DownREIT.  While "multi-family" is generally understood to refer to apartment communities, it could also refer to townhomes, single-family homes or other single- or multi-family dwellings that are rented to consumers for housing purposes.

Multi-family acquisitions will generally be financed with long-term conventional, fixed-rate debt issued by banks, insurance companies, pension funds or other financial institutions. We specifically will seek loans that are insured by HUD.  Whenever possible, long-term debt shall be non-recourse to the borrower.  From time to time, the Company may utilize lines of credit and/or other short-term borrowing to either bridge the period until long-term financing can be put in place or to make necessary or prudent investments, which may later be refinanced with long-term debt.

Multi-family properties will be acquired for both income and long-term capital gain.  Management is targeting assets with an initial minimum capitalization rate of at least 6%, which utilizing prudent leverage would result in a stabilized leverage yield of 8% to 10%.

Multi-family properties are by nature diverse, as no one tenant represents a significant portion of the overall income of the project.  While it is the Company's intention to diversify its investments over time among its Target Markets, we do not intend to place any restriction on the percentage of assets that may be invested in any of the metropolitan areas constituting our initial Target Markets.

The Company will be responsible for its own sourcing and underwriting of multi-family investment opportunities, but may sometimes rely upon Encore to provide underwriting and other acquisition services.  See "Implementation of New Strategy", above.  We will benefit from long-term relationships between our management, consultants, Trustees, owners, brokers, lenders and developers of multi-family properties.  Financing will also be coordinated by the Company.

Multi-family due diligence activities, including technical and legal assessment, will be performed internally by our DownREIT, or highly qualified third parties with whom the Company and its management, consultants and members of the Board of Trustees have done business through the years.

Initially, all multi-family properties shall be operated by a third-party property manager with significant experience in the local markets in which the Company will be acquiring and/or developing.  Over time, the Company expects to buy or build its own property management platform.

From time to time, the Company may also dispose of assets.  While these activities will generally be conducted by Company personnel, the Company may also elect to utilize qualified third party firms, brokers or consultants to assist the Company with dispositions.

*Investments in real estate mortgages*

The Company does not intend to invest in real estate mortgages for purposes of long-term investment.  However, the Company may initially acquire real estate mortgages as a means to gain control over a multi-family property or portfolio of multi-family properties that fits the Company's investment criteria.  Additionally, as the Company disposes of non-core Retail Properties and land held for future development, it may elect to seller-finance such dispositions, at least in part, by accepting purchase money notes from the buyer(s) of those non-core assets.

*Securities of or interests in persons primarily engaged in real estate activities and Investments in other securities.*

The Company may, from time to time, invest in companies primarily engaged in real estate activities and/or invest in securities of companies that are so engaged, such as it did when it completed the Main Strategic Investments transaction and acquired, by way of contribution to our Operating Partnership, the VEREIT Common Stock that our Operating Partnership currently holds.  While we do not anticipate that this will be a material part of our business strategy, we will evaluate such opportunities on a case by case basis.

**Funds From Operations**

Due to certain unique operating characteristics of real estate companies, as discussed below, the National Association of Real Estate Investment Trusts, Inc. ("*NAREIT*"), an industry trade group, has promulgated a measure known as funds from operations ("*FFO*"), which we believe to be an appropriate supplemental measure to reflect the operating performance of a REIT. The use of FFO is recommended by the REIT industry as a supplemental performance measure. FFO is not equivalent to our net income or loss as determined under GAAP.  NAREIT developed FFO as a relative measure of performance and liquidity of an equity REIT to recognize that income-producing real estate historically has not depreciated on the basis determined under GAAP. We consider FFO available to common shareholders - diluted and FFO appropriate measures of performance for an equity REIT and for its investment segments.  However, FFO available to common shareholders - diluted and FFO should not be

considered an exclusive alternative to net income determined in accordance with GAAP as an indication of our operating performance.

Accordingly, we believe that to facilitate a clear understanding of our consolidated historical operating results, FFO available to common shareholders - diluted should be considered in conjunction with our net income and cash flows reported in the consolidated financial statements and notes to the financial statements.  However, our measure of FFO available to common shareholders - diluted may not be comparable to similarly-titled measures of other REITs because these REITs may apply the definition of FFO in a different manner than we apply it.

We define FFO, a non-GAAP measure, consistent with the standards established by the White Paper on FFO approved by the Board of Governors of NAREIT, as revised in February 2004, which we refer to in this discussion as the "White Paper." The White Paper defines FFO as net income or loss computed in accordance with GAAP, excluding gains or losses from sales of property but including asset impairment write downs, plus depreciation and amortization, after adjustments for unconsolidated partnerships and joint ventures. Adjustments for unconsolidated partnerships and joint ventures are calculated to reflect FFO. Our FFO calculation complies with NAREIT's policy described above.

FFO, as used in this Private Placement Memorandum, means:

- Net Income (Loss) - determined in accordance with GAAP;

- excluding gains (or losses) from sales of depreciable operating property;

- excluding extraordinary items (as defined by GAAP);

- plus depreciation and amortization of real estate assets; and

- after adjustments for unconsolidated partnerships and joint ventures.

We calculate FFO available to common shareholders - diluted in the same manner, except that Net Income (Loss) is replaced by Net Income (Loss) Available to Common Shareholders, and we include the effect of Operating Partnership Units held by minority interest holders, if applicable.

The historical accounting convention used for real estate assets requires straight-line depreciation of buildings and improvements, which implies that the value of real estate assets diminishes predictably over time, especially if such assets are not adequately maintained or repaired and renovated as required by relevant circumstances and/or is requested or required by tenants for operational purposes in order to maintain their value. We believe that, since real estate values historically rise and fall with market conditions, including inflation, interest rates, the business cycle, unemployment and consumer spending, presentations of operating results for a REIT using historical accounting for depreciation may be less informative. Historical accounting for real estate involves the use of GAAP. We believe that the use of FFO, which excludes the impact of real estate related depreciation and amortization, provides a more complete understanding of our performance to investors and to management, and when compared year over year, reflects the impact on our operations from trends in occupancy rates, rental rates, operating costs, general and administrative expenses, and interest costs, which may not be immediately apparent from net income. However, FFO should not be construed to be more relevant or accurate than the current GAAP methodology in calculating net income or in its applicability in evaluating our operating performance.

**Liquidity and Capital Resources**

*Overview*

Our primary source of liquidity for the acquisition of multi-family properties consistent with our investment criteria will be the proceeds of this offering and subsequent offerings.  We expect our Existing Portfolio to provide cash flow from operations sufficient to cover operating expenses and capital expenditures for the Existing Portfolio.

*Cash Flows*

Initially, and until our Pipeline Projects in the DownREIT are completed and stabilized, and we acquire additional fully-developed projects directly into our Operating Partnership, all of our cash flow from operations will be attributable to the operations of the Existing Portfolio.  The level of our cash flow will depend on multiple factors, including rental rates and occupancy rates.  Our net cash provided by operating activities will also be affected by the level of our operating expenses and other expenses as well as capital expenditures.

*Short-Term Liquidity Requirements*

Our short-term liquidity requirements will consist primarily of funds to meet our cash contribution requirements to the DownREIT in order to complete the Encore Transaction, and funds necessary to pay for operating expenses and other expenditures associated with the acquisition and development of our properties.  We believe that our working capital following the completion of this offering, borrowing capacity and future equity offerings will continue to be sufficient to meet our short-term liquidity requirements for the next twelve months, unless we make additional acquisitions of existing multi-family properties directly into our Operating Partnership, in which case our ability to complete such acquisitions will depend upon the amount of any assumed debt on such acquired property, and the willingness of the owner to accept Operating Partnership Units in lieu of cash in payment for the owner's equity in excess of the assumed debt.

*Long-Term Liquidity Requirements*

Our long-term liquidity requirements will consist primarily of funds necessary to pay for the costs associated with the acquisition of additional properties, development of land, scheduled debt maturities, renovations, expansions, and other non-recurring capital expenditures that need to be made periodically to our properties currently owned or to be acquired.  In the future, we expect to satisfy our long-term liquidity requirements through various sources of capital, including our existing working capital, cash provided by operations, equity contributions from investors and long-term property mortgage financing.

We expect to continue to acquire properties in the future and to fund the equity portion of such acquisitions with available cash and/or by raising additional equity capital.  We intend to fund the remaining portion of the purchase price through borrowings, which we intend to arrange in accordance with our general borrowing policy. See "Investment Strategy", above.

**Future Acquisitions**

We may finance new acquisitions by obtaining mortgages on our properties or the new properties to be acquired, raising additional capital through additional equity offerings, debt financings, retention of cash flow (subject to the REIT minimum distribution requirements) or any combination of the above methods.  We may assemble properties for redeployment through a ground lease to the ultimate developer/owner of the improvements to be constructed on the ground-leased site.

We may also seek to utilize our UPREIT structure to acquire properties.  See "Company Background and Existing Structure" – "Our Operating Partnership", above.  In acquiring properties utilizing our UPREIT structure, the owner/developer would contribute a property or properties to our Operating Partnership in exchange for OPUs, which could be convertible into common shares of beneficial interest of Borderplex.  Utilizing our UPREIT structure to acquire properties would be advantageous to Borderplex because it would allow the seller of the property or properties to be acquired by Borderplex to avoid the unfavorable tax implications associated with a sale of the property to Borderplex or a contribution of the property directly to Borderplex in exchange for shares of beneficial interest of Borderplex.

Alternatively, as in the case of the transaction with Encore, we might seek to utilize more "DOWNREITs" to acquire properties in transactions that are not taxable to the contributor of the properties.  A "DOWNREIT" structure would be essentially a substitute for our existing UPREIT structure, except that we might have multiple DOWNREIT limited liability companies or limited partnerships for acquisition of specific properties or portfolios,

in which case the contributor of the properties or portfolios to the DOWNREIT limited liability companies or limited partnerships would acquire an interest only in the specific DOWNREIT entity, in which the Company or our Operating Partnership would control the board of managers, in the case of a limited liability company, or serve as the general partner, in the case of a limited partnership, rather than acquiring an interest in our entire portfolio in our Operating Partnership.  The DOWNREIT structure would also allow us to acquire interests in projects indirectly, *e.g.*, income-producing interests in entities operating multi-family assets and/or income producing registered stock in other companies.

We may also participate with other entities in property ownership through joint ventures or other types of co-ownerships.  Equity investments may be subject to existing mortgage financing and other indebtedness, or this financing or indebtedness may be incurred in connection with acquiring interests in such properties.  Any such financing or indebtedness would have priority over Borderplex's equity interest in such property.

### Contractual Commitments

Borderplex has numerous short and long-term contractual commitments, consisting of (i) standard operating agreements associated with our Office Portfolio, such as elevator maintenance, security service, janitorial service, parking management services and other similar operating agreements associated with our Existing Portfolio, and (ii) existing borrowings incurred to acquire and operate our Existing Portfolio.  The financial impact of these contractual commitments is reflected in our financial results and disclosed in more detail under "Management Discussion and Analysis of Financial Condition and Results of Operation – Contractual Obligations."  With the exception of the San Isidro Apartments, which are third-party managed, all operating expenses are paid directly.

### Recent Developments

During 2014 and 2015, Borderplex completed numerous transactions, to include:

- A strategic initiative to refinance long term debt in the Office Properties in order to take advantage of the favorable market conditions, separate the maturity dates of the initial financing on the Office Properties, and mitigate risk with concentration of lease rollovers of tenants in 2017, 2018 and 2019, including the refinancing of our three largest core properties – Chase Tower, Wells Fargo Plaza and 415 Mesa.

- A change in parking management at our Office Properties.

- Completion of a rooftop lease and assignment agreement with respect to rooftop technology leases at the Wells Fargo Plaza.

- Completion of two transactions to sell non-core Retail Properties, and an accretive transaction in which we distributed a 67,000 sq. ft. redevelopment property (Bassett Tower), to a group of outside limited partners in our Operating Partnership in exchange for 150,000 OPUs held by them.

- Completion of the Main Strategic Investments Transaction, involving the contribution of VEREIT Common Stock to our Operating Partnership.

- Completion of the first phase of our new multi-family strategy with the acquisition of San Isidro Apartments in Santa Fe, New Mexico.

- Execution of material office leases in our Office Properties.

- Restoration of one of our Retail Properties following a structural loss.

<u>See</u> "Management Discussion and Analysis of Financial Condition and Results of Operations" – "Recent Developments".

**Competition**

The central business district in downtown El Paso has a limited supply of privately held, Class A office towers that compete with our two Office Properties, Chase Tower and Wells Fargo Plaza.  Currently, there are six Class A office towers in downtown El Paso, totaling1.6 million square feet.  In addition to Chase Tower and Wells Fargo, these include The Anson Mills Building at 303 Oregon, the Centre Building at 123 Mills Avenue, the Cortez at 310 Mesa, and the Stanton Tower at 100 N. Stanton.  In addition, a new nine-story office building was recently announced, comprising a minimum of 126,000 square feet of new office space. This building is scheduled to break ground in early 2016, with a 1st quarter 2018 delivery date.  Hunt Properties, the owner/developer of the building, has indicated that it will occupy three floors, leaving approximately 65,000 square feet of speculative office and retail space.  The Borderplex Office Properties are the two most recognizable office towers in downtown El Paso.  The two anchor tenants, JP Morgan Chase and Wells Fargo Bank, hold naming rights to the buildings.  The two largest law firms in El Paso, ScottHulse PC and KempSmith LLP, as well as many other respected professional service tenants, are housed in our Office Properties.  See "Description of Real Estate".

**Conflict of Interest Policies**

*UPREIT Structure.* Conflicts of interest could arise in the future as a result of the relationships between us and our affiliates on the one hand, and our Operating Partnership or any partner thereof, on the other.  Our Trustees and officers have duties to our Company under applicable Maryland law in connection with their management of the Company. At the same time, as the general partner of our Operating Partnership, we have fiduciary duties and obligations to our Operating Partnership and its limited partners under Delaware law in connection with the management of our Operating Partnership.  Our fiduciary duties and obligations as general partner to our Operating Partnership and its outside limited partners may come into conflict with the duties of our Trustees and officers to our Company.

The limited partnership agreement of our Operating Partnership contains a provision that in the event of a conflict of interest between our shareholders and the limited partners of our Operating Partnership, as general partner we will endeavor in good faith to resolve the conflict in a manner not adverse to either our shareholders or the limited partners of our Operating Partnership, and, if we, in our sole discretion as general partner of our Operating Partnership, determine that a conflict cannot be resolved in a manner not adverse to our shareholders and the limited partners of our Operating Partnership, the conflict will be resolved in favor of our shareholders

*Transactions between Borderplex and Trustees.*  Many of the Trustees are engaged in the real estate business in El Paso, Texas and some of the other initial Target Markets.  The interests and economic objectives of the Trustees, insofar as their existing holdings are concerned, may compete with and conflict with the objectives and holdings of Borderplex in its Target Markets.  Each of the Trustees will have an obligation to disclose and/or avoid a conflict of interest between such Trustee and Borderplex.  Each of the Trustees has duties to Borderplex, and certain of the Trustees may also have duties to their affiliated business enterprises, which may require that any such Trustee recuse himself or herself from voting on certain matters in which the Trustee or his or her affiliates may have an interest and/or possibly resign as a Trustee.  We do not have a policy, however, that expressly prohibits our Trustees, officers, security holders or affiliates from engaging for their own account in business activities of the types conducted by us.

*Purchases from and Sales to Affiliates.*  Borderplex may purchase properties from its Trustees and affiliates when such an investment is consistent with Borderplex's investment objectives and policies.  Such a property may only be acquired from a Trustee or affiliate if certain conditions are met.  Borderplex will not sell properties to a Trustee or affiliate, unless Borderplex has received fair market bids from unrelated third parties with respect to any such property to be sold, at a price consistent with such bids, or, if no fair market bids are available or solicited, then at a price consistent with an independent appraisal of a property.  The sale to a Trustee or an affiliate must be at no less than the value determined on the basis of a summary appraisal of the property.  We shall submit any transaction in which our non-independent Trustees have an interest to our independent Trustees for consideration and approval.

**Legal Proceedings**

We are from time to time a party to litigation incidental to the conduct of our business. Other than a suit by the Company against a former tenant of Chase Tower for damages incurred by the Company resulting from the former tenant's default of its lease obligations, there are no pending or threatened legal proceedings to which we are a party, and none, pending or threatened, that, in our opinion, is likely to have material adverse effect on our financial results.

**Employees**

We currently have fifteen employees, all but two of whom are devoted exclusively to the management of the Company's Existing Portfolio. James C. Potts as Borderplex's chief investment officer, under the oversight and direction of the Board of Trustees will direct the implementation of the Company's new multi-family strategy both in connection with the management and operation of Encore Borderplex Multifamily, LLC, and in connection with any acquisition of multi-family assets directly by our Operating Partnership, as well as the ongoing management of our Existing Portfolio, which we expect to become an increasingly less significant element of our business as we expand our multi-family asset base. The number of employees is expected to increase as we execute our new multi-family strategy, and the six person Encore multi-family development team will become direct employees of the DownREIT on the Merger Effective Date. See "Implementation of New Strategy" – "Phase II" – "Operations", above, and "Management of Borderplex Realty Trust".

**Equity Incentive Plan**

As we expand our operations and implement our new business strategy, the Board of Trustees will evaluate whether to establish an equity incentive plan for our employees.

**Compensation of Senior Management**

The Company will disclose the compensation of senior management on a confidential basis upon request.

## MANAGEMENT DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Management's discussion and analysis of financial condition and results of operations are more clearly understood when read in conjunction with the accompanying audited consolidated financial statements for the years ending December 31, 2014, 2013 and 2012. Undue reliance should not be placed upon historical financial statements since they are not indicative of expected results of operations or financial condition for any future periods.

*Overview*

Borderplex was formed in 2006 to acquire, develop and manage real estate, in the downtown El Paso Market and commenced operations in the first quarter of 2007 with the acquisition of Chase Tower, followed by the acquisition of the Wells Fargo Plaza and the Retail Portfolio.  In 2014, the Board of Trustees developed a new strategy encompassing the acquisition of multi-family real estate, and acquired its first multi-family asset, San Isidro Apartments in Santa Fe, New Mexico in April 2015.  As of October 1, 2015 our existing real estate assets consisted of our two Office Properties, 13 Retail Properties, one multi-family property (the San Isidro Apartments), and three parcels of land that we are holding for future development.  See "The Company" - "Company Background and Existing Structure" - "Existing Portfolio", "Description of Real Estate," and "Certain Relationships and Related-Party Transactions." We plan to continue to operate our Existing Portfolio located in the El Paso Market to maximize returns and capitalize on repositioning, redevelopment and/or development opportunities. We will also consider strategic dispositions of existing assets to maximize cash returns and, as appropriate, to redeploy capital into multi-family properties, consistent with our new strategy. The acquisition of the San Isidro Apartments is the first phase of our multi-family strategy; consummation of the joint venture with Encore through the formation of the DownREIT is the second phase, consisting initially of the five Pipeline Projects.  The third phase will consist of (i) acquisition of new multi-family properties directly into our DownREIT that produce attractive cash returns or that can be repositioned or redeveloped so that they produce attractive cash returns, and (ii) development of new multi-family projects within our DownREIT in addition to the five Pipeline Projects being contributed by Encore.  See "The Company" - "Overview and New Multi-Family Strategy" - "Implementation of New Strategy".

With this new strategy, our primary objective is to become the premier owner-operator of apartment communities and quality rental housing for the rapidly growing—and underserved—communities in our Target Markets by:

- Capitalizing on significant growth in the number of renters in the Borderplex Target Markets;

- Selectively acquiring higher-yielding apartment assets in submarkets currently overlooked by institutional capital;

- Actively developing, redeveloping and managing apartment assets to generate sustainable long-term cash flow growth;

- Creating long-term value by developing a strong brand that caters to the cultural preferences and needs of renters within our Target Markets; and

- Combining institutional quality management with efficient access to capital to rapidly build a multi-billion-dollar multifamily platform focused on providing housing to the underserved local communities in our Target Markets.

Households within our Target Markets are often concentrated in submarkets which have not attracted meaningful institutional investment, resulting in lower transaction volumes and higher yields. Apartment ownership and operation within these submarkets tends to be highly fragmented and limited effort has been made to customize products and services to meet the unique cultural needs and preferences of many customer segments. By acquiring higher yielding assets in submarkets with limited competition and combining institutional quality management with efficient access to capital, we will create value for investors by providing the right products and services to this rapidly growing and underserved demographic comprising this renter base.

Having established an initial market position with the acquisition of the San Isidro Apartments in Santa Fe, and the consummation of the joint venture with Encore through the formation of the DownREIT, we will continue to (i) acquire multifamily properties directly into our Operating Partnership that produce attractive cash returns or that can be repositioned or redeveloped such that they produce attractive cash returns, and (ii) develop new multi-family projects in our DownREIT. As we execute our new multifamily strategy, we expect to significantly increase our multifamily asset base. As a result, our future multifamily acquisitions of completed projects through our Operating Partnership, and new development and construction through the DownREIT, will be the primary driver of our performance. The following table summarizes key pro forma projections and assumptions based on the execution of our new multi-family strategy; the pro forma assumes the completion of the first and second closing of the Encore Transaction.

Proforma Projections and Assumptions

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Multifamily Assets (millions) | | | | | | |
| Development | $ 233 | $ 250 | $ 480 | $ 600 | $ 375 | $ 375 |
| Acquisitions | $ 20 | $ 250 | $ 160 | $ 200 | $ 125 | $ 125 |
| Total | $ 253 | $ 500 | $ 640 | $ 800 | $ 500 | $ 500 |
| Aggregate Investment | $ 253 | $ 753 | $ 1,393 | $ 2,193 | $ 2,693 | $ 3,193 |
| Revenues | | | | | | |
| Multifamily | $ 2 | $ 19 | $ 61 | $ 136 | $ 251 | $ 385 |
| Office | $ 8 | $ 9 | $ 9 | $ 9 | $ 9 | $ 9 |
| Retail | $ 1 | $ 1 | $ 1 | $ 1 | $ 1 | $ 1 |
| Subtotal | $ 11 | $ 29 | $ 71 | $ 146 | $ 261 | $ 395 |
| Property Operating Expenses | $ (7) | $ (16) | $ (37) | $ (83) | $ (151) | $ (215) |
| Net Operating Income | $ 4 | $ 13 | $ 34 | $ 63 | $ 110 | $ 180 |
| Interest and Mortgage Insurance Expense | $ (2) | $ (7) | $ (16) | $ (32) | $ (49) | $ (67) |
| Acquisition Expense | $ (0) | $ (1) | $ (1) | $ (1) | $ (1) | $ (1) |
| Corporate Overhead | $ (1) | $ (4) | $ (4) | $ (4) | $ (4) | $ (5) |
| Income on Investment Securities | $ 0 | $ 1 | $ 1 | $ 1 | $ 1 | $ 1 |
| Funds from Operations (FFO) | $ 1 | $ 2 | $ 14 | $ 27 | $ 57 | $ 108 |
| Depreciation and Amortization | $ (2) | $ (8) | $ (20) | $ (34) | $ (54) | $ (72) |
| Consolidated Net Income | $ (1) | $ (6) | $ (6) | $ (7) | $ 3 | $ 36 |
| Non-Controlling Interests | $ 0 | $ 2 | $ 1 | $ 0 | $ (1) | $ (4) |
| Net Income (Loss) | $ (1) | $ (4) | $ (5) | $ (7) | $ 2 | $ 32 |

1. Multifamily acquisitions assume a 5.75% capitalization rate, 55% gross margin, 6.8% vacancy, 3.0% revenue growth, and 2.5% expense growth.
2. Multifamily development projects assume a 24 month development and lease-up period.
3. Stabilized multifamily development projects assume a 6.60% yield on development cost, 60% gross margin, 6.8% vacancy, 3.0% revenue growth, and 2.5% expense growth.

4. The forecast does not assume any substantial changes in the Chase Tower or Wells Fargo office buildings.
5. The retail portfolio assumes continued 85% stabilized.

General and Administrative

The Encore transaction includes the transfer of the six person multi-family development team from Encore to the DownREIT. The annual cost of this additional staff is estimated at $896,000 annually. In addition, the transaction with Encore entails the payment of fees for new developments undertaken in the DownREIT, in addition to the five Pipeline Projects being contributed by Encore to the DownREIT (4% up to $10 million) and a fee for new acquisitions acquired directly into our Operating Partnership worked by the development team (.25%). See "The Company" – "Implementation of New Strategy" – "Phase II – The Encore Transaction".

Although we expect results from future operations to be driven by our new multifamily strategy, immediately following this offering our Existing Portfolio will continue to have a material effect on our performance. As such, the following discussion and analysis of financial condition and results of operations is necessarily focused on historic operations related to the Existing Portfolio, whereas the recently acquired San Isidro Apartments property has only been in the portfolio for approximately six months as of the date of this Private Placement Memorandum.

**Significant Accounting Estimates and Critical Accounting Policies**

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of Borderplex, its subsidiaries and joint ventures in which Borderplex has a controlling interest. The accounts of the following entities have been consolidated:

- Borderplex Realty Trust
- Borderplex 201 E, Main, LLC
- Borderplex 401 N. Oregon, LLC
- Borderplex Bassett, LLC
- Borderplex San Isidro, LLC
- Bridger Mountain Investments, LLC
- BRT  Property Services, LLC
- BRT Realty Holdings LLC
- BRT Realty Operating Limited Partnership
- BRT Surface Parking, LLC
- EP Overland Street, LLC
- EP Stanton Street, LLC
- EP Stanton/Overland Joint Venture
- Madison River Investments, LLC
- Madison River Member, LLC
- Wheeler Peak Investments, LLC
- Wheler Bridger Joint Venture

All significant inter-company balances and transactions have been eliminated.

*Non-controlling Interest*

Non-controlling interest represents the portion of equity in the subsidiary not attributable directly or indirectly to Borderplex. The profit and loss derived from the performance of the subsidiary is allocated to net income attributable to non-controlling interest in the consolidated statement of income.

*Basis of Accounting*

Borderplex's policy is to prepare its consolidated financial statements based on generally accepted accounting principles ("*GAAP*").

*Properties*

Real estate assets are stated at cost. Construction and improvement costs incurred in connection with the development of new properties or the redevelopment of existing properties are capitalized to the extent the total carrying value of the property does not exceed the estimated fair value of the completed property. Real estate taxes and interest costs incurred during construction periods are capitalized. Capitalized interest costs are based on qualified expenditures and interest rates in place during the construction period. Capitalized real estate taxes and interest costs are amortized over their respective lives which are consistent with the corresponding assets.

Tenant improvements, either paid directly or in the form of construction allowances paid to tenants, are capitalized and depreciated over the lease term; maintenance and repairs are charged to expense when incurred. Expenditures for significant betterments and improvements are capitalized.

Real estate assets, including developments in progress, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. A real estate asset is considered to be impaired when the estimated future undiscounted operating cash flow is less than its carrying value. To the extent an impairment has occurred, the excess of the carrying value of the asset over its estimated fair value will be expensed to operations.

Depreciation or amortization expense is computed using the straight-line method based upon the following estimated useful lives:

|                                                | Years  |
|------------------------------------------------|--------|
| Buildings and improvements                     | 5 - 40 |
| Equipment, tenant improvements and fixtures    | 3 - 10 |

*Use of Estimates*

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Highly-liquid investments with maturities at dates of purchase of three months or less are classified as cash equivalents. Borderplex maintains its cash in bank deposit accounts which, at times, may exceed federally insured limits. Borderplex believes it is not exposed to any significant credit risk on cash and cash equivalents.

*Leases*

Leases which transfer substantially all of the risks and benefits of ownership to tenants are considered finance leases and the present values of the minimum lease payments and the estimated residual values of the leased properties, if any, are accounted for as receivables. Leases in which we retain substantially all of the risks and benefits of ownership are considered capital leases and the present values of the minimum lease payments are accounted for as assets and liabilities.

*Income Taxes*

Borderplex has elected to be taxed as a REIT, under applicable sections of the Code. To qualify as a REIT, the Company must meet a number of organizational and operational requirements, including a requirement that we distribute at least 90% of our REIT taxable income to our shareholders. As a REIT, we generally will not be subject

to federal income tax at the corporate level. Borderplex is organized and operates in such a manner as to qualify for taxation as a REIT under the Code, and intends to continue to operate in such a manner, but no assurance can be given that we will operate in a manner so as to qualify or remain qualified as a REIT.  See "Material United States Federal Income Tax Considerations."

*Purchase Accounting for Acquisition in Real Estate*

Acquisitions of properties are accounted for utilizing the purchase method and accordingly, the consolidated results of operations of acquired properties are included in our consolidated results of operations from the respective dates of acquisition. The purchase price of the real estate is allocated to the acquired tangible assets, consisting primarily of land, building and tenant improvements and identified intangible assets and liabilities, consisting of the value of above-market and below-market leases, other value of in-place leases, value of tenant relationships and acquired ground leases, based in each case on their fair values.

*Revenue Recognition and Related Matters*

Minimum rent revenues are recognized on a straight-line basis over the terms of the related leases. Minimum rent revenues also include amounts collected from tenants to allow the termination of their leases prior to their scheduled termination dates and accretion related to above and below-market tenant leases on acquired properties.

Borderplex provides an allowance for doubtful accounts against the portion of accounts receivable, including straight-line rents, which are estimated to be uncollectible. Such allowances are reviewed periodically based upon recovery experience. For that portion of the otherwise recognizable deferred rent that is not deemed to be probable of collection, no revenue is recognized.

Overage rents are recognized on an accrual basis once tenant sales exceed contractual tenant lease thresholds. Recoveries from tenants are established in the leases or computed based upon a formula related to real estate taxes, insurance and other operating expenses and are generally recognized as revenues in the period the related costs are incurred.

Interest on notes receivable is recognized over the term of the note and calculated primarily using the simple-interest method on principal amounts outstanding,

**Results of Operations**

*Comparison of Year Ended December 31, 2014 to Year Ended December 31, 2013*

As of December 31, 2014, our real estate assets consisted of 17 properties with a total rentable area of 772,365 square feet and an average occupancy of 78.7% for the year. This compares to our portfolio as of December 31, 2013, which consisted of 20 properties with a total rentable area of 799,562 square feet and an average occupancy of 78.6% for the year.

Occupancy held steady, showing an increase of .1% as leasing efforts were able to replace tenants who moved out.

Revenues increased $114,200, primarily as a result of an increase in parking fees. Recoveries decreased due to the decrease in recoverable operating expenses at the Office Properties and new and renewal leases with current base years.

Property operating expenses were relatively flat, with all categories showing nominal increases or decreases that netted to less than a $5,000 variance. Total other operating expenses increased $917,000, primarily attributable to increase in corporate general and administrative costs.

Total non-operating expenses, including net interest expense and other income expense increased $1,527,600 as a result of the $1.5 million prepayment penalty paid in connection with the early refinancing of the Wells Fargo mortgage note.

*Comparison of Year Ended December 31, 2013 to Year Ended December 31, 2012*

As of December 31, 2013, our real estate assets consisted of 20 properties with a total rentable area of 799,562 square feet and an average occupancy of 78.6% for the year. This compares to our portfolio as of December 31, 2012, which consisted of 22 properties with a total rentable area of 809,612 square feet and an average occupancy of 77.6% for the year.

Occupancy increased 1.0% chiefly as a result of the reclassification of two vacant retail properties out of the retail portfolio into the land portfolio. Improvements located at the two retail properties were demolished and the resulting sites, along with one additional site acquired during the year, were aggregated into a single development site. For the near term, we plan to hold the development site for future development.

Revenues decreased $166,700, primarily as a result of decreases in recoveries. Recoveries decreased due to the decrease in recoverable operating expenses at the Office Properties.

Property operating expenses remained relatively flat, with decreases in repairs and maintenance offset by increases in taxes and insurance. Repairs and maintenance decreased due to fewer scheduled and emergency repairs for the year. Total other operating expenses increased $201,400, principally due to the hiring of Dana Hamilton as our new chief executive officer in September 2013.  Ms. Hamilton left the Company in October of 2014.

Total non-operating expenses, including net interest expense and other income (expense), remained relatively flat year over year, resulting in a decrease in overall net income of $317,100. As we execute our new multifamily strategy, we expect to achieve growth in net operating income as we make accretive acquisitions, develop new projects, and take advantage of operating leverage to spread fixed costs over a larger asset base.

*Funds From Operations*

Due to certain unique operating characteristics of real estate companies, as discussed above (See "The Company" – "Funds from Operation"), we believe that FFO available to common shareholders diluted, should be considered in conjunction with our net income and cash flows determined in accordance with GAAP.

The table below reflects the items deducted or added to net income (loss) in our calculation of FFO for the years ended December 31, 2014, 2013 and 2012. Items are presented net of minority interest portions where applicable.

