**SUPPLEMENT TO**
**PRIVATE PLACEMENT MEMORANDUM**
**DATED OCTOBER 1, 2015 ("<u>MEMORANDUM</u>")**

**GENERAL.**  This Supplement to Private Placement Memorandum pertains to the Private Placement Memorandum of Borderplex Realty Trust dated October 1, 2015 ("<u>Private Placement Memorandum</u>"). Capitalized terms used in this Supplement and not otherwise defined shall have the same meaning as such terms are given in the Private Placement Memorandum.

**UPDATED INFORMATION.**

1.      **<u>STRATEGIC INVESTOR</u>**.  The Company recently received a Subscription Agreement in the amount of $10 million from Burrell Diversified Investment, LLC ("<u>Burrell Investment</u>"), a company controlled by Daniel C. Burrell, a strategic investor with whom the Company has been conducting negotiations for several months.  In addition to the initial investment by Burrell Investment, Mr. Burrell has stated his intention to raise an additional $15 million to $40 million of capital prior to June 30, 2016.  In order to effect this strategic relationship with Mr. Burrell and his companies, the Board of Trustees of the Company has agreed in principle that, based upon arranging specified amounts of additional capital for Borderplex, Mr. Burrell will have an increasingly larger role in the governance and management of Borderplex.  The Company and Mr. Burrell are in the process of finalizing an Investor Rights Agreement that outlines the additional capital to be contributed by Mr. Burrell and/or his Affiliates and the concomitant governance and/or management rights that will attach to such additional capital contributions (the "<u>Burrell Investor Rights Agreement</u>").  The terms of the Burrell Investor Rights Agreement to be executed between the Company and Burrell Investment provide increased governance and management responsibilities based upon additional capital raised, as follows:

(a)     The initial $10 million subscription from Burrell Investment will entitle Mr. Burrell to be appointed as a Trustee of the Company, initially to fill an existing vacancy on the Board of Trustees (the "<u>Board</u>").  Thereafter, the terms of the Burrell Investor Rights Agreement will allow Burrell Investment to include its nominee in the slate of nominees recommended by the Board for election as Trustees of the Company at annual or special meeting of the shareholders called for such purpose.

(b)     For aggregate investments greater than $20 million, Burrell Investment would be entitled to have Mr. Burrell named as lead independent trustee.  Additionally, Burrell Investment would be entitled to require that the Company's Board include among its number two nominees designated by Burrell Investment ("<u>Investor Nominees</u>").  As with Mr. Burrell's original appointment, the additional directors would initially be appointed by the Board to fill vacancies pursuant to the Bylaws of the Company, and thereafter the Burrell Investor Rights Agreement would allow Burrell Investment to include the specified number of Trustees in the slate of nominees recommended by the Board to the shareholders for election at the annual or special meeting called for that purpose.  Additionally, (i) one of the Investor Nominees would have the right to be named as a member ("<u>Investor Investment Committee Member</u>") of the investment committee of the Board ("<u>Investment Committee</u>"), and (ii) to the fullest extent permitted by applicable law (including with respect to any standard of conduct required of trustees under Maryland law) Mr. Burrell would be named as the lead independent trustee.

(c)     For aggregate investments greater than $35 million, Burrell Investment would be entitled to require that the Company's Board include among its number three Investor Nominees.  Additionally, decisions by the Investment Committee would require the concurrence of the Investor Investment Committee Member then serving on the Investment Committee ("<u>Investor Consent Rights</u>").

(d)     For aggregate investments greater than $45 million, Burrell Investment would be entitled to require that the Company's Board include among its number a number of Investor Nominees that, if elected, would comprise one trustee greater than the highest whole number that would not exceed 50% of the entire Board of Trustees immediately after such election.  Additionally, upon reaching this investment level the

1067958.3

1

E X H I B I T   B

Company would be obligated, to the fullest extent permitted by applicable law (including with respect to any standard of conduct required of Trustees under Maryland law), to appoint Mr. Burrell as chairman of the Board and as president and chief executive officer of the Company.