(in thousands, except per share data)

|  | 2012 | 2013 | 2014 |  |
|---|---|---|---|---|
| Net income (loss) | $        707 | $        359 | $     (1,090) | (1) |
| Add: Depreciation and amortization | 1,446 | 1,487 | 1,440 |  |
| Less: Net (gain) loss from casualty insurance proceeds | (77) | - | - |  |
| Less: Net (gain) loss on sale of assets | 1 | (21) | (292) |  |
| Funds from operations | $     2,078 | $     1,824 | $          58 |  |
| Average shares outstanding | 2,855 | 2,855 | 2,859 |  |
| Funds from operations per share | $       0.73 | $       0.64 | $        0.02 |  |

1) Net loss due to refinancing costs.  Net Income would have been $411,373 without the effect of the refinancing, with FFO of $1,559,366, or $0.55 per share.

*Cash Flows for the year ending December 31, 2014*

Our ending cash and cash equivalents as of December 31, 2014 were $2.8 million. This represents a net cash increase of $2.8 million for the year. Cash from operating activities for 2014 decreased $1.8 million primarily as a result of a decrease in net income as a result of the effect of a prepayment penalty of $1.5 million paid in connection with the refinancing of Wells Fargo Plaza. Cash used for investing activities totaled $307,100, representing a decrease of $1.6 million from the prior year due to sale of two retail properties. Cash used for investing activities consisted primarily of capital projects for our office buildings.  See "Description of Real Estate".

*Cash Flows for the year ending December 31, 2013*

Our ending cash and cash equivalents as of December 31, 2013 were $799,000. This represents a net cash outflow of $1.5 million for the year. Cash from operating activities decreased $202,500, primarily related to a decrease in net income. Cash used in investing activities totaled $2.0 million, representing an increase of $492,000 from the prior year. Investing activities consisted primarily of capital projects for our office buildings.

### *Liquidity and Capital Resources*

As of September 30, 2015, we had $558,300 in cash and cash equivalents and additional borrowing capacity of $5.2 million under our line of credit with Capital Bank.

Our principal demands for funds will be for multi-family property acquisitions, funds required by our DownREIT for our multi-family development and construction activities in the DownREIT, capital improvements to properties, operating expenses, dividends to our investors and the payment of principal and interest on our outstanding indebtedness.

Generally, cash needs for property acquisitions and our development activities will be met through proceeds from the sale of our common shares through equity offerings, mortgage financings and financings under our line of credit. We may also, from time to time, enter into other agreements with third parties whereby third parties will make equity investments in specific properties or groups of properties that we acquire.

We expect to meet our future short-term operating liquidity requirements through a combination of net cash provided by our current property operations and the operations of properties to be acquired in the future. Management expects that our properties will generate sufficient cash flow to cover all operating expenses, capital improvements and the payment of a semi-annual dividend. Other potential future sources of capital include our existing working capital, equity contributions from investors, proceeds from secured or unsecured financings from banks or other lenders, proceeds from the sale of properties and undistributed FFO.

### *Contractual Obligations*

Most of our contractual obligations consist of long-term loan obligations for which payment terms vary. As of September 30, 2015, we had notes payable of $42.7 million consisting of the following:

(1) An unsecured note given to a private company in connection with the acquisition of the Bassett Tower in the original amount of $750,000, dated November 21, 2007, with interest due annually at varying interest rates. The note bore an initial annual rate of interest of 3.00% until November 30, 2011. The interest rate from December 1, 2011 to November 30, 2014 increased to 4.00% and the final interest rate from December 1, 2014 to maturity date of November 21, 2017 is 5.00%. At any time after the sixth anniversary of the effective date of the note, the lender may elect to convert all or portions of the then outstanding balance of the note to common shares of beneficial interest of the Company at a price of $12.50 per share. The outstanding balance as of September 30, 2015 was $750,000.

(2) A non-interest bearing note payable to a trust in the original amount of $450,000 payable in full at maturity on June 19, 2017. The note is collateralized by real estate (development site). The outstanding balance as of September 30, 2015 was $450,000.

(3) A note payable to a financial institution in the original principal amount of $11.8 million, with a fixed interest rate of 4.51%, interest only for three years, with monthly installments of principal and interest of $59,700 starting December 1, 2017.  The note has a maturity and balloon payment due on November 1, 2024. The note is collateralized by the Wells Fargo Plaza. The outstanding balance as of September 30, 2015 was $11.7 million.

(4) A note payable to a life insurance company in the original principal amount of $1.8 million, with a fixed interest rate of 5.125%, paid in monthly installments of principal and interest in the amount of $14,000, and a maturity date of March 1, 2029. The note is collateralized by real estate (415 Mesa). The outstanding balance as of September 30, 2015 was $1.62 million.

(5) A note payable to a life insurance company in the original principal amount of $10.0 million, with a fixed interest rate of 4.30%, paid in monthly installments of principal and interest of $62,190, fully amortizing, with a maturity date of August 1, 2035. This note is collateralized by the Chase Tower. The outstanding balance as of September 30, 2015 was $9.9 million.

(6) An FHA HUD insured note payable to a financial institution in the original amount of $16.7 million, with a fixed interest rate of 3.2%, paid in monthly installments of $61,566, fully amortizing, with a maturity of March 1, 2054.  This note is collateralized by the San Isidro Apartments.  The outstanding balance as of September 30, 2015 was $16.4 million.

(7) A revolving line of credit with a financial institution in the amount of $7,000,000, with a maturity date of April 15, 2017, bearing interest at prime plus .75%, with a minimum interest rate of 4.0%.  The facility requires a monthly payment of interest only.  The note is collateralized by $10.8 million (in value) VEREIT Common Stock.  The outstanding balance as of September 30, 2015 was $1,800,000.

There were no other long term contractual obligations existing as of September 30, 2015.

Aggregate maturities for our contractual obligations as of September 30, 2015 are presented in the following table:

Aggregate Maturities on Contractual Obligations[1]

(in thousands)

|  | Total | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long-term debt obligations | $ 64,892 | $ 2,294 | $ 9,976 | $ 2,369 | $ 50,254 |
| Capital leases | $ - | $ - | $ - | $ - | $ - |
| Operating leases | $ - | $ - | $ - | $ - | $ - |
| Other long-term liabilities | $ - | $ - | $ - | $ - | $ - |
| **Total** | **$ 64,892** | **$ 2,294** | **$ 9,976** | **$ 2,369** | **$ 50,254** |

[1]Includes Principal and Interest

### Recent Developments

In February 2014, we executed an accretive transaction whereby we traded a 67,000 square foot redevelopment property, Bassett Tower, to limited partners in our Operating Partnership in exchange for 150,000 OP units. This transaction decreased gross real estate assets by $1.6 million, increased net income by $80,000 (as this property had negative net operating income at the time of exchange) and decreased the OP units owned by outside limited partners in our Operating Partnership by 4.7876% to an outstanding nominal amount at the time of 1.1099%. The net effect on FFO was an increase of $0.05 per share equivalent.

In February 2014, we refinanced an outstanding debt balance on 415 Mesa of $482,300, interest rate of 5.875% and monthly installments of $7,500. The new note had a principal balance of $1.8 million, interest rate of

5.125% and 180 monthly installments of $14,000.  The net effect was free cash of $1.2 million after refinancing costs that included a prepayment fee of $15,000.  The cash proceeds were used for Borderplex operations.

In March 2014, we changed parking management at our Office Properties to Parking Systems of America, resulting in an approximately $61,000 increase (14%) in net revenues from 2014 over 2013, and a projected increase of approximately a $124,000 (25%) from 2015 over 2014.

In September 2014, we executed a Rooftop Lease & Assignment Agreement with Crown Castle, LLC, one of the nation's largest managers of broadcasting and mobile telephone infrastructure, for the rooftop rights at the Wells Fargo Tower.  This transaction provided an upfront payment to BRT of $560,000 and a 60% revenue share in future leases, in exchange for the 30-year assignment of the buildings two existing rooftop agreements, and the leasing rights on new leases.  The payment was treated as income for tax purposes; for financial statements the income will be amortized over the life of each agreement.

In October 2014, we refinanced an outstanding debt balance of $8.4 million, interest rate of 6.48%, and monthly installments of $64,700 on the Wells Fargo Plaza.  The new note had a principal amount of $11.8 million, interest rate of 4.51%, with 3 years of interest-only payments and then 84 monthly installments of $59,700. The net effect of the refinancing resulted in cash proceeds of $1.8 million being placed into reserves to use for current and future building improvements.  The refinancing required a prepayment penalty of $1.5 million.

In December 2014 we executed a sale of two retail properties totaling 21,154 square feet (116 Stanton & 406-412 Stanton) with net proceeds to BRT of $2.41 million. Proceeds were used for Borderplex operations and acquisition of the San Isidro Apartments.  Borderplex will continue strategic dispositions of non-core retail assets or development parcels to maximize cash returns and redeploy capital into the new multi-family strategy.

In February 2015 we executed a transaction with Main Strategic Investments, LLC, which contributed $15 million (in value) of worth of shares of American Realty Capital Partners, Inc., now known as VEREIT.  As of October 1, 2015, the company announced a quarterly dividend of $0.1375 per share, which if continued will result in quarterly dividends for Borderplex of $226,200.

In April 2015 we acquired a 176-unit multi-family apartment complex, San Isidro Apartments, Santa Fe, NM, completing Phase I of the new multi-family strategy.  Total acquisition cost was $20 million, with an assumption of a $16.43 million fully amortizing 40-year HUD note, at an interest rate of 3.2%.  Total equity was $3.58 million, with the seller electing to receive $2.50 million in our Operating Partnership Units.  At the same time that the San Isidro Apartments were acquired, BRT purchased for $1.3M an adjacent 3.87 acre land parcel fully zoned for 100 additional multifamily units.

In July 2015, we refinanced an outstanding debt balance of $7.1 million, interest rate of 6.48% and monthly installments of $55,600 on the Chase Tower.  The new note had a principal balance of $10.0 million, interest rate of 4.3%, and monthly installments of $62,200, fully-amortizing over 240 months.  The net effect of the refinancing resulted in free cash of $1.2 million, after a prepayment penalty of $1.1 million.

In August 2015, restoration of a retail property commenced following a structural loss in the prior year. The majority of costs are to be paid through insurance claim proceeds.  The net effect when completed will be a modern refurbished property with an increase in net asset value in excess of $100,000.

In 2015, Borderplex signed two major office leases, including a 28,996 square foot lease in Chase Tower at $15.25 per square foot with Emergence Health Network, and an 8,900 square foot (usable area) lease in Wells Fargo Plaza with the Texas Attorney General's office at $24.70 per square foot (gross rent).

### DESCRIPTION OF REAL ESTATE

As of the date of this Private Placement Memorandum, our real estate holdings consist of the Existing Portfolio, which includes our Office Properties, Retail Properties and raw land held for redevelopment in downtown El Paso, and the San Isidro Apartments with adjacent expansion site in Santa Fe. See "The Company" – "Company Background and Existing Structure" – "Existing Portfolio". As we close the transaction with Encore, and execute our multi-family strategy, we expect to significantly expand our multi-family asset base so that this business segment becomes the leading driver of the Company's performance.

#### *Existing Portfolio, El Paso Market*

In 2006, Borderplex was formed to acquire, develop and manage real estate, initially in the El Paso Market. We plan to continue to operate our Office Properties and Retail Properties located in El Paso to maximize returns and capitalize on repositioning, redevelopment and/or development opportunities. We will also consider strategic dispositions of assets in our Existing Portfolio, including the raw land parcels held for redevelopment in downtown El Paso, to maximize cash returns and, as appropriate, to redeploy capital into our new multi-family strategy.

#### *Multi-family*

We intend to acquire multi-family properties in the Target Markets by providing quality housing to historically underserved, rapidly growing, population segments within these markets, many of which have high concentrations of Hispanic residents. We intend to acquire multi-family properties that produce attractive cash returns or that can be repositioned, redeveloped or developed such that they produce attractive cash returns. The Hispanic market segment has experienced significant growth in recent years and is expected to continue to grow at a rate that significantly outpaces the population of the United States at large. Borderplex will capitalize on multi-family housing demand generated by this rapid growth in the southwestern United States by creating a product and brand that explicitly cater to the unique needs and cultural preferences of this growing market segment. The first multi-family acquisition was completed in April 2015.

The table below presents a summary of our Existing Portfolio as of the date of this Private Placement Memorandum:

As of September 30, 2015

| Property/Portfolio | Properties | Sq. Ft. | Occupancy | Average Remaining Lease Term | Avg. Annual Rent Per Occupied Sq. Ft. |
|---|---|---|---|---|---|
| Chase Tower[1,3] | 1 | 351,271 | 79.2% | 3.8 Yrs. | $ 14.70 |
| Wells Fargo Plaza[2,3] | 1 | 309,814 | 89.0% | 3.2 Yrs. | $ 13.83 |
| Retail Portfolio[4] | 13 | 99,957 | 84.0% | 2.7 Yrs. | $ 10.00 |
| Multi-Family[5] | 1 | 146,831 | 95.0% | N/A | N/A |
| **Subtotal - Improved Properties** | **16** | **907,873** | | **2.9 Yrs.** | **$ 11.51** |
| Land Portfolio[6] | 3 | 214,159 | | N/A | N/A |
| **Total** | **19** | **1,122,032** | | **2.9 Yrs.** | **$ 11.51** |

[1]  Occupancy calculation includes 3,697 square feet of office and 3,402 square feet of storage leased on a month-to-month basis totaling 7,099 square feet.

[2]  Occupancy calculation includes 9,257 square feet of office and 4,589 square feet of storage leased on a month-to-month basis totaling 13,846 square feet.

[3]  Rents are generally full service gross with tenants reimbursing expenses over their base year.

[4]  Rents are generally triple net with tenants reimbursing real estate taxes, property insurance, and common area maintenance expenses.

[5]  Occupancy calculation based upon 167 of total 176 units occupied.

<sup>6</sup>  Includes two undeveloped parcels in downtown El Paso, and 3.87 acre expansion site adjacent to San Isidro apartments

*Competitive Environment*

According to the Costar Group, Inc. ("*Costar*"), office vacancy and rents for the El Paso Market have experienced positive trends over the past three years, with vacancy declining from 12.0% to 7.2% and asking rents increasing from $14.68 to $16.21 per square foot as of 3Q2015. While these trends have been positive, office market participants report that property owners may be underreporting vacancy and actual leasing results. With regard to downtown El Paso retail, although there have been some challenges in the El Paso Market, the area has recently begun to see positive activity. In recent years, several national chains including Walgreens, CVS, Starbucks and TCBY opened new stores in the downtown El Paso Market. Further, as of the date of this Private Placement Memorandum, three hotel projects including the Indigo, the A-Loft, and a private boutique hotel, and four mixed-use retail/apartments projects have been announced and are under construction. One high-rise Class A office tower has also recently been announced at 601 Mesa scheduled for completion in 1Q2018. The approval of $470 million in "Quality of Life" bonds dedicated to public improvements will also benefit downtown El Paso. Downtown Quality of Life projects in planning or under construction include the redevelopment of San Jacinto Plaza, a new Children's Museum, a new Hispanic Cultural Center, and a Multi-Purpose Arena. Other public projects in planning or under construction in downtown El Paso include the El Paso Trolley with lines circulating throughout the center city and connecting the UTEP and El Paso Community College campuses to downtown; Brio, a rapid bus transit system, with a central hub in downtown El Paso; and the new baseball stadium, which opened in 2014 as the home of the San Diego Padres Triple A affiliate, the El Paso Chihuahuas, the newest Triple A baseball team in the U.S. We believe that commercial real estate in the El Paso Market should benefit from continued private and public investment.

*Description and Operating Performance*

Our Office Properties include two Class A office buildings located in the heart of the El Paso Market. The Chase Tower is an 18-story high rise with 351,270 rentable square feet, including storage. The property includes an on-site garage with 353 parking spaces and access to an additional 254 spaces in the immediate vicinity. The Wells Fargo Plaza is a 21 story high rise with 309,814 rentable square feet, including storage. Wells Fargo Plaza includes a 580 parking space garage located adjacent to the office tower and connected via an underground tunnel. Since acquisition, the Company has injected capital investments designed to enhance operating performance and desirability of the Office Properties. We have recently completed a full lobby renovation in the Wells Fargo Plaza in 2Q 2015, with a lobby remodel at Chase Tower projected in 2016. We are also actively marketing Chase Tower as one of a limited number of properties in El Paso with direct access to an active fiber optic telecommunications network in order to unlock value associated with this important feature.

Our Retail Properties include 13 properties totaling 99,957 rentable square feet located in downtown El Paso. Plans for the Retail Properties include the potential redevelopment or sale of select properties, as appropriate, in order to maximize returns and to focus our efforts on our new core multi-family strategy. Also included in our Existing Portfolio are two prime development sites totaling 44,643 square feet located directly across from San Jacinto Plaza, in the heart of downtown El Paso. One site is currently utilized for parking while the other is being held for future development. We continue to seek development partners to explore opportunities for maximizing the value of these two sites, but we will also consider strategic dispositions of these sites to maximize cash returns and, as appropriate, to redeploy capital into our new multi-family strategy.

Our multi-family project in Santa Fe, New Mexico is currently managed by Monarch Properties, Inc. Since acquisition in April 2015, the project has performed above underwriting expectations. The adjacent 3.87 acre tract of land zoned and platted for an additional 100 apartments is held for expansion of the San Isidro Apartments.

In the opinion of Borderplex management, properties in our Existing Portfolio are adequately insured.

A summary of historical performance for the properties in our Existing Portfolio is presented in the table below:

|  | 2012 | 2013 | 2014 | 2015 3Q |
|---|---|---|---|---|
| *Average Base Rent Per Sq. Ft.* | | | | |
| Chase Tower [1] | $ 14.53 | $ 14.81 | $ 15.17 | $ 15.50 |
| Wells Fargo Plaza [1] | $ 13.30 | $ 12.73 | $ 13.19 | $ 14.13 |
| Retail Portfolio [2] | $ 9.82 | $ 9.83 | $ 9.56 | $ 8.90 |
| | | | | |
| *Occupancy at year end [3]* | | | | |
| Chase Tower | 74.9% | 79.5% | 73.6% | 81.3% |
| Wells Fargo Plaza | 78.1% | 83.1% | 83.4% | 88.2% |
| Retail Portfolio | 84.7% | 80.4% | 81.9% | 72.8% |

1.  Average rents for Chase and Wells Fargo are office base rents only stated as in place at year end, and exclude storage rates & rooftop revenue.  Office rates are full service gross with tenants reimbursing expenses over base year.  Wells Fargo office rates include rent concessions which expire in 2015.
2.  Rents for retail properties are generally triple net with tenants reimbursing real estate taxes, property insurance, and common area maintenance expenses.
3.  Occupancy stated as of December 31 of each year and September 30, 2015.

*Capital Investments*

Since acquisition, we have invested over $3.5 million in the Chase Tower and $4.8 million in the Wells Fargo Plaza for building improvements.   Over the next five years, we plan to invest just over $7.3 million.  Major elements of our capital improvements program include mechanical upgrades, such as chillers, generators and boiler replacements, code compliance items such as ADA restroom remodels, fire protection, and ACM abatements, as well as cosmetic enhancements to interior and exterior common areas.  With these investments, we intend to realize cost savings from efficiency improvements and increase occupancy by positioning our Office Properties as the premier downtown El Paso addresses.  Our budgeted capital improvement expenditures for the next five years are presented in the table below:

Building Improvements Only (in thousands)

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Chase Tower | $ 1,440 | $ 810 | $ 500 | $ 200 | $ 200 |
| Wells Fargo Plaza | 1,145 | 1,140 | 830 | 850 | 200 |
| Total | $ 2,585 | $ 1,950 | $ 1,330 | $ 1,050 | $ 400 |

Tenant improvements, landlord work and capitalized leasing commissions are excluded.

*Tenancy*

The tenancy at the Chase Tower and Wells Fargo Plaza consists primarily of finance, legal services and other professional services tenants.  For the Retail Properties, tenants consist primarily of local discount retailers and professional services. Major tenants as of the date of this Private Placement Memorandum are presented in the table below:

Tenancy (Sq. Ft. and Annual Rent in thousands)

| Building/ Portfolio | Tenant | Industry | Annualized Base Rent | | Expiration | Sq. Ft. | Percent of Building/ Sq. Ft. |
|---|---|---|---|---|---|---|---|
| Wells Fargo Plaza | Wells Fargo Bank | Banking | $ | 1,024 | Jan-18 | 69 | 22.41% |
| | Kemp Smith | Legal | $ | 307 | Dec-19 | 22 | 7.06% |
| | HealthScope Benefits | Health Services | $ | 223 | Dec-21 | 15 | 4.85% |
| | Sanders Wingo | Advertising | $ | 186 | Apr-18 | 13 | 4.26% |
| | Paso del Norte Health Foundation | Foundation | $ | 207 | Jun-21 | 11 | 3.53% |
| Chase Tower | Strategic Growth Bancorp | Banking | $ | 364 | Jul-23 | 37 | 10.5% |
| | JPMorgan Chase | Banking | $ | 498 | Sep-17 | 33 | 9.3% |
| | Emergence Health Network | Health Services | $ | 484 | Aug-25 | 29 | 8.3% |
| | ScottHulse | Legal | $ | 337 | Aug-18 | 25 | 7.2% |
| | HUB International Texas | Insurance | $ | 323 | Jun-19 | 23 | 6.5% |
| Retail Portfolio | Stewart Title Company | Prof. Services | $ | 226 | Mar-20 | 14 | 14.1% |
| | United Fashions of Texas, Ltd | Retail | $ | 39 | Dec-16 | 10 | 10.4% |

*Lease Roll Over*

For the 10 years ending December 31, 2025, lease roll over for properties in our Existing Portfolio averaged 10% of rentable area per year. While there is some roll over concentration for our Office Properties in 2018 and 2019, the process of completing building upgrades, renovation of the lobbies and the designation of a full-service restaurant space in the lobby of the Wells Fargo Plaza (currently vacant) have been implemented to assist in renewals and increasing occupancy.  With these efforts, we intend to mitigate roll over risk. Lease expirations for the 10 years ending December 31, 2025 are presented in the tables below:

Lease Rollover (Sq. Ft. and Annual Rent in thousands)

| | Chase Tower | | | | Wells Fargo Plaza | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Leases | Sq. Ft. | Annual Rent | Percent of Gross Annual Rent | Leases | Sq. Ft. | Annual Rent | Percent of Gross Annual Rent |
| 2016 | 4 | 9 | $ 162 | 4.0% | 7 | 13 | $ 195 | 5.4% |
| 2017 | 4 | 37 | $ 568 | 14.0% | 8 | 26 | $ 394 | 10.9% |
| 2018 | 7 | 49 | $ 874 | 21.6% | 4 | 97 | $ 1,372 | 37.9% |
| 2019 | 7 | 58 | $ 977 | 24.1% | 4 | 32 | $ 433 | 12.0% |
| 2020 | 5 | 22 | $ 355 | 8.7% | 4 | 17 | $ 271 | 7.5% |
| 2021 | - | - | $ - | 0.0% | 4 | 36 | $ 532 | 14.7% |
| 2022 | 3 | 44 | $ 375 | 9.2% | 1 | 8 | $ 129 | 3.6% |
| 2023 | 1 | 14 | $ 210 | 5.2% | 1 | 12 | $ 84 | 2.3% |
| 2024 | - | - | $ - | 0.0% | - | - | $ - | 0.0% |
| 2025 | 2 | 30 | $ 532 | 13.1% | 1 | 12 | $ 207 | 5.7% |
| **Total** | **33** | **262** | **$ 4,053** | **100.0%** | **34** | **253** | **$ 3,617** | **100.0%** |

| | Retail Portfolio | | | | Total Current Assets | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Leases | Sq. Ft. | Annual Rent | Percent of Gross Annual Rent | Leases | Sq. Ft. | Annual Rent | Percent of Gross Annual Rent |
| 2016 | 10 | 31 | $ 215 | 31.0% | 21 | 53 | $ 572 | 6.8% |
| 2017 | 3 | 10 | $ 89 | 12.8% | 15 | 73 | $ 1,051 | 12.6% |
| 2018 | 3 | 11 | $ 82 | 11.8% | 14 | 156 | $ 2,328 | 27.8% |
| 2019 | 3 | 4 | $ 54 | 7.7% | 14 | 95 | $ 1,463 | 17.5% |
| 2020 | 1 | 14 | $ 226 | 32.5% | 10 | 54 | $ 851 | 10.2% |
| 2021 | 1 | 2 | $ 10 | 1.5% | 5 | 39 | $ 543 | 6.5% |
| 2022 | - | - | $ - | 0.0% | 4 | 52 | $ 504 | 6.0% |
| 2023 | 1 | 1 | $ 19 | 2.7% | 3 | 27 | $ 313 | 3.7% |
| 2024 | - | - | $ - | 0.0% | - | - | $ - | 0.0% |
| 2025 | - | - | $ - | 0.0% | 3 | 42 | $ 739 | 8.8% |
| **Total** | **22** | **74** | **$ 695** | **100.0%** | **89** | **588** | **$ 8,364** | **100.0%** |

*Debt*

As of the date of this Private Placement Memorandum, debt associated with our Existing Portfolio represents 55.7% of the appraised and estimated market values of our total assets, and is comprised primarily of mortgages on our real estate. We expect to continue to employ the prudent use of leverage on these assets in order to optimize the risk return tradeoff for our shareholders. A summary of major components of debt for our Existing Portfolio is presented in the table below:

| Debt | Chase Tower | | Wells Fargo Plaza | | Retail and Land Portfolios[1] | | San Isidro | |
|---|---|---|---|---|---|---|---|---|
| Initial loan amount | $ | 10,000,000 | $ | 11,770,000 | $ | 2,950,000 | $ | 16,657,300 |
| Term[2] | | 240 months | | 120 months | | 180 months | | 480 months |
| Amortization period | | 240 months | | 300 months | | 180 months | | 480 months |
| Interest rate as of October 1, 2015[2] | | 4.300% | | 4.510% | | 5.125% | | 3.200% |
| Balance as of October 1, 2015 | $ | 9,947,191 | $ | 11,770,000 | | Various | $ | 16,341,606 |
| Maturity date[3] | | Aug-35 | | Nov-24 | | Various | | Feb-54 |
| Balloon amount due at maturity | $ | N/A[4] | $ | 10,084,450 | $ | 1,200,000 | $ | N/A[4] |

[1]The Borderplex Bassett, LLC loan is included in the Retail and Land Portfolios; as of November, 2013, the lender may convert the outstanding balance of the note into shares of common equity, in increments of $50,000, at a per share price of $12.50.

[2]Term and interest rate for the Retail and Land Portfolios represent weighted averages.

[3]For the Retail and Land Portfolios, maturity dates range from June 2017 to March 2029.

[4]Fully amortizing.

*VEREIT (f/k/a ARCP) Common Stock*

As further described in this Private Placement Memorandum (See "The Company" - "Company Background and Existing Structure" - "Main Strategic Investments Transaction"), MSI, a company controlled by Christopher H. Cole, contributed to our Operating Partnership 1,645,338 shares of VEREIT Common Stock. VEREIT, Inc. ("*VEREIT*") is a self-managed publicly traded Maryland corporation valued at $7.37 billion with an investment strategy designed to generate consistent monthly dividends to its stockholders, most recently at the rate of 6.4% per annum. It owns, acquires, manages, leases and finances a diversified portfolio of retail, restaurant, office and industrial real estate assets. VEREIT has announced that it will continue to focus on expanding and diversifying its portfolio of high-quality net leased properties with such tenants as Walgreens, FedEx, General Electric and Goodyear. VEREIT intends to maintain an average portfolio lease duration of 10-12 years and continue to pursue an investment strategy designed to maximize cash flow and achieve long term growth. VEREIT's stock price has ranged in the last 12 months from a high of $12.48 to a low of $7.38, and as of October 1, 2015 VEREIT Common Stock closed at $7.73.

## MANAGEMENT OF BORDERPLEX REALTY TRUST

**Board of Trustees and Executive Officers**

Borderplex has a Board of Trustees comprising eight members, divided into three classes. The Declaration of Trust and Bylaws provide that the number of Trustees may be established by the Board of Trustees but may not be fewer than one nor more than 15. The following table sets forth certain information concerning the individuals who currently serve as Trustees:

| Name | Age | Position | Class | Term[1] Ends | Tenure |
|------|-----|----------|-------|--------------|--------|
| W. David Bernard | 66 | Trustee | Class I | 2014 | 8 years |
| J.A. Cardwell | 83 | Chairman and Trustee | Class I | 2014 | 8years |
| Myriam G. de la Vega | 55 | Trustee | Class I | 2014 | 4 years |
| Luis R. Fernandez | 61 | Trustee | Class II | 2015 | 8 years |
| James C. Potts | 69 | Chief Investment Officer and Trustee | Class II | 2015 | 6 months |
| Jeffrey Perea-Branch | 52 | Trustee | Class II | 2015 | 6 months |
| William D. Sanders | 73 | Trustee | Class III | 2016 | 8 years |
| Scott M. Schwartz | 50 | Trustee | Class III | 2016 | 8 years |

[1]Trustees continue to hold office until their successors are elected. The 2014 and 2015 Class Trustees will stand for election and/or their successors will be elected at the next shareholders meeting, to be held in 2016.

The following is a biographical summary of the experience of our Trustees and executive officers.

**W. David Bernard** – Mr. Bernard is president and chairman of ScottHulse PC, an El Paso-based regional law firm with offices in El Paso and San Antonio, Texas and Las Cruces, NM. He has been certified in commercial real estate law by the Texas State Board of Legal Specialization since 1983. Since joining ScottHulse in 1979, Mr. Bernard has advised clients on all aspects of the acquisition, financing, development, construction, leasing, management and sale of improved and unimproved real property, as well as formation of joint ventures, partnerships and syndications of real estate projects. Mr. Bernard has represented clients in the sale or acquisition of more than thirty privately held companies ranging in size from $2 million to $120 million in enterprise value. He received a Bachelor of Science degree with honors from The United States Military Academy and a Doctor of Jurisprudence with honors from the University of Texas School of Law, where he was associate editor of the Texas Law Review. He is currently chairman of the El Paso Museum of Art Foundation and has served on the executive committee and as general counsel of the Greater El Paso Chamber of Commerce, president of the board of directors of St. Clement's Episcopal School, and chancellor of the Episcopal Diocese of the Rio Grande.

**Jeffrey Perea-Branch** – Mr. Branch is a real estate developer and entrepreneur. Born in Santa Fe, New Mexico, Mr. Branch is a 32-year veteran of the commercial real estate industry in the southwestern United States. His development experience includes regional & community retail, medical office, multi-family, hotel and industrial/office. Mr. Branch has developed projects for numerous institutional and corporate clients including: *Christus--Healthcare,* http://www.christushealth.org*, Whole Foods Market,* http://www.wholefoodsmarket.com*, Lowe's Home Improvement,* http://www.Lowes.com*, Regal Cinemas,* http://www.regmovies.com to name a few. Prior to launching his management/leasing and development companies in 2000, Mr. Branch co-founded Branch Commercial Real Estate Advisors in 1985, with his father Michael Branch. Mr. Branch graduated from Arizona State University with a Bachelor of Science in Architecture/Urban Planning and a minor in Real Estate finance. Mr. Branch holds the Certified Commercial Investment Member (CCIM) designation and the Certified Retail Executive (CRX) designation from the International Council of Shopping Centers. An active participant in the commercial real estate industry in New Mexico & the southwestern United States, Mr. Branch is a former board member of National Association of Office and Industrial Properties (NAIOP). He was previously a member of the Santa Fe, New Mexico's Historic Design Review Board and the Metropolitan Redevelopment Commission.

**J. A. Cardwell** – Mr. Cardwell founded Petro Stopping Centers L.P., an operator of full-service truck stopping centers, in 1975 and served as its chief executive officer until it was sold for $725 million in 2011.  Mr. Cardwell served as a director of Archstone-Smith Trust (NYSE: ASN), and its predecessors Property Trust of America, Security Capital Pacific Trust and Archstone Communities Trust from 1980 to 2007, when it was taken private in a transaction valued at $22.2 billion.  Mr. Cardwell was also a director of the El Paso Electric Company from 1990 to 2004 and a director of State National Bancshares, Inc.

**Myriam G. de la Vega** – Since 2006, Ms. de la Vega has served as the chief executive officer of Maximus Inmobiliaria, the development and Management Company for Grupo de la Vega's real estate operations, and vice president of Almacenes Distribuidores de la Frontera.  Prior to assuming these responsibilities, she was the managing director of Carta Blanca de Cd. Juarez, the second largest beer distributor in Mexico.  Ms. De la Vega is a founder and major stockholder in Domino's Pizza Cd. Juárez and Altec Purificación.  She also serves on the Board of Afore Nacional Banamex and is an active member of Grupo Empresarial Promotor Siglo XX1, Centro Cultural Paso del Norte, Plan Estratégico de Cd. Juárez, Proyecto Educativo ESCUELA PARA EL ÉXITO, Hospital Infantil de Cd. Juárez and Task Force for the Recovery of Public Spaces in Chihuahua State.