Notwithstanding the governance rights outlined above, no such appointment of Mr. Burrell as chairman of the Board or as president and chief executive officer or of a particular Investor Nominee shall be required if a majority of Trustees who are not Investor Nominees reasonably determine in good faith, after consultation with outside legal counsel, that Mr. Burrell and/or such Investor Nominee has been involved in any of the events enumerated in items 2(d) or (e) of Schedule 13D under the Exchange Act, or item 401(f) of Regulation S-K under the Exchange Act, or is subject to any order, decree or judgment of any governmental authority prohibiting services as an officer, trustee or director of any company.

The governance rights of Burrell Investment outlined in 1(a) through (d) above are reduced if the ownership interest of Burrell Investment and its Affiliates in the Company is reduced below certain levels, as follows:

(i) if the total number of outstanding common shares of beneficial interest of the Company owned by Burrell Investment and its Affiliates, assuming that all OPUs in the Operating Partnership are converted into common shares of beneficial interest ("Burrell Ownership Percentage") is less than or equal to 30%, but greater than or equal to 20%, then Burrell Investment would be entitled to no less than three Trustees, and at the request of a majority of the Trustees who are not Investor Nominees, Mr. Burrell must promptly resign as chief executive officer of the Company and as chairman of the Board;

(ii) if the Burrell Ownership Percentage is less than 20%, but greater than or equal to 15%, then Burrell Investment would be entitled to no less than two Trustees, and the Investor Investment Committee Member shall no longer be entitled to the Investor Consent Rights;

(iii) if the Burrell Ownership Percentage is less than 15% but greater than or equal to 10%, Burrell Investment would be entitled to one Trustee, and at the request of the majority of the Trustees who are not Investor Nominees (a) the Investor Nominee representative on the Investment Committee would promptly resign, and (b) Mr. Burrell would promptly resign as lead independent trustee; and

(iv) if the Burrell Ownership Percentage is less than10%, then all obligations of the Company under the Burrell Investor Rights Agreement shall terminate.

If the Burrell Ownership Percentage falls below the requisite amounts specified in clauses (i) through (iv) above, then Burrell Investment can preserve its rights by acquiring additional common shares of beneficial interest sufficient to restore the Burrell Ownership Percentage to the required level within 180 days of first falling below the applicable percentage.

2.      **VALUE PROTECTION AGREEMENT**.  The Board of Trustees of the Company has agreed to give "value protection" to all investors in the offering described in the Private Placement Memorandum relative to the downtown El Paso real estate assets owned by the Company and the common stock of VEREIT, Inc. (NYSE: VER).  In short, a subscriber in the current offering will be protected against any net, aggregate loss incurred by the Company in the disposition of any of these legacy assets for a five year period extending from February 1, 2016 through and including January 31, 2021.  If the Company incurs a net, aggregate loss in the disposition of these legacy assets, calculated by comparing the gross sales price or other gross amount realized by the Company from the sale or other disposition of any such legacy assets during the specified period against the adjusted book value of such assets as of September 30, 2015, then the Company will issue additional shares to investors in the current offering in an amount equal to their pro rata share of such loss.  A copy of the Value Protection Agreement  is attached to this Supplement to Private Placement Memorandum as Exhibit A.

3.    **MINIMUM SUBSCRIPTIONS**.  The Company recently entered into an amendment to the Encore Contribution Agreement which defers the closing on the River Walk Apartments until April 30, 2016. The River Walk Apartments have the longest development timeline, and the Company can defer that closing without affecting the overall development timeline.  Based upon the deferral of the River Walk closing, the Company can complete the Encore transaction and the acquisition of the other initial Pipeline Projects (i.e. Sendero Ranch, Evans Station and Swiss Avenue), which will require approximately $26 million in equity from Borderplex.  Accordingly, the Company has determined to close the offering based upon minimum subscriptions of $30 million at this time.  As stated in Paragraph 4 below, the Company will continue to accept additional subscriptions beyond this minimum subscription amount in order to fund the eventual closing of the River Walk Apartments, as well as the Grand Mission Apartments (which were always dependent upon the Company raising additional equity in the offering, as specified in the Private Placement Memorandum).