**James C. Potts** – Mr. Potts is Chief Investment Officer of Borderplex.  Mr. Potts is founder and President of State SteelWorks, where he provides strategic direction and oversight of operating performance.  Previously, Mr. Potts served as Chairman of Verde Apartment Communities, a wholly-owned subsidiary of a private REIT involved in development, construction and management of upscale multi-family communities. Prior to that, Mr. Potts held a number of senior positions with Security Capital Group Incorporated (NYSE:SCZ) until its sale to GE Capital. Those responsibilities included Co-Chairman and Chief Investment Officer of Security Capital Atlantic, (NYSE:SCA), and, President and COO of Homestead Studio Suites Hotels (NYSE:HSD), an extended-stay hotel company which developed and operated 136 hotels across the continental U.S.  Prior to that, Mr. Potts was a Senior Partner with Trammel Crow Residential and a member of its management board. Mr. Potts is a graduate of Georgia Tech and holds an MBA degree from Georgia State University.

**Luis R. Fernandez** – Mr. Fernandez is currently the chairman and chief executive officer of Frutas Concentradas, a leading marketer and importer of Mexican soft drinks and groceries into the United States.  He also serves as the chairman for Sistema Axis, S.A., a developer of residential housing in Northern Mexico; Axiscom, S.A., a major shareholder of Transtelco Holding, Inc., which provides telecommunications service in Mexico; and Fevaxis, S.A., a primary shareholder of one of Mexico's largest glass container manufacturers.  Mr. Fernandez serves on the boards of Capital Bank and Aqua Salus, S.A., and is a member of the Borderplex Alliance and partner of Plan Estrategico de Cd. Juarez.

**William D. Sanders** – Mr. Sanders founded and currently serves as the chairman of Strategic Growth Bank Incorporated, a Southwestern focused financial holding company.  Mr. Sanders is a member of the Board of Capital Bank in El Paso, Texas, and of First National Bank of Santa Fe, which operates as First National Santa Fe, First National Denver, and First National Rio Grande.  Mr. Sanders is also Chairman of the Board of Guardian Mortgage Company, Inc.  Prior to founding Strategic Growth Bancorp, he founded Verde Realty, a private real estate investment trust, and served as its co-chairman. Mr. Sanders also founded and served as chairman of Security Capital Group Incorporated, a publicly held international real estate operating and investment management company, which was sold to GE Capital Corporation in May 2002.  Founded in 1991, Security Capital had controlling interests in 18 public and private fully integrated real estate operating companies with a total market capitalization of over $26 billion, eight of which were NYSE listed companies.  The principal offices of Security Capital and its directly-owned affiliates were in Atlanta, Brussels, Chicago, Denver, El Paso, Houston, London, Luxembourg City, New York and Santa Fe.  Prior to establishing Security Capital, Mr. Sanders founded LaSalle Partners Limited (now Jones Lang LaSalle Incorporated) in 1968 and served as its chairman until his retirement in 1989.  He previously served as a director of CarrAmerica, Continental Bank Corporation, King Ranch, Inc., Lone Star Technologies, R.R. Donnelley, Security Capital European Realty, Security Capital US Realty and Storage USA.  He is a past chairman of the National Association of Real Estate Investment Trust and is a Trustee Emeritus of Cornell University.  Mr. Sanders is a member of the Board of Directors of Western Refining, Inc. (NYSE:WNR).

**Scott M. Schwartz** – Mr. Schwartz is chief executive officer of The Mesa Group, Inc., a diversified investment, real estate development and asset Management Company with holdings in commercial real estate and residential land development companies and banking. Mr. Schwartz is responsible for capital deployment,

development, financing and management of The Mesa Group's assets.  Mr. Schwartz serves on the boards of directors of Southwest Land Development Services, Inc., Rocky Mountain Mortgage Company, as well as Foster-Schwartz Development and its affiliated companies.  He also serves on the Board of Directors and Executive Committee of the Greater El Paso Chamber of Commerce and the El Paso Regional Economic Development Corporation, and is a member of Young Presidents' Organization.  Mr. Schwartz serves on the boards of numerous other civic and charitable organizations. Mr. Schwartz graduated *magna cum laude* with Honors from Claremont McKenna College in Claremont, California.

## Advisors

The Board of Trustees may appoint advisors in such numbers as it may determine to advise the Board.  Any such advisors may attend meetings of the Board of Trustees and/or Borderplex committee meetings upon invitation of the Board and may participate in such meetings with voice but no vote.  The Board of Trustees has appointed the following person as an advisor:

**A. Richard Moore** - Richard Moore has been a Managing Director of Strategic Growth Bank Incorporated since February 2013.  Prior to joining Strategic Growth, Mr. Moore was affiliated with Verde Realty, a Maryland REIT, in various positions including Executive Vice President, Chief Financial Officer, and Corporate Secretary from November 2004 through December 2012.  From December 1999 through November 2004, Mr. Moore was based in London with Security Capital European Realty where he served as Chairman of the Board and Chief Executive Officer.  Mr. Moore was a Managing Director of Security Capital Group Incorporated (NYSE:SCZ) from May 1998 through May 2003, serving as interim Chief Financial Officer of Homestead Village Incorporated (NYSE:HSD) from August 1998 through December 1999.  Mr. Moore was with Goldman, Sachs & Co. from June 1980 through April 1998.  For 16 years he was in the Real Estate Department of the Investment Banking Division.  From November 1996 through April 1998, Mr. Moore was an equity analyst for the REIT industry at Goldman Sachs.  From 1973 through 2000, Mr. Moore was associated with Winthrop Paul Rockefeller & Associates, serving as chief operating officer from 1973 through 1978; and from 1970 through 1973, Mr. Moore was an associate of Winthrop Rockefeller & Associates serving as a speechwriter to Mr. Rockefeller while he served as Governor of Arkansas and as coordinator for his activities in rural economic development once he left office.  Mr. Moore is a Director of the Paso del Norte Foundation.  Mr. Moore holds a B.A. and B.D from Southern Methodist University and an M.B.A. from the Harvard Business School.

## Classified Board

In accordance with our Declaration of Trust, the Board of Trustees is divided into three classes, Class I, Class II and Class III, with the Trustees of each class serving until the third annual meeting after their election, and thereafter until their successors are duly elected and qualify.  At each annual meeting of shareholders, upon the expiration of the term of a class of Trustees, the successor to each such Trustee in the class will be elected to serve from the time of election and qualification until the third annual meeting following his or her election and until his or her successor is duly elected and qualifies.  Any additional trusteeships resulting from an increase in the number of trustees will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the trustees.

## Management

The founders of Borderplex and current Trustees have devoted and will continue to devote significant time and energy to the development of Borderplex.  In addition, the Board has recently assembled a highly qualified management team, with substantial multi-family real estate and finance experience.  In particular, James Potts, who will become chief investment officer following completion of this offering, has more than 30 years of industry experience.

In addition to Mr. Potts, the Encore Transaction will enable to the Company to acquire an experienced, six person multi-family development team encompassing senior management, land acquisition management, development management, asset management, development operations and administrative services.  This team consists of Bradley Miller (President), Charlie Keels (Land Acquisition Manager), Angela Hill (Senior Development

Manager), Patricia Ivie (Asset Manager), Ryan Hayden (Development Associate) and Amanda Henson (Administrative Services).  The following is a summary of the experience of Mssrs. Miller and Keels:

**Brad Miller – President of Encore Multi-Family**

Brad Miller has over 30 years of multi-family development and investment experience and has overseen the development and acquisition of more than 20,000 multi-family units.  Prior to joining Encore Multi-Family, LLC, Mr. Miller served as a national partner for Fore Property Company, where he oversaw development activities in multiple markets, including Florida, Arizona, Nevada, and Texas. He also was directly responsible for developing the first LEED-certified multi-family community in North Texas.  Mr. Miller served as CEO for a subsidiary of Olympus Real Estate Partners where he oversaw the development of approximately 3,000 residential lots and over 20 investments comprising of $350 million in asset value. In addition, he was a residential partner with Lincoln Property Company.  Mr. Miller oversaw development and investment activities for Security Capital Atlantic (NYSE:SCA). Mr. Miller has a Bachelor of Business Administration in Accounting from Texas Christian University and is a Certified Public Accountant in Texas. He also is a Certified Class A General Contractor in Florida.

**Charlie Keels – Development and Finance Manager of Encore Multi-Family**

Charlie Keels is the development and finance manager for Encore Multi-Family, where he is actively involved in all multi-family functions and is responsible for underwriting, due-diligence, pre-development, financing, development, and acquisitions. He also has experience in HUD/FHA financing as well as conventional financing and is actively involved in structuring new debt.  Mr. Keels previously served as the controller of a skilled nursing facility chain.  Mr. Keels holds a Bachelor of Business Administration in Accounting from Texas A&M University.

**Trustee Compensation**

Dating to the founding of the Company, Trustees have served without compensation.  The Board of Trustees will continue to review the appropriateness of implementing a compensation plan for its Trustees as we begin the implementation of our new multi-family strategy.

## SECURITIES AND SECURITY OWNERSHIP

The following table sets forth information regarding the beneficial ownership of our common shares of beneficial interest in the Company and/or Operating Partnership Units in our Operating Partnership as of October 1, 2015 by:

- each person known by us to be the beneficial owner of more than 5% of our outstanding common shares and/or Operating Partnership Units convertible into common shares representing more than 5% of our outstanding common shares

- each of our officers and Trustees; and

- all of our officers and Trustees as a group.

| Name of Beneficial Owner | Position | Shares[1] | OP Units[2] | Class | Percent of Common |
|---|---|---|---|---|---|
| W. David Bernard[3] | Trustee | 10,000 | | Common | 0.3% |
| Jeffrey Perea Branch[4] | Trustee | | 322,580 | OP | |
| J.A. Cardwell[5] | Chairman and Trustee | 120,000 | | Common | 4.1% |
| Luis R. Fernandez[6] | Trustee | 90,000 | | Common | 3.1% |
| James C. Potts | Trustee | 0 | | | 0% |
| William D. Sanders | Trustee | 50,000 | | Common | 1.7% |
| Scott M. Schwartz[7] | Trustee | 50,000 | | Common | 1.7% |
| Myriam G. de la Vega | Trustee | 25,000 | | Common | 0.9% |
| **Subtotal Trustees and Officers** | | **345,000** | **322,580** | | **12.07%** |
| Paul L. Foster[8] | NA | 270,005 | | Common | 9.5% |
| Main Strategic Investments, LLC[9] | NA | | 1,935,484 | OP | |
| **Total** | | **615,005** | **2,258,064** | | **21.57%** |

[1]2,858,507 common shares outstanding as of the date of this Private Placement Memorandum.

[2]2,290,105 Operating Partnership Units outstanding as of the date of this Private Placement Memorandum.

[3]W. David Bernard's beneficial ownership totals include 10,000 shares owned by BFLP Partners, his family partnership. Other members of ScottHulse PC, where Mr. Bernard serves as chairman, own or control an additional 40,000 shares.

[4]San Isidro Apartments, LLC, an affiliate of Jeffrey Perea Branch, owns 322,580 Operating Partnership Units.

[5]J.A. Cardwell's beneficial ownership totals include 20,000 shares owned by J. A. Cardwell, 50,000 shares owned by J.A. Cardwell, Jr. and 50,000 shares owned by CP Properties, LP.

[6]Luis R. Fernandez's beneficial ownership totals include 90,000 shares owned by Grupo Feralsa, S.A. de C.V.

[7]Scott M. Schwartz's beneficial ownership totals include 50,000 shares owned by The Mesa Group II, Ltd.

[8]Paul L. Foster's beneficial ownership totals include 50,000 shares owned by Paul L. Foster, 25,000 shares owned by his wife, Alejandra de la Vega, and 195,005 shares owned by Franklin Mountain Investments Limited Partnership.

[9]Main Strategic Investments, LLC, an affiliate of Christopher H. Cole, owns 1,935,484 Operating Partnership Units. Pursuant to the Investor Rights Agreement, MSI has the right to designate two individuals to be included in the slate of nominees recommended by the Board of Trustees for election at the annual meeting of shareholders. Main Strategic Investments, LLC has not exercised this right as of the date of this Private Placement Memorandum.

The following table sets forth mailing addresses of the beneficial owners indicated above:

| Name of Beneficial Owner | Address |
| --- | --- |
| W. David Bernard | 201 E. Main, Suite 1100, El Paso, TX  79901 |
| Jeffrey Perea Branch | P.O. Box 2328, Santa Fe, NM  87504 |
| J. A. Cardwell | 6080 Surety Dr., El Paso, TX 79905 |
| Luis R. Fernandez | 500 W. Overland Ave., Suite 300, El Paso, TX 79901 |
| James C. Potts | 1155 Allgood Road, Suite 6, Marietta, GA 30062 |
| William D. Sanders | 201 E. Main, 3rd Floor, El Paso, TX 79901 |
| Scott M. Schwartz | P.O. Box 12010, El Paso, TX 79913 |
| Myriam G. de la Vega | 303 N. Oregon, Suite 1201, El Paso, TX 79901 |
| Paul L. Foster | 123 West Mills Ave., Suite 600, El Paso, TX 79901 |
| Main Strategic Investments, LLC | 201 E. Main, Suite 1517, El Paso, TX 79901 |

## CERTAIN RELATIONSHIPS AND RELATED-PARTY TRANSACTIONS

### Competing Businesses of Trustees

Many of the Trustees are engaged in the real estate business in El Paso, Texas and some of the other initial Target Markets. The interests and economic objectives of the Trustees, insofar as their existing holdings are concerned, may compete and conflict with the objectives and holdings of Borderplex in its Target Markets. See "The Company – Conflicts of Interest Policies."

### Renewal of Leases With Tenants of the Chase Tower Affiliated With Certain Trustees

Two of the major tenants in the Chase Tower are ScottHulse PC, occupying 24,042 square feet of office space and 1,256 square feet of storage, and Strategic Growth Bancorp, occupying 36,939 square feet of office space. Those tenants are affiliates of Trustees W. David Bernard and William D. Sanders, respectively. The leases in the Chase Tower with ScottHulse PC and Strategic Growth Bancorp are material to the profitability of the Chase Tower. The lease with ScottHulse PC comes up for renewal in 2018, and the lease with Strategic Growth Bancorp comes up for renewal in 2022. There are no assurances that either of these leases will be renewed or that, if either of them is renewed, it will be renewed at the same rental rates as or higher rates than currently provided in the lease. The interests of ScottHulse PC and Strategic Growth Bancorp, respectively, will be adverse to the interests of Borderplex in negotiating any such lease renewals.

### ScottHulse PC.

ScottHulse PC, an affiliate of Trustee W. David Bernard, has provided legal services to Borderplex in connection with the preparation of this Private Placement Memorandum and the offering of the REIT Shares. ScottHulse PC will receive payment for these legal services from Borderplex from the proceeds of the offering.

### Trustee and Executive Officer Compensation.

Dating to the founding of the Company, Trustees have served without compensation. The Board of Trustees will continue to review the appropriateness of implementing a compensation plan for its Trustees as we begin the implementation of our new multi-family strategy. The Board of Trustees will also continue to review and evaluate executive officer compensation, to include the desirability of an equity incentive plan for executive officers and other employees. See "Management of Borderplex Realty Trust – Trustee Compensation", and "The Company" – "Equity Incentive Plan".

### Exculpation and Indemnification of Officers and Trustees

The Borderplex Declaration of Trust eliminates the liability of Trustees and officers to Borderplex and its shareholders for money damages to the maximum extent permitted by Maryland law as in effect from time to time. Maryland currently permits the declaration of trust of a Title 8 REIT to provide that trustees and officers will not be liable to the trust or its shareholders for money damages, except for liability resulting from (i) actual receipt of an improper benefit or profit in money, property, or services; or (ii) a final judgment based upon a finding of active and deliberate dishonesty by the trustee or officer that was material to the cause of action adjudicated. See "Certain Provisions of Maryland Law and of the Borderplex Declaration of Trust, Bylaws and Securityholders' Agreement" – "Limitation of Liability and Indemnification of Trustees and Officers".

## DESCRIPTION OF SHARES OF BENEFICIAL INTEREST

*The following summary of the material terms of our shares of beneficial interest does not purport to be complete and is subject to and qualified in its entirety by reference to Title 8 and to our Declaration of Trust and Bylaws. Certain provisions of our Declaration of Trust and Bylaws are summarized elsewhere in this Private Placement Memorandum under various headings. For a complete description, refer to the Borderplex Declaration of Trust and Bylaws, copies of which will be provided upon request. See "Additional Information".*

### General

The Borderplex Declaration of Trust provides that Borderplex may issue up to: (i) 250,000,000 common shares of beneficial interest, $0.01 par value per share, and (ii) 50,000,000 preferred shares of beneficial interest, $0.01 par value per share. As of the date of this Private Placement Memorandum, 2,858,507 common shares of beneficial interest are issued and outstanding among 215 shareholders, and no preferred shares are issued and outstanding. Upon completion of the offering, assuming the sale of the 5,160,000 shares offered, there will be 8,018,507 common shares of beneficial interest issued and outstanding (assuming the issuance of all of the REIT Shares described in this Private Placement Memorandum) and no preferred shares will be issued and outstanding. As permitted by Maryland law, the Borderplex Declaration of Trust permits the Borderplex Board of Trustees, with the approval of a majority of the entire Board and without any action by Borderplex shareholders, to amend the Borderplex Declaration of Trust to increase or decrease the aggregate number of shares of beneficial interest or the number of shares of any class or series of shares of beneficial interest that Borderplex has authority to issue.

Maryland law and the Borderplex Declaration of Trust provide that none of the Borderplex shareholders will be personally liable for any of obligations of Borderplex solely as a result of that shareholder's status as a shareholder.

### Voting Rights of Common Shares

Subject to the provisions of the Borderplex Declaration of Trust regarding the restrictions on the transfer and ownership of shares of beneficial interest and except as may otherwise be specified in the terms of any class or series of Borderplex shares, each outstanding common share of beneficial interest will entitle the holder to one vote on all matters submitted to a vote of shareholders, including the shareholders' election of Trustees, and, except as provided with respect to any other class or series of shares of beneficial interest, the holders of such common shares possess the exclusive voting power. Trustees elected by shareholders will be elected by the affirmative vote of a plurality of the votes cast at a meeting of shareholders. There is no cumulative voting in the election of Trustees.

### Dividends, Liquidation, and Other Rights

All REIT Shares issued in connection with the offering will be duly authorized, fully paid and non-assessable. Holders of REIT Shares will be entitled to receive dividends when, as and if authorized by the Borderplex Board of Trustees and declared by Borderplex out of assets legally available for the payment of dividends. Holders of REIT Shares also will be entitled to share ratably in the assets of Borderplex legally available for distribution to shareholders in the event of its liquidation, dissolution or winding up, after payment of or adequate provision for all of its known debts and liabilities. These rights are subject to the preferential rights of any other class or series of shares of beneficial interest of Borderplex and to the provisions of the Borderplex Declaration of Trust regarding restrictions on transfer of shares.

Holders of REIT Shares have no preference, conversion, exchange, sinking fund, or redemption or appraisal rights, and have no preemptive rights to subscribe for any of Borderplex's other securities. Subject to the restrictions on transfer of shares contained in the Borderplex Declaration of Trust and the Borderplex Securityholders' Agreement and to the power of the Board of Trustees to reclassify common shares with differing voting rights, all common shares will have equal dividend, liquidation and other rights.

**Power to Reclassify Shares**

The Borderplex Declaration of Trust authorizes the Board of Trustees to classify and reclassify any unissued preferred shares and to reclassify any previously classified but unissued common shares and preferred shares of any series from time to time in one or more series, as authorized by the Board of Trustees, without shareholder approval.  Prior to issuance of shares of each class or series, the Board of Trustees is required by Maryland law and the Declaration of Trust to set for each such class or series, subject to the provisions of the Declaration of Trust regarding the restrictions on transfer of shares of beneficial interest, the terms, preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications, and terms or conditions of redemption for each such class or series.  As a result, the Board of Trustees could authorize the issuance of preferred shares that have priority over the REIT Shares with respect to dividends and rights upon liquidation and with other terms and conditions that could have the effect of delaying, deterring or preventing a transaction or a change in control that might involve a premium price for holders of REIT Shares or otherwise might be in their best interests.  As of the date of this Private Placement Memorandum, no preferred shares are outstanding, and no preferred shares will be issued in connection with the offering.

**Restrictions on Ownership and Transfer**

The Borderplex Declaration of Trust contains restrictions on the ownership and transfer of our shares of beneficial interest that are intended to assist us in qualifying under the Code as a REIT, among other purposes.  For Borderplex to qualify as a REIT under the Code no more than 50% of the value of its shares (after taking into account options to acquire shares) may be owned, directly or indirectly, by five or fewer individuals (as defined in the Code to include certain entities and constructive ownership among specified family members) during the last half of a taxable year (other than the first taxable year).

Subject to certain exceptions specified in the Declaration of Trust, no holder may own, or be deemed to own by virtue of the attribution provisions of the Code, more than 9.8% (the *"Ownership Limit"*) of the number or value of the issued and outstanding shares of beneficial interest of Borderplex.  The Board of Trustees, upon receipt of a ruling from the IRS or an opinion of counsel or other evidence satisfactory to the Board of Trustees and upon such other conditions as the Board of Trustees may direct, may also exempt a proposed transferee from the Ownership Limit, provided that the Board of Trustees obtains such representations and undertakings from such proposed transferee as the Board deems appropriate and such proposed transferee agrees that any violation will result in the exchange of such shares for Excess Shares (as defined below), to the extent necessary.  In connection with granting a waiver of the Ownership Limit or at any other time, our Board of Trustees may from time to time increase or decrease the Ownership Limit for all persons, unless, after giving effect to such increase, five or fewer individuals could beneficially own, in the aggregate, more than 49.9% in number or value of our shares of beneficial interest.  A decreased Ownership Limit may only be made prospectively as to subsequent holders (other than a decrease as a result of a retroactive change in existing law that would require a decrease for Borderplex to maintain its REIT status under the Code).  Prior to increasing or decreasing the Ownership Limit, the Board of Trustees may require such opinions of counsel, affidavits, undertakings or agreements as it may deem necessary or advisable in order to ensure Borderplex's status as a REIT.  The Ownership Limit may not be increased to a percentage which is greater than 9.8%.  Except as otherwise permitted pursuant to such an exception from the Board of Trustees, any transfer of shares or other event that would create a direct or indirect ownership of shares of Borderplex in excess of the Ownership Limit shall be null and void *ab initio*, and the intended transferee will acquire no rights to the shares.  In addition, any transfer of shares or other event that, if effective, would (i) result in our shares being beneficially owned by fewer than 100 persons (determined under the principles of Section 856(a) of the Code), (ii) result in our being "closely held" under Section 856(h) of the Code or otherwise cause us to fail to qualify to be taxed as a REIT or (iii) cause us to constructively own 9.8% or more of the ownership interests in a tenant of our real property shall be null and void *ab initio*, and the intended transferee will acquire no rights to the shares.

The foregoing restrictions on transferability and ownership will not apply if the Board of Trustees determines that it is no longer in the best interests of Borderplex to attempt or to continue to qualify as a REIT.

Any shares of beneficial interest of Borderplex, the purported transfer of which would result in a person (the *"Purported Transferee"*) owning shares in excess of the Ownership Limit or violation of any other restriction described above, that is not otherwise permitted as provided above will constitute excess shares (*"Excess Shares"*)

of the same class and will be transferred pursuant to the Declaration of Trust to a party not affiliated with Borderplex designated by Borderplex as the trustee of a trust for the exclusive benefit of an organization or organizations described in Sections 170(b)(1)(A) and 170(c) of the Code and identified by the Board of Trustees as the beneficiary or beneficiaries of the trust (the *"Charitable Beneficiary"*), until such time as the Excess Shares are transferred to a person whose ownership will not violate the restrictions on ownership.  While these Excess Shares are held in trust, they will be entitled to share in any distributions paid with respect to such Excess Shares, which will be paid to the trust for the benefit of the Charitable Beneficiary and may only be voted by the trustee for the benefit of the Charitable Beneficiary.  Subject to the Ownership Limit, the Excess Shares will be transferred by the trustee at the direction of Borderplex to any person (if the Excess Shares would not be Excess Shares in the hands of such person).  The Purported Transferee will receive the lesser of (i) the price paid by the Purported Transferee for the Excess Shares (or, if no consideration was paid, fair market value on the day of the event causing the Excess Shares to be held in trust) or (ii) the price received from the sale or other disposition of the Excess Shares held in trust.  Any proceeds in excess of the amount payable to the Purported Transferee will be paid to the Charitable Beneficiary.  In addition, such Excess Shares held in trust are subject to purchase by Borderplex for a 90-day period at a purchase price equal to the lesser of (i) the price paid for the Excess Shares by the Purported Transferee (or, if no consideration was paid, fair market value at the time of the event causing the shares to be held in trust) or (ii) the fair market value of the Excess Shares on the date Borderplex elects to purchase.  Fair market value, for these purposes, means the last reported sales price reported on the NYSE on the trading day immediately preceding the relevant date, or if not then traded on the NYSE, the last reported sales price on the trading day immediately preceding the relevant date as reported on any exchange or quotation system over or through which the relevant class of shares may be traded, or if not then traded over or through any exchange or quotation system, then the market price on the relevant date as determined by the Board of Trustees.

From and after the purported transfer to the Purported Transferee of the Excess Shares, the Purported Transferee shall cease to be entitled to distributions, voting rights and other benefits with respect to the Excess Shares except the right to payment on the transfer of the Excess Shares as described above.  Any distribution paid to a Purported Transferee on shares prior to the discovery by Borderplex that such shares had been exchanged for Excess Shares in violation of the provisions of the Declaration of Trust shall be repaid to the trust for the benefit of the Charitable Beneficiary.

Any certificates evidencing shares of beneficial interest will bear a legend referring to the restrictions described above.

Any person who acquires or attempts or intends to acquire shares that will or may violate any of the foregoing restrictions on transferability and ownership, or any person who is a transferee such that Excess Shares would result, is required to give written notice immediately to us, or in the case of a proposed or attempted transfer to give at least 30 days' prior written notice, and provide us with such other information as we may request.

Each shareholder shall upon demand be required to disclose to Borderplex in writing such information with respect to the direct, indirect and constructive ownership of shares of beneficial interest as the Board of Trustees deems reasonably necessary.

These ownership limitations could have the effect of discouraging a takeover or other transaction in which holders of some, or a majority, of the common shares might receive a premium for their shares over the then prevailing market price or which such holders might believe to be otherwise in their best interest.

In addition, the REIT Shares are subject to the restrictions on transfer set forth in the Borderplex Securityholders' Agreement.  Under the Borderplex Securityholders' Agreement, investors who acquire REIT Shares in this offering may transfer such shares, subject to compliance with applicable securities laws and a right of first offer in favor of Borderplex.  Notwithstanding the foregoing restrictions on transfers, subject to certain conditions, each investor may transfer REIT Shares to (i) affiliates, (ii) members of the investor's immediate family, (iii) such investor's executors, administrators, testamentary trustees, legatees or beneficiaries upon such investor's death, and (iv) any lender to whom such REIT Shares are assigned to secure a bona fide indebtedness of such investor.  Additionally, no transfer of Borderplex shares will be permitted if such transfer or conversion would result in or constitute a non-exempt prohibited transaction under the ERISA or Section 4975 of the Code or would likely

cause the assets of Borderplex to be deemed "plan assets" (as defined in ERISA and regulations under ERISA). However, the Company cannot provide any assurances that ERISA "plan assets" status will be avoided.

The REIT Shares offered in this Private Placement Memorandum have not been registered under the Securities Act or the securities laws of any jurisdiction and are subject to the restrictions set forth under the heading "Private Placement and Notice to Investors – Transfer Restrictions."

**Transfer Agent and Registrar**

Borderplex will act as its own transfer agent and registrar for its shares.

**CERTAIN PROVISIONS OF MARYLAND LAW AND OF THE
BORDERPLEX DECLARATION OF TRUST, BYLAWS AND SECURITYHOLDERS' AGREEMENT**

*The following is a description of certain provisions of Maryland law and of the Borderplex Declaration of Trust, Bylaws and Securityholders' Agreement. For a complete description, refer to Maryland law and to the Borderplex Declaration of Trust, Bylaws and Securityholders' Agreement, copies of which will be provided upon request. See "Additional Information."*

**Number of Trustees; Classified Board; Vacancies**

The Borderplex Declaration of Trust and Bylaws provide that the number of Trustees may only be increased or decreased by a vote of a majority of the entire Board of Trustees. Upon completion of the offering, the Board of Trustees is expected to consist of eight members. Except as may be provided by the Board of Trustees in setting the terms of any class or series of shares, any vacancy, including a vacancy created by an increase in the number of Trustees, may be filled only by a majority of the remaining Trustees, even if the remaining Trustees do not constitute a quorum, and any Trustee elected to fill such vacancy shall serve until the next annual meeting of shareholders and until his or her successor is duly elected and qualifies.

The Declaration of Trust and Bylaws provide that the number of Trustees may be established by the Board of Trustees but may not be fewer than one nor more than 15. In accordance with the terms of the Declaration of Trust, our Board of Trustees is divided into three classes, Class I, Class II and Class III, with each class of Trustees serving until the third annual meeting after their election and until their successors are duly elected and qualify. As the term of each class expires, Trustees in that class will be elected to serve until the third annual meeting of shareholders after their election and until their successors are duly elected and qualify.

At least two annual meetings of shareholders, instead of one, will generally be required to effect a change in a majority of the Board of Trustees, which could discourage a third party from making a tender offer or otherwise attempting to obtain control of Borderplex, even though such an attempt might be beneficial to Borderplex and its shareholders.

**Removal of Trustees**

The Borderplex Declaration of Trust provides that, subject to the right of one or more holders of preferred shares to elect or remove one or more Trustees, a Trustee may only be removed for cause and then only by the affirmative vote of at least two-thirds of the votes entitled to be cast in the election of Trustees. This provision, when coupled with the exclusive power of the Board of Trustees of Borderplex to fill vacancies on the Board of Trustees, precludes shareholders from removing incumbent Trustees and filling the vacancies created by such removal with their own nominees.

**Business Combinations**

Maryland law prohibits certain "business combinations" between Borderplex and an interested shareholder or an affiliate of an interested shareholder for five years after the most recent date on which the interested shareholder becomes an interested shareholder. These business combinations include a merger, consolidation, share exchange, or, in circumstances specified in the statute, an asset transfer or issuance or reclassification of equity securities. Maryland law defines an interested shareholder as:

- any person who beneficially owns 10% or more of the voting power of the company's outstanding voting shares; or

- an affiliate or associate of the company who, at any time within the two year period prior to the date in question, was the beneficial owner of 10% or more of the voting power of the company's then outstanding voting shares.

A person is not an interested shareholder of Borderplex if the Borderplex Board of Trustees approves in advance the transaction by which the person would otherwise have become an interested shareholder. In approving

a transaction, the Board of Trustees may provide that its approval is subject to compliance, at or after the time of approval, with any terms and conditions determined by the Board of Trustees.

After the five-year prohibition, any business combination between a Title 8 REIT, such as the Company, and an interested shareholder generally must be recommended by the board of trustees and approved by the affirmative vote of at least:

- 80% of the votes entitled to be cast by holders of the company's then outstanding voting shares; and

- two-thirds of the votes entitled to be cast by holders of the company's voting shares other than shares held by the interested shareholder with whom or with whose affiliate the business combination is to be effected or shares held by an affiliate or associate of the interested shareholder.

These super-majority vote requirements do not apply if shareholders receive a minimum price, as defined under Maryland law, for their shares in the form of cash or other consideration in the same form as previously paid by the interested shareholder for its shares.

**Control Share Acquisitions**

Maryland law provides that a holder of "control shares" of a Title 8 REIT acquired in a "control share acquisition" has no voting rights with respect to those shares unless approved by a vote of two-thirds of the votes entitled to be cast on the matter.  Shares owned by the acquiring person, by officers or by employees who are Trustees are excluded from the shares entitled to vote on the matter.  "Control shares" are voting shares that, if aggregated with all other shares previously acquired by the acquiring person, or in respect of which the acquiring person is able to exercise or direct the exercise of voting power (except solely by virtue of a revocable proxy), would entitle the acquiring person to exercise voting power in electing Trustees within one of the following ranges of voting power:

- one-tenth or more but less than one-third;

- one-third or more but less than a majority; or

- a majority or more of all voting power.

Control shares do not include shares the acquiring person is then entitled to vote as a result of having previously obtained shareholder approval.  A "control share acquisition" means the acquisition of issued and outstanding control shares, subject to certain exceptions.

A person who has made or proposes to make a control share acquisition may compel the board of trustees to call a special meeting of shareholders to be held within 50 days of demand to consider the voting rights of the shares.  The right to compel the calling of a special meeting is subject to the satisfaction of certain conditions, including an undertaking to pay the expenses of the meeting.  If no request for a meeting is made, Borderplex may present the question at any shareholders meeting.