4.    **DURATION OF CURRENT OFFERING**.  In order to accommodate the additional capital contributions anticipated from Burrell Investment and/or its Affiliates, as well as other investors, the Company will continue to offer and sell additional REIT Shares pursuant to this Offering and the Private Placement Memorandum up to an amount the Board of Trustees deems advisable.  Accordingly, the offering is hereby extended until June 30, 2016 for such purpose.  The Company will not accept subscriptions, however, in excess of what the Board of Trustees believes can be invested and used to execute the Company's new multi-family strategy.

5.    **COMMITMENTS TO DATE**.  The other terms and conditions of the Offering, including the price at which REIT shares are offered ($7.75 per REIT Share) remain the same as set forth in the Private Placement Memorandum.  As of the date of this Supplement, the Company has received subscriptions and/or verbal commitments aggregating approximately $34.45 million.  We are requesting that subscriptions be returned, or in the case of investors that have already submitted subscriptions, that the below Affirmation be returned, by February 8, 2016.  We anticipate that the first call for funds could be as early as February 22, 2016.

**ACKNOWLEDGMENT AND AFFIRMATION**
**(For Investors That Have Already Submitted a Subscription Agreement)**

The undersigned hereby acknowledges receipt of this Supplement to Private Placement Memorandum and a copy of the Value Protection Agreement.  I have reviewed these documents and, if I have already submitted a Subscription Agreement, hereby affirm my subscription in the amount of $_____ and agree to the extension of the Company's offering on the terms described herein.  Additionally, by executing the Joinder to Value Protection Agreement attached hereto I agree to be a party to the Value Protection Agreement on the terms stated therein.

DATE:            _____, 2016

NAME OF
INVESTOR:        _____

BY (Print):      _____

SIGNED:          _____

THE DATE OF THIS SUPPLEMENT IS JANUARY 28, 2016.

**Attachments:**
Exhibit A - Value Protection Agreement
Exhibit B - Joinder to Value Protection Agreement

1067958.3

## EXHIBIT A

### VALUE PROTECTION AGREEMENT

**THIS VALUE PROTECTION AGREEMENT** (this "Agreement"), is made effective as of February 1, 2016 ("Effective Date"), by and among Borderplex Realty Trust, a Maryland real estate investment trust (the "Company"), and each of the persons who execute a joinder to this Agreement (each an "Investor" and collectively, the "Investors").

### RECITALS

The Company is conducting a private placement of its Common Shares pursuant to a Private Placement Memorandum; and

As described in the January 2016 Supplement (the "Supplement") to Private Placement Memorandum, the Company will offer all Investors in the Offering certain protections against loss related to the disposition by the Company of Legacy Assets currently owned by the Company; and

As part of the Subscription Agreement to subscribe for Common Shares in the Offering, each of the Investors purchasing Common Shares pursuant to the Private Placement Memorandum will have the right to sign a joinder to this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Definitions**.   The following terms shall have the meanings set forth herein for purposes of this Agreement:

"Additional Shares" has the meaning given in Section 2.2 of this Agreement.

"Adjusted Book Value" means the adjusted book value of the Legacy Assets as of September 30, 2015, as set forth on Exhibit A.

"Affiliate" with regard to a person, means a person that controls, is controlled by, or is under common control with such original person.  For purposes of this definition, "control," when used with respect to any person, means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "affiliated," "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" has the meaning given in the first paragraph of this Agreement.

"Allocable Share of the Loss" has the meaning given in Section 2.2 of this Agreement.

"Beneficial Owner" has the meaning set forth in Rule 13d-3 promulgated under the Exchange Act.  The terms "Beneficially Own" and "Beneficial Ownership" shall have correlative meanings.

"Board" means the Board of Trustees of the Company.

"Closing Price" on any date shall mean the last sale price for Common Shares, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, for such Common Shares, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the NYSE or, if such Common Shares are not listed or admitted to trading on the NYSE, as reported on the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which such Common Shares are listed or admitted to trading.