If voting rights are not approved at the shareholders meeting or if the acquiring person does not deliver the statement required by Maryland law, then, subject to certain conditions and limitations, the company may redeem any or all of the control shares, except those for which voting rights have previously been approved, for fair value. Fair value is determined without regard to the absence of voting rights for the control shares and as of the date of the last control share acquisition or, if a meeting of shareholders is held at which the voting rights of the shares were considered and not approved, as of the date of the meeting.  If voting rights for control shares are approved at a shareholders meeting and the acquirer is then entitled to vote a majority or more of all voting power, all other shareholders (other than the acquiring person) may exercise appraisal rights.  The fair value of the shares for purposes of these appraisal rights may not be less than the highest price per share paid by the acquiring person in the control share acquisition.  The control share acquisition statute does not apply to shares acquired in a merger,

consolidation or share exchange if Borderplex is a party to the transaction, nor does it apply to acquisitions approved by or exempted by the Declaration of Trust or Bylaws of Borderplex.

The Borderplex Bylaws contain a provision exempting from the control share acquisition statute any and all acquisitions by any person of Borderplex's shares of beneficial interest.  There can be no assurance that this provision will not be amended or eliminated at any time in the future, and may be amended or eliminated with retroactive effect.

**Maryland Unsolicited Takeovers Act**

The "unsolicited takeover" provisions in Subtitle 8 of Title 3 of the Maryland General Corporation Law, which applies to Title 8 REITs for this purpose, permit a Title 8 REIT with a class of equity securities registered under the Exchange Act and at least three independent trustees to elect to be subject, by provision in its declaration of trust or bylaws or a resolution of its board of trustees and notwithstanding any contrary provision in the declaration of trust or bylaws, to any or all of five provisions:

- a classified board;

- a two-thirds vote shareholder requirement for removing a trustee;

- a requirement that the number of trustees be fixed only by vote of the trustees;

- a requirement that a vacancy on the board be filled only by the remaining trustees and for the remainder of the full term of the class of trustees in which the vacancy occurred; and

- a majority requirement for the calling by shareholders of a special meeting of shareholders.

Provisions in the Borderplex Declaration of Trust and Bylaws, unrelated to Subtitle 8, already provide for each of the foregoing matters, except that any Trustee elected to fill a vacancy shall serve only until the next annual meeting of shareholders and until his or her successor is duly elected and qualifies.

**Mergers and Other Extraordinary Transactions**

Under Maryland law, a Title 8 REIT generally cannot merge with another entity or engage in other extraordinary transactions unless advised by its board of trustees and approved by the affirmative vote of shareholders entitled to cast at least two-thirds of the votes entitled to be cast on the matter unless a lesser percentage (but not less than a majority of all of the votes entitled to be cast on the matter) is set forth in the real estate investment trust's declaration of trust.  Our Declaration of Trust provides that mergers may be approved by a majority of all of the votes entitled to be cast on the matter.  Our Declaration of Trust also provides that we may consolidate the Trust with one or more other entities into a new entity or sell or transfer all or substantially all of our assets if advised by our Board of Trustees and approved by the affirmative vote of a majority of all the votes entitled to be cast on the matter.

**Amendment to Our Declaration of Trust and Bylaws**

Under Maryland law, a Maryland real estate investment trust generally cannot amend its declaration of trust unless advised by its board of trustees and approved by the affirmative vote of shareholders entitled to cast at least two-thirds of the votes entitled to be cast on the matter unless a different percentage (but not less than a majority of all of the votes entitled to be cast on the matter) is set forth in the trust's declaration of trust.  The Borderplex Declaration of Trust provides for approval by a majority of all the votes entitled to be cast on the matters described in this paragraph, except for amendments to certain provisions of the Declaration of Trust, the approval of which requires the affirmative vote of the holders of two-thirds of the votes entitled to be cast on the matter.  In addition, under Maryland law and the Borderplex Declaration of Trust, the Board of Trustees will be permitted, without any action by the Borderplex shareholders, to amend the Declaration of Trust from time to time to qualify as a REIT under the Code or the Maryland REIT Law. As permitted by the Maryland REIT Law, the Borderplex Declaration of Trust contains a provision permitting the Board of Trustees, without any action by shareholders, to

amend the Declaration of Trust to increase or decrease the aggregate number of shares of beneficial interest or the number of shares of any class or series of shares of beneficial interest that Borderplex has authority to issue.

Our Board of Trustees has the exclusive power to adopt, alter or repeal any provision of our Bylaws and to make new Bylaws.

**Limitation of Liability and Indemnification of Trustees and Officers**

The Borderplex Declaration of Trust eliminates the liability of Trustees and officers to Borderplex and its shareholders for money damages to the maximum extent permitted by Maryland law as in effect from time to time. Maryland law currently permits the declaration of trust of a Title 8 REIT to provide that trustees and officers will not be liable to the trust or its shareholders for money damages, except for liability resulting from:

- actual receipt of an improper benefit or profit in money, property, or services; or

- a final judgment based upon a finding of active and deliberate dishonesty by the trustee or officer that was material to the cause of action adjudicated.

In addition, the Borderplex Declaration of Trust authorizes Borderplex, to the maximum extent permitted by Maryland law, to indemnify, and to pay in advance or reimburse reasonable expenses to, any of its present or former shareholders, trustees, officers, employees, or agents, or any individual who, while a trustee or officer and at the request of Borderplex, serves or has served another entity, employee benefit plan or any other enterprise as a trustee, director, officer, partner or otherwise. The Borderplex Bylaws require Borderplex, to the maximum extent permitted by Maryland law, to indemnify and advance expenses to each present or former trustee or officer who is made or threatened to be made a party to a proceeding by reason of his or her service to Borderplex. The Borderplex Bylaws also permit us to indemnify and advance expenses to any present or former employee of Borderplex.

Maryland law permits Borderplex to indemnify its present and former trustees and officers against liabilities and reasonable expenses actually incurred by them in any proceeding unless it is established that:

- the act or omission of the trustee or officer was material to the matter giving rise to the proceeding; and

  o    was committed in bad faith; or
  o    was the result of active and deliberate dishonesty; or

- the trustee or officer actually received an improper personal benefit in money, property, or services; or

- in a criminal proceeding, the trustee or officer had reasonable cause to believe that the act or omission was unlawful.

However, under Maryland law, we may not indemnify for an adverse judgment in a suit by or in our right or for a judgment of liability on the basis that personal benefit was improperly received, unless in either case a court orders indemnification and then only for expenses. Borderplex is required, as a condition to advancing expenses, to obtain:

- a written affirmation by the trustee or officer of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification; and

- a written undertaking by the trustee or officer to repay the amount advanced if the standard of conduct for indemnification is not met.

**Term and Termination**

The Borderplex Declaration of Trust provides that Borderplex will have perpetual existence. Pursuant to the Declaration of Trust, and subject to the provisions of any classes or series of shares of beneficial interest then outstanding and the approval by a majority of the entire Board of Trustees, Borderplex may be terminated by the affirmative vote of a majority of all of the votes entitled to be cast on the matter.

**Meetings of Shareholders**

Under the Borderplex Bylaws, annual meetings of shareholders will be held in the month of September of each year or as soon thereafter as the Board of Trustees may determine at a date and time as determined by the Board of Trustees. Special meetings of shareholders may be called by the chairman of the Board of Trustees (or any co-chairman), the president, or the Board of Trustees, and must be called by the secretary upon the written request of the shareholders entitled to cast not less than a majority of all the votes entitled to be cast at such meeting. Only matters set forth in the notice of the special meeting may be considered and acted upon at such a meeting. The Bylaws, as permitted by the Declaration of Trust, provide that any action required or permitted to be taken at a meeting of shareholders may be taken without a meeting if (i) a unanimous consent setting forth the action is given in writing or by electronic transmission by each shareholder entitled to vote on the matter and filed with the minutes of proceedings of the shareholders or (ii) if the action is advised, and submitted to the shareholders for approval, by the Board of Trustees and a consent in writing or by electronic transmission of shareholders entitled to cast not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting of shareholders is delivered to the Trust in accordance with applicable law, the Declaration of Trust and the Bylaws.

**Advance Notice of Trustee Nominations and New Business**

The Borderplex Bylaws provide that, with respect to an annual meeting of shareholders, nominations of individuals for election to the Board of Trustees and the proposal of business to be considered by shareholders at the annual meeting may be made only:

- pursuant to the notice of the meeting;

- by the Board of Trustees; or

- by a shareholder who was a shareholder of record both at the time of the provision of notice and at the time of the meeting, who is entitled to vote at the meeting and who has complied with the advance notice procedures set forth in the Bylaws.

With respect to special meetings of shareholders, only the business specified in the notice of meeting may be brought before the meeting of shareholders and nominations of individuals for election to the Board of Trustees may be made only:

- pursuant to the notice of the meeting;

- by the Board of Trustees; or

- provided that the Board of Trustees has determined that Trustees shall be elected at such meeting, by a shareholder who was a shareholder of record both at the time of the provision of notice and at the time of the meeting, who is entitled to vote at the meeting and who has complied with the advance notice provisions set forth in the Bylaws.

The purpose of requiring shareholders to give advance notice of nominations and other proposals is to afford the Board of Trustees the opportunity to consider the qualifications of the proposed nominees or the advisability of the other proposals and, to the extent considered necessary by the Board of Trustees, to inform shareholders and make recommendations regarding the nominations or other proposals. The advance notice procedures also permit a more orderly procedure for conducting shareholder meetings. Although the Bylaws do not give the Board of Trustees the power to disapprove timely shareholder nominations and proposals, they may have

the effect of delaying a contest for the election of Trustees or proposals for other action if the proper procedures are not followed and of discouraging or deterring a third party from conducting a solicitation of proxies to elect its own slate of Trustees to the Board of Trustees or to approve its own proposal.

**Borderplex Securityholders' Agreement**

The Borderplex Securityholders' Agreement contains terms and provisions important to the business and affairs of Borderplex and to holders of the REIT Shares.  The Borderplex Securityholders' Agreement contains restrictions on transfers of REIT Shares.  <u>See</u> "Summary - Borderplex Securityholders' Agreement."

**DESCRIPTION OF PARTNERSHIP AGREEMENT OF BRT REALTY OPERATING LIMITED PARTNERSHIP**

Our Company operates in an "UPREIT Structure".  Following the completion of this offering, our Operating Partnership will, directly or indirectly through its wholly owned subsidiaries, hold substantially all of our assets and conduct substantially all of our operations.  We will contribute the net proceeds from this offering to our Operating Partnership in exchange for OPUs.  As the sole general partner of our Operating Partnership, we will generally have the exclusive power under the Operating Partnership Agreement to manage and conduct its business, subject to limited approval and voting rights of the limited partners.  For a complete understanding of these voting rights, conversion rights of the limited partners, and other matters concerning the operation of our Operating Partnership, please refer to the Agreement of Limited Partnership of BRT Realty Operating Limited Partnership dated as of September 1, 2008, a copy of which will be provided upon request.

**MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS**

**This discussion is not intended or written by Borderplex or its counsel to be used, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed under U.S. tax laws. This discussion is written and provided to support the promotion or marketing of the REIT Shares offered hereby. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor concerning the potential tax consequences of an investment in the REIT Shares.**

*The following discussion is not intended as tax advice. Investors should consult their tax advisors regarding the tax effect of an investment in any of the REIT Shares on their personal tax situation. The following discussion of certain federal income tax aspects is general in nature and is based upon current tax law, which may change materially during the course of an investment in the REIT Shares. No rulings have been or are expected to be sought from the IRS with respect to any of the tax aspects of an investment in the REIT Shares. Except to the extent explicitly set forth below, the following discussion applies to individual citizens or residents of the United States who hold any of the REIT Shares. Non-United States holders should consult their tax advisors regarding the special tax considerations that apply to them. The following summary is based on the Code, its legislative history, administrative pronouncements, judicial decisions and United States Treasury Department regulations ("Treasury Regulations"), subsequent changes to any of which may affect the tax consequences described in this Private Placement Memorandum, possibly on a retroactive basis. The following summary is not exhaustive of all possible tax considerations and does not give detailed discussion of any state, local, or foreign tax considerations, nor does it discuss all of the aspects of federal income taxation that may be relevant to a prospective shareholder in light of his or her particular circumstances or to various types of shareholders, including insurance companies, tax-exempt entities, financial institutions, broker-dealers, foreign corporations and persons who are not citizens or residents of the United States, which shareholders are subject to special treatment under the federal income tax laws.*

**Federal Income Tax Considerations With Respect To Borderplex As A REIT**

Borderplex was formed as a Maryland Real Estate Investment Trust and made an election to be treated as a REIT for U.S. federal income tax purposes. It has timely filed Form 1120-REIT, *U.S. Income Tax Return for Real Estate Investment* Trusts, for all years beginning January 1, 2007 and thereafter. Borderplex intends to operate in a manner that will permit it to satisfy the requirements for taxation as a REIT under applicable provisions of the Code. No assurance can be given, however, that such requirements will be met in the future. The following is a description of the U.S. federal income tax consequences to Borderplex and its shareholders if Borderplex continues to qualify as a REIT under the Code. Since these consequences are highly technical and complex, investors are urged to consult their own tax advisors regarding the federal, state, local, foreign, and other tax ramifications of the purchase, ownership, and disposition of Borderplex shares.

Based upon the representations of Borderplex, it is the opinion of Borderplex's counsel, ScottHulse PC, that Borderplex has been organized and operated in conformity with the requirements for qualification as a REIT. ScottHulse PC's opinion is based upon representations made by Borderplex as to certain factual matters relating to its organization and manner of operation. In addition, ScottHulse PC's opinion is based upon the law existing and in effect on the date of this Private Placement Memorandum. Borderplex's qualification and taxation as a REIT depends upon its ability to meet on a continuing basis, through actual operating results, several asset composition prescriptions, certain distribution levels, diversity of share ownership requirements, and various qualification criteria imposed by the Code as discussed below (collectively the "*Tests*"). ScottHulse PC will not review compliance with these Tests on a continuing basis. No assurance can be given that Borderplex will satisfy the Tests on a continuing basis.

In brief, if the Tests are met, then entities such as Borderplex that invest primarily in real estate and that otherwise would be treated for federal income tax purposes as corporations, are allowed a deduction for dividends paid to shareholders. This treatment substantially eliminates the "double taxation" at both the corporate and shareholder levels that generally results from the use of corporations. However, as discussed in greater detail below, such an entity remains subject to tax in certain circumstances even if it qualifies as a REIT.

If Borderplex fails to qualify as a REIT in any year, Borderplex will be subject to federal income taxation as if Borderplex were a domestic corporation for that year and, potentially, one or more subsequent years, and its shareholders will be taxed in the same manner as shareholders of ordinary corporations. In this event, Borderplex could be subject to potentially significant tax liabilities, and therefore the amount of cash available for distribution to its shareholder would be reduced or eliminated.

The Board of Trustees believes that Borderplex has been organized, operated, and will continue to be operated, in a manner that permits Borderplex to qualify as a REIT. There can be no assurance, however, that this expectation will be fulfilled, because qualification as a REIT depends on its continuing to satisfy the Tests, which in turn will be dependent in part on its operating results. The Tests, as well as other tax aspects of REIT organization and operation, are described below.

**Taxation of Borderplex**

*General*

In any year in which Borderplex qualifies as a REIT, Borderplex in general will not be subject to U.S. federal income tax on that portion of its REIT taxable income or capital gain which is distributed to shareholders. Borderplex may, however, be subject to tax at normal corporate rates upon any taxable income or capital gain not distributed. To the extent that Borderplex elects to retain and pay income tax on its net long-term capital gain, shareholders are required to include their proportionate share of Borderplex's undistributed long-term capital gain in income but receive a credit for their share of any taxes paid on such gain by Borderplex.

Notwithstanding its qualification as a REIT, Borderplex may also be subject to taxation in other circumstances. If Borderplex should fail to satisfy either the 75% or the 95% gross income test, which are discussed below, and nonetheless maintain its qualification as a REIT because other requirements are met, Borderplex will be subject to a 100% tax on the greater of either: (1) the amount by which 75% of its gross income exceeds the amount qualifying under the 75% test for the taxable year; or (2) the amount by which 95% of its gross income exceeds the amount of its income qualifying under the 95% test for the taxable year, multiplied in either case by a fraction intended to reflect its profitability. If Borderplex should fail to satisfy the asset tests, which are discussed below, and nonetheless maintain its qualification as a REIT because other requirements are met, Borderplex may be subject to a tax that would be the greater of: (a) $50,000; or (b) an amount determined by multiplying the highest rate of tax for corporations by the net income generated by the assets (that caused Borderplex to fail such asset tests) for the period beginning on the first date of the failure and ending on the day Borderplex disposed of the assets (or otherwise satisfies the asset tests). If Borderplex should fail to satisfy one or more of the requirements for REIT qualification and nonetheless maintain its qualification as a REIT because other requirements are met, Borderplex may be subject to a $50,000 penalty for each failure. Borderplex will be subject to a tax of 100% on net income from any "prohibited transaction," as described below, and if Borderplex has net income from the sale or other disposition of "foreclosure property" which is held primarily for sale to customers in the ordinary course of business or other non-qualifying income from foreclosure property, Borderplex will be subject to tax on such income from foreclosure property at the highest corporate rate. Borderplex may also be subject to a tax of 100% on the amount of any rents from real property as well as, deductions or excess interest paid by any of its "taxable REIT subsidiaries" to Borderplex that would be reduced through reapportionment under Section 482 of the Code in order to more clearly reflect income of the taxable REIT subsidiary. A taxable REIT subsidiary is any corporation in which a REIT, directly or indirectly, owns stock and where the REIT and the corporation have made a joint election to treat the corporation as a taxable REIT subsidiary. *See* "Other Tax Considerations-Investments in taxable REIT subsidiaries." In addition, if Borderplex should fail to distribute during each calendar year at least the sum of:

(1)     85% of its REIT ordinary income for such year;

(2)     95% of its REIT capital gain net income for such year; and

(3)     any undistributed ordinary income and capital gain net income from prior years,

Borderplex would be subject to a 4% excise tax on the excess of such required distribution over the amounts actually distributed. To the extent that Borderplex elects to retain and pay income tax on its taxable income and capital gain,

such retained amounts will be treated as having been distributed for purposes of the 4% excise tax. If Borderplex acquires any asset from a corporation that is or has been a C corporation in a transaction in which its basis in the asset is less than the fair market value of the asset, in each case determined as of the date on which it acquires the asset, and it subsequently recognizes gain on the disposition of the asset during the 10-year period beginning on the date on which it acquired the asset, then it will be required to pay tax at the highest regular corporate tax rate on this gain to the extent of the excess of:  (1) the fair market value of the asset; over (2) its adjusted basis in the asset, in each case determined as of the date on which it acquired the asset. For the tax year 2014, the 10-year period described above was reduced to five years, and legislative efforts have been undertaken to continue to apply a five-year period for tax years after 2014. However, absent final legislation, the 10-year period will apply to tax year 2015 and future years. The results described in this paragraph with respect to the recognition of gain assume that the C corporation will refrain from making an election to receive different treatment under applicable Treasury Regulations on its tax return for the year in which Borderplex acquires the asset from the C corporation. The IRS has issued Treasury Regulations that generally exclude from the application of this built-in gains tax any gain from the sale of property acquired in an exchange under Section 1031 (a like-kind exchange) or Section 1033 (an involuntary conversion) of the Code.

A REIT is permitted to designate in a notice mailed to shareholders within sixty days of the end of the taxable year, or in a notice mailed with its annual report for the taxable year, such amount of undistributed net long-term capital gains it received during the taxable year, which its shareholders are to include in their taxable income as long-term capital gains. Thus, if Borderplex made this designation, its shareholders would include in their income as long-term capital gains their proportionate share of the undistributed net capital gains as designated by Borderplex and Borderplex would have to pay the tax on such gains within thirty-days of the close of its taxable year. Each of its shareholders would be deemed to have paid the shareholder's share of the tax paid by Borderplex on such gains, which tax would be credited or refunded to the shareholder. A shareholder would increase his tax basis in his shares by the difference between the amount of income to the holder resulting from the designation less the holder's credit or refund for the tax paid by Borderplex. Borderplex may also be subject to the corporate "alternative minimum tax," as well as tax in various situations and on some types of transactions not presently contemplated. Borderplex will use the calendar year both for federal income tax purposes and for financial reporting purposes.

In order to qualify as a REIT, Borderplex must meet, among others, the following requirements:

***Share ownership test***

Borderplex shares must be held by a minimum of 100 persons for at least 335 days in each taxable year (or a proportional number of days in any short taxable year). In addition, at all times during the second half of each taxable year, no more than 50% in value of its shares may be owned, directly or indirectly and by applying constructive ownership rules, by five or fewer individuals, which for this purpose includes some tax-exempt entities. Any shares held by a qualified domestic pension or other retirement trust will be treated as held directly by its beneficiaries in proportion to their actuarial interest in such trust rather than by such trust. If Borderplex complies with the Treasury Regulations for ascertaining its actual ownership and did not know, or exercising reasonable diligence would not have reason to know, that more than 50% in value of its outstanding shares were held, actually or constructively, by five or fewer individuals, then Borderplex will be treated as meeting such requirement.

In order to ensure compliance with the 50% test, Borderplex has placed restrictions on the transfer of Borderplex shares to prevent additional concentration of ownership. Moreover, to evidence compliance with these requirements under Treasury Regulations, Borderplex must maintain records which disclose the actual ownership of its outstanding shares and such regulations impose penalties against Borderplex for failing to do so. In fulfilling its obligations to maintain records, Borderplex must and will demand written statements each year from the record holders of designated percentages of its shares disclosing the actual owners of such shares as prescribed by Treasury Regulations.  A list of those persons failing or refusing to comply with such demand must be maintained as a part of its records. A shareholder failing or refusing to comply with its written demand must submit with his or her tax returns a similar statement disclosing the actual ownership of its shares and other information. In addition, the declaration of trust of Borderplex provides restrictions regarding the transfer of shares that are intended to assist Borderplex in continuing to satisfy the share ownership requirements.  See "Description of Shares of Beneficial Interest—Restrictions on Ownership and Transfer." Borderplex intends to enforce the limitation on ownership of shares to assure that its qualification as a REIT will not be compromised.

*Asset tests*

At the close of each quarter of its taxable year, Borderplex must satisfy tests relating to the nature of its assets. Where Borderplex invests in a partnership, limited liability company, or trust taxed as a partnership or as a disregarded entity, Borderplex will be deemed to own a proportionate share of the partnership's, limited liability company's, or trust's assets.  At least 75% of the value of its total assets must be represented by interests in real property, interests in mortgages on real property, shares in other REITs, cash, cash items, government securities, and qualified temporary investments. Although the remaining 25% of its assets generally may be invested without restriction, Borderplex is prohibited from owning securities representing more than 10% of either the vote or value of the outstanding securities of any issuer other than a qualified REIT subsidiary, another REIT, or a taxable REIT subsidiary (the "*10% vote and value test*"). Further, no more than 25% of the value of its total assets may be represented by securities of one or more taxable REIT subsidiaries, and no more than 5% of the value of its total assets may be represented by securities of any non-government issuer other than a qualified REIT subsidiary, another REIT, or a taxable REIT subsidiary (the "*25% and 5% asset tests*").

The following assets are not treated as "securities" held by Borderplex for purposes of the value portion of the 10% vote and value test: (i) "straight debt" meeting certain requirements of Section 856(m)(2) of the Code, discussed below, unless Borderplex holds (either directly or through its "controlled" taxable REIT subsidiaries) certain other securities of the same corporate or partnership issuer that have an aggregate value greater than 1% of such issuer's outstanding securities; (ii) loans to individuals or estates; (iii) certain rental agreements calling for deferred rents or increasing rents that are subject to Section 467 of the Code, other than with certain related persons; (iv) obligations to pay Borderplex amounts qualifying as "rents from real property" under the 75% and 95% gross income tests described below; (v) securities issued by a state or any political subdivision of a state, the District of Columbia, a foreign government, any political subdivision of a foreign government, or the Commonwealth of Puerto Rico, but only if the determination of any payment received or accrued under the security does not depend in whole or in part on the profits of any entity not described in this paragraph (v), or payments on any obligation issued by such an entity; (vi) securities issued by another qualifying REIT; and (vii) other arrangements  as determined by the IRS. In addition, any debt instrument issued by a partnership will not be treated as a "security" under the value portion of the 10% vote and value test if at least 75% of the partnership's gross income (excluding gross income from prohibited transactions) is derived from sources meeting the requirements of the 75% gross income test described below. If the partnership fails to meet the 75% gross income test, then the debt instrument issued by the partnership nevertheless will not be treated as a "security" to the extent of Borderplex's interest as a partner in the partnership. Also, in looking through any partnership to determine Borderplex's allocable share of any securities owned by the partnership, Borderplex's share of the assets of the partnership, solely for purposes of applying the value portion of the 10% vote and value test, will correspond not only to Borderplex's interest as a partner in the partnership but also to Borderplex's proportionate interest in certain debt securities issued by the partnership.

Under Section 856(m)(2) of the Code, debt generally will constitute "straight debt" if the debt is a written unconditional promise to pay on demand or on a specified date a sum certain in money:  (i) which is not convertible, directly or indirectly, into stock; and (ii) the interest rate (or the interest payment dates) of which is not contingent on the profits, the borrower's discretion or similar factors. However, a security may satisfy the definition of "straight debt" even though the time of payment of interest or principal thereunder is subject to a contingency, if:  (a) such contingency does not have the effect of changing the effective yield to maturity more than the greater of 0.25% or 5% of the annual yield to maturity; or (b) neither the aggregate issue price nor the aggregate face amount of the issuer's debt instruments held by the REIT exceeds $1 million and not more than 12 months of unaccrued interest can be required to be prepaid thereunder.  Also, a security can satisfy the definition of "straight debt" even though the time or amount of any payment thereunder is subject to a contingency upon a default or the exercise of a prepayment right by the issuer of the debt, provided that such contingency is consistent with customary commercial practice.

If Borderplex fails to meet either of the 5% asset test or the 10% vote and value test described above at the end of any quarter and such failure is not cured within thirty-days thereafter, Borderplex will fail to qualify as a REIT unless the exceptions described below are applicable. After the thirty-day cure period, Borderplex can dispose of sufficient assets to cure such a violation that does not exceed the lesser of 1% of Borderplex 's assets at the end of the relevant quarter or $10,000,000 if the disposition occurs within six months after the last day of the calendar

quarter in which Borderplex identifies the violation. For violations of these tests that are larger than this amount and for violations of the other asset tests described above, where such violations are due to reasonable cause and not willful neglect, Borderplex may avoid disqualification as a REIT, after the thirty day cure period, by taking steps including the disposition of sufficient assets to meet the asset tests (within six months after the last day of the calendar quarter in which Borderplex identifies the violation) and paying a tax equal to the greater of $50,000 or the highest corporate tax rate multiplied by Borderplex's net income generated by the non-qualifying assets.

### *Gross income tests*

There are currently two separate percentage tests relating to the sources of Borderplex's gross income which must be satisfied for each taxable year. For purposes of these tests, where Borderplex invests in a partnership, limited liability company, or trust taxed as a partnership or as a disregarded entity, Borderplex will be treated as receiving its share of the income and loss of the partnership, limited liability company, or trust, and the gross income of the partnership, limited liability company, or trust will retain the same character in its hands as it has in the hands of the partnership, limited liability company, or trust. The two tests are as follows:

1.      The 75% Test. At least 75% of Borderplex's gross income for the taxable year must be "qualifying income." Qualifying income generally includes:

(a)      rents from real property except as modified below;

(b)      interest on obligations secured by mortgages on, or interests in, real property;

(c)      gains from the sale or other disposition of certain non "dealer property," which includes interests in real property and real estate mortgages, other than gain from property held primarily for sale to customers in the ordinary course of Borderplex's trade or business;

(d)      dividends or other distributions on shares in other REITs, as well as gain from the sale of such shares;

(e)      abatements and refunds of real property taxes;

(f)      income from the operation of, and gain from the sale of, "foreclosure property," which means property acquired at or in lieu of a foreclosure of a mortgage secured by such property;

(g)      certain non-contingent commitment fees received for agreeing to make loans secured by mortgages on real property or to purchase or lease real property; and

(h)      certain qualified temporary investment income attributable to the investment of new capital received by Borderplex in exchange for Borderplex shares or certain publicly offered debt which income is received or accrued during the one-year period following the receipt of such capital.

Rents received from a tenant will not, however, qualify as rents from real property in satisfying the 75% test, or the 95% gross income test described below, if Borderplex, or an owner of 10% or more of its shares, directly or constructively owns 10% or more of such tenant unless the tenant is a taxable REIT subsidiary of Borderplex and certain other requirements are met with respect to the real property being rented. In addition, if rent attributable to personal property leased in connection with a lease of real property is greater than 15% of the total rent received under the lease, then the portion of rent attributable to such personal property will not qualify as rents from real property. Moreover, an amount received or accrued will not qualify as rents from real property, or as interest income, for purposes of the 75% and 95% gross income tests if it is based in whole or in part on the income or profits of any person, although an amount received or accrued generally will not be excluded from "rents from real property" solely by reason of being based on a fixed percentage or percentages of receipts or sales. Finally, for rents received to qualify as rents from real property, Borderplex generally must not furnish or render services to tenants, other than through a taxable REIT subsidiary or an "independent contractor" from whom Borderplex derives no

income, except that Borderplex may directly provide services that are "usually or customarily rendered" in connection with the rental of apartment units for occupancy only, or are not otherwise considered "rendered to the occupant for his convenience." A REIT is permitted to render a de minimis amount of impermissible services to tenants, and still treat amounts received with respect to that property as rent from real property. The amount received or accrued by the REIT during the taxable year for the impermissible services with respect to a property may not exceed 1% of all amounts received or accrued by the REIT directly or indirectly from the property. The amount received for any service or management operation for this purpose shall be deemed to be not less than 150% of the direct cost of the REIT in furnishing or rendering the service or providing the management or operation. Furthermore, Borderplex may furnish such impermissible services to tenants through a taxable REIT subsidiary and still treat amounts otherwise received with respect to the property as rent from real property.

Borderplex may provide services at any of its acquired, or to be acquired, properties. Borderplex intends that, for purposes of the 75% and 95% gross income tests, the services provided at its properties will be of the type that are usually or customarily rendered in connection with the rental of space for occupancy only and not those rendered to the occupant for his convenience. ScottHulse, PC, in rendering its opinion as to Borderplex's qualification as a REIT, is relying on its representations to that effect. Borderplex intends that independent contractors or a taxable REIT subsidiary will perform services that cannot be provided directly by Borderplex or its agents.

2.      The 95% Test. In addition to deriving 75% of its gross income from the sources listed above, at least 95% of its gross income for the taxable year must be derived from the above-described qualifying income, or from dividends, interest, or gains from the sale or disposition of stock or other securities that are not dealer property.

Dividends, other than on REIT Shares, and interest on any obligations not secured by an interest in real property are included for purposes of the 95% test, but not for purposes of the 75% test. In addition, any income of Borderplex from any type of transaction entered into by Borderplex to hedge indebtedness (including gain from the sale or disposition of such a transaction) and which is clearly and timely identified, and hedge indebtedness incurred or to be incurred to acquire or carry real estate assets will not constitute gross income (rather than being treated as either qualifying or non-qualifying income) for purposes of both the 95% test and the 75% test.

For purposes of determining whether Borderplex complies with the 75% and 95% income tests, gross income does not include income from prohibited transactions. A "prohibited transaction" is a sale of property held primarily for sale to customers in the ordinary course of a trade or business, excluding foreclosure property, unless such property is held by Borderplex for at least two years and other requirements relating to the number of properties sold in a year, their tax bases, and the cost of improvements made to the property are satisfied.

Even if Borderplex fails to satisfy one or both of the 75% or 95% gross income tests for any taxable year, Borderplex may still qualify as a REIT for such year if Borderplex is entitled to relief under certain provisions of the Code. These relief provisions will generally be available if:

(1)      its failure to comply with gross income tests was due to reasonable cause and not to willful neglect; and

(2)      following Borderplex's identification of the failure, Borderplex files with the IRS a schedule describing each item of its qualifying gross income for the taxable year of the failure.

It is not possible, however, to state whether in all circumstances Borderplex would be entitled to the benefit of these relief provisions. If these relief provisions apply, however, Borderplex will nonetheless be subject to a special tax upon the greater of the amount by which Borderplex fails either the 75% or 95% gross income test for that year.

### *Annual distribution requirements*

In order to qualify as a REIT, Borderplex is required to make distributions, other than capital gain dividends, to its shareholders each year in an amount at least equal to the sum of 90% of its REIT taxable income, computed without regard to the dividends paid deduction and REIT net capital gain, plus 90% of its net income after

tax, if any, from foreclosure property, minus the sum of various items of excess non-cash income. In addition, Borderplex's "REIT taxable income" will be reduced by any taxes it is required to pay on any gain it recognizes from the disposition of any asset it acquired from a corporation that is or has been a C corporation in a transaction in which its basis in the asset is less than the fair market value of the asset, in each case determined as of the date on which it acquired the asset, within the 10-year or other applicable period following the acquisition of such asset.