"Common Shares" shall mean common shares of beneficial interest, $0.01 par value per share, of the Company.

"Company" has the meaning given in the first paragraph of this Agreement.

"Current Share Price" means (i) the per share price determined by the Board and received by the Company in the most recent arms-length private or public issuance of not less than $10 million of its Common Shares, (ii) the price per OP Unit received by the Operating Partnership in its most recent arms-length private issuance of not less than $10 million dollars of its OP Units or (iii) in the event that the Common Shares are listed on a national securities exchange, the Market Price.

"Declaration of Trust" means the Declaration of Trust of the Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Investors" has the meaning given in the first paragraph of this Agreement.

"Legacy Asset(s)" means all downtown El Paso real estate assets, and shares of common stock, par value $0.01 per share, of VEREIT, Inc. (NYSE: VER), on the books of the Company as of October 1, 2015, as listed on Exhibit A hereto.

"Legacy Asset Gain" and "Legacy Asset Gains" mean the amount by which the gross sales price or other gross amount realized by the Company from the sale or other disposition of any Legacy Asset during the Protection Period exceeds the Adjusted Book Value of such Legacy Asset.

"Legacy Asset Loss" and "Legacy Asset Losses" mean the amount by which the Adjusted Book Value of any Legacy Asset sold or otherwise disposed of by the Company during the Protection Period exceeds the gross sales price or other gross amount realized by the Company with respect to such Legacy Asset.

"Market Price" on any date shall mean, with respect to Common Shares, the Closing Price for such Common Shares on such date.

"Net Legacy Asset Loss" means the amount by which Legacy Asset Losses exceed Legacy Asset Gains.

"NYSE" means the New York Stock Exchange, or successor thereto.

"Offering" means offering and sale of Common Shares pursuant to the Private Placement Memorandum, as the offering described therein may be extended by the Company.

"Person", whether or not capitalized, means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity (or any department, agency or political subdivision thereof) or any other entity.

"Private Placement Memorandum" means that certain Private Placement Memorandum of the Company, dated October 1, 2015, as supplemented by the Supplement, and all amendments, supplements, modifications and replacements thereof.

"Protected Class Percentage" means the fraction, expressed as a percentage, the numerator of which is the total number of Common Shares issued by the Company in the Offering, and the denominator of which is the total number of Common Shares of the Company issued and outstanding as of the termination date of the Offering.

"Protected Class Share of the Net Legacy Asset Loss" means the Net Legacy Asset Loss multiplied by the Protected Class Percentage.

"Protected Shares" means any and all Common Shares purchased by the Investors in the Offering.  The term "Protected Shares" shall include (i) any and all shares Transferred from time to time in accordance with this Agreement and applicable law; provided that, such transferee executes a joinder to this Agreement and (ii) any and all shares issued in substitution for or in place of any Protected Shares previously issued.

"Protection Period" means the period from February 1, 2016 through and including January 31, 2021.

"Operating Partnership" means BRT Realty Operating Limited Partnership, a Delaware limited partnership.

"OP Units" means Class A Units and Class B Units in the Operating Partnership representing a fractional, undivided share of the limited partnership interests therein having the rights, preferences and privileges set forth in the Agreement of Limited Partnership of the Operating Partnership.

"Supplement" has the meaning given in the recitals.

"Transfer" and "Transferred" mean any sale, transfer, distribution, assignment, pledge, hypothecation, encumbrance, granting a security interest in, or any grant, issuance, or sale or conveyance of any option, warrant or right to acquire, or other disposition of any Common Shares.

## ARTICLE 2
## VALUE PROTECTION AGREEMENT

**Section 2.1    Record of Legacy Asset Gains and Losses**.  From and after the Effective Date, the Company shall maintain current and accurate records of Legacy Asset Gains and Legacy Asset Losses. Beneficial Owners of Protected Shares shall have the right to inspect such records at reasonable times and upon reasonable notice to the Company.