To the extent that Borderplex does not distribute all of its net capital gain or if Borderplex distributes at least 90%, but less than l00%, of its REIT taxable income, as adjusted, Borderplex will be subject to tax on the undistributed amount at corporate capital gains or corporate income tax rates, as the case may be. A REIT is permitted, with respect to undistributed net long-term capital gains it received during the taxable year, to designate in a notice mailed to shareholders within sixty days of the end of the taxable year, or in a notice mailed with its annual report for the taxable year, such amount of such gains which its shareholders are to include in their taxable income as long-term capital gains. Thus, if Borderplex made this designation, its shareholders would include in their income as long-term capital gains their proportionate share of the undistributed net capital gains as designated by Borderplex, and Borderplex would have to pay the tax on such gains within thirty days of the close of its taxable year. Each of its shareholders would be deemed to have paid the shareholder's share of the tax paid by Borderplex on such gains, which tax would be credited or refunded to the shareholder. A shareholder would increase its tax basis in its REIT Shares by the difference between the amount of income to the holder resulting from the designation less the holder's credit or refund for the tax paid by Borderplex.

Borderplex intends to make timely distributions sufficient to satisfy the annual distribution requirements. In this regard, Borderplex's declaration of trust authorizes Borderplex to take the steps as may be necessary to cause Borderplex to distribute to its shareholders an amount sufficient to permit Borderplex to meet the distribution requirements. It is possible that Borderplex may not have sufficient cash or other liquid assets to meet the 90% distribution requirement due to timing differences between the actual receipt of income and actual payment of expenses on the one hand, and the inclusion of such income and deduction of such expenses in computing its REIT taxable income on the other hand. Additionally, this may be due to Borderplex's inability to control cash distributions from any properties over which it does not have decision making control, or for other reasons. To avoid any problem with the 90% distribution requirement, Borderplex will closely monitor the relationship between its REIT taxable income and cash flow and, if necessary, will borrow funds in order to satisfy the distribution requirement. However, there can be no assurance that such borrowing would be available at such time.

Distributions must generally be made during the taxable year to which they relate.  Nonetheless, dividends may be paid in one year but be treated as having been paid in the prior year in two circumstances. Under the first circumstance, Borderplex would have to:  (a) declare the dividend before the due date of its tax return for such year (including extensions); (b) pay the dividend in the twelve month period following the close of such taxable year and not later than the date of the "first regular dividend payment" made after such declaration; and (c) elect on such tax return to have the dividend treated as if paid in the prior year. Under the second circumstance, if Borderplex declares a dividend in October, November, or December of any year with a record date in one of these months and pays the dividend on or before January 31 of the following year, Borderplex will be treated as having paid the dividend on December 31 of the year in which the dividend was declared.

If Borderplex fails to meet the 90% distribution requirement as a result of an adjustment to its tax return by the IRS, Borderplex may retroactively cure the failure by paying a "deficiency dividend," plus applicable penalties and interest, within a specified period.

Borderplex would incur a 4% nondeductible excise tax on the excess of the required distribution over the sum of the amounts actually distributed and amounts retained for which federal income tax was paid if Borderplex fails to distribute during a calendar year (or in the case of distributions with declaration and record dates falling in the last three months of the calendar year, by the end of January following such calendar year) at least the sum of: (1) 85% of the REIT ordinary income for such year; (2) 95% of the REIT capital gain net income for such year; and (3) any undistributed taxable income from prior periods.

### *Tax aspects of Borderplex's investments in partnerships*

As discussed previously, on September 21, 2008, the Company reorganized into an UPREIT structure by forming our Operating Partnership.  Under this structure, our Operating Partnership owns, directly or indirectly, all of the assets of Borderplex.  An advantage of an UPREIT structure is that it generally allows a REIT to acquire appreciated assets in a manner that does not result in current recognition of gain to the contributor of the assets, unless and until the contributor converts its OPUs in the UPREIT to common shares in the REIT or such assets are sold by the REIT.

Borderplex may invest in other entities that for U.S. federal income tax purposes are classified as partnerships. In general, a partnership, such as our Operating Partnership, is a "pass-through" entity which is not subject to federal income tax. Rather, partners are allocated their proportionate shares of the items of income, gain, loss, deduction, and credit of the partnership, and are potentially subject to tax thereon, without regard to whether the partner received a distribution from the partnership. In such event, Borderplex includes its proportionate share of the foregoing partnership items for purposes of the various REIT gross income tests and in the computation of its REIT taxable income.  See "–Taxation of Borderplex –General" and "–Taxation of Borderplex –Gross income tests."

Each partner's share of a partnership's tax attributes is generally determined in accordance with its partnership agreement, although the allocations will be adjusted for tax purposes if they do not comply with the technical provisions of Code Section 704(b) and the regulations under Code Section 704(b).  Notwithstanding these allocation provisions, for purposes of complying with the gross income and asset tests discussed above, Borderplex will be deemed to own its proportionate share of each of the assets of the partnership and will be deemed to have received a share of the income of the partnership based on its capital interest in the partnership. Accordingly, any increase in its REIT taxable income from its interest in an entity taxed as a partnership, whether or not a corresponding cash distribution is also received from such entity, will increase its distribution requirements. However, Borderplex will not be subject to federal income tax on this additional income if Borderplex distributes an amount equal to such additional income to its shareholders. Moreover, for purposes of the REIT asset tests, Borderplex will include its proportionate share of assets held by an entity taxed as a partnership. See "–Taxation of Borderplex –Annual Distribution Requirements" and "–Taxation of Borderplex –Asset tests."

### *Tax allocations with respect to book-tax difference on contributed properties*

Under section 704(c) of the Code, income, gain, loss, and deductions attributable to appreciated or depreciated property that is contributed to a partnership generally must be allocated for U.S. federal income tax purposes in a manner such that the contributor is charged with, or benefits from, the unrealized gain or unrealized loss associated with the property at the time of contribution. The amount of unrealized gain or unrealized loss generally is equal to the difference between the fair market value of the contributed property at the time of contribution and the adjusted tax basis of the property at the time of contribution, which is referred to as the book-tax difference. A book-tax difference also can exist with respect to an asset that has not appreciated or depreciated in economic terms if that asset has been depreciated for tax purposes.

Treasury Regulations under Section 704(c) require partnerships to use a reasonable method for allocation of items affected by Section 704(c) of the Code. Borderplex expects to have the authority to elect the method used by any partnerships that it controls to eliminate book-tax differences with respect to each property affected by Section 704(c) of the Code, except with respect to any asset as to which any such partnership has an obligation under a separate agreement to use another method, which obligation is not waived.

### *Liquidation of Partnerships*

If any partnership entity in which Borderplex invests, liquidates and dissolves, a distribution of property other than money generally will not result in taxable gain to a partner, except to the extent provided in Sections 704(c)(l)(B), 731(c), 737, and 751 of the Code. The basis of any property distributed to a partner generally will equal the adjusted basis of the partner's partnership interest, reduced by any money distributed in liquidation. A distribution of money upon the liquidation of any partnership entity in which Borderplex invests, however, will be taxable to a partner to the extent that the amount of money distributed in liquidation, including any deemed

distributions of cash as a result of a reduction in the partner's share of partnership liabilities, exceeds the partner's tax basis in its partnership interest.

### Sale of Properties

Borderplex's share of any gain realized by any partnership, in which Borderplex invests, on the sale of any "dealer property" generally will be treated as income from a prohibited transaction that is subject to 100% penalty tax. See "Taxation of Borderplex –Gross income tests –The 95% Test." Under existing law, whether property is dealer property is a question of fact that depends on all the facts and circumstances with respect to the particular transaction. Borderplex intends to hold, and, to the extent within its control, to have any joint venture to which it is a partner hold, properties for investment with a view to long-term appreciation, to engage in the business of acquiring, owning, operating, and developing the properties, and to make sales of its properties and other properties acquired subsequent to the date hereof as are consistent with its investment objectives. Based upon its investment objectives, Borderplex believes that overall, its properties should not be considered dealer property and that the amount of income from prohibited transactions, if any, will not be material.

### Failure to Qualify

If Borderplex fails to qualify for taxation as a REIT in any taxable year and certain relief provisions described above do not apply, Borderplex will be subject to tax, including applicable alternative minimum tax, on its taxable income at regular corporate rates. Distributions to shareholders in any year in which Borderplex fails to qualify as a REIT will not be deductible by Borderplex, nor generally will they be required to be made under the Code. In such event, to the extent of current and accumulated earnings and profits, all distributions to shareholders will be taxable as ordinary income, and subject to limitations in the Code, corporate distributees may be eligible for the dividends-received deduction. Unless entitled to relief under specific statutory provisions, Borderplex also will be disqualified from re-electing taxation as a REIT for the four taxable years following the year during which REIT qualification was lost.

## Taxation of Borderplex Shareholders

### Taxation of taxable domestic shareholders

As long as Borderplex qualifies as a REIT, distributions made to its taxable domestic shareholders out of current or accumulated earnings and profits, and not designated as qualified dividends or capital gain dividends, will be taken into account by them as ordinary income and will not be eligible for the dividends-received deduction for corporations. Ordinary dividends will be taxable to its domestic shareholders as ordinary income, except that such dividends will be taxed at the rate applicable to long-term capital gains to the extent that such dividends are designated as "qualified dividend income" by Borderplex in a notice to shareholders mailed not later than sixty days after the close of the taxable year. Generally, qualified dividend income is attributable to dividends received by Borderplex from non-REIT corporations (such as taxable REIT subsidiaries) or are attributable to income upon which Borderplex had paid corporate income tax (e.g., to the extent that Borderplex distributed less than 100% of its taxable income).

A REIT is subject to corporate-level tax on any recognized net capital gain during the taxable year, unless it elects to declare and pay a "capital gain dividend." If a REIT declares a capital gain dividend, it may also designate the individual rate to which this capital gain will be subject – usually 20%. If the REIT makes no such designation, then the capital gain dividend will be taxed to an individual at 28%. Distributions designated as capital gain dividends and undistributed capital gains will be taxed as long-term capital gains, to the extent they do not exceed the actual net capital gain of the REIT for the taxable year, without regard to the period for which the shareholder has held its shares. However, corporate shareholders may be required to treat up to 20% of some capital gain dividends as ordinary income.

To the extent that Borderplex makes distributions in excess of current and accumulated earnings and profits, these distributions are treated first as a tax-free return of capital to its shareholders, reducing the tax basis of a shareholder's shares by the amount of such distribution, but not below zero, with distributions in excess of the shareholder's tax basis taxable as capital gains, if the shares are held as a capital asset. In addition, any dividend

declared by Borderplex in October, November, or December of any year and payable to a shareholder of record on a specific date in any such month shall be treated as both paid by Borderplex and received by the shareholder on December 31 of such year, provided that the dividend is actually paid by Borderplex during January of the following calendar year. Shareholders may not include in their individual income tax returns any of Borderplex's net operating losses or capital losses. Federal income tax rules may also require that certain minimum tax adjustments and preferences be apportioned to Borderplex's shareholders.

In general, any loss upon a sale or exchange of shares by a shareholder who has held such shares for six months or less, after applying holding period rules, will be treated as a long-term capital loss, to the extent of distributions required to be treated by such shareholder as long-term capital gains.

Shareholders should consult their tax advisor with respect to taxation of capital gains and capital gain dividends and with regard to state, local, and foreign taxes on capital gains.

### *Taxation of taxable domestic shareholders – Foreign accounts*

Certain payments made to "foreign financial institutions" in respect of accounts of domestic shareholders at such financial institutions may be subject to withholding at a rate of 30%. Domestic shareholders should consult their tax advisors regarding the effect, if any, of these rules on their ownership and disposition of REIT Shares.  See "Taxation of Borderplex Shareholders—Taxation of foreign shareholders—Foreign accounts."

### *Backup withholding*

Borderplex will report to its domestic shareholders and to the IRS the amount of distributions paid during each calendar year, and the amount of tax withheld, if any, with respect to the paid distributions. Under the backup withholding rules, a shareholder may be subject to backup withholding at applicable rates with respect to distributions paid unless such shareholder is a corporation or comes within other exempt categories and, when required, demonstrates this fact or provides a taxpayer identification number, certifies as to no loss of exemption from backup withholding, and otherwise complies with applicable requirements of the backup withholding rules. A shareholder that does not provide Borderplex with its correct taxpayer identification number may also be subject to penalties imposed by the IRS. Any amount paid as backup withholding will be credited against the shareholder's income tax liability. In addition, Borderplex may be required to withhold a portion of capital gain distributions made to any shareholders who fail to certify their non-foreign status to Borderplex.

### *Taxation of tax-exempt shareholders*

The IRS has issued a revenue ruling in which it held that amounts distributed by a REIT to a tax-exempt employees' pension trust do not constitute unrelated business taxable income. Subject to the discussion below regarding a "pension-held REIT," based upon the ruling, the analysis in the ruling and the statutory framework of the Code, distributions to a shareholder that is a tax-exempt entity should also not constitute unrelated business taxable income, provided that the tax-exempt entity does not hold its shares as "debt financed property" within the meaning of the Code. Generally, *"debt financed property"* is property the acquisition or holding of which was financed through a borrowing by the tax-exempt entity.

However, for tax-exempt shareholders that are social clubs, voluntary employee benefit associations, supplemental unemployment benefit trusts and qualified group legal services plans exempt from U.S. federal income taxation under Sections 501(c)(7), (c)(9), (c)(17) and (c)(20) of the Code, respectively, income from an investment in Borderplex will constitute unrelated business taxable income unless the organization properly sets aside or reserves such amounts for purposes specified in the Code. These tax-exempt stockholders should consult their own tax advisors concerning these "set aside" and reserve requirements.

Notwithstanding the above, however, if any pension or other retirement trust that qualifies under Section 401(a) of the Code holds more than 10% by value of the interests in a "pension-held REIT" at any time during a taxable year, a portion of the dividends paid to the qualified pension trust by such REIT may constitute unrelated business taxable income. For these purposes, a "pension-held REIT" is defined as a REIT if such REIT would not have qualified as a REIT but for the provisions of the Code which look through such a qualified pension trust in

determining ownership of stock of the REIT and at least one qualified pension trust holds more than 25% by value of the interests of such REIT or one or more qualified pension trusts (each owning more than a 10% interest by value in the REIT) hold in the aggregate more than 50% by value of the interests in such REIT.

### *Taxation of foreign shareholders*

Borderplex will qualify as a "domestically controlled qualified investment entity" so long as less than 50% in value of its shares is held by foreign persons, such as, nonresident aliens and foreign corporations, partnerships, trusts, and estates. Borderplex currently anticipates that it will qualify as a domestically controlled qualified investment entity. Under these circumstances, gain from the sale of shares of Borderplex by a foreign person should not be subject to U.S. taxation, unless such gain is effectively connected with such person's U.S. business or, in the case of an individual foreign person, such person is present within the U.S. for more than 182 days in such taxable year.

Distributions of cash generated by its real estate operations, but not by the sale or exchange of property (which is subject to FIRPTA as described in the next paragraph), that are paid to foreign persons generally will be subject to U.S. withholding tax at a rate of 30%, unless an applicable tax treaty reduces that tax and the foreign shareholder files with Borderplex the required form evidencing such lower rate or unless the foreign shareholder files an IRS Form W-8ECI with Borderplex claiming that the distribution is "effectively connected" income. Under applicable Treasury Regulations, foreign shareholders generally must provide the IRS Form W-8ECI beginning January 1, 2000 and every three years thereafter unless the information on the form changes before that date.

Distributions to foreign shareholders of proceeds attributable to the sale or exchange by Borderplex of U.S. real property interests are subject to income and withholding taxes pursuant to the Foreign Investment in Real Property Tax Act of 1980, P.L. 96-499 ("*FIRPTA*"), and may be subject to branch profits tax in the hands of a shareholder which is a foreign corporation if it is not entitled to treaty relief or exemption. Borderplex is required by applicable Treasury Regulations to withhold 35% of any distribution to a foreign person that could be designated by Borderplex as a capital gain dividend; this amount is creditable against the foreign shareholder's FIRPTA tax liability.

The federal income taxation of foreign persons is a highly complex matter that may be affected by many other considerations. Accordingly, foreign investors should consult their own advisors regarding the income and withholding tax considerations with respect to their investment in Borderplex.

### *Taxation of foreign shareholders – Foreign accounts*

Withholding taxes may apply to certain types of payments made to "foreign financial institutions" (as defined in the Code) and certain other non-U.S. entities (including payments to domestic shareholders that hold REIT Shares through such a foreign financial institution or non-U.S. entity). Specifically, a 30% withholding tax may be imposed on dividends on, and gross proceeds from the sale or other disposition of, stock paid to a foreign financial institution or to a non-financial foreign entity, unless: (i) the foreign financial institution undertakes certain diligence and reporting; (ii) the non-financial foreign entity either certifies it does not have any substantial U.S. owners or furnishes identifying information regarding each substantial U.S. owner; or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in clause (i) above, then in order to avoid the imposition of such withholding, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain U.S. persons or U.S.-owned foreign entities, annually report certain information about such accounts to the IRS (or, in some cases, local tax authorities), and withhold 30% on payments it makes to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these provisions may be subject to different rules.

Under the applicable Treasury Regulations and IRS guidance, the withholding provisions described above will generally apply to payments of dividends made on or after July 1, 2014 and to payments of gross proceeds from a sale or other disposition of stock on or after January 1, 2017. Because Borderplex may not know the extent to

which a distribution is a dividend for U.S. federal income tax purposes at the time it is made, for purposes of these withholding rules Borderplex may treat the entire distribution as a dividend. Prospective investors should consult their tax advisors regarding these withholding provisions.

### Tax Rates

Generally, the maximum individual tax rate for long-term capital gain and for qualifying dividends is 20%. Because Borderplex is not generally subject to federal income tax on the portion of its REIT taxable income or capital gains distributed to its shareholders, Borderplex's dividends generally are not eligible for the 20% tax rate on dividends. As a result, Borderplex's ordinary REIT dividends will usually to be taxed at the higher tax rates applicable to ordinary income. However, the maximum 20% tax rate for long-term capital gains and dividends generally applies to:

(1)     a shareholder's long-term capital gain, if any, recognized on the disposition of Borderplex's shares;

(2)     a distribution designated by Borderplex as a 20%-rate capital gain distribution;

(3)     Borderplex's dividends attributable to dividends received by Borderplex from non-REIT corporations, such as taxable REIT subsidiaries; and

(4)     Borderplex's dividends to the extent attributable to income upon which Borderplex has paid corporate income tax (e.g., to the extent that Borderplex distributes less than 100% of its taxable income).

Generally, the maximum tax rate on long-term capital gain and qualified dividends is 20% for shareholders whose taxable income is in the 39.6% tax bracket.  Additionally, under Section 1411 of the Code, there is a 3.8% Medicare tax on long-term capital gain and dividends earned by shareholders with more than $200,000 in taxable income individually, or $250,000 as a married couple filing jointly.

## Other Tax Considerations

### Investments in taxable REIT subsidiaries

It is anticipated that Borderplex may establish one or more taxable REIT subsidiaries.  A taxable REIT subsidiary can engage in activities in which a REIT is not permitted to directly engage without jeopardizing its REIT status. In order for a corporation to be classified as a taxable REIT subsidiary of Borderplex, both entities must file an election for such classification. Taxable REIT subsidiaries of Borderplex will pay federal and state income taxes at the full applicable corporate rates on their income prior to payment of any dividends. Such taxable REIT subsidiaries will attempt to minimize the amount of such taxes, but there can be no assurance whether or the extent to which measures taken to minimize taxes will be successful. To the extent a taxable REIT subsidiary of Borderplex is required to pay federal, state, or local taxes, the cash available for distribution by such taxable REIT subsidiary to its shareholders will be reduced accordingly.

Taxable REIT subsidiaries are subject to limitations on the deductibility of payments made to the associated REIT which could materially increase the taxable income of the taxable REIT subsidiary and are subject to prohibited transaction taxes on certain other payments made to the associated REIT. Borderplex will be subject to a tax of 100% on the amount of any rents from real property, deductions, or excess interest paid by any of its taxable REIT subsidiaries to Borderplex that would be reduced through reapportionment under Code Section 482 in order to more clearly reflect income of the taxable REIT subsidiary.

### Possible legislative or other actions affecting tax consequences

Prospective shareholders should recognize that the present federal income tax treatment of an investment in Borderplex may be modified by legislative, judicial, or administrative action at any time and that any such action may affect investments and commitments previously made. The rules dealing with federal income taxation are

constantly under review by persons involved in the legislative process and by the IRS and the Treasury Department, resulting in revisions of regulations and revised interpretations of established concepts as well as statutory changes. Revisions in federal tax laws and interpretations of these laws could adversely affect the tax consequences of an investment in Borderplex.

### State and Local Taxes

Borderplex and its shareholders may be subject to state or local taxation in various jurisdictions, including those in which Borderplex or its shareholders transact business or reside. The state and local tax treatment of Borderplex and its shareholders may not conform to the federal income tax consequences discussed above. Consequently, prospective Borderplex shareholders should consult their own tax advisors regarding the effect of state and local tax laws on an investment in the shares.

**You are advised to consult with your own tax advisor regarding the specific tax consequences to you of the ownership and sales of REIT Shares, including the federal, state, local, foreign, and other tax consequences of such ownership and sale and of potential changes in applicable tax laws.**

## CERTAIN CONSIDERATIONS APPLICABLE TO ERISA,
## GOVERNMENTAL AND OTHER PLAN INVESTORS

Employee benefit plans that are subject to the fiduciary provisions of ERISA (including, without limitation, pension and profit-sharing plans), plans that are subject to Section 4975 of the Code (including, without limitation, IRAs and Keogh plans), entities deemed to hold "plan assets" of the foregoing, and trusts or other entities holding the assets of any of the foregoing  (each, a "*Benefit Plan Investor*"), as well as governmental plans, foreign plans, and other employee benefit plans, accounts, or arrangements that are not subject to the fiduciary provisions of ERISA or Section 4975 of the Code, and trusts or other entities supporting or holding the assets of any of the foregoing (collectively, with Benefit Plan Investors, referred to as "*Plans*"), may generally invest in Borderplex, subject to the following considerations.

*General Fiduciary Considerations for Investment in Borderplex by Plan Investors.*  The fiduciary provisions of ERISA, and the fiduciary provisions of pension codes applicable to governmental, foreign, or other employee benefit plans or retirement arrangements that are not subject to ERISA may impose limitations on investment in Borderplex.  Fiduciaries of Plans, in consultation with their advisors, should consider, to the extent applicable, the impact of such fiduciary rules and regulations on an investment in Borderplex.  Among other considerations, the fiduciary of a Plan should take into account the composition of the Plan's portfolio with respect to diversification; the cash flow needs of the Plan and the effects thereon of the illiquidity of the investment; the economic terms of the Plan's investment in Borderplex; the Plan's funding objectives; the tax effects of the investment and the tax and other risks described in the sections of this Private Placement Memorandum discussing tax considerations and risk factors; the fact that the shareholders in Borderplex are expected to consist of a diverse group of shareholders (including, taxable, tax-exempt, domestic, and foreign entities); and the fact that the management of Borderplex will not take the particular objectives of any shareholders or class of shareholders into account.

Plan fiduciaries should also take into account the fact that, while the Board of Trustees of Borderplex will have certain general fiduciary duties to Borderplex, the Board of Trustees will not have any direct fiduciary relationship with or duty to any shareholders, either with respect to its investment in REIT Shares or with respect to the management and investment of the assets of Borderplex.  Similarly, it is intended that the assets of Borderplex will not be considered plan assets of any Plan or be subject to any fiduciary or investment restrictions that may exist under pension codes specifically applicable to such Plans.  Each Plan will be required to acknowledge and agree in connection with its investment in REIT Shares to the foregoing status of Borderplex and the Board of Trustees and that there is no rule, regulation, or requirement applicable to such shareholder that is inconsistent with the foregoing description of Borderplex and the Board of Trustees.

Plan fiduciaries may be required to determine and report annually the fair market value of the assets of the Plan.  Since it is expected that there will not be any public market for the REIT Shares, there may not be an independent basis for the Plan fiduciary to determine the fair market value of the REIT Shares.

*ERISA and Other Benefit Plan Investors.*  A fiduciary acting on behalf of a Benefit Plan Investor, in addition to the matters described above, should take into account the following considerations in connection with an investment in Borderplex.

*ERISA Restrictions if Borderplex Holds Plan Assets.*  If Borderplex is deemed to hold plan assets of the shareholders that are Benefit Plan Investors, the investment in Borderplex by each such Benefit Plan Investor could constitute an improper delegation of investment authority by the fiduciary of such Benefit Plan Investor.  In addition, any transaction Borderplex enters into would be treated as a transaction with each such Benefit Plan Investor and any such transaction (such as a property lease, acquisition, sale or financing) with certain "parties in interest" (as defined in ERISA) or "disqualified persons" (as defined in Section 4975 of the Code) with respect to a Benefit Plan Investor could be a "prohibited transaction" under ERISA or Section 4975 of the Code. If Borderplex were subject to ERISA, certain aspects of the structure and terms of Borderplex could also violate ERISA.

*ERISA Plan Assets.*  Under ERISA and regulations issued thereunder by the U.S. Department of Labor (the "*Regulation*"), generally, a Benefit Plan Investor's assets would be deemed to include an undivided interest in

each of the underlying assets of Borderplex unless investment in Borderplex by Benefit Plan Investors is not "significant" (as defined below) or another exception from holding plan assets is available.

**_Significant Investment by Benefit Plan Investors._**  Investment by Benefit Plan Investors would not be "significant" if less than 25% of the value of each class of equity interests in Borderplex (excluding the interests of the members of the Board of Trustees and any other person (other than a Benefit Plan Investor) who has discretionary authority or control, or provides investment advice for a fee (direct or indirect) with respect to the assets of Borderplex, and affiliates of any of the foregoing persons (a "_Management Affiliate_")), is held by Benefit Plan Investors.  A commingled vehicle that is subject to ERISA will generally count as a Benefit Plan Investor for this purpose only to the extent of investment in such entity by Benefit Plan Investors.  The Board of Trustees currently intends to limit investment in Borderplex by Benefit Plan Investors so that participation by such shareholders is not "significant" with respect to any class of Borderplex's equity interests, but does not assure this result.

Each shareholder and each transferee will be required to represent and warrant whether it is a Benefit Plan Investor or a Management Affiliate, and the Board of Trustees reserves the right to reject subscriptions in whole or in part for any reason, including that the shareholder is a Benefit Plan Investor.  The Board of Trustees also has the authority to restrict transfers of REIT Shares to the extent it deems appropriate to avoid having the assets of Borderplex be deemed to be plan assets of any Benefit Plan Investor.

**_Prohibited Transaction Considerations._**  Fiduciaries of Benefit Plan Investors should also consider whether an investment in Borderplex could involve a direct or indirect transaction with a "party in interest" or "disqualified person" as defined in ERISA and Section 4975 of the Code, and if so, whether such prohibited transaction may be covered by an exemption.  ERISA contains a statutory exemption that permits a Benefit Plan Investor to enter into a transaction with a person who is a party in interest or disqualified person solely by reason of being a service provider or affiliated with a service provider to the Benefit Plan Investor, provided that the transaction is for "adequate consideration."  There are also a number of administrative prohibited transaction exemptions that may be available to certain fiduciaries acting on behalf of a Benefit Plan Investor.  Fiduciaries of Benefit Plan Investors should also consider whether investment in Borderplex could involve a conflict of interest.  In particular, a prohibited conflict of interest could arise if the fiduciary acting on behalf of the Benefit Plan Investor has any interest in, or affiliation with, Borderplex or the Board of Trustees.

**_Governmental Plans_**.  Government sponsored plans are not subject to the fiduciary provisions of ERISA, and are also not subject to the prohibited transaction provisions under ERISA and Section 4975 of the Code. However, federal, state, or local laws or regulations governing the investment and management of the assets of such plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code discussed above and may include other limitations on permissible investments.  Accordingly, fiduciaries of governmental plans, in consultation with their advisors, should consider the requirements of their respective pension codes with respect to investments in Borderplex, as well as the general fiduciary considerations discussed above.

The fiduciary of each prospective governmental plan shareholder will be required to represent and warrant that investment in Borderplex is permissible, complies in all respects with applicable law, and has been duly authorized.

**_Individuals Investing With IRA Assets_**.  REIT Shares sold by Borderplex may be purchased or owned by shareholders who are investing assets of their IRAs.  Borderplex's acceptance of an investment by an IRA should not be considered to be a determination or representation by the Borderplex Board of Trustees or any of its respective affiliates that such an investment is appropriate for an IRA.  In consultation with its advisors, each prospective IRA shareholder should carefully consider whether an investment in Borderplex is appropriate for an IRA and permissible under the terms of its IRA governing documents.  Shareholders that are IRAs should consider in particular that the REIT Shares will be illiquid and that it is not expected that a significant market will exist for the resale of the REIT Shares, as well as the other general fiduciary considerations described above**.**

Although IRAs are not generally subject to ERISA, they are subject to the provisions of Section 4975 of the Code, prohibiting transactions with "disqualified persons" and investments and transactions involving fiduciary conflicts.  A prohibited transaction or conflict of interest could arise if the fiduciary making the decision to invest has a personal interest in or affiliation with Borderplex, its Board of Trustees, or any of their respective affiliates.  In

the case of an IRA, a prohibited transaction or conflict of interest that involves the beneficiary of the IRA could result in disqualification of the IRA.  A fiduciary for an IRA who has any personal interest in or affiliation with Borderplex, the Board of Trustees or any of their respective affiliates, should consult with his or her tax and legal advisors regarding the impact such interest or affiliation may have on an investment in REIT Shares with assets of the IRA.

Shareholders that are IRAs should consult with their counsel and advisors as to the prohibited transaction, conflict of interest, and other provisions of the Code applicable to an investment in Borderplex.

***Unrelated Business Taxable Income***.  The Code imposes a tax on the unrelated business taxable income ("*UBTI*") of tax-exempt entities, including certain Plans.  UBTI is the income of a tax-exempt entity that is generated by the conduct of a trade or business not substantially related to the exempt purpose for which the entity was organized.  UBTI also generally includes income derived from property held for the production of income to the extent that the acquisition of such property was financed, in whole or in part, by borrowed funds.  A fiduciary of a Plan, in consultation with the Plan's tax and legal advisors, should consider whether investment in Borderplex will produce UBTI to the Plan.

ACCEPTANCE OF SUBSCRIPTIONS OF ANY PLAN IS IN NO RESPECT A REPRESENTATION BY BORDERPLEX, THE BOARD OF TRUSTEES, OR ANY OTHER PARTY THAT SUCH INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO THAT PLAN OR THAT THE INVESTMENT IS APPROPRIATE FOR SUCH PLAN.  EACH PLAN FIDUCIARY SHOULD CONSULT WITH HIS OR HER OWN LEGAL ADVISORS AS TO THE PROPRIETY OF AN INVESTMENT IN BORDERPLEX IN LIGHT OF THE SPECIFIC REQUIREMENTS APPLICABLE TO THAT PLAN.

## PLAN OF DISTRIBUTION

Borderplex will act in its own behalf in arranging the private placement of the REIT Shares offered hereby. Jamie Gallagher will act as primary contact for, and will be available to consult with, any prospective investor who is a recipient of this Private Placement Memorandum.  No officer or employee of Borderplex, including Jamie Gallagher, will receive any commission or other special remuneration in connection with the offering and sale of REIT Shares.

Borderplex undertakes to make available to every prospective investor, during the course of this offering and before any sale, the opportunity to ask questions of and receive answers from Borderplex concerning the terms and conditions of this offering and to obtain any appropriate additional information necessary to verify the accuracy of the information contained in this Private Placement Memorandum or for any other purpose relevant to a prospective investment in the REIT Shares offered hereby.  Additional information will be made available to you to the extent that Borderplex's management possesses the information or can obtain it without unreasonable effort or expense.

**How to Subscribe**

A subscriber who wishes to purchase any REIT Shares should deliver to Borderplex:

(1)     one dated, completed and executed subscription agreement and investor questionnaire, as well as a joinder to the Securityholders' Agreement, with all blanks properly completed; and

(2)     a check payable to the order of **Borderplex Realty Trust**, in the amount of $7.75 per REIT Share subscribed for, or otherwise as set forth in and in accordance with the procedure set forth in the subscription agreement and investor questionnaire.

A subscriber must make a minimum investment of 13,000 REIT Shares ($100,750).  However, Borderplex reserves the right, in its sole discretion, to accept subscriptions in lesser amounts.  All funds will be returned to the subscriber without interest (together with the subscription documents executed by such subscriber) if its subscription is rejected.  Subscriptions may be rejected for failure to satisfy the investor suitability standards, failure to conform to the requirements of this offering, insufficient documentation, over-subscription for this offering or such other reasons as the Board or management of Borderplex may determine in its sole discretion.

**Subscription Process**

The subscription agreement and investor questionnaire, and the joinder to the Securityholders' Agreement, will be accepted starting as of the date of this offering and up until the termination of this offering (the "*Investment Period*"), unless the Investment Period is extended.  Borderplex will accept or reject subscriptions no later than forty-five days from receipt by Borderplex.  A confirmation of your purchase and admission as a shareholder will be sent to you after you have been admitted as a shareholder.  In the event your subscription is not accepted, your funds, without interest, will be returned to you within ten days after the date of such rejection.