**Section 2.2    Notice to Beneficial Owners of Protected Shares; Issuance of Additional Common Shares**.  Within ninety (90) days following the earlier of (i) the sale or other disposition by the Company of the last Legacy Asset, or (ii) expiration of the Protection Period, the Company shall make a final calculation of the Net Legacy Asset Loss, if any, incurred by the Company and shall give notice to each Beneficial Owner of Protected Shares of (i) the aggregate amount of the Net Legacy Asset Loss, if any, (ii) the Protected Class Share of the Net Legacy Asset Loss, and (iii) the allocable portion of the Protected Class Share of the Net Legacy Asset Loss attributable to the Common Shares held by such Beneficial Owner (the "Allocable Share of the Loss").  Within thirty days following the giving of such notice, the Company shall issue or cause to be issued to each Beneficial Owner of Protected Shares additional Common Shares in an amount equal to such Beneficial Owner's Allocable Share of the Loss divided by the Current Share Price (such shares, the "Additional Shares"). If this amount of Common Shares is not a whole number of Common Shares, the Company shall issue and pay, as applicable, to such Beneficial Owner that number of Common Shares which equals the nearest whole number less than such amount, plus an amount of cash representing the value of any fractional shares which would

otherwise be payable.  Notwithstanding anything to the contrary in this Agreement, no Investor will be entitled to Additional Shares to the extent that receipt of such shares in accordance with this Section 2.2 would cause such Investor to violate Article VII of the Declaration of Trust.

Section 2.3     **Transfer Ledger; Transfers**.  The Company shall keep accurate and complete records in the stock transfer books of the Company in which all Protected Shares are identified by share certificate number and any and all transfers relating to such Protected Shares are tracked so as to identify any substitute shares issued therefor as Protected Shares.  The rights of an Investor under this Agreement may not be transferred or otherwise separated from the Protected Shares to which such rights attach, and the Company shall not be obligated to recognize any person as having rights hereunder other than the Beneficial Owners of Protected Shares, as shown on the books and records of the Company.

### ARTICLE 3
### MISCELLANEOUS

Section 3.1     **Notices**.

(a)     All communications under this Agreement shall be in writing and shall be mailed by first class mail, postage prepaid, or telegraphed or telexed, or given by facsimile or delivered by hand:

(i)     if to the Company, at:

Borderplex Realty Trust
221 N. Kansas St., Suite 2010
El Paso, Texas  79901
Facsimile:  (915) 975-8141

or at such other address as it may have furnished in writing to the Investors, or

(ii)     if to any Investor, to the address of such Investor as it appears in the share ledger, or other appropriate register, of the Company.

(b)     Any notice so addressed, when mailed by registered or certified mail shall be deemed to be given three (3) days (seven (7) days in the case of Investors whose address is not in the United States of America) after so mailed, and when telegraphed or telexed or delivered by hand shall be deemed to be given immediately, and when given by facsimile, shall be deemed to be given when confirmed electronically or telephonically, provided that the original is mailed by first class mail, postage prepaid, at the same time in accordance with Section 3.1(a).

Section 3.2     **Legends**.  Each certificate evidencing any Common Shares owned by the Investors shall bear a legend reading substantially as follows, in addition to any other legend required by applicable law:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A VALUE PROTECTION AGREEMENT EFFECTIVE AS OF FEBRUARY 1, 2016 BETWEEN THE COMPANY AND HOLDERS OF CERTAIN SECURITIES OF THE COMPANY (AS AMENDED, THE "VALUE PROTECTION AGREEMENT").  A COPY OF THE VALUE PROTECTION AGREEMENT IS AVAILABLE TO ANY SHAREHOLDER UPON REQUEST AND WITHOUT CHARGE.

1067958.3

**Section 3.3**   **Successors and Assigns**.   Except as otherwise expressly provided herein, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company and each of the Investors as beneficial owners of the Protected Shares.