**Determination of Offering Price**

The per REIT Share offering price of $7.75 was determined by numerous factors, including, (i) the Dutch Auction described herein, and recent arms-length transactions involving our OPUs, as well as (ii) our evaluation of financial results and various assumptions that we have made.  Borderplex cannot assure that the offering price (or the valuation on which it was based) is accurate or fairly reflects a price that would have been reached by independent parties in arm's-length negotiations or that it fairly reflects the value of the REIT Shares in the marketplace given alternative investment opportunities.

**LEGAL MATTERS**

The law firm of ScottHulse PC,  El Paso, Texas, has served as legal counsel to Borderplex with respect to certain matters related to this offering.

**INDEPENDENT AUDITORS/ACCOUNTING SERVICES**

Borderplex has retained Lauterbach, Borschow & Co., P.C. ("*Lauterbach Borschow*") to audit the financial statements of Borderplex since 2013.

Lauterbach Borschow also provided consultation for certain aspects of the Private Placement Memorandum, including the "Use of Proceeds". Lauterbach Borschow will continue to provide accounting services to the Company following the completion of the offering.

## ADDITIONAL INFORMATION

Upon request of a prospective investor, we will make available to such investor the opportunity to ask questions of, and receive answers from, us concerning the terms and conditions of this offering.  Further, we will, subject to confidentiality agreements and other considerations, obtain and make available additional information, reasonably requested by such investor to the extent we possess such information and can acquire it without unreasonable effort or expense, necessary to verify the accuracy of any of the information concerning the terms and conditions of this offering or any of the transactions referred to herein.

The summaries of, and references to, various documents in this Private Placement Memorandum do not purport to be complete, and in each instance reference should be made to the actual document, copies of which will be provided to potential investors and their professional advisors on request.

Potential investors should retain their own professional advisors to review and evaluate the economic, tax and other consequences of ownership of REIT Shares.  Neither this Private Placement Memorandum, nor any other information furnished by Borderplex, should be construed as investment, legal, accounting or tax advice.

**ANNEXES**

1.      **Annex "A" –  Borderplex Securityholders' Agreement**
2.      **Annex "B"  – Financial Statements of Borderplex**

**Annex A to
Private Placement Memorandum**

## SECURITYHOLDERS' AGREEMENT

---

### SECURITYHOLDERS' AGREEMENT

**THIS SECURITYHOLDERS' AGREEMENT** (this "Agreement"), is made effective as of October 30, 2006, by and among Borderplex Community Trust, a Maryland real estate investment trust (the "Company"), and each of the persons who executes a joinder to this Agreement (each an "Investor" and collectively, the "Investors").
**RECITALS**

The Company was organized on October 30, 2006 and one (1) unit of beneficial interest was issued to Scott M. Schwartz as the initial shareholder ("Initial Shareholder"); and

**WHEREAS**, Scott M. Schwartz will execute this Securityholders' Agreement as the Initial Shareholder; and

**WHEREAS**, the Company intends to conduct a private placement of its Common Shares pursuant to a Private Placement Memorandum dated as of November 1, 2006; and

**WHEREAS**, as described in the Private Placement Memorandum, upon the completion of the offering described in the Private Placement Memorandum, the Initial Shareholder will withdraw and the one (1) unit of beneficial interest issued to the Initial Shareholder will be redeemed at the original purchase price thereof; and

**WHEREAS**, as part of the Subscription Agreement to subscribe for Common Shares, each of the Investors purchasing Common Shares pursuant to the Private Placement Memorandum is required to execute a joinder to this Securityholders Agreement as a condition to such Investor's purchase of the Common Shares and in order to record the understanding between each Investor and the Company regarding certain matters relating to the management of the Company and such Investor's ownership of Common Shares.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

Definitions. The following terms shall have the meanings set forth herein for purposes of this Agreement:

"Affiliate" with regard to a person, means a person that controls, is controlled by, or is under common control with such original person. For purposes of this definition, "control," when used with respect to any person, means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "affiliated," "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" has the meaning given in the first paragraph of this Agreement.

"Beneficial Owner" means any person deemed to be a "beneficial owner" of a security as defined in Rule 16a-1(a)(2) under the Exchange Act. The terms "Beneficially Own" and "Beneficial Ownership" shall have correlative meanings.

"Board" means the Board of Trustees of the Company.

"Commission" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

824660 v1

"Common Shares" means the common shares of beneficial interest of the Company and any other securities that subsequently may be issued or issuable with respect to the Common Shares as a result of a unit split or dividend or any sale, transfer, assignment or other transaction involving the Common Shares by the Company and any securities into which the Common Shares may thereafter be changed as a result of merger, consolidation, recapitalization or other similar transaction.

"Company" has the meaning given in the first paragraph of this Agreement.

"Company Purchase Notice" has the meaning given in Section 3.4(a)

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"Immediate Family" means, with respect to any Investor who is an individual, such Investor's spouse and descendants (whether natural or adopted) and any trust for the benefit of such Investor and/or such Investor's spouse and/or descendants.

"Initial Shareholder" has the meaning given in the Recitals.

"Investors" has the meaning given in the first paragraph of this Agreement.

"Offer" has the meaning given in Section 3.4(a).

"Offered Interest" has the meaning given in Section 3.4(a).

"Offeror" has the meaning given in Section 3.4(a).

"Permitted Transferees" has the meaning given in Section 3.2.

"Person", whether or not capitalized, means any individual, corporation, proprietorship, firm, partnership, limited partnership, limited liability company, trust, association or other entity.

"Private Placement Memorandum" means that certain Private Placement Memorandum of Borderplex Community Trust dated November 1, 2006, and all amendments, modifications and replacements thereof.

"Qualified Public Event" means either (i) a firmly underwritten public offering of Common Shares registered under the Securities Act upon terms and provisions satisfactory to the Company or (ii) the registration of the Common Shares under Section 12(b) or 12(g) of the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"Transfer" has the meaning given in Section 3.1.

## ARTICLE 2
## VOTING AGREEMENT

Until the earlier of (i) December 31, 2009, or (ii) the effectiveness of the registration statement filed with the Commission in connection with a Qualified Public Event, each Investor agrees to take all actions necessary, including, without limitation, the voting of such Investor's Common Shares, the execution of written consents, the calling of special meetings, the removal of trustees, the filling of vacancies on the Board, the waiving of notice and the attending of meetings, so as to cause the Board to include the nominees recommended by the Board as trustees of the Company; provided, however, that no Investor shall be required to vote its Common Shares or execute a

824660 v1

2

written consent in favor of the election of any nominee as trustee who has been convicted or found guilty of, or pleaded guilty, nolo contendere or no contest to, or is currently charged with either a felony or other crime premised, in whole or in part, upon:

    (a)    allegations of fraud, misrepresentation, deceit, theft, embezzlement, extortion, money laundering, conversion, misappropriation, burglary, counterfeiting, false pretenses, bribery, or gambling; or

    (b)    violations of any provision of the Commodity Exchange Act, the Securities Act, the Securities Exchange Act, the Trust Indenture Act of 1939, the Investment Advisers Act of 1940, the Securities Investor Protection Act of 1970, the Foreign Corrupt Practices Act of 1977, the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, the Bank Secrecy Act, or any similar statute of a state or foreign jurisdiction, or any rule, regulation or order under any such statutes.

## ARTICLE 3
## TRANSFER RESTRICTIONS

**Section 3.1**    **Prohibition on Transfer**. Except as set forth in this <u>Article 3</u>, no Investor shall, directly or indirectly, whether by operation of law or otherwise, sell, transfer, distribute, assign, bequeath, pledge, hypothecate, encumber, grant a security interest in, or grant, issue, sell or convey any option, warrant or right to acquire, or otherwise dispose of ("<u>Transfer</u>"), any Common Shares, without the prior written consent of the Company.

**Section 3.2**    **Permitted Transfers**. Subject to the provisions of <u>Section 3.3</u>, the restrictions contained in <u>Section 3.1</u> shall not apply with respect to any Transfer of Common Shares by any Investor to (i) any Affiliate of such Investor, (ii) any member of such Investor's Immediate Family, (iii) such Investor's executors, administrators, testamentary trustees, legatees or beneficiaries upon such Investor's death, (iv) any lender to whom such Common Shares are assigned or pledged to secure bona fide indebtedness of the Investor (all such transferees collectively referred to as "<u>Permitted Transferees</u>"); provided, however, that the Permitted Transferee represents in writing that such Transfer was made in accordance with applicable securities laws and that the restrictions contained in this <u>Article 3</u> shall continue to apply to the Common Shares after such Transfer; and provided, further, that the Permitted Transferee agrees in writing to be bound by the provisions of this Agreement. In addition, if for any reason the continued holding of Common Shares by an Investor would result in such Investor's failing to qualify as a real estate investment trust under the Internal Revenue Code of 1986, as amended, or would otherwise be illegal under any applicable law, rule or regulation, then, upon five (5) days' prior written notice to the Company, the Investor may Transfer such Common Shares to any person that is not engaged, directly or indirectly, in a business that is competitive with the Company, which person will be deemed a Permitted Transferee; provided, however, that the Permitted Transferee represents in writing that such Transfer was made in accordance with applicable securities laws and that the restrictions contained in this <u>Article 3</u> shall continue to apply to the Common Shares after such Transfer; and provided, further, that the Permitted Transferee agrees in writing to be bound by the provisions of this Agreement.

**Section 3.3**    **ERISA Plans**. In addition to the restrictions on Transfer contained elsewhere in this Agreement, no Investor shall Transfer any Common Shares to any person if such Transfer, in the reasonable judgment of the Company, would result in or constitute a non-exempt prohibited transaction under ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended, or would likely cause the Company's assets to be deemed "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 or otherwise under ERISA. Upon request of any Investor, the Company will provide such information with respect to the entity owners of the Company as the requesting party may reasonably request in order to assist such party in determining whether any proposed Transfer would have the effects described in this <u>Section 3.3</u> and such Investor shall be entitled to rely upon such information in making its determination.

**Section 3.4**    **Right of First Offer**. Notwithstanding the provisions of <u>Section 3.1</u>, from and after December 31, 2009, an Investor may Transfer its Common Shares if such Transfer is made in accordance with the following provisions:

(a)     If any Investor (the "Offeror") desires to Transfer all or any portion of the Offeror's Common Shares (all or such portion is hereinafter referred to as the "Offered Interest"), the Offeror shall first deliver to the Company a written notice setting forth an offer to sell the Offered Interest on specified terms and conditions, other than price (the "Offer"). The Company may elect to purchase the entire Offered Interest by delivering written notice to the Offeror of its election to purchase within twenty (20) days after receipt of the Offer. Such notice by the Company (the "Company Purchase Notice") shall set forth the price at which the Company proposes to purchase the Offered Interest.

(b)     In the event that the Company has elected to purchase all of the Offered Interest, the Offeror may sell the Offered Interest to the Company or, within ninety (90) days after the expiration of the twenty (20) day period referred to in Section 3.4(a), Transfer the Offered Interest to one or more third parties at a price no less than 105% of the price specified in the Company Purchase Notice and on other terms and conditions no more favorable to the transferees than those contained in the Offer. After the expiration of such ninety (90) day period, any Transfer of all or any portion of any Investor's Common Shares shall once again be subject to the provisions of this Section 3.4.

(c)     In the event that the Company has not elected to purchase all of the Offered Interest, the Offeror may, within ninety (90) days after the expiration of the twenty (20) day period referred to in Section 3.4(a), Transfer the Offered Interest to one or more third parties at any price, but on other terms and conditions no more favorable to the transferees than those specified in the Offer. After the expiration of such ninety (90) day period, any Transfer of all or any portion of any Investor's Common Shares shall once again be subject to the provisions of this Section 3.4.

(d)     The Company may assign its rights under this Section 3.4.

### ARTICLE 4
### MISCELLANEOUS

**Section 4.1     Notices.**

(a)     All communications under this Agreement shall be in writing and shall be mailed by first class mail, postage prepaid, or telegraphed or telexed, or given by facsimile or delivered by hand:

(i)     if to the Company, at:

Borderplex Community Trust
201 East Main Drive, Suite 1516
El Paso, Texas 79901
Facsimile: (915) 975-8141

or at such other address as it may have furnished in writing to the Investors, or

(ii)     if to any Investor, to the address of such Investor as it appears in the stock ledger, or other appropriate register, of the Company.

(b)     Any notice so addressed, when mailed by registered or certified mail shall be deemed to be given three (3) days (seven (7) days in the case of Investors whose address is not in the United States of America) after so mailed, and when telegraphed or telexed or delivered by hand shall be deemed to be given immediately, and when given by facsimile, shall be deemed to be given when confirmed electronically or telephonically, provided that the original is mailed by first class mail, postage prepaid, at the same time in accordance with Section 4.1(a).

**Section 4.2** **Legends.** Each certificate representing any Common Shares owned by the Investors shall bear a legend reading substantially as follows, in addition to any other legend required by applicable law:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A SECURITYHOLDERS' AGREEMENT DATED AS OF OCTOBER 30, 2006, AS AMENDED, BETWEEN THE COMPANY AND HOLDERS OF CERTAIN SECURITIES OF THE COMPANY. THE VOTING, SALE, TRANSFER AND OTHER DISPOSITION OF THESE SECURITIES IS SUBJECT TO THE TERMS OF SUCH AGREEMENTS AND THESE SECURITIES ARE TRANSFERABLE ONLY IN COMPLIANCE WITH SUCH AGREEMENTS AND, UNDER CERTAIN CIRCUMSTANCES, THE COMPANY MAY HAVE A RIGHT TO ACQUIRE THESE SECURITIES. A COPY OF EACH OF THE SECURITYHOLDERS' AGREEMENT IS AVAILABLE TO ANY MEMBER UPON REQUEST AND WITHOUT CHARGE.

**Section 4.3** **Successors and Assigns.** Except as otherwise expressly provided herein, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company and each of the Investors.

**Section 4.4** **Amendment and Waiver.** This Agreement may be amended, and the observance of any term of this Agreement may be waived, but only with the written consent of the Company and Investors then holding a majority of the outstanding Common Shares; *provided* that without the consent of any other Investor, any Investor may from time to time enter into one or more agreements amending, modifying or waiving the provisions of this Agreement with respect to such Investor if such action does not adversely affect the rights or interest of the Company or any other Investor. No delay on the part of any party in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any party of any right, power or remedy preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.

**Section 4.5** **Reports to ERISA Investors.** On or before December 31 of each year, the Company shall prepare and deliver to each Investor that is subject to ERISA a statement as to the fair market value of the Company as of the preceding September 30th of such year, which statement shall include an explanation of how such fair market value was determined and any formulae used in calculating such value. The Company need not engage a third party appraisal for purposes of determining the fair market value of the Company for purposes of this Section 4.5, but rather may make its own reasonable determination of such value.

**Section 4.6** **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, and the remainder of this Agreement shall remain operative and in full force and effect. The parties shall negotiate in good faith a replacement clause or provision as consistent with the ineffective clause or provision as is practicable under law.

**Section 4.7** **Counterparts.** One or more counterparts of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

**Section 4.8** **Governing Law.** This Agreement shall be construed in accordance with and governed by the internal laws of the State of Maryland.

**Section 4.9** **Entire Understanding.** This Agreement sets forth the entire agreement and understanding of the parties hereto with respect to the matters set forth herein and supersedes any and all prior agreements, arrangements and understandings among the parties with respect to the matters set forth herein.

**Section 4.10** **No Third Party Beneficiaries.** This Agreement is solely for the benefit of the parties hereto and no provisions of this Agreement shall be deemed to confer upon any other party any remedy, claim, liability, reimbursement, cause of action or other right.

**Section 4.11    Invalidity of Provisions**.  If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

**Section 4.12    Headings**.  The headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

**Section 4.13    No Presumption Against Drafter**.  The parties hereto have jointly participated in the negotiation and drafting of this Agreement.  In the event of any ambiguity or in the event a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the parties hereto and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any provision of this Agreement.

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date and year first above written.

**BORDERPLEX COMMUNITY TRUST**, a Maryland Real Estate Investment Trust

By: _____

Name:    J. A. CARDWELL

Title:    Chairman of the Board and President

_____

SCOTT M. SCHWARTZ,

Initial Investor

**Annex B to
Private Placement Memorandum**

**FINANCIAL STATEMENTS OF BORDERPLEX**

**BORDERPLEX COMMUNITY TRUST AND SUBSIDIARIES**
**(A REAL ESTATE INVESTMENT TRUST)**

**CONSOLIDATED FINANCIAL REPORT**

**DECEMBER 31, 2014 AND 2013**

**CONTENTS**

**INDEPENDENT AUDITOR'S REPORT ON THE CONSOLIDATED
FINANCIAL STATEMENTS**                                                  1-2

**CONSOLIDATED FINANCIAL STATEMENTS**

Consolidated balance sheets                                                3

Consolidated statements of income                                         4

Consolidated statements of changes in shareholders' equity                5

Consolidated statements of cash flows                                     6

Notes to the consolidated financial statements                         7-16

**SUPPLEMENTARY INFORMATION**

Consolidating balance sheet                                               17

Consolidating statement of income                                         18

Consolidating schedule of general and administrative expenses             19

Consolidated funds from operations                                        20



4130 Rio Bravo Street
El Paso, Texas 79902
T (915) 544-6950 | F (915) 544-1303
www.lb-cpa.com

## INDEPENDENT AUDITOR'S REPORT

To the Board of Directors
Borderplex Community Trust
El Paso, Texas

### Report on the Consolidated Financial Statements

We have audited the accompanying consolidated financial statements of Borderplex Community Trust and Subsidiaries, which comprise the consolidated balance sheets as of December 31, 2014 and 2013, and the related consolidated statements of income, changes in partner's capital, and cash flows for the years ended December 31, 2014 and 2013 and the related notes to the consolidated financial statements.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of the consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's Responsibility

Our responsibility is to express an opinion on the consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

1

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above presents fairly, in all material respects, the financial position of Borderplex Community Trust and Subsidiaries as of December 31, 2014 and 2013, in accordance with accounting principles generally accepted in the United States of America.

**Report on Supplementary Information in Relation to Consolidated Financial Statements as a Whole**

Our audits were conducted for the purpose of forming an opinion on the consolidated financial statements as a whole. The accompanying consolidated supplementary information is presented for purposes of additional analysis and is not a required part of the consolidated financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the consolidated financial statements as a whole.

*Lauterbach, Borschow: Company*

El Paso, Texas
April 24, 2015

2

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

**December 31, 2014 and 2013**

|  | 2014 | 2013 |
|---|---|---|
| **ASSETS** | | |
| Investment in real estate: | | |
| Investment in real estate | $ 53,740,624 | $ 56,430,697 |
| Less accumulated depreciation and amortization | (12,571,277) | (11,470,841) |
| Net investment in real estate | 41,169,347 | 44,959,856 |
| Cash and cash equivalents | 2,837,147 | 79,894 |
| Accounts and tenant receivables, net | 223,399 | 187,362 |
| Prepaid expenses and other assets | 3,544,481 | 1,328,778 |
| Total assets | $ 47,774,374 | $ 46,555,890 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Mortgage notes and other notes payable | $ 21,852,236 | $ 17,805,294 |
| Accounts payable and accrued expenses | 808,609 | 781,031 |
| Security deposits | 201,283 | 218,587 |
| Deferred revenue | 539,626 | - |
| Total liabilities | 23,401,754 | 18,804,912 |
| **SHAREHOLDERS' EQUITY** | | |
| Common shares of beneficial interest, $.01 par value, | | |
| 250,000,000 shares authorized, 3,004,830 shares issued, | | |
| 2,858,507 shares outstanding at December 31, 2014 and | | |
| 2,854,830 shares outstanding at December 31, 2013 | 30,048 | 30,048 |
| Additional paid in capital | 29,780,929 | 29,780,929 |
| Retained deficit | (4,237,049) | (2,231,752) |
|  | 25,573,928 | 27,579,225 |
| Less cost of treasury stock, 146,323 shares at | | |
| December 31, 2014 and 150,000 shares at 2013 | (1,471,503) | (1,500,000) |
| Borderplex Community Trust Shareholders' Equity | 24,102,425 | 26,079,225 |
| Noncontrolling interest | 270,195 | 1,671,753 |
| Total Shareholders' Equity | 24,372,620 | 27,750,978 |
| Total liabilities and shareholders' equity | $ 47,774,374 | $ 46,555,890 |

See Notes to the Consolidated Financial Statements

3

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

**For the Years Ended December 31, 2014 and 2013**

|  | 2014 | 2013 |
|---|---|---|
| Revenues: | | |
| Minimum rents | $ 8,221,439 | $ 8,245,692 |
| Tenant recoveries | 362,871 | 503,414 |
| Other tenant charges | 105,028 | 125,841 |
| Other | 767,956 | 468,139 |
| Total revenues | 9,457,294 | 9,343,086 |
| Expenses: | | |
| Utilities | 1,560,758 | 1,533,328 |
| Repairs and maintenance | 1,737,733 | 1,863,932 |
| Taxes and insurance | 1,285,353 | 1,434,400 |
| Management and other fees | 19,630 | 30,969 |
| Other operating costs | 315,242 | 402,774 |
| General and administrative | 1,530,362 | 1,092,014 |
| Depreciation and amortization | 1,439,973 | 1,486,875 |
| Total expenses | 7,889,051 | 7,844,292 |
| Financial income (expense) | | |
| Interest income | 10,209 | 1,202 |
| Interest expense | (2,668,688) | (1,141,039) |
| Reissuance of treasury stock | | |
| Total financial expense | (2,658,479) | (1,139,837) |
| Net income (loss) | (1,090,236) | 358,957 |
| Less: noncontrolling interest in net income | 12,101 | (21,169) |
| Net income (loss) attributable to Borderplex Community Trust | $ (1,078,135) | $ 337,788 |
| Net income (loss) | (1,090,236) | 358,957 |
| Add back (substract): | | |
| Depreciation and amortization | 1,439,973 | 1,486,875 |
| Net (gain) on disposition of assets | (291,980) | (21,447) |
| Funds from operations | $ 57,757 | $ 1,824,385 |
| FFO yield on equity | 0.22% | 6.51% |

See Notes to the Consolidated Financial Statements

4

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY**

**For the Years Ended December 31, 2014 and 2013**

| | Shares | | Common Shares of Beneficial Interest | | Additional Paid-In Capital | | Retained Earnings (Deficit) | | Treasury Shares | | Borderplex Community Trust Total | | Noncontrolling Interest | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Borderplex Community Trust Shareholders | | | | | | | | | | |
| Balance, December 31, 2012 | 2,854,830 | $ | 30,048 | $ | 29,780,929 | $ | (1,713,091) | $ | (1,500,000) | $ | 26,597,886 | $ | 1,703,751 | $ | 28,301,637 |
| Net income | - | | - | | - | | 337,788 | | - | | 337,788 | | 21,169 | | 358,957 |
| Distributions | - | | - | | - | | (856,449) | | - | | (856,449) | | (53,167) | | (909,616) |
| Balance, December 31, 2013 | 2,854,830 | $ | 30,048 | $ | 29,780,929 | $ | (2,231,752) | $ | (1,500,000) | $ | 26,079,225 | $ | 1,671,753 | $ | 27,750,978 |
| **Net loss** | - | | - | | - | | (1,078,135) | | - | | (1,078,135) | | (12,101) | | (1,090,236) |
| **Reissuance of treasury stock** | 3,677 | | - | | - | | - | | 28,497 | | 28,497 | | - | | 28,497 |
| **Distributions and reallocations** | - | | - | | - | | (927,162) | | - | | (927,162) | | (1,389,457) | | (2,316,619) |
| **Balance, December 31, 2014** | 2,858,507 | $ | 30,048 | $ | 29,780,929 | $ | (4,237,049) | $ | (1,471,503) | $ | 24,102,425 | $ | 270,195 | $ | 24,372,620 |

See Notes to the Consolidated Financial Statements

5

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**For the Years Ended December 31, 2014 and 2013**

|  | 2014 | 2013 |
|---|---|---|
| Cash Flows From Operating Activities |  |  |
| Net income (loss) | $ (1,090,236) | $ 358,957 |
| Adjustments to reconcile net income to net cash |  |  |
| provided by operating activities: |  |  |
| Depreciation and amortization | 1,439,973 | 1,486,875 |
| Gain on sale of real estate | (291,980) | (21,447) |
| (Increases) decreases in assets |  |  |
| Accounts receivable | (36,037) | (82,840) |
| Prepaids and other assets | (550,919) | (51,388) |
| Increases (decreases) in liabilities |  |  |
| Security deposits | (17,304) | (4,702) |
| Accounts payable and accrued expenses | 32,596 | 177,537 |
| Deferred revenue | 539,626 | - |
| Net cash provided by operating activities | 25,719 | 1,862,992 |
| Cash Flows From Investing Activities |  |  |
| Proceeds from sale of real estate, net | 2,373,886 | 182,878 |
| Acquisition of real estate and property additions | (2,681,030) | (2,171,579) |
| Purchase of premises and equipment | - | (4,275) |
| Net cash used in investing activities | (307,144) | (1,992,976) |
| Cash Flows From Financing Activities |  |  |
| Proceeds from long-term borrowings | 13,520,000 | - |
| Principal payments on long-term borrowings | (9,473,058) | (471,552) |
| Deferred stock issuance cost | (165,124) | - |
| Reissuance of treasury stock | 28,497 | - |
| Cash dividends paid | (871,637) | (909,616) |
| Net cash provided (used) by financing activities | 3,038,678 | (1,381,168) |
| Increase (decrease) in cash and cash equivalents | 2,757,253 | (1,511,152) |
| Cash and cash equivalents: |  |  |
| Beginning | 79,894 | 1,591,046 |
| Ending | $ 2,837,147 | $ 79,894 |
| Supplemental Disclosures of Cash Flow Information |  |  |
| Cash Payment for: |  |  |
| Interest | $ 2,668,688 | $ 1,141,039 |

See Notes to the Consolidated Financial Statements

6

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

---

**Note 1. Nature of Business and Significant Accounting Policies**

Organization and Nature of Business: Borderplex Community Trust ("Borderplex") was formed on October 30, 2006 under the laws of the State of Maryland. Borderplex is a self-administered and self-managed real estate investment trust, referred to as a "REIT". Borderplex was incorporated to raise capital and acquire ownership interests in high quality real estate properties, including office, retail, industrial, and multi-family residential properties, as well as other real estate-related assets. On September 1, 2008, Borderplex contributed all of its assets to BCT Realty Operating Limited Partnership in exchange for general and limited partnership interests. As of December 31, 2014, Borderplex owns 94.16% of BCT Realty Operating Limited Partnership.

**A summary of Borderplex's significant accounting policies follows:**

Principles of Consolidation: The accompanying consolidated financial statements include the accounts of Borderplex, its subsidiaries and joint ventures in which Borderplex has a controlling interest. The accounts of the following entities have been consolidated:

- Borderplex Community Trust
- BCT Realty Operating Limited Partnership
- Borderplex 201 E. Main, LLC
- EP Stanton Street, LLC
- EP Overland Street, LLC
- EP Stanton/Overland Joint Venture
- Borderplex Bassett, LLC
- Borderplex 401 N. Oregon, LLC
- Madison River investments, LLC
- BCT Property Services, LLC
- Madison River Member, LLC
- BCT Realty LP Holdings, LLC
- Wheeler Peak Investments, LLC
- Bridger Mountain Investments, LLC
- Wheeler Bridger Joint Venture

All significant inter-company balances and transactions have been eliminated.

Non-controlling Interest: Non-controlling interest represents the portion of equity in the subsidiary not attributable directly or indirectly to Borderplex. The profit and loss derived from the performance of the subsidiary is allocated to net income attributable to noncontrolling interest in the consolidated statement of income.

Properties: Real estate assets are stated at cost. Construction and improvement costs incurred in connection with the development of new properties or the redevelopment of existing properties are capitalized to the extent the total carrying value of the property does not exceed the estimated fair value of the completed property. Real estate taxes and interest costs incurred during construction periods are capitalized. Capitalized interest costs are based on qualified expenditures and interest rates in place

7

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Business and Significant Accounting Policies (continued)**

during the construction period. Capitalized real estate taxes and interest costs are amortized over their respective lives which are consistent with the corresponding assets.

Tenant improvements, either paid directly or in the form of construction allowances paid to tenants, are capitalized and depreciated over the lease term. Maintenance and repairs are charged to expense when incurred. Expenditures for significant betterments and improvements are capitalized.

Real estate assets, including developments in progress, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. A real estate asset is considered to be impaired when the estimated future undiscounted operating cash flow is less than its carrying value. To the extent impairment has occurred, the excess of the carrying value of the asset over its estimated fair value will be expensed to operations.

Depreciation or amortization expense is computed using the straight-line method based upon the following estimated useful lives:

|  | Years |
|---|---|
| Buildings and improvements | 5 - 40 |
| Equipment, tenant improvements and fixtures | 3 - 10 |

Use of Estimates: The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Cash and Cash Equivalents: Highly-liquid investments with maturities at dates of purchase of three months or less are classified as cash equivalents.

Borderplex maintains its cash in bank deposit accounts, which, at times, may exceed federally insured limits. Borderplex believes it is not exposed to any significant credit risk on cash and cash equivalents.

Leases: Leases which transfer substantially all of the risks and benefits of ownership to tenants are considered finance leases and the present values of the minimum lease payments and the estimated residual values of the leased properties, if any, are accounted for as receivables. Leases which transfer substantially all of the risks and benefits of ownership to us are considered capital leases and the present values of the minimum lease payments are accounted for as assets and liabilities.

Income Taxes: Borderplex has elected to be taxed as a REIT under sections of the Internal Revenue Code. To qualify as a REIT, the company must meet a number of organizational and operational requirements, including a requirement that we distribute at least 90% of our REIT taxable income to our stockholders. As a REIT, we generally will not be subject to federal income tax at the corporate level. Borderplex is organized and operates in such a manner as to qualify for taxation as a REIT under the Code, and intends

8

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

---

### Note 1. Nature of Business and Significant Accounting Policies (continued)

to continue to operate in such a manner, but no assurance can be given that we will operate in a manner so as to qualify or remain qualified as a REIT.

Accounting principles generally accepted in the United States of America require management to evaluate tax positions taken by the company and recognize a tax liability (or asset) if the company has taken an uncertain position that more likely than not would not be sustained upon examination by the IRS. Management has analyzed the tax positions taken by Borderplex, and has concluded that as of December 31, 2014 and 2013, no uncertain positions are taken or are expected to be taken that would require recognition of a liability (or asset) or disclosure in the consolidated financial statements. Borderplex is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any of the tax periods in progress. Management believes Borderplex is no longer subject to income tax examinations by the U.S. federal tax authorities for years before 2011 and by state or local tax authorities for years before 2010.

Purchase Accounting for Acquisition in Real Estate: Acquisitions of properties are accounted for utilizing the purchase method and accordingly, the consolidated results of operations of acquired properties are included in our consolidated results of operations from the respective dates of acquisition. The purchase price of the real estate is allocated to the acquired tangible assets, consisting primarily of land, building and tenant improvements and identified intangible assets and liabilities, consisting of the value of above-market and below-market leases, other value of in-place leases, value of tenant relationships and acquired ground leases, based in each case on their fair values.

The fair value of the tangible assets of an acquired property is determined by valuing the property as if it were vacant. The "if vacant" fair value is allocated to land, where applicable, buildings, tenant improvements and equipment based on comparable sales and other relevant information obtained in connection with the acquisition of the property.

The estimated fair value of acquired in-place at-market tenant leases are the costs we would have incurred to lease the property to the occupancy level of the property at the date of acquisition. Such estimate includes the fair value of leasing commissions, legal costs and tenant coordination costs that would be incurred to lease the property to this occupancy level. Additionally, we evaluate the time period over which such occupancy level would be achieved and include an estimate of the net operating costs (primarily real estate taxes, insurance and utilities) incurred during the lease-up period, which generally ranges up to one year. Acquired in-place at-market tenant leases are amortized over the average lease term.

Intangible assets and liabilities are also recorded for above-market and below-market in-place tenant and ground leases where we are either the lessor or the lessee. Above-market and below-market in-place tenant and ground lease values are recorded based on the present value (using an interest rate which reflects the risks associated with the leases acquired) of the difference between the contractual amounts to be received or paid pursuant to the in-place leases and our estimate of fair market lease rates for the corresponding in-place leases, measured over a period equal to the remaining non-cancelable term of the

9

**1021263.13**

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### Note 1. Nature of Business and Significant Accounting Policies (continued)

leases. Above and below-market lease values are amortized over the remaining non-cancelable terms of the respective leases.

Due to existing contacts and relationship with tenants at our currently owned properties, no significant value has been ascribed to the tenant relationships at the acquired properties.

Revenue Recognition and Related Matters: Minimum rent revenues are recognized on a straight-line basis over the terms of the related leases. Minimum rent revenues also include amounts collected from tenants to allow the termination of their leases prior to their scheduled termination dates and accretion related to above and below-market tenant leases on acquired properties.

Borderplex provides an allowance for doubtful accounts against the portion of accounts receivable, including straight-line rents, which are estimated to be uncollectible. Such allowances are reviewed periodically based upon recovery experience. For that portion of the otherwise recognizable deferred rent that is not deemed to be probable of collection, no revenue is recognized. There was no allowance for December 31, 2014 and the allowance for doubtful accounts at December 31, 2013 was $110,455.