**Section 3.4**   **Amendment and Waiver**.   This Agreement may be amended, and the observance of any term of this Agreement may be waived, but only with the written consent of the Company and the Investors; provided that without the consent of any other Investor, any Investor may from time to time enter into one or more agreements amending, modifying or waiving the provisions of this Agreement with respect to such Investor if such action does not adversely affect the rights or interest of the Company or any other Investor.  No delay on the part of any party in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any party of any right, power or remedy preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.

**Section 3.5**   **Severability**.   Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, and the remainder of this Agreement shall remain operative and in full force and effect. The parties shall negotiate in good faith a replacement clause or provision as consistent with the ineffective clause or provision as is practicable under law.

**Section 3.6**   **Counterparts**.   One or more counterparts of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

**Section 3.7**   **Governing Law**.   This Agreement shall be construed in accordance with and governed by the internal laws of the State of Maryland.

**Section 3.8**   **Entire Understanding**.   This Agreement sets forth the entire agreement and understanding of the parties hereto with respect to the matters set forth herein and supersedes any and all prior agreements, arrangements and understandings among the parties with respect to the matters set forth herein.

**Section 3.9**   **No Third Party Beneficiaries**.   This Agreement is solely for the benefit of the parties hereto and no provisions of this Agreement shall be deemed to confer upon any other party any remedy, claim, liability, reimbursement, cause of action or other right.

**Section 3.10**   **Headings**.   The headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

**Section 3.11**   **No Presumption Against Drafter**.   The parties hereto have jointly participated in the negotiation and drafting of this Agreement.  In the event of any ambiguity or in the event a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the parties hereto and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any provision of this Agreement.

**[Remainder of this Page Intentionally Left Blank]**

1067958.3

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement to be effective as of the date and year first above written.

**BORDERPLEX REALTY TRUST**, a Maryland real estate investment trust

By: _____
Name:   J. A. CARDWELL
Title:    Chairman of the Board

**INVESTOR**

_____
Name of Investor

**List of Schedules and Exhibits**:
Exhibit A – List of Legacy Assets and Adjusted Book Values

**EXHIBIT A TO**
**VALUE PROTECTION AGREEMENT**

List of Legacy Assets and Adjusted Book Values

| | |
|---|---|
| Chase Tower | $12,848,336 |
| Wells Fargo Plaza | $16,839,647 |
| Retail Properties | |
| 315El Paso | $ 56,000 |
| 320, 324-326 El Paso | $ 1,988,000 |
| 321,401-403 El Paso | $ 946,000 |
| 112 Mesa | $ 1,075,000 |
| 124 Mesa | $ 163,000 |
| 415 Mesa | $ 2,332,000 |
| 216 Oregon | $ 786,000 |
| 500 Oregon | $ 1,000,000 |
| 304 Overland | $ 320,000 |
| 318 Overland | $ 473,000 |
| 300 Stanton | $ 695,000 |
| 426-428 Stanton | $ 607,000 |
| 515 Stanton | $ 419,000 |
| Total | $ 11,560,000 |
| Development Sites | |
| Mesa at Mills | $2,159,035 |
| Mesa at Main | $3,690,360 |
| VEREIT Shares (1,645,338 shares of common stock) | $13,162,704 |
| Total Adjusted Book Value | $60,260,082 |

**Exhibit B**

<u>Joinder to Value Protection Agreement</u>

The undersigned, as of this _____ day of _____ 2016, hereby joins in the execution of the Value Protection Agreement of Borderplex Realty Trust, a Maryland real estate investment trust, effective as of February 1, 2016, to bind the signator to the terms thereof.

This joinder may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

Signature line for individuals:

Signed:_____
Print Name: _____
Date signed:_____

Signature block for trusts, partnerships, corporations, limited liability companies, etc.:

Name of Entity:_____

By:_____
Print Name:_____
Print Title:_____
Date signed :_____

The undersigned, on behalf of Borderplex Realty Trust, hereby agrees to and acknowledges the joinder of the foregoing signator to the Value Protection Agreement.

Borderplex Realty Trust,
a Maryland real estate investment trust

By:      _____
Name:   _____
Title:   _____

1067958.3