Overage rents are recognized on an accrual basis once tenant sales exceed contractual tenant lease thresholds. Recoveries from tenants are established in the leases or computed based upon a formula related to real estate taxes, insurance and other property operating expenses and are generally recognized as revenues in the period the related costs are incurred.

Interest on the note receivable is recognized over the term of the note and calculated primarily using the simple-interest method on principal amounts outstanding.

Subsequent Events: Borderplex has evaluated subsequent events through April 24, 2015, the date on which the financial statements were available to be issued. See Note 13 for further information for subsequent events.

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 2.  Investment in Real Estate**

Investment in real estate consisted of the following at December 31:

| | | Gross Asset (Liability) | | 2014 Accumulated Depreciation (Amortization)/ Accretion | | Net Carrying Amount |
|---|---|---|---|---|---|---|
| Land | $ | 15,190,479 | $ | - | $ | 15,190,479 |
| Buildings and equipment | | 27,879,143 | | (4,681,460) | | 23,197,683 |
| Other | | 134,410 | | (103,316) | | 31,094 |
| Tenant improvements | | 4,808,050 | | (2,479,067) | | 2,328,983 |
| Capitalized lease costs | | 1,028,251 | | (607,143) | | 421,108 |
| Tenant Leases: | | | | | | |
| In-place | | 4,988,542 | | (4,988,542) | | - |
| Above-market | | 102,458 | | (102,458) | | - |
| Below-market | | (390,709) | | 390,709 | | - |
| | $ | 53,740,624 | $ | (12,571,277) | $ | 41,169,347 |

| | | Gross Asset (Liability) | | 2013 Accumulated Depreciation (Amortization)/ Accretion | | Net Carrying Amount |
|---|---|---|---|---|---|---|
| Land | $ | 16,772,465 | $ | - | $ | 16,772,465 |
| Buildings and equipment | | 29,534,164 | | (4,190,338) | | 25,343,826 |
| Other | | 110,023 | | (95,199) | | 14,824 |
| Tenant improvements | | 4,414,810 | | (1,999,110) | | 2,415,700 |
| Capitalized lease costs | | 898,944 | | (485,903) | | 413,041 |
| Tenant Leases: | | | | | | |
| In-place | | 4,988,542 | | (4,988,542) | | - |
| Above-market | | 102,458 | | (102,458) | | - |
| Below-market | | (390,709) | | 390,709 | | - |
| | $ | 56,430,697 | $ | (11,470,841) | $ | 44,959,856 |

Borderplex recorded depreciation, tenant improvement and capitalized lease cost amortization and intangible lease net amortization of $1,439,973 and $1,486,875 for the years ending December 31, 2014 and 2013 respectively.

11

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### Note 3. Prepaid Expense and Other Assets

The following table summarizes the significant components of prepaid expenses and other assets at December 31:

|  | 2014 |  | 2013 |
|---|---|---|---|
| Deferred rents | $ 1,049,190 | $ | 986,753 |
| Deferred loan fees | 468,371 |  | 116,518 |
| Prepaid insurance and expenses | 73,981 |  | 120,816 |
| Deferred capital cost | 165,124 |  | - |
| Other assets | 158,155 |  | 104,691 |
| Security and escrow deposits | 1,629,660 |  | - |
|  | $ 3,544,481 | $ | 1,328,778 |

### Note 4. Accounts Payable and Accrued Expenses

The following table summarizes the significant components of accounts payable and accrued expenses at December 31:

|  | 2014 |  | 2013 |
|---|---|---|---|
| Accounts payable | $ 15,377 | $ | 12,772 |
| Payroll/bonuses payable | 102,954 |  | 105,231 |
| Payroll tax payable | 19,209 |  | 984 |
| Accrued interest and deferred interest | 28,363 |  | 29,123 |
| Accrued operating expenses | 343,512 |  | 222,822 |
| Distributions payable | 27 |  | 5,045 |
| Prepaid rent | 273,133 |  | 405,954 |
| Health insurance payable | 14,380 |  | (900) |
| Retainage on contracts | 11,654 |  | - |
|  | $ 808,609 | $ | 781,031 |

### Note 5. Notes Payable

Notes payable consist of the following at December 31:

|  | 2014 |  | 2013 |
|---|---|---|---|
| A note payable to a company in the original amount of $750,000, dated November 21, 2007, with interest due annually at varying interest rates. The note bears an initial annual rate of interest of 3% until November 30, 2011. The interest rate from December 1, 2011 to November 30, 2014 | $ 750,000 | $ | 750,000 |

12

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

| Note 5. Notes Payable (continued) | 2014 | 2013 |
|---|---|---|
| increases to 4%, and the final interest period from December 1, 2014 to maturity date of November 21, 2017 increases to 5%. At any time after the sixth anniversary of the effective date of the note, the lender may elect to convert all or portions of the then outstanding balance of the note to shares of beneficial interests of the REIT at a price of $12.50 per share. | | |
| A note payable to an investment company in the original amount of $9,600,000 paid in monthly installments of $64,700 including interest of 6.48%, with a balloon payment due at maturity on July 1, 2018.  The note is collateralized by real estate. The note was paid off in 2014 | - | 8,583,563 |
| A note payable to an investment company in the original amount of $8,250,000 paid in monthly installments of $55,602 including interest of 6.48%, with a balloon payment due at maturity on August 1, 2018.   This note is collateralized by real estate. | 7,198,287 | 7,392,183 |
| A note payable to an investment company in the original amount of $769,717 paid in monthly installments of $7,534 including interest of 5.875%, with a maturity date of July 1, 2020. The note is collateralized by real estate. The note was refinanced on February 27, 2014 with the same lender in the amount of $1,750,000.   The refinanced note has an interest rate of 5.125% and a maturity date of March 1, 2019. | 1,683,949 | 487,489 |
| A note payable to a bank in the original amount of $220,390 paid in monthly installments of $2,235 including interest of 6.25% with a balloon payment due at maturity on June 1, 2015. The note is collateralized by real estate. The note was paid off in full in 2014. | - | 142,059 |
| A note payable to a trust bearing no interest in the original amount of $450,000 payable in full at maturity on June 19, 2017. The note is collateralized by real estate. | 450,000 | 450,000 |

13

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

| Note 5. Notes Payable (continued) | 2014 | 2013 |
|---|---|---|
| A note payable to a bank in the original amount of $11,770,000, an interest rate of 4.51% paid in monthly interest only installments of $59,707 for the first 36 months then $163,660 thereafter.  Note matures on November 6, 2024. The note is collateralized by real estate. | 11,770,000 | - |
| | $   21,852,236 | $   17,805,294 |

Aggregate maturities required on long-term debt as of December 31, 2014, are due in future years as follows:

| Periods ending December 31, | |
|---|---|
| 2015 | $          289,910 |
| 2016 | 308,076 |
| 2017 | 1,646,818 |
| 2018 | 8,100,844 |
| 2019 | 1,638,128 |
| Thereafter | 9,868,460 |
| | $     21,852,236 |

### Note 6.  Revolving Line of Credit Agreement

Borderplex has funds available for withdrawal against a $5,000,000 revolving line of credit agreement with a bank due April 10, 2015.  The line of credit bears interest at the Wall Street Journal prime rate minus .50%, with a floor of 5.00%.  No draws were taken against the line of credit as of December 31, 2014 and 2013.

### Note 7. Deferred Revenue

On September 10, 2014, the Partnership entered into a master lease agreement with Crown Castle (Crown) for the roof top antenna rights at Wells Fargo Plaza.  The agreement is for 30 years ending in September 2044. The Partnership received $560,000 at the close of the agreement and transferred the rights to all the existing leases to Crown for the rooftop. In addition, the Partnership will receive 60% of the revenues from all future leases of roof top antenna space. The Partnership has recorded the transaction as a financing arrangement and will amortize the initial payment over the life of the agreement.

14

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### Note 8. Leases

Borderplex leases office space to several tenants under various non-cancelable leases. Total minimum future lease payments receivable in future years is as follows:

Periods ending December 31,

| | | |
|---|---|---|
| 2015 | $ | 7,903,085 |
| 2016 | | 7,763,279 |
| 2017 | | 7,213,409 |
| 2018 | | 5,132,392 |
| 2019 | | 3,590,947 |
| Thereafter | | 6,658,911 |
| | $ | 38,262,023 |

### Note 9. Defined Contribution Retirement Plan

Borderplex participates in a defined contribution retirement plan under Internal Revenue Code Section 401(k) that covers substantially all of Borderplex's full time employees. The plan is sponsored by a subsidiary of Borderplex which manages all of Borderplex's employees. Borderplex may make discretionary matching contributions equal to the uniform percentage of each employee's salary deferrals. Borderplex contributions are 100% of the participants' contributions up to 4% of the participants' annual salary.  Borderplex contributions to the plan were $37,648 and $38,171 for the years ended December 31, 2014 and 2013, respectively.

### Note 10. Related Parties

There are several stockholders of the "REIT" which have affiliations with tenants in properties owned by Borderplex or perform services on behalf of Borderplex. The amounts included in the consolidated financial results of operations for the related parties through the twelve months ended December 31, 2014 and 2013 are summarized as follows:

| | | 2014 | | 2013 |
|---|---|---|---|---|
| Income: | | | | |
| Rental income | $ | 1,031,559 | $ | 1,153,446 |
| | | | | |
| Expenses: | | | | |
| Commissions | $ | 3,392 | $ | 6,911 |
| Management fees | | 5,744 | | 30,969 |
| Legal & professional fees | | 52,453 | | 45,279 |
| | | | | |
| | $ | 61,589 | $ | 83,159 |

15

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

---

### Note 11. Commitments and Contingencies

In the normal course of business, from time to time, Borderplex is involved in legal proceedings relating to the ownership and operations of its properties. In management's opinion, the liabilities, if any, that may ultimately result from such legal actions are not expected to have a material adverse effect on our consolidated financial position, results of operations or liquidity.

Borderplex periodically enters into contingent agreements for the acquisition of properties. Each acquisition is subject to satisfactory completion of due diligence and, in the case of property acquired under development, completion of the project.

### Note 12. Major Tenants

A significant portion of Borderplex's rental income is derived from one tenant. Net rents for the years ended December 31 are as follows:

|          | 2014 |        |   | 2013 |        |
|----------|------|--------|---|------|--------|
| Tenant A | $ 1,032,000 | 12.55% | $ | 1,054,035 | 12.78% |

### Note 13. Subsequent Events

In January 21, 2015, Borderplex Community Trust (BCT), general partner of the operating partnership, admitted a new limited partner, Main Strategic Investments LLC (MSI). MSI contributed 1,645,338 shares of American Realty Capital Properties, Inc., a Real Estate Investment Trust that trades on NASDAQ as ARCP was in exchange for 40.1051% interest in the operating partnership. Management is optimistic that ARCP stock will appreciate from its original price of $9 and future dividends will have a positive impact to BCT's performance.

On April 22, 2015, Borderplex acquired a multifamily property in Santa Fe, NM. The total price was $21.1 million including land for additional development. Borderplex assumes a 40 year HUD loan with 38 years remaining and a balance of $16.4 million. The seller is receiving $2.5 million in operating partnership units in lieu of cash.

On May 15, 2015, BCT Realty Operating Limited Partnership entered into a line of credit agreement for $7,000,000 which will replace the current line of credit. The agreement will be collateralized by ARCP stock, has a maturity date of 24 months and carrying a minimum interest rate of 4%.

16

**1021263.13**

A-25

**SUPPLEMENTARY INFORMATION**

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATING BALANCE SHEET**

**December 31, 2014**

| ASSETS | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| Investment in real estate: | | | | | | | | |
| Investment in real estate | $ - $ | 16,714,080 $ | 22,026,997 $ | - $ | 12,705,991 $ | 2,293,556 $ | - $ | 53,740,624 |
| Less accumulated depreciation and amortization | - | (4,916,368) | (6,645,334) | - | (906,259) | (103,316) | - | (12,571,277) |
| Net investment in real estate | - | 11,797,712 | 15,381,663 | - | 11,799,732 | 2,190,240 | - | 41,169,347 |
| Cash and cash equivalents | 9,073 | (157,593) | (185,867) | (30,417) | (131,379) | 3,333,330 | - | 2,837,147 |
| Accounts and tenant receivables, net | - | 53,570 | 96,435 | - | 22,589 | 174,138 | (123,333) | 223,399 |
| Investment in subsidiaries | 24,172,586 | - | - | - | - | 37,192,754 | (61,365,340) | - |
| Prepaid expenses and other assets | - | 738,204 | 2,423,198 | - | 79,159 | 303,920 | - | 3,544,481 |
| Intercompany | - | 6,040,129 | - | 1,061,530 | 11,905,892 | 2,055,105 | (21,062,656) | - |
| Total assets | $ 24,181,659 $ | 18,472,022 $ | 17,715,429 $ | 1,031,113 $ | 23,675,993 $ | 45,249,487 $ | (82,551,329) $ | 47,774,374 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | | | |
| Mortgage notes and other notes payable | $ - $ | 7,198,287 $ | 11,770,000 $ | 750,000 $ | 1,683,949 $ | 450,000 $ | - $ | 21,852,236 |
| Accounts payable and accrued expenses | 9,079 | 381,695 | 353,702 | 28,321 | 35,919 | 123,232 | (123,339) | 808,609 |
| Security deposits | - | 58,034 | 98,834 | - | 44,415 | - | - | 201,283 |
| Deferred revenue | - | - | 539,626 | - | - | - | - | 539,626 |
| Intercompany | - | - | 3,053,931 | - | - | 18,008,725 | (21,062,656) | - |
| Total liabilities | 9,079 | 7,638,016 | 15,816,093 | 778,321 | 1,764,283 | 18,581,957 | (21,185,995) | 23,401,754 |
| Common shares | 30,048 | - | - | - | - | - | - | 30,048 |
| Additional paid in capital | 29,780,929 | - | - | - | - | - | - | 29,780,929 |
| Partners' equity | - | 10,626,877 | 3,237,078 | 297,796 | 21,048,491 | 27,464,292 | (62,674,534) | - |
| Retained earnings (deficit) | (4,237,049) | 207,129 | (1,337,742) | (45,004) | 863,219 | (796,762) | 1,109,160 | (4,237,049) |
| | 25,573,928 | 10,834,006 | 1,899,336 | 252,792 | 21,911,710 | 26,667,530 | (61,565,374) | 25,573,928 |
| Less cost of 146,323 shares of treasury stock | (1,471,503) | - | - | - | - | - | - | (1,471,503) |
| | 24,102,425 | 10,834,006 | 1,899,336 | 252,792 | 21,911,710 | 26,667,530 | (61,565,374) | 24,102,425 |
| Noncontrolling interest | 70,155 | - | - | - | - | - | 200,040 | 270,195 |
| | 24,172,580 | 10,834,006 | 1,899,336 | 252,792 | 21,911,710 | 26,667,530 | (61,365,334) | 24,372,620 |
| Total liabilities and shareholders' equity | $ 24,181,659 $ | 18,472,022 $ | 17,715,429 $ | 1,031,113 $ | 23,675,993 $ | 45,249,487 $ | (82,551,329) $ | 47,774,374 |

17

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATING STATEMENT OF INCOME**

**For the Year Ended December 31, 2014**

| | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | | |
| Minimum rents | $    - | $ 3,760,471 | 3,502,010  $ | (5,588)  $ | 994,114  $ | $    - | (29,568)  $ | 8,221,439 |
| Tenant recoveries | - | 121,422 | 41,212 | 300 | 199,937 | - | - | 362,871 |
| Other tenant charges | - | 76,898 | 19,071 | - | 9,059 | - | - | 105,028 |
| Management and other fees | - | - | - | - | - | 538,684 | (538,684) | - |
| Other | - | 126,904 | 348,572 | - | 292,480 | - | - | 767,956 |
| Total revenues | - | 4,085,695 | 3,910,865 | (5,288) | 1,495,590 | 538,684 | (568,252) | 9,457,294 |
| Expenses: | | | | | | | | |
| Utilities | - | 854,149 | 687,537 | 2,267 | 16,805 | - | - | 1,560,758 |
| Repairs and maintenance | - | 852,573 | 827,628 | 497 | 57,035 | - | - | 1,737,733 |
| Taxes and insurance | - | 421,659 | 371,561 | 2,486 | 214,227 | 275,420 | - | 1,285,353 |
| Management and other fees | - | 166,064 | 160,990 | 187 | 55,624 | - | (363,235) | 19,630 |
| Other operating costs | - | 151,131 | 139,189 | 84 | 24,838 | - | - | 315,242 |
| General and administrative | - | 374,175 | 309,536 | 287 | 15,370 | 1,036,011 | (205,017) | 1,530,362 |
| Depreciation and amortization | - | 571,950 | 691,571 | 4,252 | 163,780 | 8,420 | - | 1,439,973 |
| Total expenses | - | 3,391,701 | 3,188,012 | 10,060 | 547,679 | 1,319,851 | (568,252) | 7,889,051 |
| Financial income (expense) | | | | | | | | |
| Loss from Subsidiaries | (1,078,135) | - | - | - | - | (18,924) | 1,097,059 | - |
| Interest income | - | 621 | 4,037 | - | - | 5,551 | - | 10,209 |
| Interest expense | - | (487,486) | (2,064,632) | (29,656) | (84,692) | (2,222) | - | (2,668,688) |
| Total financial income (expense) | (1,078,135) | (486,865) | (2,060,595) | (29,656) | (84,692) | (15,595) | 1,097,059 | (2,658,479) |
| Net income (loss) before minority interest | (1,078,135) | 207,129 | (1,337,742) | (45,004) | 863,219 | (796,762) | 1,097,059 | (1,090,236) |
| Minority interest in net income | - | - | - | - | - | - | 12,101 | 12,101 |
| **Net income (loss)** | $   (1,078,135)  $ | 207,129  $ | (1,337,742)  $ | (45,004)  $ | 863,219  $ | (796,762)  $ | 1,109,160  $ | (1,078,135) |

18

A-28

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATING SCHEDULE GENERAL & ADMINISTRATIVE EXPENSES**

For the Year Ended December 31, 2014

| | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| General and administrative expenses: | | | | | | | | |
| Salaries and wages | $          - $ | 133,549 $ | 119,780 $ | -  $ | -  $ | 862,443 $ | -  $ | 1,115,772 |
| Legal and professional | - | 71,863 | 60,317 | - | 9,572 | 100,759 | - | 242,511 |
| Office expenses | - | 45,596 | 42,025 | 116 | 2,376 | 28,461 | (29,568) | 89,006 |
| Travel and entertainment | - | - | - | - | - | 15,431 | - | 15,431 |
| Due diligence | - | - | - | - | - | 25,711 | - | 25,711 |
| Tenant move-in expense | - | 17,765 | 10,628 | - | 621 | - | - | 29,014 |
| Leasing commissions | - | 101,184 | 71,466 | - | 2,387 | - | (175,037) | - |
| Other | - | 3,301 | 4,415 | - | - | - | (412) | 7,304 |
| Bank fees | - | 917 | 905 | 171 | 414 | 3,206 | - | 5,613 |
| Total general and administrative expenses | $          - $ | 374,175 $ | 309,536 $ | 287 $ | 15,370 $ | 1,036,011 $ | (205,017) $ | 1,530,362 |

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**SCHEDULE OF FUNDS FROM OPERATIONS**

**For the Year Ended December 31, 2014**

| | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| Minimum rents | $ - | $ 3,760,471 | $ 3,502,010 | $ (5,588) | $ 994,114 | $ - | $ (29,568) | $ 8,221,439 |
| Tenant recoveries | - | 121,422 | 41,212 | 300 | 199,937 | - | - | 362,871 |
| Other tenant charges | - | 76,898 | 19,071 | - | 9,059 | - | - | 105,028 |
| Management and other fees | - | - | - | - | - | 538,684 | (538,684) | - |
| Other | - | 127,525 | 352,609 | - | 500 | 5,551 | - | 486,185 |
| | - | 4,086,316 | 3,914,902 | (5,288) | 1,203,610 | 544,235 | (568,252) | 9,175,523 |
| Utilities | - | 854,149 | 687,537 | 2,267 | 16,805 | - | - | 1,560,758 |
| Repairs and maintenance | - | 852,573 | 827,628 | 497 | 57,035 | - | - | 1,737,733 |
| Taxes and insurance | - | 421,659 | 371,561 | 2,486 | 214,227 | 275,420 | - | 1,285,353 |
| Management and other fees | - | 166,064 | 160,990 | 187 | 55,624 | - | (363,235) | 19,630 |
| Other operating costs | - | 151,131 | 139,189 | 84 | 24,838 | - | - | 315,242 |
| General and administrative | - | 374,175 | 309,536 | 287 | 15,370 | 1,036,011 | (205,017) | 1,530,362 |
| Interest expense | - | 487,486 | 2,064,632 | 29,656 | 84,692 | 2,222 | - | 2,668,688 |
| | - | 3,307,237 | 4,561,073 | 35,464 | 468,591 | 1,313,653 | (568,252) | 9,117,766 |
| Funds From Operations | $ - | $ 779,079 | $ (646,171) | $ (40,752) | $ 735,019 | $ (769,418) | $ - | $ 57,757 |
| Average Equity | | | | | | | | $ 26,047,551 |
| FFO Yield | | | | | | | | 0.22% |

20

**BORDERPLEX COMMUNITY TRUST AND SUBSIDIARIES**
**(A REAL ESTATE INVESTMENT TRUST)**

**CONSOLIDATED FINANCIAL REPORT**

**DECEMBER 31, 2013 AND 2012**

# CONTENTS

**INDEPENDENT AUDITOR'S AND INDEPENDENT
ACCOUNTANT'S REPORT ON THE CONSOLIDATED
FINANCIAL STATEMENTS**                                             1-2

**CONSOLIDATED FINANCIAL STATEMENTS**

Consolidated balance sheets                                          3

Consolidated statements of income                                   4

Consolidated statements of changes in shareholders' equity          5

Consolidated statements of cash flows                               6

Notes to the consolidated financial statements                    7-15

**SUPPLEMENTARY INFORMATION**

Consolidating balance sheet                                        16

Consolidating statement of income                                  17

Consolidating schedule of general and administrative expenses      18

Consolidated funds from operations                                 19

A-32



**LAUTERBACH, BORSCHOW & COMPANY**
A PROFESSIONAL CORPORATION
CERTIFIED PUBLIC ACCOUNTANTS
BUSINESS & PERSONAL CONSULTANTS

4130 RIO BRAVO DR., SUITE B
EL PASO, TEXAS 79902
(915) 544-6950
FAX (915) 544-1303

**INDEPENDENT AUDITOR'S AND INDEPENDENT ACCOUNTANT'S REPORT**

To the Board of Directors
Borderplex Community Trust
El Paso, Texas

**Report on the Consolidated Financial Statements**

We have audited the accompanying consolidated financial statements and consolidated balance sheet of Borderplex Community Trust and Subsidiaries, which comprise the consolidated balance sheet as of December 31, 2013 and 2012, and the related consolidated statements of income, changes in partner's capital, and cash flows for the year ended December 31, 2013 and the related notes to the consolidated financial statements.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of the consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated balance sheet is free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

1

**Opinion**

In our opinion, the consolidated financial statements referred to above presents fairly, in all material respects, the financial position of Borderplex Community Trust and Subsidiaries as of December 31, 2013 and 2012, in accordance with accounting principles generally accepted in the United States of America.

**Report on Supplementary Information in Relation to Consolidated Financial Statements as a Whole**

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements and consolidated balance sheet as of December 31, 2013 and 2012 respectively as a whole. The accompanying consolidated supplementary information is presented for purposes of additional analysis and is not a required part of the consolidated financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information as of December 31, 2013 and 2012 has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and consolidated balance sheet respectively and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements and balance sheet or to the consolidated financial statements and balance sheet itself, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information as of December 31, 2013 and 2012 is fairly stated in all material respects in relation to the consolidated financial statements and consolidated balance sheet as a whole.

**Other Matter**

We have compiled the accompanying consolidated statements of income, changes in partners' equity and cash flows for the year ended December 31, 2012, and the related notes to the financial statements. We have not audited or reviewed these accompanying financial statements and, accordingly, do not express an opinion or provide any other form of assurance about whether the financial statements are in accordance with accounting principles generally accepted in the United States of America.

We conducted the compilation in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The objective of a compilation is to assist management in presenting financial information in the form of financial statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements.

*Lauterbach, Borschow & Company*

El Paso, Texas
April 30, 2014

2

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

**December 31, 2013 and 2012**

| | | 2013 | | 2012 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Investment in real estate: | | | | |
| Investment in real estate | $ | 56,430,697 | $ | 54,486,714 |
| Less accumulated depreciation and amortization | | (11,470,841) | | (10,054,406) |
| Net investment in real estate | | 44,959,856 | | 44,432,308 |
| Cash and cash equivalents | | 79,894 | | 1,591,046 |
| Accounts and tenant receivables, net | | 187,362 | | 104,522 |
| Prepaid expenses and other assets | | 1,328,778 | | 1,277,390 |
| Total assets | $ | 46,555,890 | $ | 47,405,266 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| **LIABILITIES** | | | | |
| Mortgage notes and other notes payable | $ | 17,805,294 | $ | 18,276,846 |
| Accounts payable and accrued expenses | | 781,031 | | 603,494 |
| Security deposits | | 218,587 | | 223,289 |
| Total liabilities | | 18,804,912 | | 19,103,629 |
| **SHAREHOLDERS' EQUITY** | | | | |
| Common shares of beneficial interest, $.01 par value, | | | | |
| 250,000,000 shares authorized, 3,004,830 shares issued, | | | | |
| 2,854,830 shares outstanding at December 31, 2013 and 2012 | | 30,048 | | 30,048 |
| Additional paid in capital | | 29,780,929 | | 29,780,929 |
| Retained deficit | | (2,231,752) | | (1,713,091) |
| | | 27,579,225 | | 28,097,886 |
| Less cost of treasury stock, 150,000 shares | | | | |
| at December 31, 2013 and 2012 | | (1,500,000) | | (1,500,000) |
| Borderplex Community Trust Shareholders' Equity | | 26,079,225 | | 26,597,886 |
| Noncontrolling interest | | 1,671,753 | | 1,703,751 |
| Total Shareholders' Equity | | 27,750,978 | | 28,301,637 |
| Total liabilities and shareholders' equity | $ | 46,555,890 | $ | 47,405,266 |

See Notes to the Consolidated Financial Statements

1021263.13

3

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

**For the Years Ended December 31, 2013 and 2012**

| | (Audited) 2013 | (Compiled) 2012 |
|---|---|---|
| Revenues: | | |
| Minimum rents | $ 8,245,692 | $ 8,243,913 |
| Tenant recoveries | 503,414 | 649,226 |
| Other tenant charges | 125,841 | 117,811 |
| Other | 468,139 | 498,792 |
| Total revenues | 9,343,086 | 9,509,742 |
| Expenses: | | |
| Utilities | 1,533,328 | 1,546,970 |
| Repairs and maintenance | 1,863,932 | 2,040,367 |
| Taxes and insurance | 1,434,400 | 1,338,024 |
| Management and other fees | 30,969 | 36,468 |
| Other operating costs | 402,774 | 307,664 |
| General and administrative | 1,092,014 | 932,091 |
| Depreciation and amortization | 1,486,875 | 1,445,370 |
| Total expenses | 7,844,292 | 7,646,954 |
| Financial income (expense) | | |
| Interest income | 1,202 | 2,616 |
| Interest expense | (1,141,039) | (1,158,490) |
| Total financial expense | (1,139,837) | (1,155,874) |
| Net income | 358,957 | 706,914 |
| Less:  noncontrolling interest in net income | (21,169) | (52,055) |
| Net income attributable to Borderplex Community Trust | $ 337,788 | $ 654,859 |
| Net income | 358,957 | 706,914 |
| Add back (subtract): | | |
| Depreciation and amortization | 1,486,875 | 1,445,370 |
| Net gain from casualty insurance proceeds | - | (76,829) |
| Net loss on sale of assets | (21,447) | 1,061 |
| Funds from operations | $ 1,824,385 | $ 2,076,516 |
| FFO yield on equity | 6.51% | 7.31% |

See Notes to the Consolidated Financial Statements

4

A-36

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY**

For the Years Ended December 31, 2013 and 2012

| | | Borderplex Community Trust Shareholders | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Shares | Common Shares of Beneficial Interest | Additional Paid-In Capital | Retained Earnings (Deficit) | Treasury Shares | Borderplex Community Trust Total | Noncontrolling Interest | Total |
| Balance, December 31, 2011 (Compiled) | 2,854,830 | $ 30,048 | $ 29,780,929 | $ (1,522,238) | $ (1,500,000) | $ 26,788,739 | $ 1,715,600 | $ 28,504,339 |
| Net income (Compiled) | - | - | - | 665,602 | - | 665,602 | 41,312 | 706,914 |
| Distributions (Compiled) | - | - | - | (856,455) | - | (856,455) | (53,161) | (909,616) |
| Balance, December 31, 2012 | 2,854,830 | $ 30,048 | $ 29,780,929 | $ (1,713,091) | $ (1,500,000) | $ 26,597,886 | $ 1,703,751 | $ 28,301,637 |
| Net income | - | - | - | 337,788 | - | 337,788 | 21,169 | 358,957 |
| Distributions | - | - | - | (856,449) | - | (856,449) | (53,167) | (909,616) |
| Balance, December 31, 2013 | 2,854,830 | $ 30,048 | $ 29,780,929 | $ (2,231,752) | $ (1,500,000) | $ 26,079,225 | $ 1,671,753 | $ 27,750,978 |

See Notes to the Consolidated Financial Statements

5

1021263.13

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**For the Years Ended December 31, 2013 and 2012**

| | (Audited) 2013 | (Compiled) 2012 |
|---|---|---|
| Cash Flows From Operating Activities | | |
| Net income | $ 358,957 | $ 706,914 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 1,486,875 | 1,445,370 |
| Gain on sale of real estate | (21,447) | (76,829) |
| Loss on disposal of property and equipment | - | 1,061 |
| (Increases) decreases in assets | | |
| Accounts receivable | (82,840) | 73,120 |
| Prepaids and other assets | (51,388) | (39,488) |
| Increases (decreases) in liabilities | | |
| Security deposits | (4,702) | (14,942) |
| Accounts payable and accrued expenses | 177,537 | (29,739) |
| **Net cash provided by operating activities** | 1,862,992 | 2,065,467 |
| | | |
| Cash Flows From Investing Activities | | |
| Proceeds from sale of real estate, net | 182,878 | - |
| Acquisition of real estate and property additions | (2,171,579) | (1,916,721) |
| Proceeds of insurance claim | - | 423,176 |
| Purchase of premises and equipment | (4,275) | (7,581) |
| **Net cash used in investing activities** | (1,992,976) | (1,501,126) |
| | | |
| Cash Flows From Financing Activities | | |
| Proceeds from long-term borrowings | - | 450,000 |
| Principal payments on long-term borrowings | (471,552) | (442,151) |
| Cash dividends paid | (909,616) | (1,364,356) |
| **Net cash used in financing activities** | (1,381,168) | (1,356,507) |
| | | |
| **Decrease in cash and cash equivalents** | (1,511,152) | (792,166) |
| | | |
| Cash and cash equivalents: | | |
| Beginning | 1,591,046 | 2,383,212 |
| Ending | $ 79,894 | $ 1,591,046 |
| | | |
| Supplemental Disclosures of Cash Flow Information | | |
| Cash Payment for: | | |
| Interest | $ 1,141,039 | $ 1,158,490 |

See Notes to the Consolidated Financial Statements

6

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Business and Significant Accounting Policies**

Organization and Nature of Business: Borderplex Community Trust ("Borderplex") was formed on October 30, 2006 under the laws of the State of Maryland. Borderplex is a self-administered and self-managed real estate investment trust, referred to as a "REIT". Borderplex was incorporated to raise capital and acquire ownership interests in high quality real estate properties, including office, retail, industrial, and multi-family residential properties, as well as other real estate-related assets. On September 1, 2008, Borderplex contributed all of its assets to BCT Realty Operating Limited Partnership in exchange for general and limited partnership interests. As of December 31, 2013, Borderplex owns 94.16% of BCT Realty Operating Limited Partnership.

**A summary of Borderplex's significant accounting policies follows:**

Principles of Consolidation: The accompanying consolidated financial statements include the accounts of Borderplex, its subsidiaries and joint ventures in which Borderplex has a controlling interest. The accounts of the following entities have been consolidated:

- Borderplex Community Trust
- BCT Realty Operating Limited Partnership
- Borderplex 201 E. Main, LLC
- EP Stanton Street, LLC
- EP Overland Street, LLC
- EP Stanton/Overland Joint Venture
- Borderplex Bassett, LLC
- Borderplex 401 N. Oregon, LLC
- Madison River Investments, LLC
- BCT Property Services, LLC

All significant inter-company balances and transactions have been eliminated.

Non-controlling Interest: Non-controlling interest represents the portion of equity in the subsidiary not attributable directly or indirectly to Borderplex. The profit and loss derived from the performance of the subsidiary is allocated to net income attributable to noncontrolling interest in the consolidated statement of income.

Properties: Real estate assets are stated at cost. Construction and improvement costs incurred in connection with the development of new properties or the redevelopment of existing properties are capitalized to the extent the total carrying value of the property does not exceed the estimated fair value of the completed property. Real estate taxes and interest costs incurred during construction periods are capitalized. Capitalized interest costs are based on qualified expenditures and interest rates in place during the construction period. Capitalized real estate taxes and interest costs are amortized over their respective lives which are consistent with the corresponding assets.

Tenant improvements, either paid directly or in the form of construction allowances paid to tenants, are

7

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Business and Significant Accounting Policies (continued)**

capitalized and depreciated over the lease term. Maintenance and repairs are charged to expense when incurred. Expenditures for significant betterments and improvements are capitalized.

Real estate assets, including developments in progress, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value may not be recoverable. A real estate asset is considered to be impaired when the estimated future undiscounted operating cash flow is less than its carrying value. To the extent impairment has occurred, the excess of the carrying value of the asset over its estimated fair value will be expensed to operations.

Depreciation or amortization expense is computed using the straight-line method based upon the following estimated useful lives:

|  | Years |
| --- | --- |
| Buildings and improvements | 5 - 40 |
| Equipment, tenant improvements and fixtures | 3 - 10 |

Use of Estimates: The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Cash and Cash Equivalents: Highly-liquid investments with maturities at dates of purchase of three months or less are classified as cash equivalents.

Borderplex maintains its cash in bank deposit accounts, which, at times, may exceed federally insured limits. Borderplex believes it is not exposed to any significant credit risk on cash and cash equivalents.

Leases: Leases which transfer substantially all of the risks and benefits of ownership to tenants are considered finance leases and the present values of the minimum lease payments and the estimated residual values of the leased properties, if any, are accounted for as receivables. Leases which transfer substantially all of the risks and benefits of ownership to us are considered capital leases and the present values of the minimum lease payments are accounted for as assets and liabilities.

Income Taxes: Borderplex has elected to be taxed as a REIT under sections of the Internal Revenue Code. To qualify as a REIT, the company must meet a number of organizational and operational requirements, including a requirement that we distribute at least 90% of our REIT taxable income to our stockholders. As a REIT, we generally will not be subject to federal income tax at the corporate level. Borderplex is organized and operates in such a manner as to qualify for taxation as a REIT under the Code, and intends to continue to operate in such a manner, but no assurance can be given that we will operate in a manner so as to qualify or remain qualified as a REIT.

Accounting principles generally accepted in the United States of America require management to evaluate tax positions taken by the company and recognize a tax liability (or asset) if the company has taken an uncertain position that more likely than not would not be sustained upon examination by the IRS.

8

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Business and Significant Accounting Policies (continued)**

Management has analyzed the tax positions taken by Borderplex, and has concluded that as of December 31, 2013 and 2012, no uncertain positions are taken or are expected to be taken that would require recognition of a liability (or asset) or disclosure in the consolidated financial statements. Borderplex is subject to routine audits by taxing jurisdictions; however, there are currently no audits for any of the tax periods in progress. Management believes Borderplex is no longer subject to income tax examinations by the U.S. federal tax authorities for years before 2010 and by state or local tax authorities for years before 2009.

Purchase Accounting for Acquisition in Real Estate:   Acquisitions of properties are accounted for utilizing the purchase method and accordingly, the consolidated results of operations of acquired properties are included in our consolidated results of operations from the respective dates of acquisition. The purchase price of the real estate is allocated to the acquired tangible assets, consisting primarily of land, building and tenant improvements and identified intangible assets and liabilities, consisting of the value of above-market and below-market leases, other value of in-place leases, value of tenant relationships and acquired ground leases, based in each case on their fair values.

The fair value of the tangible assets of an acquired property is determined by valuing the property as if it were vacant. The "if vacant" fair value is allocated to land, where applicable, buildings, tenant improvements and equipment based on comparable sales and other relevant information obtained  in connection with the acquisition of the property.

The estimated fair value of acquired in-place at-market tenant leases are the costs we would have incurred to lease the property to the occupancy level of the property at the date of acquisition.  Such estimate includes the fair value of leasing commissions, legal costs and tenant coordination costs that would be incurred to lease the property to this occupancy level.  Additionally, we evaluate the time period over which such occupancy level would be achieved and include an estimate of the net operating costs (primarily real estate taxes, insurance and utilities) incurred during the lease-up period, which generally ranges up to one year. Acquired in-place at-market tenant leases are amortized over the average lease term.

Intangible assets and liabilities are also recorded for above-market and below-market in-place tenant and ground leases where we are either the lessor or the lessee. Above-market and below-market in-place tenant and ground lease values are recorded based on the present value (using an interest rate which reflects the risks associated with the leases acquired) of the difference between the contractual amounts to be received or paid pursuant to the in-place leases and our estimate of fair market lease rates for the corresponding in-place leases, measured over a period equal to the remaining non-cancelable term of the leases.  Above and below-market lease values are amortized over the remaining non-cancelable terms of the respective leases.

Due to existing contacts and relationship with tenants at our currently owned properties, no significant value has been ascribed to the tenant relationships at the acquired properties.

Revenue Recognition and Related Matters:   Minimum rent revenues are recognized on a straight-line basis over the terms of the related leases. Minimum rent revenues also include amounts collected from tenants to allow the termination of their leases prior to their scheduled termination dates and accretion

9

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Nature of Business and Significant Accounting Policies (continued)**

related to above and below-market tenant leases on acquired properties.

Borderplex provides an allowance for doubtful accounts against the portion of accounts receivable, including straight-line rents, which are estimated to be uncollectible. Such allowances are reviewed periodically based upon recovery experience. For that portion of the otherwise recognizable deferred rent that is not deemed to be probable of collection, no revenue is recognized. The allowance for doubtful accounts at December 31, 2013 was $110,455 and there was no allowance for December 31, 2012.

Overage rents are recognized on an accrual basis once tenant sales exceed contractual tenant lease thresholds. Recoveries from tenants are established in the leases or computed based upon a formula related to real estate taxes, insurance and other property operating expenses and are generally recognized as revenues in the period the related costs are incurred.

Interest on the note receivable is recognized over the term of the note and calculated primarily using the simple-interest method on principal amounts outstanding.

Reclassification:  Certain items in the 2012 consolidated financial statement have been reclassified to conform to the current year presentation.

Subsequent Events:  Borderplex has evaluated subsequent events through April 30, 2014, the date on which the financial statements were available to be issued.  See Note 12 for further information for subsequent events.

**Note 2. Investment in Real Estate**

Investment in real estate consisted of the following at December 31:

| | Gross Asset (Liability) | | 2013 Accumulated Depreciation (Amortization)/ Accretion | Net Carrying Amount |
|---|---|---|---|---|
| Land | $ | 16,772,465 | $ | - $ | 16,772,465 |
| Buildings and equipment | | 29,534,164 | | (4,190,338) | 25,343,826 |
| Other | | 110,023 | | (95,199) | 14,824 |
| Tenant improvements | | 4,414,810 | | (1,999,110) | 2,415,700 |
| Capitalized lease costs | | 898,944 | | (485,903) | 413,041 |
| Tenant Leases: | | | | | |
| In-place | | 4,988,542 | | (4,988,542) | - |
| Above-market | | 102,458 | | (102,458) | - |
| Below-market | | (390,709) | | 390,709 | - |
| | $ | 56,430,697 | $ | (11,470,841) $ | 44,959,856 |

10

**BCT REALTY OPERATING LIMITED PARTNERSHIP AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 2.  Investment in Real Estate (continued)**

| | Gross Asset (Liability) | | 2012 Accumulated Depreciation (Amortization)/ Accretion | | Net Carrying Amount |
|---|---|---|---|---|---|
| Land | $ | 16,011,497 | $ | - | $ 16,011,497 |
| Buildings and equipment | | 29,276,091 | | (3,439,349) | 25,836,742 |
| Construction in progress | | 485 | | - | 485 |
| Other | | 105,747 | | (86,333) | 19,414 |
| Tenant improvements | | 3,540,294 | | (1,470,390) | 2,069,904 |
| Capitalized lease costs | | 852,309 | | (378,317) | 473,992 |
| Tenant Leases: | | | | | |
| In-place | | 4,988,542 | | (4,964,186) | 24,356 |
| Above-market | | 102,458 | | (102,458) | - |
| Below-market | | (390,709) | | 386,627 | (4.082) |
| | $ | 54,486,714 | $ | (10,054,406) | $ 44,432,308 |

Borderplex recorded depreciation, tenant improvement and capitalized lease cost amortization and intangible lease net amortization of $1,486,875 and $1,445,370 for the years ending December 31, 2013 and 2012 respectively.

**Note 3. Prepaid Expense and Other Assets**

The following table summarizes the significant components of prepaid expenses and other assets at December 31:

| | 2013 | | 2012 |
|---|---|---|---|
| Deferred rents | $ | 986,753 | $ 902,247 |
| Deferred loan fees | | 116,518 | 141,459 |
| Prepaid insurance and expenses | | 120,816 | 134,721 |
| Other assets | | 104,691 | 98,963 |
| | $ | 1,328,778 | $ 1,277,390 |

11

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 4. Accounts Payable and Accrued Expenses**

The following table summarizes the significant components of accounts payable and accrued expenses at December 31:

|  | 2013 | | 2012 |
|---|---|---|---|
| Accounts payable | $ 12,772 | $ | 55,694 |
| Payroll/bonuses payable | 105,231 | | 73,333 |
| Payroll tax payable | 984 | | 892 |
| Accrued interest and deferred interest | 29,123 | | 29,883 |
| Accrued operating expenses | 222,822 | | 120,396 |
| Distributions payable | 5,045 | | 68 |
| Prepaid rent | 405,954 | | 325,394 |
| Health insurance payable | (900) | | (2,166) |
| Retainage on contracts | - | | - |
|  | $ 781,031 | $ | 603,494 |

**Note 5. Notes Payable**

Notes payable consist of the following at December 31:

|  | 2013 | | 2012 |
|---|---|---|---|
| A note payable to a company in the original amount of $750,000, dated November 21, 2007, with interest due annually at varying interest rates. The note bears an initial annual rate of interest of 3% until November 30, 2011. The interest rate from December 1, 2011 to November 30, 2014 increases to 4%, and the final interest period from December 1, 2014 to maturity date of November 21, 2017 increases to 5%. At any time after the sixth anniversary of the effective date of the note, the lender may elect to convert all or portions of the then outstanding balance of the note to shares of beneficial interests of the REIT at a price of $12.50 per share. | $ 750,000 | $ | 750,000 |
| A note payable to an investment company in the original amount of $9,600,000 paid in monthly installments of $64,700 including interest of 6.48%, with a balloon payment due at maturity on July 1, 2018. The note is collateralized by real estate. | 8,583,563 | | 8,796,120 |

12

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 5. Notes Payable (continued)**

| | | |
|---|---:|---:|
| A note payable to an investment company in the original amount of $8,250,000 paid in monthly installments of $55,602 including interest of 6.48%, with a balloon payment due at maturity on August 1, 2018.  This note is collateralized by real estate. | 7,392,183 | 7,573,945 |
| A note payable to an investment company in the original amount of $769,717 paid in monthly installments of $7,534 including interest of 5.875%, with a maturity date of July 1, 2020.  The note is collateralized by real estate. | 487,489 | 547,336 |
| A note payable to a bank in the original amount of $220,390 paid in monthly installments of $2,235 including interest of 6.25% with a balloon payment due at maturity on June 1, 2015. The note is collateralized by real estate. | 142,059 | 159,445 |
| A note payable to a trust bearing no interest in the original amount of $450,000 payable in full at maturity on June 19, 2017.  The note is collateralized by real estate. | 450,000 | 450,000 |
| | $   17,805,294 | $   18,276,846 |

Aggregate maturities required on long-term debt as of December 31, 2013, are due in future years as follows:

| Periods ending December 31, | | |
|---|---|---:|
| 2014 | $ | 502,705 |
| 2015 | | 639,672 |
| 2016 | | 550,144 |
| 2017 | | 1,336,414 |
| 2018 | | 14,196,853 |
| Thereafter | | 579,506 |
| | $ | 17,805,294 |

**Note 6.  Revolving Line of Credit Agreement**

Borderplex has funds available for withdrawal against a $5,000,000 revolving line of credit agreement with a bank due April 30, 2014.  The line of credit bears interest at the Wall Street Journal prime rate minus .50%, with a floor of 5.00%.  No draws were taken against the line of credit as of December 31, 2013 and 2012.

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 7. Leases**

Borderplex leases office space to several tenants under various non-cancelable leases.  Total minimum future lease payments receivable in future years is as follows:

| Periods ending December 31, | | |
|---|---|---:|
| 2014 | $ | 7,686,684 |
| 2015 | | 7,001,022 |
| 2016 | | 6,326,610 |
| 2017 | | 5,682,468 |
| 2018 | | 3,703,769 |
| Thereafter | | 5,085,117 |
| | $ | 35,485,670 |

**Note 8. Defined Contribution Retirement Plan**

During 2013, Borderplex participated in a defined contribution retirement plan under Internal Revenue Code Section 401(k) that covered substantially all of Borderplex's full time employees. The plan was sponsored by a subsidiary of Borderplex which manages all of Borderplex's employees. Borderplex may make discretionary matching contributions equal to the uniform percentage of each employee's salary deferrals.  Borderplex contributions for 2013 were 100% of the participants' contributions up to 4% of the participants' annual salary.   Borderplex contributions to the plan were $38,171 and $8,883 for the years ended December 31, 2013 and 2012, respectively.

**Note 9. Related Parties**

There are several stockholders of the "REIT" which have affiliations with tenants in properties owned by Borderplex or perform services on behalf of Borderplex. The amounts included in the consolidated financial results of operations for the related parties through the twelve months ended December 31, 2013 and 2012 are summarized as follows:

| | For the period ended December 31: | | | |
|---|---|---:|---|---:|
| | | 2013 | | 2012 |
| Income: | | | | |
| Rental income | $ | 1,153,446 | $ | 1,322,344 |
| Expenses: | | | | |
| Commissions | $ | 6,911 | | - |
| Management fees | | 30,969 | | 40,119 |
| Legal & professional fees | | 45,279 | | 90,906 |
| | $ | 83,159 | $ | 131,025 |

14

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 10. Commitments and Contingencies**

In the normal course of business, from time to time, Borderplex is involved in legal proceedings relating to the ownership and operations of its properties.  In management's opinion, the liabilities, if any, that may ultimately result from such legal actions are not expected to have a material adverse effect on our consolidated financial position, results of operations or liquidity.

Borderplex periodically enters into contingent agreements for the acquisition of properties.  Each acquisition is subject to satisfactory completion of due diligence and, in the case of property acquired under development, completion of the project.

**Note 11. Major Tenants**

A significant portion of Borderplex's rental income is derived from one tenant.  Net rents for the years ended December 31 are as follows:

|          |    | 2013      |        |    | 2012      |        |
|----------|----|-----------|--------|----|-----------|--------|
| Tenant A | $  | 1,054,035 | 12.78% | $  | 1,054,035 | 12.79% |

**Note 12. Subsequent Events**

June 6, 2013, Borderplex Community Trust (BCT), parent company to the operating partnership, entered into a Sale and Purchase Agreement with 2 limited partners to trade 150,000 of their partnership units for Bassett Tower.  The limited partners were both controlled by a director of BCT, who had originally contributed properties to BCT in exchange for partnership units.  The sale concluded on February 3, 2014.  Historically, the property had been operating at a net operating loss thus management believes that operating income will be positively impacted.

15

**SUPPLEMENTARY INFORMATION**

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATING BALANCE SHEET**

December 31, 2013

| ASSETS | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| Investment in real estate: | | | | | | | | |
| Investment in real estate | $ - | $ 16,444,489 | $ 21,213,342 | $ 1,574,349 | $ 14,973,319 | $ 2,225,198 | $ - | $ 56,430,697 |
| Less accumulated depreciation and amortization | - | (4,344,418) | (5,953,762) | (155,895) | (921,870) | (94,896) | - | (11,470,841) |
| Net investment in real estate | | 12,100,071 | 15,259,580 | 1,418,454 | 14,051,449 | 2,130,302 | | 44,959,856 |
| Cash and cash equivalents | 4,572 | (293,931) | (192,121) | (26,921) | (33,688) | 621,983 | | 79,894 |
| Accounts and tenant receivables, net | - | 77,050 | 47,170 | - | 55,481 | 7,661 | | 187,362 |
| Investment in subsidiaries | 26,079,225 | - | - | - | - | 37,211,691 | (63,290,916) | - |
| Prepaid expenses and other assets | - | 718,225 | 515,343 | 8,985 | 64,029 | 22,196 | | 1,328,778 |
| Intercompany | - | 5,821,722 | - | - | 7,640,136 | 1,938,497 | (15,400,355) | - |
| Total assets | $ 26,083,797 | $ 18,423,137 | $ 15,629,972 | $ 1,400,518 | $ 21,777,407 | $ 41,932,330 | $ (78,691,271) | $ 46,555,890 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | | | |
| Mortgage notes and other notes payable | $ - | $ 7,392,183 | $ 8,583,563 | $ 750,000 | $ 629,548 | $ 450,000 | $ - | $ 17,805,294 |
| Accounts payable and accrued expenses | 4,572 | 311,124 | 288,981 | 32,472 | 53,756 | 90,126 | - | 781,031 |
| Security deposits | - | 92,953 | 79,022 | 1,000 | 45,612 | - | - | 218,587 |
| Intercompany | - | - | 3,441,328 | 319,250 | - | 11,639,777 | (15,400,355) | - |
| Total liabilities | 4,572 | 7,796,260 | 12,392,894 | 1,102,722 | 728,916 | 12,179,903 | (15,400,355) | 18,804,912 |
| Common shares | 30,048 | - | - | - | - | - | - | 30,048 |
| Additional paid in capital | 29,780,929 | - | - | - | - | - | - | 29,780,929 |
| Partners' equity | - | 10,565,045 | 3,156,436 | 407,876 | 20,307,275 | 29,153,337 | (63,589,969) | - |
| Retained earnings (deficit) | (2,231,752) | 61,832 | 80,642 | (110,080) | 741,216 | 599,090 | (1,372,700) | (2,231,752) |
| | 27,579,225 | 10,626,877 | 3,237,078 | 297,796 | 21,048,491 | 29,752,427 | (64,962,669) | 27,579,225 |
| Less cost of 50,000 shares of treasury stock | (1,500,000) | - | - | - | - | - | - | (1,500,000) |
| | 26,079,225 | 10,626,877 | 3,237,078 | 297,796 | 21,048,491 | 29,752,427 | (64,962,669) | 26,079,225 |
| Noncontrolling interest | - | - | - | - | - | - | 1,671,753 | 1,671,753 |
| | 26,079,225 | 10,626,877 | 3,237,078 | 297,796 | 21,048,491 | 29,752,427 | (63,290,916) | 27,750,978 |
| Total liabilities and shareholders' equity | $ 26,083,797 | $ 18,423,137 | $ 15,629,972 | $ 1,400,518 | $ 21,777,407 | $ 41,932,330 | $ (78,691,271) | $ 46,555,890 |

16

1021263.13

A-49

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATING STATEMENT OF INCOME**

For the Year Ended December 31, 2013

| | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | | |
| Minimum rents | $          - | $   3,747,403 | $   3,413,475 | $   27,394 | $   1,057,420 | $          - | $          - | $   8,245,692 |
| Tenant recoveries | - | 176,694 | 107,001 | 1,800 | 217,919 | - | - | 503,414 |
| Other tenant charges | - | 108,573 | 16,404 | - | 864 | - | - | 125,841 |
| Management and other fees | - | - | - | - | - | 416,051 | (416,051) | - |
| Other | - | 112,813 | 333,879 | - | 21,447 | - | - | 468,139 |
| Total revenues | - | 4,145,483 | 3,870,759 | 29,194 | 1,297,650 | 416,051 | (416,051) | 9,343,086 |
| Expenses: | | | | | | | | |
| Utilities | - | 831,403 | 667,517 | 19,692 | 14,716 | - | - | 1,533,328 |
| Repairs and maintenance | - | 974,323 | 826,612 | 11,165 | 51,832 | - | - | 1,863,932 |
| Taxes and insurance | - | 465,290 | 453,175 | 39,386 | 234,633 | 241,916 | - | 1,434,400 |
| Management and other fees | - | 186,627 | 167,179 | 1,088 | 30,970 | - | (354,895) | 30,969 |
| Other operating costs | - | 255,564 | 143,407 | 571 | 3,232 | - | - | 402,774 |
| General and administrative | 3,278 | 277,414 | 279,180 | 12,199 | 3,965 | 577,134 | (61,156) | 1,092,014 |
| Depreciation and amortization | - | 601,018 | 681,241 | 25,517 | 170,538 | 8,561 | - | 1,486,875 |
| Total expenses | 3,278 | 3,591,639 | 3,218,311 | 109,618 | 509,886 | 827,611 | (416,051) | 7,844,292 |
| Financial income (expense) | | | | | | | | |
| Income from Subsidiary | 341,066 | - | - | - | - | 1,010,465 | (1,351,531) | - |
| Interest income | - | 919 | 98 | - | - | 185 | - | 1,202 |
| Interest expense | - | (492,931) | (571,904) | (29,656) | (46,548) | - | - | (1,141,039) |
| Total financial income (expense) | 341,066 | (492,012) | (571,806) | (29,656) | (46,548) | 1,010,650 | (1,351,531) | (1,139,837) |
| Net income (loss) before minority interest | 337,788 | 61,832 | 80,642 | (110,080) | 741,216 | 599,090 | (1,351,531) | 358,957 |
| Minority interest in net income | - | - | - | - | - | - | (21,169) | (21,169) |
| Net income (loss) | $   337,788 | $   61,832 | $   80,642 | $   (110,080) | $   741,216 | $   599,090 | $   (1,372,700) | $   337,788 |

17

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**CONSOLIDATING SCHEDULE GENERAL & ADMINISTRATIVE EXPENSES**

For the Year Ended December 31, 2013

| | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| General and administrative expenses: | | | | | | | | |
| Salaries and wages | $ - | $ 153,593 | $ 142,867 | $ - | $ - | $ 487,335 | $ - | $ 783,795 |
| Legal and professional | - | 51,297 | 44,862 | 9,780 | 3,879 | 86,666 | - | 196,484 |
| Office expenses | - | 40,266 | 34,304 | 1,909 | 22 | (24,015) | - | 52,486 |
| Travel and entertainment | - | - | - | - | - | 11,729 | - | 11,729 |
| Due diligence | - | - | - | - | - | 8,736 | - | 8,736 |
| Tenant move-in expense | - | 7,573 | 11,996 | - | - | - | - | 19,569 |
| Leasing commissions | - | 20,456 | 41,379 | - | - | - | (61,156) | 679 |
| Other | 3,278 | 3,422 | 3,018 | - | - | - | - | 9,718 |
| Bank fees | - | 807 | 754 | 510 | 64 | 6,683 | - | 8,818 |
| Total general and administrative expenses | $ 3,278 | $ 277,414 | $ 279,180 | $ 12,199 | $ 3,965 | $ 577,134 | $ (61,156) | 1,092,014 |

18

1021263.13

A-51

**BORDERPLEX COMMUNITY TRUST**
**(A REAL ESTATE INVESTMENT TRUST) AND SUBSIDIARIES**

**SCHEDULE OF FUNDS FROM OPERATIONS**

For the Year Ended December 31, 2013

| | Borderplex Community Trust | Chase Tower | Wells Fargo Plaza | Bassett Tower | Downtown Retail | Corporate | Eliminations | Consolidated Total |
|---|---|---|---|---|---|---|---|---|
| Minimum rents | $ - | $ 3,747,403 | $ 3,413,475 | $ 27,394 | $ 1,057,420 | $ - | $ - | $ 8,245,692 |
| Tenant recoveries | - | 176,694 | 107,001 | 1,800 | 217,919 | - | - | 503,414 |
| Other tenant charges | - | 108,573 | 16,404 | - | 864 | - | - | 125,841 |
| Management and other fees | - | - | - | - | - | 416,051 | (416,051) | - |
| Other | - | 113,732 | 333,977 | - | - | 185 | - | 447,894 |
| | - | 4,146,402 | 3,870,857 | 29,194 | 1,276,203 | 416,236 | (416,051) | 9,322,841 |
| Utilities | - | 831,403 | 667,517 | 19,692 | 14,716 | - | - | 1,533,328 |
| Repairs and maintenance | - | 974,323 | 826,612 | 11,165 | 51,832 | - | - | 1,863,932 |
| Taxes and insurance | - | 465,290 | 453,175 | 39,386 | 234,633 | 241,916 | - | 1,434,400 |
| Management and other fees | - | 186,627 | 167,179 | 1,088 | 30,970 | - | (354,895) | 30,969 |
| Other operating costs | - | 255,564 | 143,407 | 571 | 3,232 | - | - | 402,774 |
| General and administrative | 3,278 | 277,414 | 279,180 | 12,199 | 3,965 | 577,134 | (61,156) | 1,092,014 |
| Interest expense | - | 492,931 | 571,904 | 29,656 | 46,548 | - | - | 1,141,039 |
| | 3,278 | 3,483,552 | 3,108,974 | 113,757 | 385,896 | 819,050 | (416,051) | 7,498,456 |
| Funds From Operations | $ (3,278) | $ 662,850 | $ 761,883 | $ (84,563) | $ 890,307 | $ (402,814) | $ - | $ 1,824,385 |
| Average Equity | | | | | | | $ | 28,026,308 |
| FFO Yield | | | | | | | | 6.51% |

19

**BORDERPLEX REALTY TRUST**
**CONSOLIDATED BALANCE SHEETS**
As of September 30, 2015

|  |  | Unaudited 2015 |
|---|---|---|
| **ASSETS** |  |  |
| Investment in real estate: |  |  |
| Land | $ | 18,608,568 |
| Buildings and equipment |  | 48,297,292 |
| Other |  | 140,867 |
| Accumulated depreciation |  | (5,610,484) |
|  |  |  |
| Net investment in real estate |  | 61,436,243 |
|  |  |  |
| Cash and cash equivalents |  | 558,314 |
| Investments, available for sale securities |  | 12,702,009 |
| Accounts and tenant receivables, net |  | 615,036 |
| Tenant improvements, net |  | 2,977,929 |
| Capitalized lease costs |  | 461,320 |
| Prepaid expenses and other assets |  | 3,642,403 |
|  |  |  |
| Total assets | $ | 82,393,254 |
|  |  |  |
| **LIABILITIES AND PARTNERS' EQUITY** |  |  |
|  |  |  |
| Mortgage notes and other notes payable | $ | 42,680,798 |
| Accounts payable and accrued expenses |  | 2,261,651 |
| Security deposits |  | 276,655 |
|  |  |  |
| Total liabilities |  | 45,219,104 |
|  |  |  |
| **SHAREHOLDERS' EQUITY** |  |  |
| Common shares of beneficial interest, $.01 par value, |  |  |
| 250,000,000 shares authorized, 3,004,830 shares issued, |  |  |
| 2,858,507 shares outstanding |  | 30,048 |
| Additional paid in capital |  | 28,144,301 |
| Accumulated Other Comprehensive Income (Loss) |  | (2,297,991) |
| Retained deficit |  | (5,549,946) |
|  |  | 20,326,412 |
| Noncontrolling interest |  | 16,847,738 |
|  |  |  |
| Total Shareholders' Equity |  | 37,174,150 |
|  |  |  |
| Total liabilities and shareholders' equity | $ | 82,393,254 |

**BORDERPLEX REALTY TRUST**
**CONSOLIDATED STATEMENTS OF INCOME**
**For Nine Months Ending September 30, 2015**

|  |  | Unaudited YTD 2015 |
| --- | --- | --- |
| Revenues: |  |  |
| Minimum rents | $ | 6,904,423 |
| Tenant recoveries |  | 370,971 |
| Other tenant charges |  | 168,708 |
| Other |  | 335,168 |
| Total revenues |  | 7,779,270 |
| Expenses: |  |  |
| Utilities |  | 1,280,352 |
| Repairs and maintenance |  | 1,455,458 |
| Taxes and insurance |  | 1,172,305 |
| Management and other fees |  | 32,157 |
| Other operating costs |  | 264,542 |
| General and administrative |  | 1,411,822 |
| Depreciation and amortization |  | 1,343,211 |
| Total expenses |  | 6,959,847 |
| Financial income (expense) |  |  |
| Interest income |  | 13,254 |
| Interest expense |  | (2,295,713) |
| Total financial expense |  | (2,282,459) |
| Net income | $ | (1,463,036) |
| Add back (substract): |  |  |
| Depreciation and amortization |  | 1,343,211 |
| Net gain from casualty insurance proceeds |  | 142,226 |
| Net (Gain) loss on sale of assets |  |  |
| Funds from operations | $ | 22,401 |
| FFO yield on equity, annualized |  | 0.12% |

## GLOSSARY OF DEFINED TERMS

*"10% vote and value test"* is defined on page 92.

*"25% and 5% asset tests"* is defined on page 92.

*"ADA"* is defined on page 17.

*"ADC Cost"* is defined on page 38

*"Adjusted Unit Price"* is defined on page 39.

*"Affiliate*", whether or not capitalized, means, when used with reference to a specified person, (i) any person that directly or indirectly controls or is controlled by or is under common control with the specified person, or (ii) any person that is an employee of, an officer of, a general partner in or a trustee of, or serves in a similar capacity with respect to, the specified person or any person described in clause (i).  In the case of a person who is an individual, Affiliate shall include (x) any member of the immediate family of such person, including the spouse, siblings and lineal descendants and their spouses, of such immediate family member, (y) any trust whose principal beneficiary is such person or one or more members of such immediate family, and (z) any person or entity controlled by such individual's immediate family or any such trust.  For purposes of this definition, "control" when used with respect to any specified person or entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

*"Benefit Plan Investors"* and *"Benefit Plan Investor"* is defined on pages 21 and 102.

*"Board of Managers"* is defined on page 38.

*"Borderplex"* is defined on the Cover Page.

*"Charitable Beneficiary"* is defined on page 80.

*"Code"* is defined on the Cover Page.

*"Company"* is defined on the Cover Page.

*"Costar"* is defined on page 66.

*"debt financed property"* is defined on page 98.

*"DownREIT"* is defined on pages 2 and 36.

*"DownREIT Development Projects"* is defined on page 40.

*"DownREIT Operating Agreement"* is defined on page 38.

*"DownREIT Units"* is defined on page 37.

*"Dutch Auction"* is defined on page 4.

*"El Paso Market"* is defined on pages 8 and 35.

*"Encore"* is defined on pages 2 and 36.

*"Encore Contribution Agreement"* is defined on page 37.

*"Encore Transaction"* is defined on pages 2 and 36.

*"ERISA"* is defined on page 7.

*"Excess Shares"* is defined on page 79.

*"Existing Portfolio"* is defined on page 45.

*"FFO"* is defined on page 50.

*"FIRPTA"* is defined on page 99.

*"GAAP"* is defined on page 59.

*"HUD"* is defined on page 37.

*"Initial Closing"* is defined on pages 3 and 38.

*"Initial Unit Price"* is defined on page 39.

*"Investment Period"* is defined on page 105.

*"IRS"* is defined on page 6.

*"Lauterbach Borschow"* is defined on page 107.

*"Management Affiliate"* is defined on page 103.

*"Merger Effective Date"* is defined on pages 3 and 38.

*"MSI"* is defined on pages 4 and 45.

*"NAREIT"* is defined on page 50.

*"Net Appreciation"* is defined on page 40.

*"New Projects"* is defined on page 39.

*"Office Properties"* is defined on page 45.

*"Operating Partnership"* is defined on page 1.

*"Operating Partnership Agreement"* is defined on page 5.

*"Operating Partnership Units"* is defined on page 4.

*"OPUs"* is defined on page 4.

*"Outside Conversion Date"* is defined on pages 3 and 40.

*"Ownership Limit"* is defined on page 79.

*"Performance Incentive Fee"* is defined on page 40.

*"Pipeline Projects"* is defined on pages 2 and 37.

*"Plans"* is defined on page 102.

*"Purported Transferee"* is defined on page 79.

*"Regulation"* is defined on page 102.

*"REIT"* is defined on the Cover Page.

*"REIT Shares"* is defined on the Cover Page.

*"Retail Properties"* is defined on page 45.

*"Second Closing"* is defined on page 2.

*"Securities Act"* is defined on the Cover Page.

*"Securities Market Law"* is defined on page v.

*"Target Markets"* is defined on the Cover Page and page 35.

*"Tests"* is defined on page 89.

*"Threshold Ownership Percentage"* is defined on pages 4 and 46.

*"Title 8"* is defined on page 1.

*"Treasury Regulations"* is defined on page 89.

*"UBTI"* is defined on page 104.

*"UPREIT Structure"* is defined on page 45.

*"VEREIT"* is defined on page 70.

*"VEREIT Common Stock"* is defined on page 46.